UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PLUMBERS' & PIPEFITTERS' LOCAL #562
SUPPLEMENTAL PLAN & TRUST and
PLUMBERS' & PIPEFITTERS' LOCAL #562
PENSION FUND, On Behalf of Themselves
and All Others Similarly Situated,

               Plaintiffs,

       vs.

J.P. MORGAN ACCEPTANCE CORPORATION I,
J.P. MORGAN ALTERNATIVE LOAN TRUST
2006-A1, J.P. MORGAN ALTERNATIVE LOAN
TRUST 2006-A2, J.P. MORGAN ALTERNATIVE
LOAN TRUST 2006-A3, J.P. MORGAN
ALTERNATIVE LOAN TRUST 2006-A4, J.P.
MORGAN ALTERNATIVE LOAN TRUST 2006-
A5, J.P. MORGAN ALTERNATIVE LOAN TRUST
2006-A6, J.P. MORGAN ALTERNATIVE LOAN
TRUST 2006-A7, J.P. MORGAN ALTERNATIVE
LOAN TRUST 2006-S1, J.P. MORGAN
ALTERNATIVE LOAN TRUST 2006-S2, J.P.
MORGAN ALTERNATIVE LOAN TRUST 2006-S3,
J.P. MORGAN ALTERNATIVE LOAN TRUST
2006-S4, J.P. MORGAN MORTGAGE
ACQUISITION TRUST 2006-A3, J.P. MORGAN
MORTGAGE ACQUISITION TRUST 2006-A4, J.P.
MORGAN MORTGAGE ACQUISITION TRUST
2006-A5, J.P. MORGAN MORTGAGE
ACQUISITION TRUST 2006-A6, J.P. MORGAN
MORTGAGE ACQUISITION TRUST 2006-A7, J.P.
MORGAN MORTGAGE ACQUISITION TRUST
2006-ACC1, J.P. MORGAN MORTGAGE
ACQUISITION TRUST 2006-CH2, J.P. MORGAN
MORTGAGE ACQUISITION TRUST 2006-HE2,
J.P. MORGAN MORTGAGE ACQUISITION
TRUST 2006-HE3, J.P. MORGAN MORTGAGE
ACQUISITION TRUST 2006-NC1, J.P. MORGAN
MORTGAGE ACQUISITION TRUST 2006-RM1,

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No. 08 Civ. _____

CV-08 1713

Supreme Court of the State of New York
County of Nassau

Index No. 5675/08

KORMAN, CH. J.

WALL, M.J.

NOTICE OF REMOVAL

*FILED*
2008 APR 25  AM 11:48
CLERK
U.S. DISTRICT COURT
E.D.N.Y.

Removed from

Caption continues on following page.

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
J.P. MORGAN MORTGAGE ACQUISITION        :
TRUST 2006-S2, J.P. MORGAN MORTGAGE
ACQUISITION TRUST 2006-WF1, J.P. MORGAN  :
MORTGAGE ACQUISITION TRUST 2006-WMC2,   :
J.P. MORGAN MORTGAGE ACQUISITION
TRUST 2006-WMC3, J.P. MORGAN MORTGAGE   :
ACQUISITION TRUST 2006-WMC4, J.P.        :
MORGAN MORTGAGE ACQUISITION TRUST
2007-A1, J.P. MORGAN MORTGAGE            :
ACQUISITION TRUST 2007-A2, J.P. MORGAN   :
MORTGAGE ACQUISITION TRUST 2007-CH1,     :
J.P. MORGAN MORTGAGE ACQUISITION
TRUST 2007-CH2, J.P. MORGAN MORTGAGE     :
ACQUISITION TRUST 2007-S1, J.P. MORGAN   :
SECURITIES INC., DAVID M. DUZYK, LOUIS
SCHIOPPO, JR., CHRISTINE E. COLE and EDWIN :
F. McMICHAEL,                            :
                                         :
               Defendants.               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

PLEASE TAKE NOTICE that Defendants J.P. Morgan Acceptance Corporation I (the

"Depositor Defendant"), J.P. Morgan Securities Inc. (the "Underwriter Defendant"), David M.

Duzyk, Louis Schioppo, Jr., Christine E. Cole, and Edwin F. McMichael (the "Individual

Defendants") (collectively, the "Removing Defendants"), by and through their undersigned

counsel, hereby remove the above-captioned civil action, and all claims and causes of action

therein, from the Supreme Court of the State of New York, County of Nassau, to the United

States District Court for the Eastern District of New York, pursuant to (i) 28 U.S.C. §§ 1334(b)

and 1452(a) and Bankr. R. 9027; (ii) 28 U.S.C. §§ 1332(d), 1441(a), and 1453; and (iii)

alternatively, 28 U.S.C. §§ 1331 and 1441(a) and 15 U.S.C. § 77p(c). The Removing

Defendants appear for the purpose of removal only and for no other purpose, reserve all defenses

and rights available to them, and state as follows:

## BACKGROUND

1.      Plaintiffs filed the above-captioned putative class action on March 26, 2008 in the

Supreme Court of the State of New York, County of Nassau, under Index No. 5675/08 (the

"State Court Action").

2.      Plaintiffs purport to bring this putative class action[1] on behalf of all persons or

entities who acquired Mortgage Pass-Through Certificates and Asset-Backed Pass-Through

Certificates (the "Certificates") pursuant and/or traceable to certain Registration Statements and

Prospectus Supplements caused to be filed by the Depositor Defendant and the thirty-two trusts

named in the Complaint (the "Trust Defendants").[2]  (Compl. ¶¶ 1-4, 23.)  Each series of the

Certificates consisted of several classes or tranches with varying priorities of payment, exposures

to default, interest payment provisions and/or levels of seniority.  (Compl. ¶ 4.)  The collateral

underlying each series of the Certificates were distinct pools of mortgage loans held by the Trust

Defendants and acquired by the Depositor Defendant from various lenders (the "Originators").

(See Compl. ¶¶ 5, 29-30, 32.)

3.      The Complaint alleges that two of the Originators, ResMae Mortgage Corporation

("ResMae") and Ownit Mortgage Solutions, Inc. ("Ownit"), filed for bankruptcy pursuant to

chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code").  (Compl. ¶¶ 48, 52.)

These entities did in fact file for bankruptcy protection in the United States Bankruptcy Courts

for the District of Delaware (the "Delaware Bankruptcy Court") and the Central District of

---

[1] Removal to this Court is based upon the allegations of the Complaint.  The Removing Defendants do not concede, and expressly preserve, all rights, defenses and objections with respect to the allegations that this action properly has been brought, or may be prosecuted as, a class action.

[2] Plaintiffs appear to incorrectly identify the following non-existent entities as Trust Defendants: J.P. Morgan Mortgage Acquisition Trust 2006-A3, J.P. Morgan Mortgage Acquisition Trust 2006-A4, J.P. Morgan Mortgage Acquisition Trust 2006-A5, J.P. Morgan Mortgage Acquisition Trust 2006-A6, J.P. Morgan Mortgage Acquisition Trust 2006-A7, J.P. Morgan Mortgage Acquisition Trust 2007-A1, J.P. Morgan Mortgage Acquisition Trust 2007-A2, J.P. Morgan Mortgage Acquisition Trust 2006-S2, and J.P. Morgan Mortgage Acquisition Trust 2007-S1. (Compl. ¶ 15.)

California, respectively. See In re Liquidating Trust of ResMae Mortgage Corp., No. 07-10177

(KJC) (Bankr. D. Del., filed Feb. 12, 2007); In re Ownit Mortgage Solutions, Inc., No. 06-12579

(KT) (Bankr. C.D. Cal., filed Dec. 12, 2006). In addition, two other originators of loans at issue

in this litigation, but which are not identified in the Complaint, American Home Mortgage

Corporation ("American Home Mortgage") and New Century Mortgage Corporation ("New

Century"), have also filed for protection under chapter 11 of the Bankruptcy Code in the

Delaware Bankruptcy Court. See In re American Home Mortgage Holdings, Inc., No. 07-11051

(CSS) (Bankr. D. Del., filed Aug. 6, 2007); In re New Century TRS Holdings, Inc., et al., No.

07-10416 (KJC) (Bankr. D. Del., filed Apr. 2, 2007) (together with ResMae's and Ownit's

bankruptcy cases, the "Originator Bankruptcy Cases").

   4.  Plaintiffs assert that the offering documents for the Certificates contained various

misrepresentations and omissions in violation of the Securities Act of 1933, as amended (the

"Securities Act"). (See, e.g., Compl. ¶¶ 1, 68-83.) In particular, plaintiffs assert claims against

all Defendants except the Depositor Defendant under Section 11 of the Securities Act. (Compl.

¶¶ 68-77.) Plaintiffs also assert claims for control person liability against the Depositor

Defendant and the Individual Defendants under Section 15 of the Securities Act. (Compl. ¶¶ 78-

83.)

   5.  To be clear, although the various Originators are not named as defendants in the

State Court Action, the claims in that action are based upon allegedly untrue statements of

material fact or omissions to state a material fact relating to information that was provided by

each of the Originators to certain of the Removing Defendants in connection with the sale of the

mortgage loans underlying the Certificates. Accordingly, the adjudication of the State Court

Action will likely involve the determination of, among other things, the truthfulness of the disclosures of the Originators (including the debtor Originators) in the underlying transactions.

## BASES FOR REMOVAL

6.      This action is within the original jurisdiction of this Court under: (1) 28 U.S.C. § 1334(b) because the claims or causes of action are related to cases currently pending under the Bankruptcy Code; (2) 28 U.S.C. § 1332(d) because there is diversity jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"); and (3) if the plaintiffs assert that this action involves a "covered security," 28 U.S.C. § 1331 and 15 U.S.C. § 77v(a) because plaintiffs assert federal claims arising under the Securities Act. Each of these provisions provides a separate and independent basis supporting removal of this action.

## I.      BANKRUPTCY REMOVAL PURSUANT TO 28 U.S.C. §§ 1452 AND 1334

7.      Removal is proper under 28 U.S.C. §§ 1452(a) and 1334(b) and Bankr. R. 9027 because the State Court Action is "related to" each of the Originator Bankruptcy Cases, including the chapter 11 cases of the debtors American Home Mortgage and New Century currently pending in the Delaware Bankruptcy Court.

8.      Under 28 U.S.C. § 1452(a), "[a] party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." 28 U.S.C. § 1452(a). Under 28 U.S.C. § 1334(b), the district courts shall have "original . . . jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b).

9.      The State Court Action is "related to" the Originator Bankruptcy Cases because its outcome may have a conceivable effect on the bankruptcy estate of each of the respective

5

debtor Originators. See, e.g., In re Cuyahoga Equip. Corp., 980 F.2d 110, 114 (2d Cir. 1992) ("[t]he test for determining whether litigation has a significant connection with a pending bankruptcy proceeding is whether its outcome might have any 'conceivable effect' on the bankrupt estate").

10.     The claims against the Removing Defendants in the State Court Action are based upon allegedly untrue statements of material fact or omissions to state a material fact relating to information that was provided by each of the Originators in connection with the sale of the mortgage loans underlying the Certificates. The Depositor Defendant and each of the Individual Defendants are entitled to indemnification, contribution, reimbursement and have other potential rights against each Originator for any losses incurred in connection with the State Court Action with respect to the information that was provided by such Originator. In particular, each of the debtor Originators, including the debtors American Home Mortgage and New Century in chapter 11 cases before the Delaware Bankruptcy Court, have executed an indemnification and contribution agreement in favor of the Depositor Defendant (and the Individual Defendants) pursuant to which such defendants have a present right to be paid their defense costs, including attorneys' fees, incurred in the defense of this action, as well as a right to be paid for any other losses incurred in connection with this action to the extent such losses relate to information provided by the respective debtor Originator.

11.     The indemnification, contribution, reimbursement and other potential rights that the Depositor Defendant and the Individual Defendants currently have (and may in the future have) against the debtor Originators, including debtors American Home Mortgage and New Century, will have a direct impact on such debtors and their respective estates. For example, these indemnification, contribution, reimbursement and other rights may affect the

6

administration of the respective debtor Originator's chapter 11 case by, among other things, increasing the amount of claims asserted against its bankruptcy estate, impacting the assets of the relevant estate available for distribution to creditors and interest holders, and decreasing the amount of distributions ultimately provided to general unsecured and other creditors under a plan of reorganization in at least the American Home Mortgage and New Century chapter 11 cases. Moreover, any settlement of, or damages awarded in, the State Court Action would similarly be subject to indemnification, contribution and other rights and, accordingly, would likely have a substantial effect on the debtor Originators' bankruptcy estates and the dividends potentially distributable to creditors. Under these circumstances, federal courts in New York and other jurisdictions have held that indemnification, contribution, reimbursement and other rights against a debtor in a pending chapter 11 case provide a basis for "related to" jurisdiction under 28 U.S.C. §1334(b). See, e.g., In re WorldCom Inc., Securities Litig., 293 B.R. 308, 320-21 (S.D.N.Y. 2003) (finding that third-party statutory contribution rights under 15 U.S.C. § 77k(f)(1) gave rise to "related to" bankruptcy jurisdiction); Weisman v. Southeast Hotel Prop. Ltd. P'ship, No. 91 Civ. 6232 (MBM), 1992 WL 131080, at *4 (S.D.N.Y. June 1, 1992) (finding same for third-party contractual right to indemnification); Carpenters Pension Trust for Southern Calif. v. Ebbers, 299 B.R. 610, 613 (C.D. Cal. 2003) (indemnification claim of underwriters against debtor creates "related to" jurisdiction).

12. The Removing Defendants have filed proofs of claim in connection with their rights of indemnity, contribution and reimbursement against the relevant American Home Mortgage and New Century debtors, respectively. The Removing Defendants have also filed proofs of claim against the foregoing debtors pursuant to Section 501(b) of the Bankruptcy Code.

13.     The State Court Action is not excepted from removal under 28 U.S.C. § 1452(a) because it does not relate to a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power. See 28 U.S.C. § 1452(a).

14.     In accordance with Bankr. R. 9027(a)(1), the Removing Defendants state that, upon removal, to the extent the State Court Action involves (as anticipated) the allowance, amount, validity or priority of any claims against the debtor Originators, the administration of the estates of the debtor Originators, or the liquidation of the assets of such estates or the adjustment of the debtor-creditor relationships in such cases, the State Court Action may constitute a "core proceeding" under 28 U.S.C. § 157(b). Otherwise, the State Court Action may constitute a non-core proceeding for purposes of 28 U.S.C. § 157(c). To the extent applicable, the Removing Defendants consent to the entry of final orders and judgments by the presiding bankruptcy judge with respect to any non-core proceedings in the event that the removed action is transferred to the Delaware Bankruptcy Court.

15.     After the State Court Action has been removed to this Court, the Removing Defendants intend to move to transfer the venue of this action to the United States District Court for the District of Delaware, for automatic referral to the Delaware Bankruptcy Court, where both the American Home Mortgage and New Century chapter 11 cases are currently pending.

## II.     CAFA REMOVAL

16.     This action is also removable under CAFA, Pub. L. No. 109-2 (2005), codified as 28 U.S.C. §§ 1332(d) and 1453. Pursuant to 28 U.S.C. § 1441(a), "[e]xcept as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant

8

or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). CAFA also contains an independent removal provision in 28 U.S.C. § 1453, which provides for removal of a "class action," as that term is defined under 28 U.S.C. § 1332(d). 28 U.S.C. § 1453.

17.     Under 28 U.S.C. § 1332(d), a "'class action' means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § 1332(d)(1)(B). Plaintiffs assert that the State Court Action is brought under CPLR 901 (see Compl. ¶ 23), which is New York's analogue to Fed. R. Civ. P. 23 and authorizes "[o]ne or more members of a class . . . [to] . . . sue . . . as representative parties on behalf of all" if certain statutory requirements are satisfied. N.Y. C.P.L.R. § 901. Thus, the State Court Action is a "class action" within the meaning of 28 U.S.C. § 1332(d)(1)(B).

18.     Pursuant to 28 U.S.C. § 1332(d), as amended by CAFA, a district court shall have original jurisdiction of any putative class action commenced after February 18, 2005 if: (i) any member of the putative class is a citizen of a state different from any defendant; and (ii) the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs. See 28 U.S.C. §§ 1332(d)(2).

19.     This action was commenced after the effective date of CAFA and is a class action in which at least one member of the putative class of plaintiffs is a citizen of a state different from a defendant. 28 U.S.C. § 1332(d)(2)(A). Upon information and belief, plaintiffs are citizens of Missouri. (See Summons.) The Depositor Defendant and Underwriter Defendant, however, are both Delaware corporations and each has its principal place of business in New York. (See Compl. ¶¶ 14, 16.) As such, they are deemed to be citizens of Delaware and New

9

York for purposes of 28 U.S.C. § 1332. 28 U.S.C. § 1332(c)(1). Upon information and belief, the Individual Defendants are also citizens of states other than Missouri. Defendant David M. Duzyk is a citizen of Kentucky and resides at 1151 DeLong Road, Lexington, Kentucky 40515. (See also Summons.) Defendant Louis Schioppo, Jr. is a citizen of New Jersey and resides at 24 Forest Lane, Monroe Township, New Jersey 08831. (See also Summons.) Defendant Christine E. Cole is a citizen of Illinois and resides at 1042 Greenwood Avenue, Wilmette, Illinois 60091. (See also Summons.) Defendant Edwin F. McMichael resides in and is a citizen of New Jersey.

20.     Accordingly, at least one member of the proposed class is a citizen of a state different from at least one defendant and the minimal diversity requirements of CAFA are therefore satisfied. See 28 U.S.C. § 1332(d)(2)(A).[3]

21.     In addition, the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs. Under 28 U.S.C. § 1332(d), as amended by CAFA, the amount in controversy in a putative class action is determined by aggregating the claims of all members. 28 U.S.C. § 1332(d)(6). Here, the Complaint alleges that defendants made misstatements and omissions in connection with the issuance of "billions of dollars worth of Certificates." (Compl. ¶ 24.) Plaintiffs further allege that, because of defendants' violations, "[t]he value of the Certificates has declined substantially" and "the Certificates are no longer marketable at prices anywhere near the price paid by plaintiffs and the Class," causing plaintiffs to sustain damages. (See Compl. ¶¶ 10, 76.) Plaintiffs' allegation of "billions of dollars worth of Certificates" must mean, at the very least, $2,000,000,000. $5,000,000 is only 0.25% of $2,000,000,000, and thus Plaintiffs' allegation that the class "sustained damages" because the Certificates are no longer worth "anywhere near the price paid by plaintiffs and the Class" must be read as an allegation of

---

[3] It is irrelevant that certain defendants are citizens of New York, the state in which the action was brought. See 28 U.S.C. § 1453(b) ("A class action may be removed . . . without regard to whether any defendant is a citizen of the State in which the action is brought . . . .").

more than $5,000,000 in controversy, exclusive of interest and costs. These allegations suffice to meet CAFA's amount in controversy requirement.

22.     Plaintiffs have the burden of proving that any exceptions to CAFA apply. Regardless of who bears the burden, CAFA's exceptions to jurisdiction in 28 U.S.C. §§ 1332(d)(4), (5) and (9) do not apply here.

        a.      First, the exceptions in Sections 1332(d)(4)(A) and (B) do not apply because there is no basis for concluding that greater than one-third, let alone two-thirds, of the members of the proposed class are citizens of New York. 28 U.S.C. §§ 1332(d)(4)(A) and (B);

        b.      Second, the exception in Section 1332(d)(5)(A) does not apply because the defendants are individuals and corporate and other private entities, not "States, State officials, or other governmental entities." 28 U.S.C. § 1332(d)(5)(A);

        c.      Third, the exception in Section 1332(d)(5)(B) does not apply because the number of putative class members is alleged to be greater than 100. 28 U.S.C. § 1332(d)(5)(B). Specifically, plaintiffs allege that "there are hundreds of members in the proposed Class." (Compl. ¶ 24.); and

        d.      Finally, the exceptions in Section 1332(d)(9) do not apply because this case does not solely involve a claim: (1) concerning a "covered security" under Section 16(f)(3) of the Securities Act (15 U.S.C. § 78p(f)(3)); (2) relating to the internal affairs or governance of a corporation or other form of business enterprise and arising by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or (3) relating to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under Section 2(a)(1) of the Securities Act (15 U.S.C. § 77b(a)(1)) and the regulations issued thereunder). 28 U.S.C. § 1332(d)(9).

     e.     In addition, none of the bases for discretionary declination of jurisdiction under 28 U.S.C. § 1332(d)(3) applies, as there is no basis for concluding that greater than one-third of all members of the proposed class are citizens of New York. 28 U.S.C. § 1332(d)(3). Even if that test were met, there would still not be a sufficient basis for declining jurisdiction because, among other things, the claims asserted involve matters of national and interstate interest and are all federal law claims that will not be governed by New York law. See 28 U.S.C. § 1332(d)(3).

     23.     Contrary to plaintiffs' suggestion, Section 22(a) of the Securities Act does not present an obstacle to removal of the State Court Action (See Compl. ¶ 11 (quoting 15 U.S.C. § 77v(a)). CAFA provides an alternate, diversity-based source of federal jurisdiction and an additional removal provision for a plaintiff's Securities Act-based class action claims that involve significant amounts in controversy and are national in scope.

     24.     Because the CAFA jurisdictional requirements are met, it is proper for this Court to accept jurisdiction over this matter. Further, because plaintiffs will be unable to show that any CAFA exceptions apply, it is proper for this Court to retain jurisdiction.

**III.**    **SLUSA REMOVAL**

     25.     Alternatively, if plaintiffs assert that this action involves a "covered security" within the meaning of 15 U.S.C. § 77(p)(f)(3), then it is removable under 28 U.S.C. § 1441(a) and the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), Pub. L. No. 105-353, 112 Stat. 3227 (1998). Under 28 U.S.C. § 1441(a), "[e]xcept as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed . . . to the district court of the United

States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

26.    SLUSA amended the Securities Act to create an exception to the Securities Act's non-removal provision. As amended by SLUSA, Section 22(a) of the Securities Act provides that "[e]xcept as provided in Section 16(c), no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court of the United States." 15 U.S.C. § 77v(a) (emphasis added). This case arises "under this title," namely, the Securities Act, because it alleges violations of Sections 11 and 15 of the Securities Act. (Compl. ¶¶ 68-83.) Section 16(c) of the Securities Act provides that "[a]ny covered class action brought in any State court involving a covered security, as set forth in subsection (b), shall be removable to the Federal district court for the district in which the action is pending ..." 15 U.S.C. § 77p(c). Section 16(b) refers to "covered class actions" alleging "an untrue statement or omission of material fact in connection with the purchase or sale of a covered security" or "that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." 15 U.S.C. § 77p(b). As alleged in the Complaint and as set forth below, to the extent that plaintiffs assert that this action involves a "covered security," it is a covered class action alleging untrue statements or omissions of material fact in connection with the purchase or sale of such a security.

27.    This action is a "covered class action" within the meaning of 15 U.S.C. § 77p(f)(2)(A) because plaintiffs seek damages on behalf of a purported class consisting of "hundreds of members" and allege that "[c]ommon questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class." (Compl. ¶¶ 23-28.)

13

28.     Accordingly, plaintiffs' claims are removable to this Court under 28 U.S.C. §
1441(a) and 15 U.S.C. §§ 77p(c) and 77v(a). See, e.g., Rubin v. Pixelplus Co., No. 06-CV-2964
(ERK), 2007 WL 778485, at *6 (E.D.N.Y. March 13, 2007).

## PROPRIETY OF REMOVAL

29.     The Depositor Defendant was served with the Summons and Complaint on March
26, 2008. The Underwriter Defendant and Individual Defendants were served on or after April
11, 2008. The Trust Defendants have not yet been properly served. Because this Notice of
Removal is being filed within 30 days of the earliest date that any of the defendants were served
with the Complaint, it is timely filed under 28 U.S.C. § 1446(b) and Bankr. R. 9027(a).

30.     For the foregoing reasons, this Court has jurisdiction over this matter. The United
States District Court for the Eastern District of New York is the federal judicial district
embracing the Supreme Court of the State of New York, County of Nassau, where this suit was
originally filed. Accordingly, the present lawsuit may be removed from the Supreme Court of
the State of New York, County of Nassau, and brought before the United States District Court
for the Eastern District of New York pursuant to 28 U.S.C. §§ 1331, 1332, 1334, 1441, 1446,
1452, and 1453, as well as 15 U.S.C. § 77p(c) and Bankr. R. 9027.

31.     A copy of the Summons and Complaint filed in the State Court Action is attached
hereto as Exhibit A. Apart from the Summons and Complaint, the Removing Defendants have
received no other process, pleadings, motions or orders. See 28 U.S.C. § 1446(a); Bankr. R.
9027(a)(1); U.S. D. Ct. E.D.N.Y Local Civ. R. 81.1(b). A copy of the Stipulation Extending
Time filed in the State Court Action is attached hereto as Exhibit B. See U.S. D. Ct. E.D.N.Y
Local Civ. R. 81.1(b).

32.     In accordance with 28 U.S.C. § 1446(d) and Bankr. R. 9027(c), the Removing

Defendants will promptly file a true and correct copy of this Notice with the Clerk of Court for

the Supreme Court of the State of New York, County of Nassau, and serve plaintiffs' counsel

with a copy of this Notice of Removal.  (See Ex. C.)

33.     Consent to removal is not required at least with respect to removal under CAFA

or the bankruptcy removal statute.  See 28 U.S.C. §§ 1453(b) and 1452; see also Bankr. R. 9027.

In any event, all defendants who have been properly served are filing this Notice of Removal

through their counsel, and therefore consent to the removal of this action to this Court, subject to

and without waiving any defenses and rights available to them.  The Trust Defendants have not

yet been properly served. Nonetheless, were the Trust Defendants to be served, they or their representatives have indicated that they would consent to this removal.

WHEREFORE, the Removing Defendants submit that this action is now properly removed from the Supreme Court of the State of New York, County of Nassau and is properly before this District Court and that all further actions take place before this Court.

Dated: New York, New York          SIDLEY AUSTIN LLP
      April 25, 2008

By: _____
A. Robert Pietrzak (AP 6711)
Patrick M. McGuirk (PM 8365)
Dorothy J. Spenner (DS 7821)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

*Attorneys for Defendants J.P. Morgan Acceptance Corporation I, J.P. Morgan Securities Inc., David M. Duzyk, Louis Schioppo, Jr., Christine E. Cole, and Edwin F. McMichael*

16

Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

———————————————————— x

PLUMBERS' & PIPEFITTERS' LOCAL #562
SUPPLEMENTAL PLAN & TRUST and
PLUMBERS' & PIPEFITTERS' LOCAL #562
PENSION FUND, On Behalf of Themselves and
All Others Similarly Situated,,

                      Plaintiffs,

     vs.

J.P. Morgan Acceptance Corporation I, Alternative
Loan Trust 2006-A1, Alternative Loan Trust 2006-
A2, Alternative Loan Trust 2006-A3, Alternative
Loan Trust 2006-A4, Alternative Loan Trust 2006-
A5, Alternative Loan Trust 2006-A6, Alternative
Loan Trust 2006-A7, Alternative Loan Trust 2006-
S1, Alternative Loan Trust 2006-S2, Alternative
Loan Trust 2006-S3, Alternative Loan Trust 2006-
S4, Mortgage Acquisition Trust 2006-A3,
Mortgage Acquisition Trust 2006-A4, Mortgage
Acquisition Trust 2006-A5, Mortgage Acquisition
Trust 2006-A6, Mortgage Acquisition Trust 2006-
A7, Mortgage Acquisition Trust 2006-ACC1,
Mortgage Acquisition Trust 2006-CH2, Mortgage
Acquisition Trust 2006-HE2, Mortgage Acquisition
Trust 2006-HE3, Mortgage Acquisition Trust 2006-
NC1, Mortgage Acquisition Trust 2006-RM1,
Mortgage Acquisition Trust 2006-S2, Mortgage
Acquisition Trust 2006-WF1, Mortgage
Acquisition Trust 2006-WMC2, Mortgage
Acquisition Trust 2006-WMC3, Mortgage
Acquisition Trust 2006-WMC4, Mortgage
Acquisition Trust 2007-A1, Mortgage Acquisition
Trust 2007-A2, Mortgage Acquisition Trust 2007-
CH1, Mortgage Acquisition Trust 2007-CH2,
Mortgage Acquisition Trust 2007-S1, J.P. Morgan
Securities Inc., David M. Duzyk, Louis Schioppo
Jr., Christine E. Cole,

                      Defendants.

———————————————————— x

Index No.: 56 75/08

Date Purchased: 3-21-08

Plaintiff designates Nassau County
as the place of trial.

The basis of the venue is
CPLR 503(a)

# SUMMONS

Plaintiff(s) resides at
12385 Larimore Rd
St Louis, MO

To the above named Defendant:

       You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the

State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

DATED:    Melville, New York      COUGHLIN STOIA GELLER
           March 26, 2008          RUDMAN & ROBBINS LLP

By:    SAMUEL H. RUDMAN
        DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

Attorneys for Plaintiff

Defendant's address:

J.P. Morgan Acceptance Corporation I
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Alternative Loan Trust 2006-A1
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Alternative Loan Trust 2006-A2
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Alternative Loan Trust 2006-A3
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Alternative Loan Trust 2006-A5
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Alternative Loan Trust 2006-A6
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Alternative Loan Trust 2006-A7
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Alternative Loan Trust 2006-S1
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Alternative Loan Trust 2006-S2
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Alternative Loan Trust 2006-S3
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Alternative Loan Trust 2006-S4
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Mortgage Acquisition Trust 2006-HE3
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Mortgage Acquisition Trust 2006-NC1
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Mortgage Acquisition Trust 2006-RM1
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Mortgage Acquisition Trust 2006-S2
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Mortgage Acquisition Trust 2006-WF1
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Mortgage Acquisition Trust 2006-WMC2
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Mortgage Acquisition Trust 2006-WMC3
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Mortgage Acquisition Trust 2006-WMC4
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Mortgage Acquisition Trust 2007-A1
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Mortgage Acquisition Trust 2007-A2
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Mortgage Acquisition Trust 2007-CH1
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Mortgage Acquisition Trust 2007-CH2
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

Mortgage Acquisition Trust 2007-S1
c/o The Corporation
Attn: Christian I Greco
270 Park Avenue, 40th Floor
New York, NY 10017

J.P. Morgan Securities Inc.
c/o The Corporation
Attn: James C.P. Berry
4 Chase Metrotech Ctr /22nd Fl
Brooklyn, NY 11245

David M. Duzyk
1151 DeLong Rd
Lexington KY 40515

Louis Schioppo Jr.
24 Forest Ln
Monroe Township NJ 08831

Christine E. Cole
1042 Greenwood Avenue
Wilmette, IL 60091

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

———————————————————— x

PLUMBERS' & PIPEFITTERS' LOCAL #562 :
SUPPLEMENTAL PLAN & TRUST and :
PLUMBERS' & PIPEFITTERS' LOCAL #562 :
PENSION FUND, On Behalf of Themselves :
and All Others Similarly Situated, :

                Plaintiffs, :

   vs. :

J.P. MORGAN ACCEPTANCE :
CORPORATION I, J.P. MORGAN :
ALTERNATIVE LOAN TRUST 2006-A1, :
J.P. MORGAN ALTERNATIVE LOAN :
TRUST 2006-A2, J.P. MORGAN :
ALTERNATIVE LOAN TRUST 2006-A3, :
J.P. MORGAN ALTERNATIVE LOAN :
TRUST 2006-A4, J.P. MORGAN :
ALTERNATIVE LOAN TRUST 2006-A5, :
J.P. MORGAN ALTERNATIVE LOAN :
TRUST 2006-A6, J.P. MORGAN :
ALTERNATIVE LOAN TRUST 2006-A7, :
J.P. MORGAN ALTERNATIVE LOAN :
TRUST 2006-S1, J.P. MORGAN :
ALTERNATIVE LOAN TRUST 2006-S2, J.P. :
MORGAN ALTERNATIVE LOAN TRUST :
2006-S3, J.P. MORGAN ALTERNATIVE :
LOAN TRUST 2006-S4, J.P. MORGAN :
MORTGAGE ACQUISITION TRUST 2006- :
A3, J.P. MORGAN MORTGAGE :
ACQUISITION TRUST 2006-A4, :

———————————————————— x

Index No. *5675/08*

CLASS ACTION

COMPLAINT FOR VIOLATION OF §§11
AND 15 OF THE SECURITIES ACT OF
1933  *Filed - 3-26-08*

DEMAND FOR JURY TRIAL

[Caption continued on following page.]

- 1 -

```
―――――――――――――――――――――――――― x
J.P. MORGAN MORTGAGE ACQUISITION  :
TRUST 2006-A5, J.P. MORGAN
MORTGAGE ACQUISITION TRUST 2006-  :
A6, J.P. MORGAN MORTGAGE
ACQUISITION TRUST 2006-A7, J.P.    :
MORGAN MORTGAGE ACQUISITION
TRUST 2006-ACC1, J.P. MORGAN       :
MORTGAGE ACQUISITION TRUST 2006-
CH2, J.P. MORGAN MORTGAGE          :
ACQUISITION TRUST 2006-HE2, J.P.
MORGAN MORTGAGE ACQUISITION        :
TRUST 2006-HE3, J.P. MORGAN
MORTGAGE ACQUISITION TRUST 2006-   :
NC1, J.P. MORGAN MORTGAGE
ACQUISITION TRUST 2006-RM1, J.P.   :
MORGAN MORTGAGE ACQUISITION
TRUST 2006-S2, J.P. MORGAN         :
MORTGAGE ACQUISITION TRUST 2006-
WF1, J.P. MORGAN MORTGAGE          :
ACQUISITION TRUST 2006-WMC2, J.P.
MORGAN MORTGAGE ACQUISITION        :
TRUST 2006-WMC3, J.P. MORGAN
MORTGAGE ACQUISITION TRUST 2006-   :
WMC4, J.P. MORGAN MORTGAGE
ACQUISITION TRUST 2007-A1, J.P.    :
MORGAN MORTGAGE ACQUISITION
TRUST 2007-A2, J.P. MORGAN         :
MORTGAGE ACQUISITION TRUST 2007-
CH1, J.P. MORGAN MORTGAGE          :
ACQUISITION TRUST 2007-CH2, J.P.
MORGAN MORTGAGE ACQUISITION        :
TRUST 2007-S1, J.P. MORGAN
SECURITIES INC., DAVID M. DUZYK,   :
LOUIS SCHIOPPO, JR., CHRISTINE E.
COLE and EDWIN F. McMICHAEL,       :

                         Defendants.  :
―――――――――――――――――――――――――― x
```

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons or entities who acquired the Mortgage Pass-Through Certificates and Asset-Backed Pass-Through Certificates ("Certificates") of J.P. Morgan Acceptance Corporation I ("JP Morgan Acceptance" or the "Depositor") pursuant and/or traceable to false and misleading Registration Statements and Prospectus Supplements issued between January 2006 and March 2007 by JP Morgan Acceptance (collectively, the "Registration Statements"). This action, brought against the issuers and underwriters of the Certificates, involves solely *strict liability* and *negligence* claims brought pursuant to the Securities Act of 1933 ("1933 Act").

2.     JP Morgan Acceptance was formed in 1988 for the purpose of acquiring, owning and selling interests in those assets. JP Morgan Acceptance is a subsidiary of J.P. Morgan Securities Inc. ("JP Morgan") and is engaged in mortgage lending and other real estate finance-related businesses, including mortgage banking, mortgage warehouse lending, and insurance underwriting.

3.     The issuers of the various offerings (the "Defendant Issuers") are the Trusts identified in ¶15 established by defendants to issue billions of dollars worth of Certificates in 2006-2007.

4.     On July 29, 2005 and February 8, 2006, JP Morgan Acceptance and the Defendant Issuers caused Registration Statements to be filed with the Securities and Exchange Commission ("SEC") in connection with the issuance of billions of dollars of Certificates. The Certificates were issued pursuant to Prospectus Supplements, each of which was incorporated into the Registration Statements. The Certificates included several classes or tranches, which had various priorities of payment, exposure to default, interest payment provisions and/or levels of seniority.

5.     The Certificates were supported by large pools of mortgage loans. The Registration Statements represented that the mortgage pools would primarily consist of loan groups generally

-2-

secured by first liens on residential properties, including conventional, adjustable rate and negative amortization mortgage loans.

6.      Investors purchased the Certificates based upon two primary factors: return (in the form of interest payments), including timing of principal and interest payments, and safety (risk of default of the underlying mortgage loan assets). The Registration Statements discussed the underwriting standards purportedly used in connection with the underwriting of the underlying mortgage loans and included numerous representations about the loan-to-value ratios used to qualify borrowers, the appraisals of properties underlying the mortgages and the maximum debt-to-income ratios permitted on the mortgage loans.[1]

7.      The Registration Statements omitted and/or misrepresented the fact that the sellers of the underlying mortgages to JP Morgan Acceptance were issuing many of the mortgage loans to borrowers who: (i) did not meet the prudent or maximum debt-to-income ratio purportedly required by the lender; (ii) did not provide adequate documentation to support the income and assets required for the lenders to approve and fund the mortgage loans pursuant to the lenders' own guidelines; (iii) were steered to stated income/asset and low documentation mortgage loans by lenders, lenders' correspondents or lenders' agents, such as mortgage brokers, because the borrowers could not qualify for mortgage loans that required full documentation; and (iv) did not have the income required by the lenders' own guidelines to afford the required mortgage payments which resulted in a mismatch between the amount loaned to the borrower and the capacity of the borrower. The Registration Statements failed to disclose that the lenders or the lenders' agents knew that the borrowers either could not provide the required documentation or refused to provide it. In addition, the Registration Statements did not disclose that:

---

[1]      Loan-to-value ratio is the ratio of the money borrowed to the market value of the property.

- The underwriting, quality control and due diligence practices utilized in connection with the approval and funding of the mortgage loans were so weak that some borrowers were given mortgage loans based on stated income in the loan applications with purported income amounts that could not possibly be reconciled with the jobs claimed on the loan application or through a check of free "online" salary databases such as salary.com.

- The appraisals of many properties were inflated, as appraisers were pressured by lenders, lenders' correspondents or the lenders' agents, such as mortgage brokers, to provide the desired appraisal value regardless of the actual value of the underlying property so the mortgage loan would be approved and funded. In this way many appraisers were rewarded for their willingness to support preconceived or predetermined property values violating the Uniform Standards of Professional Appraisal Practice ("USPAP").[2]

8.    As a result of the misstatements and omissions detailed herein, the Certificates sold to plaintiffs and the Class were secured by assets that had a much greater risk profile in the form of a statistically significant difference between the expected versus actual performance of such assets than represented in the Registration Statements, and defendants offered superior credit ratings on the Certificates as a result of defendants' failure to disclose the underwriting defects and appraisal manipulations.[3]

9.    One commentator, posting on *Market Pipeline*, referred to one of the very trusts included herein – the J.P. Morgan Alternative Loan Trust Series 2006-A4 – when describing just how risky the investments in the Certificates really were:

> It's been said that risk is commonly underestimated when it comes to mortgage banking. Nowhere is that sentiment more true, apparently, than in the very nature of how many RMBS have been created.

---

[2]    USPAP are the generally accepted standards for professional appraisal practice in North America. USPAP contain standards for all types of appraisal services. Standards are included for real estate, personal property, business and mass appraisal.

[3]    The rating agencies are Moody's Investors Service, Fitch Investor Service and Standard & Poor's (the "Rating Agencies"). The Rating Agencies are approved as "Nationally Recognized Statistical Rating Organizations" (or "NRSROs") by the SEC and are intended to provide independent, easy-to-use measurements of relative credit risk.

-4-

10.     By the summer of 2007, the amount of uncollectible mortgage loans securing the Certificates began to be revealed to the public.  To avoid scrutiny for their own involvement in the sale of the Certificates, the Rating Agencies began to put negative watch labels on many Certificate classes, ultimately downgrading many.  The delinquency and foreclosure rates of the mortgage loans securing the Certificates has grown both faster and in greater quantity than what would be expected for mortgage loans of the types described in the Prospectus Supplements.  As an additional result, the Certificates are no longer marketable at prices anywhere near the price paid by plaintiffs and the Class and the holders of the Certificates are exposed to much more risk with respect to both the timing and absolute cash flow to be received than the Registration Statements/Prospectus Supplements represented.

## JURISDICTION AND VENUE

11.     The claims alleged herein arise under §§11 and 15 of the 1933 Act, 15 U.S.C. §§77k and 77o.  Jurisdiction is conferred by §22 of the 1933 Act and venue is proper pursuant to §22 of the 1933 Act.  Section 22 of the 1933 Act explicitly states that "[e]xcept as provided in section 16(c), no case arising under this title and brought *in any State* court of competent jurisdiction shall be removed to any court in the United States."  Section 16(c) refers to "covered class actions," which are defined as lawsuits brought as class actions or brought on behalf of more than 50 persons asserting claims *under state or common law*.  This is an action asserting federal law claims.  Thus, it does not fall within the definition of a "covered class action" under §16(b)-(c) and therefore is not removable to federal court under the Securities Litigation Uniform Standards Act of 1998.

12.     The violations of law complained of herein occurred in this County, including the dissemination of materially false and misleading statements complained of herein into this County.  JP Morgan Acceptance and JP Morgan conduct business in this County.

- 5 -

## PARTIES

13.   (a)   Plaintiff Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust acquired Certificates pursuant and traceable to the Registration Statements and Prospectus Supplements and has been damaged thereby.

(b)   Plaintiff Plumbers' & Pipefitters' Local #562 Pension Fund acquired Certificates pursuant and traceable to the Registration Statements and Prospectus Supplements and has been damaged thereby.

14.   Defendant JP Morgan Acceptance is a Delaware corporation headquartered in New York, New York. It is a special purpose corporation formed in 1988.

15.   Each of the Defendant Issuers of the Certificates are Delaware trusts which issued billions of dollars worth of Certificates pursuant the Registration Statements. The Defendant Issuers are:

| | |
|---|---|
| J.P. Morgan Alternative Loan Trust 2006-A1 | J.P. Morgan Alternative Loan Trust 2006-A7 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | J.P. Morgan Alternative Loan Trust 2006-S1 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | J.P. Morgan Alternative Loan Trust 2006-S2 |
| J.P. Morgan Alternative Loan Trust 2006-A4 | J.P. Morgan Alternative Loan Trust 2006-S3 |
| J.P. Morgan Alternative Loan Trust 2006-A5 | J.P. Morgan Alternative Loan Trust 2006-S4 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | J.P. Morgan Mortgage Acquisition Trust 2006-A3 |
| J.P. Morgan Mortgage Acquisition Trust 2006-A4 | J.P. Morgan Mortgage Acquisition Trust 2006-A5 |
| J.P. Morgan Mortgage Acquisition Trust 2006-A6 | J.P. Morgan Mortgage Acquisition Trust 2006-A7 |
| J.P. Morgan Mortgage Acquisition Trust 2006-ACC1 | J.P. Morgan Mortgage Acquisition Trust 2006-CH2 |
| J.P. Morgan Mortgage Acquisition Trust 2006-HE2 | J.P. Morgan Mortgage Acquisition Trust 2006-HE3 |
| J.P. Morgan Mortgage Acquisition Trust 2006-NC1 | J.P. Morgan Mortgage Acquisition Trust 2006-RM1 |
| J.P. Morgan Mortgage Acquisition Trust 2006-S2 | J.P. Morgan Mortgage Acquisition Trust 2006-WF1 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC2 | J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC4 | J.P. Morgan Mortgage Acquisition Trust 2007-A1 |
| J.P. Morgan Mortgage Acquisition Trust 2007-A2 | J.P. Morgan Mortgage Acquisition Trust 2007-CH1 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH2 | J.P. Morgan Mortgage Acquisition Trust 2007-S1 |

16.   Defendant JP Morgan engages in investment banking activities in the U.S. Its services include debt and equity underwriting, advice on mergers and acquisitions and restructuring, securities dealing and brokerage, and trade execution services, such as market making, equity

-6-

derivatives and structured investments, for institutional clients. JP Morgan is a Delaware corporation based in New York, New York. JP Morgan acted as underwriter in the sale of the Certificates and in doing so drafted and disseminated the offering documents. JP Morgan failed to perform adequate due diligence to ensure the statements incorporated into the Registration Statements were not misleading.

17.     Defendant David M. Duzyk ("Duzyk") was President and a director of JP Morgan Acceptance during the relevant time period. Defendant Duzyk signed the July 29, 2005 and February 8, 2006 Registration Statements.

18.     Defendant Louis Schioppo, Jr. ("Schioppo") was the Controller and Chief Financial Officer ("CFO") of JP Morgan Acceptance during the relevant time period. Defendant Schioppo signed the July 29, 2005 and February 8, 2006 Registration Statements.

19.     Defendant Christine E. Cole ("Cole") was a director of JP Morgan Acceptance during the relevant time period. Defendant McCarthy signed the July 29, 2005 and February 8, 2006 Registration Statements.

20.     Defendant Edwin F. McMichael ("McMichael") was a director of JP Morgan Acceptance during the relevant time period. Defendant McMichael signed the July 29, 2005 and February 8, 2006 Registration Statements.

21.     The defendants identified in ¶¶17-20 are referred to herein as the "Individual Defendants." The Individual Defendants functioned as directors to the Trusts as they were directors to Citigroup Mortgage and signed the Registration Statement for the registration of the securities issued by the Trusts.

22.     These defendants aided and abetted, and/or participated with and/or conspired with, the named defendants in the wrongful acts and course of conduct or otherwise caused the damages

- 7 -

and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

23.    Plaintiffs bring this action as a class action pursuant to CPLR 901, *et seq.*, on behalf of a class consisting of all persons or entities who acquired Certificates of the Trust Series identified herein pursuant and/or traceable to the false and misleading Registration Statements (Registration Nos. 333-127020 and 333-130192) (the "Class"). Excluded from the Class are defendants, the officers and directors and affiliates of the defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

24.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by JP Morgan Acceptance and/or JP Morgan or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. The Registration Statements issued billions of dollars worth of Certificates.

25.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

26.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

- 8 -

27. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      (a)    whether defendants violated the 1933 Act;

      (b)    whether statements made by defendants to the investing public in the Registration Statements misrepresented material facts about the Certificates and/or the underlying mortgage loans held by the Trusts; and

      (c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

28. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### BACKGROUND

29. JP Morgan Acceptance is a subsidiary of JP Morgan and is engaged in mortgage lending and other real estate finance-related businesses, including mortgage banking, mortgage warehouse lending, and insurance underwriting. JP Morgan Acceptance was set up to establish the Trusts, acquire mortgage loans and then issue Certificates of various classes or tranches that were sold to investors pursuant to Registration Statements. The Registration Statements contained data about the characteristics of the mortgage loans. However, the defendants omitted and/or misrepresented material information in the Registration Statements about the origination, underwriting, quality control, approval and funding practices and policies for the mortgage loans, as well as the likelihood borrowers would repay such mortgage loans according to the terms of the

mortgage and/or deed of trust. This depended on several factors, including creditworthiness of the

borrowers, debt-to-income levels, loan-to-value ratios, assets of the borrowers, occupancy of the

properties securing the mortgage loans, and the accuracy of other data collected during the

origination of the mortgage loans. Material omissions and misrepresentations related to these factors

rendered the mortgage loans "Defective Qualified Loans" prior to their transfer to JP Morgan

Acceptance, contradicting the representations in the Prospectus Supplements that all mortgage loans

transferred to JP Morgan Acceptance were "Qualified Loans" under tax code §860G(a)(3) and

rendering the Registration Statements false and misleading.

## THE FALSE AND MISLEADING REGISTRATION STATEMENTS/PROSPECTUS SUPPLEMENTS

30.    JP Morgan Acceptance issued Registration Statements, filed with the SEC and dated

July 29, 2005 and February 8, 2006, which discussed the mortgage loans contained in the mortgage

pools held by the Defendant Issuers. Defendants represented that the mortgage loans held by the

Defendant Issuers were mortgage loans made to creditworthy borrowers whose income

documentation was subject to established standards just a notch below those established for other

borrowers.

31.    Emphasizing the underwriting standards and income verification requirements

utilized to generate the underlying mortgage loans held by the Defendant Issuers, the Registration

Statements stated:

- Underwriting standards were applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

- In most cases, an employment verification was obtained from an independent source, typically the borrower's employer. The verification reported, among other things, the length of employment with that organization, the borrower's current salary and whether it was expected that the borrower would continue employment in the future. Where a prospective borrower was self-employed, the Registration Statements stated that the borrower was required to submit copies of signed tax returns.

- 10 -

32.    These representations were false and misleading. The true facts which were concealed were that the originators and other lenders that sold mortgage loans to JP Morgan Acceptance had become so aggressive in approving and funding loans that many of the mortgage loans were made to borrowers who had either falsified the required documentation or had not submitted it to the lender. Similarly, for those self-employed borrowers who were actually required to document income levels, income levels were routinely inflated to extreme levels in order to ensure approval of the mortgage loans.

33.    The Registration Statements also represented that where property appraisals were required, the appraiser was required to inspect the property to verify that it was in good repair and that construction, if new, had been completed. The Registration Statements further stated that the appraisal was based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home. The Registration Statements stated that appraisers and appraisals adhered to USPAP regulations and requirements.

34.    These representations were false and misleading. The true facts were that the appraisals were unreliable due to lack of controls on the part of JP Morgan and the lenders. Moreover, the originators had exerted pressure on appraisers to produce pre-determined appraisal values that were not based upon the actual values of the properties. Appraisers employed by the originators were also secretly pressured to appraise properties at a certain level or they would not be hired again, resulting in appraisals being done on a "drive-by" basis, where appraisers issued appraisals without a reasonable basis.

## FALSE STATEMENTS ABOUT ORIGINATORS' PRACTICES

**PHH Mortgage Corporation**

35.     The Registration Statements and Prospectus Supplements contained false statements about the underwriting practices of PHH Mortgage Corporation, a key originator in the following Series:

Alternative Loan Trust 2006-A1          Alternative Loan Trust 2006-A2
Alternative Loan Trust 2006-A4          Alternative Loan Trust 2006-A5
Alternative Loan Trust 2006-A6          Alternative Loan Trust 2006-A7
Alternative Loan Trust 2006-S3          Alternative Loan Trust 2006-S4
Mortgage Trust 2006-A3          Mortgage Trust 2006-A4
Mortgage Trust 2006-A5          Mortgage Trust 2006-A6
Mortgage Trust 2006-A7          Mortgage Trust 2007-A2

36.     The Alternative Loan Trust Series 2006-A1 Prospectus Supplement addressed underwriting standards utilized by PHH Mortgage, which originated 38.34% of the Pool 1 mortgages and 30.47% of the Pool 3 mortgages in Series 2006-A1:

> PHH Mortgage's underwriting standards have been established based upon its knowledge of the primary and secondary residential mortgage markets. They are intended to originate investment-quality mortgage loans that are salable in the secondary mortgage market. They are applied in originating or purchasing mortgage loans for its own account, and in originating loans for, or purchasing mortgage loans from, other lenders under various "private-label" programs. The application of the underwriting standards represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including but not limited to, the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral. PHH Mortgage may adapt its underwriting guidelines based upon the nature of a specific private-label relationship.

*Omitted Information*:  PHH Mortgage had numerous exceptions to its underwriting standards beyond what it disclosed, such that the mortgages issued had not resulted in investment-quality mortgage loans, as loans were made to borrowers with insufficient income to make the mortgage payments on the loans after loans with low initial teaser rates were reset, such that, absent housing price appreciation sufficient to make refinancing possible, these mortgage loans were sure to be problematic. PHH Mortgage was extremely aggressive in making loans, promising same-day loan decisions and a best-price guarantee wherein it would beat any lender's price or pay the borrower

- 12 -

$500. The mortgage loans PHH Mortgage held on to had suffered declines in value by late 2007 with many of the declines related to "loans with origination flaws."

37.    The Prospectus Supplement dated March 28, 2007, for Mortgage Trust Series 2007-A2 described PHH Mortgage's originating practices (PHH Mortgage originated 33% of the mortgage loans in the 2007-A2 pool), as follows:

> (a)    Closed Loan Purchases.   This platform is also known as the wholesale/correspondent platform.   PHH Mortgage generally underwrites and (i) partially processes and closes and/or (ii) purchases closed loans from financial institutions and mortgage banks.   These include banks, credit unions and other mortgage companies that are affiliated with real estate brokerage organizations. PHH Mortgage approves all of its wholesalers/correspondents *after a thorough review* of the entity's corporate, financial and licensing information.

*Omitted Information*: PHH Mortgage, which was spun-off from Cendant Corporation in 2005, was a private label mortgage provider which was the lender behind certain realtors which offered mortgage loans. As stated, PHH Mortgage acquired loans from these realtors, but did not routinely perform the thorough review represented. The lack of a thorough review was critical since the structure of the arrangement was that the real estate agents were pushing both the home and the mortgage on the borrower. Real estate agents would always push valuations in order to get the deal done and have the deal look attractive to the actual lender PHH Mortgage. PHH Mortgage looked the other way on inflated real estate values in order to keep its big corporate clients happy.

> (b)    PHH Mortgage also originates mortgage loans pursuant to alternative sets of underwriting criteria under its reduced documentation program ("Reduced Documentation Program"), stated income, stated asset program ("Stated Income, Stated Asset Program"), stated income, full asset program ("Stated Income Full Asset Program"), no income, stated asset program ("No Income Stated Asset Program") and rate and term refinance limited documentation program ("Streamlined Documentation Program"). Under the Reduced Documentation Program, Stated Income, Stated Asset Program, Stated Income Full Asset Program and No Income Stated Asset Program, certain documentation concerning income/employment and asset verification is reduced or excluded.  Each of these programs is designed to facilitate the loan approval process.
>
> Under the Streamlined Documentation Program, which is generally available only to the loans in PHH Mortgage's portfolio having no mortgage delinquencies in

- 13 -

the past 12 months, rate and term refinance loans are underwritten based solely on the original appraisal and limited credit verification, if any. Although no current appraisal of the property is obtained with respect to the origination of these mortgage loans, a "drive-by" appraisal may be obtained in certain cases and the loan-to-value ratio generally may not exceed the original loan-to-value ratio at origination.

***Omitted Information***: PHH Mortgage did little to verify that the original loan-to-value ratio on these types of loans was not exceeded and ignored situations where it was likely the original appraisal was no longer reasonable, assuming it ever was.

**Countrywide Home Loans**

38.    The Registration Statements and Prospectus Supplements contained false statements about the underwriting practices of Countrywide Home Loans, a key originator in the following Series:

| | |
|---|---|
| Alternative Loan Trust Series 2006-A1 | Alternative Loan Trust Series 2006-S3 |
| Alternative Loan Trust Series 2006-A2 | Alternative Loan Trust Series 2006-S4 |
| Alternative Loan Trust Series 2006-A4 | Mortgage Trust 2006-A4 |
| Alternative Loan Trust Series 2006-A6 | Mortgage Trust 2006-A6 |
| Alternative Loan Trust Series 2006-A7 | Mortgage Trust 2007-S1 |
| Alternative Loan Trust Series 2006-S1 | Mortgage Trust 2007-A2 |

39.    The Prospectus Supplement issued in connection with Alternative Loan Trust Series 2006-A1 further addressed the underwriting standards of Countrywide Home Loans (which originated 33.53% of the Pool 2 mortgages and 65.04% of the Pool 3 mortgages), noting:

>        Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. . . . The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

- 14 -

*Omitted Information*: Countrywide was issuing or acquiring mortgages with limited documentation and/or excessive loan-to-value ratios even where compensating factors were not demonstrated. Some borrowers with "No Doc" mortgage loans were wage earners who could have provided employment, income and asset verification, but were not required to do so because their actual income and assets would have been insufficient for the mortgage amounts. As Countrywide has reported increasing foreclosures and delinquencies, analysts who follow Countrywide closely have indicated they were not surprised given Countrywide's past practices. As *MarketWatch* reported on February 15, 2008:

> Analysts were not surprised to see the increases, pointing to past lending practices popularized by the lending industry during the height of the housing boom as an underlying problem that will continue to play out in 2008.
>
> "It is certainly not a big surprise that we are seeing more [delinquencies], as many of these loans came about because of poor underwriting practices," Gary Gordon, an analyst for Portales Partners who has been following Countrywide for almost two decades.
>
> Gordon said he expected the number to rise throughout this year as many borrowers crack under the pressure of paying off loans for which they should not [sic] originally received.
>
> "The delinquencies for these kinds of loans are then likely to come out early in the lifecycle of the loan, which is happening now," he said.

40.     The Alternative Loan Trust Series 2006-A1 Prospectus Supplement also stated with respect to Countrywide:

> Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively.

*Omitted Information*: Countrywide's appraisals were frequently inflated, reckless, contained predetermined values or were otherwise unreliable, which caused the loan-to-value ratios to be misstated. This caused mortgages to be issued for borrowers with higher than 38% debt-to-income

- 15 -

ratios even though the loan-to-value ratio was higher than 80% of what the property would appraise for under a legitimate appraisal.

41.    The Alternative Loan Trust Series 2006-A4 Prospectus Supplement, dated July 27, 2006, stated with respect to the underwriting practices of Countrywide, which accounted for 70% of mortgages in the 2006-A4 Trust:

> The Streamlined Documentation Program is available for borrowers who are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. Under the Streamlined Documentation Program, appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000. In addition, under the Streamlined Documentation Program, a credit report is obtained but only a limited credit review is conducted, no income or asset verification is required, and telephonic verification of employment is permitted. The maximum Loan-to-Value Ratio under the Streamlined Documentation Program ranges up to 95%.

> EXPANDED UNDERWRITING GUIDELINES

> Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines. The Expanded Underwriting Guidelines also permit higher debt-to-income ratios than mortgage loans underwritten pursuant to the Standard Underwriting Guidelines.

> Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000 and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000.

> *       *       *

> The same documentation and verification requirements apply to mortgage loans documented under the Alternative Documentation Program regardless of

whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Alternative Documentation Program, mortgage loans that have been underwritten pursuant to the Expanded Underwriting Guidelines may have higher loan balances and Loan-to-Value Ratios than those permitted under the Standard Underwriting Guidelines.

Similarly, the same documentation and verification requirements apply to mortgage loans documented under the Reduced Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Reduced Documentation Program, higher loan balances and Loan-to-Value Ratios are permitted for mortgage loans underwritten pursuant to the Expanded Underwriting Guidelines than those permitted under the Standard Underwriting Guidelines. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 90%. The borrower is not required to disclose any income information for some mortgage loans originated under the Reduced Documentation Program, and accordingly debt-to-income ratios are not calculated or included in the underwriting analysis. The maximum Loan-to-Value Ratio, including secondary financing, for those mortgage loans ranges up to 85%.

Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis. This program is limited to borrowers with excellent credit histories. Under the No Income/No Asset Documentation Program, the maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95%. Mortgage loans originated under the No Income/No Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income. The Stated Income/Stated Asset Documentation Program permits maximum Loan-to-Value Ratios up to 90%. Mortgage loans originated under the Stated Income/Stated Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

*Omitted Information*: These non-traditional mortgage loans were increasingly being widely used by Countrywide and its brokers where the loan-to-value ratios were over the stated limit due to "silent second" liens. In fact, for the mortgage loans generated under the Streamlined Documentation Program, appraisals were not obtained at all, even though the mortgage loans obtained did, in fact, exceed 80% of the actual value of the subject property. The importance of legitimate appraisals was

- 17 -

even more important under the Expanded Underwriting Guidelines because these mortgage loans provided for loan amounts which reached 90%, 95% or even 100% in some cases. Given the inflated appraisals frequently provided, the undisclosed risk of mortgages exceeding home values was extreme. Countrywide's appraisal practices were intended to inflate the property value so that loans would close. Countrywide was recently sued for inflated appraisals in connection with Countrywide's joint venture with KB Homes.

**Chase Home Finance LLC**

42.     The Registration Statements and Prospectus Supplements contained false statements about the underwriting practices of Chase Home Finance LLC ("CHF"), which was a key originator for the following Series:

| | |
|---|---|
| Alternative Loan Trust 2006-A1 | Alternative Loan Trust 2006-A2 |
| Alternative Loan Trust 2006-A3 | Alternative Loan Trust 2006-A4 |
| Alternative Loan Trust 2006-A5 | Alternative Loan Trust 2006-A6 |
| Alternative Loan Trust 2006-A7 | Alternative Loan Trust 2006-S1 |
| Alternative Loan Trust 2006-S4 | Mortgage Trust 2006-A3 |
| Mortgage Trust 2006-A4 | Mortgage Trust 2006-A5 |
| Mortgage Trust 2006-A6 | Mortgage Trust 2006-A7 |
| Mortgage Trust 2006-CH2 | Mortgage Trust 2006-NC1 |
| Mortgage Trust 2006-S2 | Mortgage Trust 2007-A1 |
| Mortgage Trust 2007-A2 | Mortgage Trust 2007-CH1 |
| Mortgage Trust 2007-CH2 | |

43.     The Alternative Loan Trust Series 2006-S1 Prospectus Supplement dated February 24, 2006 for loans originated by CHF (which represented 36% of the 2006-S1 pool) represented:

Under CHF's "No Doc" program, no employment information, sources of income, income amount or assets are disclosed. Additionally, employment verification is not required. The underwriting for such mortgage loans are based primarily or entirely on a stronger credit profile (evidenced by a higher minimum FICO credit risk score), a lower maximum product limit and additional due diligence performed on the collateral.

Pursuant to CHF's Stated Income Stated Asset Program (which is sometimes referred to as CHF's "SISA" program), verification of the income and assets, as stated on the application, is not required. The underwriting for such mortgage loans

- 18 -

requires AUS approval and is based entirely on stronger credit profile and lower loan-to-value ratio requirements.

*Omitted Information*: The "No Doc" mortgage loans and SISA programs were not limited to situations where the collateral was more closely analyzed, and the appraisal process was much more perfunctory than represented. In fact, in late 2007, CHF announced changes to its underwriting, essentially admitting it had been doing the opposite before the changes. The changes included:

- Developing a new upfront disclosure in a simple format, so that borrowers could compare important product features for traditional as well as non-traditional mortgages, including more information on how an adjustable-rate feature can affect the monthly payment.

- Employing underwriting guidelines that require borrowers to demonstrate their ability to handle increases in interest rates on non-traditional mortgages.

- Requiring an initial fixed rate for at least five years on adjustable-rate mortgages for non-prime borrowers to reduce payment shock risk.

44. The Prospectus Supplement dated March 28, 2007 for Mortgage Trust Series 2007-A2 described CHF's originating practices, which originated or acquired 39% of the mortgage loans on the 2007-A2 pool, as follows:

(a) The Chase Originator Mortgage Loans were originated in a manner generally consistent, except as to loan amounts, with Fannie Mae or Freddie Mac published underwriting guidelines. Therefore, each Chase Originator Mortgage Loans originated in such a manner should generally meet the credit, appraisal and underwriting standards described in such published underwriting guidelines, except for the original principal balances of such Chase Originator Mortgage Loans. Initially, a prospective borrower is required to fill out an application designed to provide pertinent information about the borrower's assets, liabilities, income and credit, the property to be financed and the type of loan desired. A three-file merged credit report for each borrower is obtained, which summarizes each repository's credit score, credit history and depth, and any derogatory public records. The middle of three credit scores is used if there is a single applicant and the lower of both middle credit scores is used if there are joint applicants. In addition, employment, income and assets are verified. Self-employed prospective borrowers are generally required to submit their federal income tax returns for the last two years and in certain cases a separate statement of income and expenses is independently verified by a third party.

- 19 -

Once the necessary information is received, a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses . . . .

*Omitted information:* During 2006, CHF represented to real estate agents that it would not require certain standard minimums if borrowers had certain credit scores. Given that credit scores could be altered or manipulated by certain borrower practices, the lack of requirements for traditional loans meant that mortgages were not originated consistent with Fannie Mae or Freddie Mac underwriting guidelines. CHF told real estate professionals that asset verification was not required with a 640 credit score or with loan-to-value ratio less than or equal to 80% and that taxes and insurance escrows were not required at any loan-to-value ratio.

      (b)    An appraisal (which in certain circumstances may be a confirmation of an existing appraisal) is required for each property to be financed. The appraisal is conducted by an independent fee appraiser who estimates the mortgaged property's market value. The independent appraisers do not receive any compensation dependent upon either the amount of the loan or its consummation. In normal practice, the lower of purchase price or appraised value determines the maximum amount which will be advanced against the property. For certain jumbo loans in high value markets, the lower value of two appraisals would be used if certain dollar amounts and loan-to-value thresholds are exceeded. An automated valuation model may be used instead of an independent fee appraiser.

*Omitted information:* CHF and its brokers either tacitly or explicitly pressured appraisers to appraise to certain values, since appraisers knew they would not be hired again if they failed to report the value desired. This led to inflated appraisals.

      (c)    From time to time, exceptions and/or variances to underwriting policies may be made. Such exceptions and/or variances may be made only if specifically approved on a loan-by-loan basis by certain credit and-underwriting personnel who have the authority to make such exceptions and/or variances. Exceptions and/or variances may be made only after careful consideration of certain mitigating factors such as borrower capacity, liquidity, employment and residential stability and local economic conditions.

*Omitted information:* CHF and its brokers were much more generous in granting exceptions than represented and the emphasis was on getting loans approved more so than on making "careful considerations" of the borrower's ability to pay.

- 20 -

**SunTrust Mortgage**

45.     The Registration Statements and Prospectus Supplements contained false statements about SunTrust, a key originator in Alternative Loan Trust Series 2006-S1 and Alternative Loan Trust Series 2006-S2. With respect to the SunTrust mortgage loans, which represented 21% of the overall pool of Alternative Loan Trust Series 2006-S1 and 47.5% of the Pool 3 mortgage loans of Alternative Loan Trust Series 2006-S1, the Prospectus Supplement represented:

> SunTrust underwriting guidelines generally follow standard Fannie Mae guidelines. They are designed to evaluate the borrower's capacity to repay the loan, to evaluate the credit history of the borrower, to verify the availability of funds required for closing and cash reserves for fully documented mortgage loans, and to evaluate the acceptability and marketability of the property to be used as collateral. SunTrust may consider a loan to have met underwriting guidelines where specific criteria or documentation are not met if, upon analyzing the overall qualitative evaluation of the loan package, there are acceptable compensating factors that can be used. SunTrust also offers reduced documentation mortgage loans that eliminate the verification of income and assets or disclosure and verification of income and assets when specific underwriting criteria are met. Disclosure and verification of employment may also be waived within specific program parameters. SunTrust continuously updates and enhances its underwriting guidelines to comply with secondary market investor guidelines and to reflect changes required for new mortgage products.

***Omitted Information***:  SunTrust did not limit alternative documentation situations to those where "acceptable compensating factors" existed. In fact, SunTrust's practice of granting a relatively high level of stated income and low documentation mortgage loans attracted mortgage brokers, correspondents and borrowers who were more inclined to provide misrepresentations, or "liar loans" as they were known in the industry. SunTrust contributed to the problem further by requiring only minimal data to approve new mortgage brokers and then doing little monitoring on an ongoing basis of the thousands of approved mortgage brokers and the mortgage brokers' practices for originating mortgage loans. Moreover, SunTrust emphasized speeding up the origination process and cutting costs – using technology to get more Alt-A mortgage loans approved at a faster rate. This de-emphasized the quality control and due diligence of the loan origination process.  SunTrust

- 21 -

compensated its loan officers based primarily on the volume of mortgage loans produced, which discouraged significant due diligence which would have protected Certificate holders. SunTrust was also becoming more aggressive in granting pay-option adjustable rate mortgages ("ARMs") which were much more likely to default.

**WMC Mortgage Corporation**

46.     The Registration Statements and Prospectus Supplements contained false statements about the underwriting practices of WMC Mortgage Corp. ("WMC"), the key originator for:

> Mortgage Trust Series 2006-WMC2
> Mortgage Trust Series 2006-WMC3
> Mortgage Trust Series 2006-WMC4

47.     The Prospectus Supplement dated December 15, 2006 for Mortgage Trust Series 2006-WMC4, described the underwriting practices of WMC, which originated all the mortgage loans in the 2006-WMC4 Trust, as follows:

>     (a)     The Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults. On a case-by-case basis WMC may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category or other guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low debt-to-income ratio ("Debt Ratio"), good mortgage payment history, an abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address. It is expected that a substantial number of the mortgage loans to be included in the trust will represent such underwriting exceptions.

>                          *      *      *

>     All mortgage loans originated or purchased under the Underwriting Guidelines are based on loan application packages submitted through mortgage brokerage companies or on loan files (which include loan application documentation) submitted by correspondents. Loan application packages submitted through mortgage brokerage companies, containing in each case relevant credit, property and underwriting information on the loan request, are compiled by the applicable mortgage brokerage company and submitted to WMC for approval and funding. The mortgage brokerage companies receive a portion of the loan origination fee charged to the mortgagor at the time the loan is made and/or a yield-spread premium for

- 22 -

services provided to the borrower. No single mortgage brokerage company accounts for more than 3%, measured by outstanding principal balance, of the mortgage loans originated by WMC.

*Omitted Information:* WMC did not focus so much on whether the borrower could repay the loan and did not exert much control, if any, over brokers who did loans for WMC. In fact, WMC was particularly aggressive in providing yield-spread premium "buy-ups" to compensate the brokers even more. Considering that WMC was known in the industry for offering subprime mortgages up to 100% on low, teaser-rate ARMs, it was very easy (and profitable) for brokers to originate loans for WMC even if the borrowers were not good credit risks. A credit risk manager which later performed an investigation into WMC loans quickly found "fraud, errors, misrepresentations, or gross negligence that took place on the part of WMC." This resulted in the loan-to-value ratio exceeding 100% at origination. Also, at origination certain documents were missing from the loan file. In 38% of the sample, there was unreasonable stated income and/or misrepresentation of income and/or employment by borrowers. WMC could have easily discovered these problems through simple due diligence.

     (b)    The general collateral requirements in the Underwriting Guidelines specify that a mortgaged property not have a condition rating of lower than "average." Each appraisal includes a market data analysis based on recent sales of comparable homes in the area. The general collateral requirements in the Underwriting Guidelines specify conditions and parameters relating to zoning, land-to-improvement ratio, special hazard zones, neighborhood property value trends, whether the property site is too isolated, whether the property site is too close to commercial businesses, whether the property site is rural, city or suburban, whether the property site is typical for the neighborhood in which it is located and whether the property site is sufficient in size and shape to support all improvements.

*Omitted Information:* The appraisals due on properties securing loans originated by brokers working for WMC were not thorough enough to confirm the property characteristics described. As a result, given the lax underwriting by WMC, the lack of valid appraisals meant that many of WMC's originations were in trouble from the origination time.

**ResMAE Mortgage Corporation**

48.     The Registration Statements and Prospectus Supplements contained false statements
about the underwriting practices of ResMAE Mortgage Corporation ("ResMAE"), a key originator
for Mortgage Trust Series 2006-RM1 and Mortgage Trust Series 2006-HE3.  The Prospectus
Supplement dated October 27, 2006 for Mortgage Trust Series 2006-HE3, described the
underwriting practices of ResMAE, which originated 60% the mortgage loans in the 2006-HE3
Trust, as follows:

> (a)     Substantially all of the mortgage loans originated by ResMAE are
> based on loan application packages submitted through licensed mortgage brokers.
> These brokers must meet minimum standards set by ResMAE based on an analysis
> of the following information submitted with an application for approval: applicable
> state lending license (in good standing), signed broker agreement and signed broker
> authorization. Once approved, licensed mortgage brokers are eligible to submit loan
> application packages in compliance with the terms of a signed broker agreement.

*Omitted Information:*  ResMAE relied significantly on mortgage brokers to originate loans and
exercised little control over them to ensure that loans were only made to borrowers with an ability
and willingness to pay back the loans. . Following ResMAE's bankruptcy, analysts attributed the
problems to poor underwriting. *Bloomberg.com* later reported: "'More than 100 other lenders will
go out of business this year,' said Doug Duncan, chief economist of the Mortgage Bankers
Association in Washington.  Many will be subprime lenders, victims of loans to borderline
borrowers last year.  'Loans in 2006 will be the worst we have ever seen in the business,' said
Matthew Howlett, an analyst who covers the subprime market in New York for Fox-Pitt, Kelton
Ltd., an investment bank. 'The underwriting quality was disastrous.'"

> (b)     All of the mortgage loans were underwritten by ResMAE's
> underwriters having the appropriate signature authority. Each underwriter is granted
> a level of authority commensurate with their proven judgment, maturity and credit
> skills.  On a case by case basis, ResMAE may determine that, based upon
> compensating factors, a prospective mortgagor not strictly qualifying under the
> underwriting risk category guidelines described below warrants an underwriting
> exception. Compensating factors may include, but are not limited to, low loan-to-
> value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable

- 24 -

employment and time in residence at the applicant's current address. A substantial portion of the Mortgage Loans represent such underwriting exceptions.

*Omitted Information:* ResMAE did not grant exceptions to underwriting guidelines solely when compensating factors were present but granted exceptions on a widespread basis. This ultimately led to defaults and investor demands that ResMAE buy back $308 million in defaulting loans. These demands forced ResMAE into bankruptcy, only a few months after JP Morgan underwrote the relevant offerings. That ResMAE would file for bankruptcy so soon after the 2006-RMI and 2006-HE3 series offerings demonstrates the lack of any meaningful due diligence by JP Morgan.

**NovaStar Mortgage, Inc.**

49.     The Registration Statements and Prospectus Supplements contained false statements about the underwriting practices of NovaStar Mortgage, Inc., a key originator for Mortgage Trust Series 2006- HE2 and Mortgage Trust Series 2006-HE3. The Prospectus Supplement dated October 27, 2006 for Mortgage Trust Series 2006-HE3, described the underwriting practices of NovaStar, which originated 22% the mortgage loans in the 2006-HE3 Series, stated as follows:

> (a)     The underwriting guidelines of NovaStar are intended to evaluate the credit history of the potential borrower, the capacity and willingness of the borrower to repay the loan and the adequacy of the collateral securing the loan. Each loan applicant completes an application that includes information with respect to the applicant's income, liabilities and employment history. Prior to issuing an approval on the loan, the loan underwriter runs an independent credit report or pulls a reissue of the clients credit through an independent 3rd party vendor, which provides detailed information concerning the payment history of the borrower on all of their debts to verify that the information submitted by the broker is still accurate and up to date.

*Omitted information:* NovaStar account executives, who brought the loans to the Company for processing, made great efforts to ensure that overly risky loans were approved by other NovaStar employees, greatly increasing the risk that mortgages would default. These efforts were facilitated by a bonus structure that rewarded the account executives' supervisors for turning a blind eye and marginalizing the Company's loan underwriters.

- 25 -