(b)      An appraisal is also required on all loans and in many cases a review appraisal or second appraisal may be required depending on the value of the property and the underwriter's comfort with the original valuation. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae. The properties securing the mortgage loans are appraised by qualified independent appraisers who are generally approved by the related originator. A streamline appraisal program is offered by our Retention division for borrowers that currently have a mortgage loan with NovaStar.

Under this program an AVM can be used to determine valuation if the full appraisal from the previous loan is less than two years old. The maximum increase in value that can be supported with an AVM is 10%. The mortgagor may also include information regarding verification of deposits at financial institutions where the mortgagor had demand or savings accounts. In the case of investment properties, income derived from the mortgaged property may have been used for underwriting purposes.

*Omitted information:* Three primary changes occurred in early 2006. First, fewer funded loans were audited for quality. Second, among these loans that were audited and reviewed, many variances from and exceptions to the underwriting guidelines that previously were flagged and recorded as "high risk" to future loan performance were overlooked in the audit process and no longer recorded in NovaStar's NOVALINQ system. Third, it became much more difficult to address and resolve questions that outside investors raised about the specific loans in the pools they were considering purchasing. By early 2006, the Quality Control Auditors were seeing a material increase in exceptions to the underwriting guidelines in the loans they reviewed.

(c)      On a case-by-case basis, exceptions to the underwriting guidelines are made where NovaStar believes compensating factors exist. Compensating factors may consist of factors like length of time in residence, lowering of the borrower's monthly debt service payments, the loan-to-value ratio on the loan, as applicable, or other criteria that in the judgment of the loan underwriter warrant an exception. All loans in excess of $350,000 currently require the approval of the underwriting supervisor or designee approved by the supervisor. All loans over $650,000 require the approval of the VP of Operations and Corporate Credit Department or its approved designees. In addition, the President of NovaStar approves all loans in excess of $1,100,000.

*Omitted information:* Underwriters received a credit toward their bonus for looking at a file regardless of whether the file was approved, so long as at least 90% of the loans they approved could

- 26 -

pass muster with the Quality Department. The underwriters, however, were supervised by Regional

Operations Managers whose bonuses were based on the number of loans they *approved and closed*,

the former auditor in the Quality Department stated. The account executives received a percentage

of each loan that closed and the percentage depended on the type and size of the loan. Supervisors

received bonuses if their department exceeded a monthly goal. Supervisors could make as much as

35% of their salary in bonuses. Supervisors would approve loans to make their bonuses regardless

of whether it made sense to approve the loan.

**Wells Fargo Bank, N.A.**

50.     The Prospectus Supplements made false statements about the loans originated by

Wells Fargo Bank, N.A. ("Wells Fargo") which was the key originator for the Mortgage Trust Series

2006-WF1. For example, the Prospectus Supplement dated August 29, 2006, for Series 2006-WF1,

stated in part:

> (a)     Wells Fargo Bank's underwriting standards are applied by or on
> behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to
> repay the loan, as well as the value and adequacy of the mortgaged property as
> collateral. The underwriting standards that guide the determination represent a
> balancing of several factors that may affect the ultimate recovery of the loan amount,
> including, among others, the amount of the loan, the ratio of the loan amount to the
> property value (*i.e.*, the lower of the appraised value of the mortgaged property and
> the purchase price), the borrower's means of support and the borrower's credit
> history. Wells Fargo Bank's guidelines for underwriting may vary according to the
> nature of the borrower or the type of loan, since differing characteristics may be
> perceived as presenting different levels of risk. With respect to certain mortgage
> loans, the originators of such loans may have contracted with unaffiliated third
> parties to perform the underwriting process.

*Omitted Information:* Wells Fargo lenders were becoming increasingly aggressive in mortgage

lending practices in 2006, leading to higher defaults, well beyond Wells Fargo's experience. In fact,

in 2006, Wells Fargo was increasing its share of subprime mortgages just as the market was

softening. The degree to which Wells Fargo was willing to go to increase volume is shown by the

fact that, in June 2006, Wells Fargo was considering offering pay-option ARMs.

- 27 -

(b)     In order to qualify for participation in Wells Fargo Bank's mortgage loan purchase programs, lending institutions must (i) meet and maintain certain net worth and other financial standards, (ii) demonstrate experience in originating residential mortgage loans, (iii) meet and maintain certain operational standards, (iv) evaluate each loan offered to Wells Fargo Bank for consistency with Wells Fargo Bank's underwriting guidelines and represent that each loan was underwritten in accordance with Wells Fargo Bank standards and (v) utilize the services of qualified appraisers.

The contractual arrangements with Correspondents may involve the commitment by Wells Fargo Bank to accept delivery of a certain dollar amount of mortgage loans over a period of time. This commitment may be satisfied either by delivery of mortgage loans one at a time or in multiples as aggregated by the Correspondent. The contractual arrangements with Correspondents may also involve the delegation of all underwriting functions to such Correspondents ("DELEGATED UNDERWRITING"), which will result in Wells Fargo Bank not performing any underwriting functions prior to acquisition of the loan but instead relying on such Correspondents' representations and, in the case of bulk purchase acquisitions from such Correspondents, Wells Fargo Bank's post-purchase reviews of samplings of mortgage loans acquired from such Correspondents regarding the Correspondents' compliance with Wells Fargo Bank's underwriting standards. In all instances, however, acceptance by Wells Fargo Bank is contingent upon the loans being found to satisfy Wells Fargo Bank's program standards.

*Omitted Information*:  In fact, Wells Fargo did not sufficiently confirm the standards of mortgage brokers, correspondents and other third parties from which Wells Fargo acquired mortgages. These third parties were able to engage in serious underwriting deficiencies without correction by Wells Fargo. Wells Fargo has subsequently attributed much of its $1.3 billion mortgage-related write-down to loans it held which were originated by third parties.

**Accredited Home Lenders, Inc.**

51.     The Prospectus Supplements made false statements about the underwriting practices of Accredited Home Lenders, Inc. ("Accredited") which was a key originator in Mortgage Trust Series 2006-ACC1. The Prospectus Supplement dated May 26, 2006, for Series 2006-ACC1, stated:

(a)     Each mortgage loan originated or acquired by Accredited is underwritten prior to loan closing, or re-underwritten after loan closing but prior to purchase by Accredited, in accordance with Accredited's underwriting guidelines. Accredited's underwriting process is intended to assess a mortgage loan applicant's credit standing and repayment ability and the value and adequacy of the real property security as collateral for the proposed mortgage loan. All underwriting and re-

- 28 -

underwriting is performed by Accredited's underwriting personnel, and Accredited does not delegate underwriting authority to any broker, correspondent or other mortgage loan provider. Accredited's underwriting standards are applied in a standardized manner which complies with applicable federal and state laws and regulations.

***Omitted Information:*** Beginning in 2007, Accredited's stated underwriting guidelines were disregarded in an effort to increase the volume of loans that Accredited originated. Accredited experienced a growing problem with bad loans attributed to management overrides of the underwriting and appraisal process. At the end of financial reporting periods, Accredited made increasing exceptions to its underwriting standards to inflate the volume of loans originated in an attempt to meet financial projections. *The amount of overrides grew to be so large that, in 2005, Accredited instituted a system to track such overrides, which included a box on the loan file that needed to be checked off by an underwriter if the loan was approved as a business decision by a higher-level manager over the recommendation of the underwriter to reject the application.*

     (b)    A full appraisal of the property proposed to be pledged as collateral is required in connection with the origination of each first priority mortgage loan and each second priority mortgage loan greater than $50,000. Appraisals are performed by licensed, third-party, fee-based appraisers and include, among other things, an inspection of the exterior and interior of the subject property. Appraisals are also required to address neighborhood conditions, site and zoning status and the condition and value of improvements. Following each appraisal, the appraiser prepares a report which includes a reproduction costs analysis (when appropriate) based on the current cost of constructing a similar home and market value analysis based on recent sales of comparable homes in the area. Appraisals generally conform to the Uniform Standards of Professional Appraisal Practice and must be on forms acceptable to Freddie Mac and Fannie Mae. Every appraisal is reviewed by a non-affiliated appraisal review firm or by Accredited's Appraisal Review Department or a qualified underwriter before the mortgage loan is closed. The appraisal may not be more than 180 days old on the day the mortgage loan is funded. A second full appraisal is required for combined mortgage loan amounts and/or property values greater than $1,000,000. For second priority mortgage loans of $50,000 or less, "drive-by" appraisals alone are acceptable. The standard appraisal may be waived in favor of an Insured Automated Value Model (AVM) with a physical inspection, provided the mortgage loan meets certain criteria. The Insured AVM is effective for the life of the mortgage loan, is transferable, and provides an unbiased opinion of the property value. The Insured AVM process includes a Property Condition Report which is a drive-by inspection that verifies the collateral is conforming. The insurance

certificate provides protection that minimizes loss severity in the event of Foreclosure.

*Omitted Information:* Accredited did not exercise sufficient controls over brokers to prevent them from pressuring appraisers to appraise to certain values, causing larger numbers of inflated (and hence worthless) appraisals. Because of the credit problems of certain of the borrowers, the appraisals were extremely important and the omission of the information about weakness in the appraisal process was significant.

(c)     All of Accredited's prospective mortgage brokers and correspondents are subjected to a pre-approval process, including verification that all required licenses are current, and are required to sign agreements pursuant to which they represent and warrant compliance with Accredited's underwriting guidelines and all applicable laws and regulations. Accredited periodically reviews each of its mortgage broker's and correspondent's performance relative to issues disclosed by Accredited's quality control review, and discontinues relationships with unacceptable performers.

*Omitted Information:* Due to Accredited's lack of controls over its brokers, there was very little review of the underwriting process. It was, in fact, the opposite since brokers were compensated for getting loans approved – not disapproved – and there were little or no consequences to the broker if the loan subsequently went bad.

**Ownit Mortgage Solutions, Inc.**

52.     The Prospectus Supplements made false statements about the underwriting practices of Ownit Mortgage Solutions, Inc. ("Ownit") which was the key originator in Mortgage Trust Series 2006-HE2. The Prospectus Supplement dated June 23, 2006, for Series 2006-HE2, stated:

(a)     The underwriting guidelines and credit matrices of the RightLoan are designed to be used as a guide in determining the credit worthiness of the borrower and his/her ability to repay. The guidelines, a reasonable loan amount and the RightLoan itself offer a solution that also facilitates making logical exceptions to those guides. Exceptions to the guidelines will be made if the loan meets the primary criteria of the RightLoan and offers supported compensating factors when a deviation occurs. In all cases, the exception(s) and compensating factor(s) are clearly documented in the file and require branch manager approval and a second signature from the corporate underwriter.

- 30 -

Using the three components, capacity, credit and collateral, the underwriter analyzes the loan profile. Capacity, which is the borrower's ability to repay, is determined by cash flow. It must be clearly shown that the borrower has a proven, historical cash flow, which will support the requested loan amount. This approach anticipates that the loan is going to be repaid from the borrower's recurring cash inflows, not from the sale of the collateral. Job stability and length of time in current residence are also strong factors in determining a borrower's capacity. Continuity of employment is a strong factor in establishing the income used as a basis for repayment. Credit is the borrower's willingness to repay his or her debts according to the contractual agreements. The most valuable resource in determining the borrower's ability to repay is the credit report. Ownit underwriters will use the credit report and credit explanation letter when supplied in determining willingness. Ownit uses the credit score as a primary factor in determining the borrower's willingness to repay his or her debts. Collateral is defined as the asset pledged by the borrower to the lender. Collateral is a secondary source of repayment; cash flow is the primary source of repayment. Ownit will evaluate the property by reviewing uniform residential real estate appraisal reports, along with other data sources, to determine whether the collateral is sufficient to secure the mortgage.

The underwriter's objective is to analyze an application individually with the understanding that no single characteristic will approve or deny a loan. The underwriter must utilize the credit report, loan application, asset verifications, appraisal and all other supporting documents in determining credit worthiness and risk. Credit risk can be defined as, but is not restricted to, limited liquid assets or reserves, and derogatory credit history. The overall situation and profile of a borrower, including compensating factors, which may offset negative characteristics, must be taken into consideration in determining if the borrower is creditworthy. Credit worthiness is determined by the borrower's ability and willingness to repay his or her contractual debt and the value of the property securing the loan. A sufficient property value gives Ownit the ability to recover its investment if the loan defaults.

**Omitted Information:** In fact, Ownit did not adequately verify the borrower's ability to pay nor the property value underlying the loan. Within months of the 2006-HE2 offering, Ownit filed for bankruptcy, as Merrill Lynch demanded Ownit buy back $165 million in loans which had defaulted. Had Ownit performed underwriting as represented, this buy-back would not have been required. The former president of Ownit, William D. Dallas, subsequently acknowledged underwriting standards were loosened in 2006 to keep up volume. *The New York Times* reported: "For his part, Mr. Dallas acknowledges that standards were lowered, but he placed the blame at the feet of investors and Wall Street, saying they encouraged Ownit and other subprime lenders to make riskier

- 31 -

loans to keep the pipeline of mortgage securities well supplied. 'The market is paying me to do a no-income-verification loan more than it is paying me to do the full documentation loans,' he said. 'What would you do?'"

> (b)    The collateral value and amount of equity in the subject property are important factors in assessing the risk of a particular loan. All properties must conform to the neighborhood and be in average or better condition. Acceptable property type includes: 1-2 family, 3-4 family, condominiums, planned unit developments ("PUDs"), modular homes and leasehold properties. Emphasis is placed on property type, location and occupancy to determine risk associated with specific LTV and credit score. Maximum financing is not available for rural properties, neighborhoods with declining values, oversupply of housing and/or marketing time over 6 months, or properties at the low or high end of value range with no comparable sales in the immediate area. Maximum financing is also not available on transactions involving a gift of equity. All appraisals should conform to the Uniform Standards of Professional Appraisal Practices. Ownit requires the underwriter to review all appraisals for content and accuracy, pulling additional data if available or warranted. Certain types of transactions require an enhanced desk or field review. Loan amounts in excess of $650,000 require a second full appraisal. The minimum square footage is 700 and deferred maintenance must be cosmetic in nature, not resulting in a health or safety hazard and should not exceed $3,500 cost to cure.

*Omitted Information:* Ownit did not exercise sufficient controls over brokers to prevent them from pressuring appraisers to appraise to certain values, causing larger numbers of inflated (and hence worthless) appraisals. Because of the credit problems of certain of the borrowers, the appraisals were extremely important and the omission of the information about weakness in the appraisal process was significant.

## FALSE STATEMENTS ABOUT UNDERWRITING OF THE LOANS GENERALLY

53.    The Registration Statements and Prospectus Supplements also misrepresented the general origination practices of the sellers and originators.

54.    The January 26, 2006 Prospectus Supplement filed by defendants with the SEC in connection with the sale of Alternative Loan Trust Series 2006-A1 stated:

- 32 -

The weighted average Loan-to-Value Ratio at origination of the Mortgage Loans in the Aggregate Pool is approximately 73.45%, and no Mortgage Loan in the Aggregate Pool had a Loan-to-Value Ratio at origination exceeding 100.00%

55.     The statement detailed above was false and misleading as the appraisal manipulations occurring at the origination stage, whereby appraisals were inflated or issued with only minimal effort, caused the loan-to-value ratio to be understated, meaning the Aggregate Pool was riskier than represented.

56.     In the Alternative Loan Trust Series 2006-A1 Prospectus Supplement defendants detailed "General Underwriting Guidelines," stating:

A lender may also originate mortgage loans pursuant to alternative sets of underwriting criteria under reduced or limited documentation programs. These programs are designed to facilitate the loan approval process. Under these programs, certain documentation concerning income/employment and asset verification is reduced or excluded. Loans underwritten under these programs are generally limited to borrowers who have demonstrated an established ability and willingness to repay the mortgage loans in a timely fashion. Permitted maximum loan-to-value ratios under these programs are generally more restrictive than those under the lender's standard underwriting criteria.

*Omitted Information*: The alternative underwriting criteria used to make the underlying mortgage loans was not limited to borrowers with a demonstrated ability/willingness to pay, nor was it combined with more restrictive loan-to-value ratios. In fact, these "alternative sets of underwriting criteria" were routinely extended to borrowers with poor credit histories, misstated income and misstated assets, and were used to issue loans which were not "more restrictive," but rather were expansive, with an emphasis on getting loans closed.

57.     The Alternative Loan Trust Series 2006-A1 Prospectus Supplement also stated:

From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's underwriter. Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions.

- 33 -

***Omitted Information***:  Exceptions to underwriting policies were not limited to situations involving "careful consideration" of "mitigating factors," but rather loans outside the underwriting standards were made as a matter of course without consideration of mitigating factors.

58.     The Alternative Loan Trust Series 2006-S3 Prospectus Supplement dated June 29, 2006 stated:

> REPRESENTATIONS    BY    SELLERS    OR    ORIGINATORS; REPURCHASES
>
> Each seller or originator of loans that are included in a trust fund for a series of securities will have made representations and warranties in respect of the loans sold by that seller or originated by that originator.  Unless otherwise specified in the related prospectus supplement, the representations and warranties typically include the following:
>
> *        *        *
>
> - The terms of the mortgage note and mortgage have not been impaired, waived, altered or modified in any respect, other than by a written instrument which has been recorded . . . .

***Omitted Information***:  The misrepresentations in the mortgage loan file represent a "waiver" of the terms of the mortgage or deed of trust.  The discovery of such a waiver may have occurred based on the servicing history and records for the mortgage loan.

59.     The Alternative Loan Trust Series 2006-S3 Prospectus Supplement also stated:

> REPRESENTATIONS    BY    SELLERS    OR    ORIGINATORS; REPURCHASES
>
> Each seller or originator of loans that are included in a trust fund for a series of securities will have made representations and warranties in respect of the loans sold by that seller or originated by that originator.  Unless otherwise specified in the related prospectus supplement, the representations and warranties typically include the following:
>
> *        *        *
>
> - No required payment on a loan was delinquent more than the number of days specified in the related prospectus supplement . . . .

- 34 -

*Omitted Information*:  Loans with early payment defaults that were transferred to the trust would be potentially over the no-more-than 30-days-delinquent requirement for the individual mortgage loans and represented mortgage loans that were defective.

60.    The Alternative Loan Trust Series 2006-S3 Prospectus Supplement stated:

REPRESENTATIONS    BY    SELLERS    OR    ORIGINATORS;
REPURCHASES

Each seller or originator of loans that are included in a trust fund for a series of securities will have made representations and warranties in respect of the loans sold by that seller or originated by that originator.  Unless otherwise specified in the related prospectus supplement, the representations and warranties typically include the following:

\*        \*        \*

•        All provisions of any primary mortgage insurance ["PMI"] policies have been and are being complied with . . . .

*Omitted Information*:  There were pervasive misrepresentations in the mortgage loans which would render the PMI policy void.

61.    The Prospectus Supplement dated June 29, 2006 and the Pooling and Servicing Agreement dated June 1, 2006 for Alternative Loan Trust Series 2006-S3 stated:

(a)    Supplement to the Prospectus:

REPRESENTATIONS    BY    SELLERS    OR    ORIGINATORS;
REPURCHASES

Each seller or originator of loans that are included in a trust fund for a series of securities will have made representations and warranties in respect of the loans sold by that seller or originated by that originator.  Unless otherwise specified in the related prospectus supplement, the representations and warranties typically include the following:

\*        \*        \*

•        Each loan was made in compliance with, and is enforceable under, all applicable local, state and federal laws and regulations in all material respects . . . .

(b)    Pooling and Servicing Agreement:

– 35 –

Representations and Warranties of the Seller as to the Mortgage Loans.

The Seller hereby represents and warrants to the Trustee:

(xii) The Seller hereby represents and warrants that, as of the Closing Date, (i) no Mortgage Loan is subject to the Home Ownership and Equity Protection Act of 1994 or any applicable, similar federal, state or local statutes or regulations related to "high cost" mortgage loans or "predatory," "high cost," "threshold" or "covered" lending (as such terms are defined in the applicable statute or regulation); (ii) no Mortgage Loan is (w) a "High-Cost Home Loan" as defined in the New Jersey Home Ownership Act effective November 27, 2003, (x) a "High-Cost Home Loan" as defined in the New Mexico Home Loan Protection Act effective January 1, 2004, (y) a "High Cost Loan" or "Covered Loan" (as such terms are defined in the current S&P's LEVELS® Glossary), or (z) governed by the Georgia Fair Lending Act, if such Mortgage Loan was originated on or after October 1, 2002 through March 6, 2003, (iii) *each Mortgage Loan at origination complied in all material respects with applicable local, state and federal laws, including, but not limited to, applicable anti-predatory and abusive lending laws*, and (iv) each Mortgage Loan is a "qualified mortgage" within the meaning of 860G(a)(3) of the Code.

*Omitted Information*: The originators had violated certain regulations. For instance, under §5 of the FTC Act, 15 U.S.C. §45, "unfair or deceptive acts or practices" have been found in or affecting the commerce related to originating mortgage loans. Borrowers were steered by lenders or the lenders' agents toward using stated income or low documentation loans when the borrower could not qualify for a traditional loan. As a result there was "a mismatch between the needs and capacity of the borrower." Also, there were evasions of the Home Ownership Equity Protection Act ("HOEPA"). Stated income/stated asset mortgage loans, low documentation mortgage loans or no income documentation mortgage loans allowed lenders or lenders' agents to evade HOEPA regulations and state predatory regulations for refinance transactions, and engage in asset-based lending without concern for the ability of the borrower to repay the loan. Had the borrower correctly stated his/her income, the correct debt-to-income ratio would have been used in determining the type of loan a borrower would qualify for. Most likely the correct income would have resulted in a high debt-to-income ratio. A borrower with a high debt-to-income ratio as part of a refinance transaction would have either: (a) not qualified for a loan, or (b) could have been the subject of a loan with

characteristics governed by HOEPA. A high level of interest and/or points would have been charged

by a lender as compensation for the risk of approving a borrower with a high debt-to-income ratio.

By evading HOEPA and state predatory lending laws, the lenders of the mortgage loans did not

have to verify that the borrower had the capacity to repay a loan and asset-based lending could be

completed.

62.    The Prospectus Supplement dated June 29, 2006 for Alternative Loan Trust Series

2006-S3 stated:

> The master servicer or the trustee, if the master servicer is also the seller or
> originator, will promptly notify the relevant seller or originator of any breach of any
> representation or warranty made by it in respect of a loan which materially and
> adversely affects the interests of the securityholders in the loan. If the applicable
> seller or originator cannot cure a breach within the time period specified in the
> related prospectus supplement following notice from the master servicer or the
> trustee, as the case may be, then that seller or originator will be obligated either (1) to
> repurchase the loan from the trust fund at a price equal to 100% of its unpaid
> principal balance as of the date of the repurchase plus accrued interest on the unpaid
> principal balance to the first day of the month following the month of repurchase at
> the loan interest rate, less any advances or amount payable as related servicing
> compensation if the seller or originator is the master servicer, or (2) substitute for the
> loan a replacement loan that satisfies the criteria specified in the related prospectus
> supplement.

*Omitted Information*:  An adequate review of the servicing records associated with the mortgage

loans in general and a review of all mortgage loans with early payment defaults or delinquencies

would have triggered a breach of the representation and warranties.

63.    The Prospectus Supplement dated June 29, 2006 and the Pooling and Servicing

Agreement dated June 1, 2006 and filed July 14, 2006 for Alternative Loan Trust Series 2006-S3

stated:

> (a)    Supplement to the Prospectus:
>
> The Offered Certificates, other than the Class A-R Certificates and the Cap Contract
> component of the Component Certificates will represent qualified mortgages under
> Section 860G(a)(3) if acquired by a REMIC within the prescribed time periods of the
> Code.

(b)     Pooling and Servicing Agreement:

Representations and Warranties of the Seller as to the Mortgage Loans.

The Seller hereby represents and warrants to the Trustee:

\*          \*          \*

(xii) The Seller hereby represents and warrants that, as of the Closing Date, (i) no Mortgage Loan is subject to the Home Ownership and Equity Protection Act of 1994 or any applicable, similar federal, state or local statutes or regulations related to "high cost" mortgage loans or "predatory," "high cost," "threshold" or "covered" lending (as such terms are defined in the applicable statute or regulation); (ii) no Mortgage Loan is (w) a "High-Cost Home Loan" as defined in the New Jersey Home Ownership Act effective November 27, 2003, (x) a "High-Cost Home Loan" as defined in the New Mexico Home Loan Protection Act effective January 1, 2004, (y) a "High Cost Loan" or "Covered Loan" (as such terms are defined in the current S&P's LEVELS® Glossary), or (z) governed by the Georgia Fair Lending Act, if such Mortgage Loan was originated on or after October 1, 2002 through March 6, 2003, (iii) *each Mortgage Loan at origination complied in all material respects with applicable local, state and federal laws, including, but not limited to, applicable anti-predatory and abusive lending laws*, and (iv) *each Mortgage Loan is a "qualified mortgage" within the meaning of 860G(a)(3) of the Code.*

*Omitted Information*: Misrepresentations in the mortgage loans changed the status of the mortgage loans from "Qualified Loans" under tax code §860G(a)(3) to "Defective Qualified Loans" prior to their transfer to JP Morgan Acceptance, contradicting the representation in the Prospectus Supplements that all mortgage loans transferred to JP Morgan Acceptance were "Qualified Loans."

64.     JP Morgan Acceptance issued the following Registration Statements between July 2005 and November 2006, which Registration Statements were false and misleading and were used to issue billions of dollars in Certificates:

| REGISTRATION STATEMENTS DATE | REGISTRATION NO. | TRUST NO. |
|---|---|---|
| JULY 29, 2005 | 333-127020 | Alternative Loan Trust 2006-A1 Alternative Loan Trust 2006-S1 |
| FEBRUARY 8, 2006 | 333-130192 | Alternative Loan Trust 2006-A2 Alternative Loan Trust 2006-A3 Alternative Loan Trust 2006-A4 Alternative Loan Trust 2006-A5 Alternative Loan Trust 2006-A6 |

Alternative Loan Trust 2006-A7
Alternative Loan Trust 2006-S2
Alternative Loan Trust 2006-S3
Alternative Loan Trust 2006-S4
Mortgage Trust 2006-A3
Mortgage Trust 2006-A4
Mortgage Trust 2006-A5
Mortgage Trust 2006-A6
Mortgage Trust 2006-A7
Mortgage Trust 2006-ACC1
Mortgage Trust 2006-CH2
Mortgage Trust 2006-HE2
Mortgage Trust 2006-HE3
Mortgage Trust 2006-NC1
Mortgage Trust 2006-RM1
Mortgage Trust 2006-S2
Mortgage Trust 2006-WF1
Mortgage Trust 2006-WMC2
Mortgage Trust 2006-WMC3
Mortgage Trust 2006-WMC4
Mortgage Trust 2007-A1
Mortgage Trust 2007-A2
Mortgage Trust 2007-CH1
Mortgage Trust 2007-CH2
Mortgage Trust 2007-S1

## DISCLOSURES EMERGE ABOUT PROBLEMS WITH
## LOANS UNDERLYING THE CERTIFICATES

65.    On November 19, 2007, Moody's announced a downgrade of JP Morgan Acceptance

tranches:

Complete rating actions are as follows:

Issuer:    JP Morgan Alternative Loan Trust 2006-A1

Cl.    1-B-1,    Downgraded to Ba1, previously Baa2,
Cl.    1-B-2,    Downgraded to B1, previously Baa3.

Issuer:    JP Morgan Alternative Loan Trust 2006-S1

Cl.    3-B-1,    Downgraded to Baa3, previously Baa2,
Cl.    3-B-2,    Downgraded to Ba2, previously Baa3.

Issuer:    JP Morgan Alternative Loan Trust 2006-S2

Cl.    M-1    Currently Aa2 on review for possible downgrade,
Cl.    M-2    Downgraded to Baa2, previously A2,
Cl.    B-1,    Downgraded to Ba3, previously Baa2,

- 39 -

       Cl.     B-2,      Downgraded to B3, previously Baa3.

**Issuer:**    JP Morgan Alternative Loan Trust 2006-A2

| Cl. | 1-M-2, | Downgraded to A3, previously A2, |
|-----|--------|----------------------------------|
| Cl. | 1-B-1, | Downgraded to Ba2, previously Baa2, |
| Cl. | 1-B-1, | Downgraded to B1, previously Baa3. |

**Issuer:**    JP Morgan Alternative Loan Trust 2006-A3

| Cl. | 1-M-2, | Downgraded to A3, previously A2, |
|-----|--------|----------------------------------|
| Cl. | 1-B-1, | Downgraded to Baa3, previously Baa2, |
| Cl. | 1-B-2, | Downgraded to Ba2, previously Baa3. |

**Issuer:**    JP Morgan Alternative Loan Trust 2006-S3

       Cl.     B-3      Downgraded to Ba1, previously Baa3.

**Issuer:**    JP Morgan Alternative Loan Trust 2006-A4

       Cl.     B-2      Downgraded to Ba1, previously Baa3.

**Issuer:**    JP Morgan Alternative Loan Trust 2006-A5

| Cl. | 1-B-1 | Downgraded to Baa2, previously Baa1, |
|-----|-------|--------------------------------------|
| Cl. | 1-B-2 | Downgraded to Ba1, previously Baa2. |

**Issuer:**    JP Morgan Alternative Loan Trust 2006-A6

| Cl. | 1-M-2 | Downgraded to Baa1, previously A2, |
|-----|-------|------------------------------------|
| Cl. | 1-B-1 | Downgraded to Ba1, previously Baa2, |
| Cl. | 1-B-2 | Downgraded to Baa2, previously Baa3. |

**Issuer:**    JP Morgan Alternative Loan Trust 2006-A7

| Cl. | 1-M-1 | Currently Aa1 on review for possible downgrade, |
|-----|-------|-------------------------------------------------|
| Cl. | 1-M-2 | Currently Aa2 on review for possible downgrade, |
| Cl. | 1-M-3 | Currently Aa3 on review for possible downgrade, |
| Cl. | 1-M-4 | Currently Aa3 on review for possible downgrade, |
| Cl. | 1-M-5 | Downgraded to Baa1, previously A2, |
| Cl. | 1-B-1 | Downgraded to Ba1, previously Baa1, |
| Cl. | 1-B-2 | Downgraded to Ba3, previously Baa2. |

66. On January 31, 2008, Standard and Poor's indicated it would take negative action on hundreds of mortgage-backed securities. The following Series where included on Standard and Poor's listing:

Mortgage Trust 2007- CH1
Mortgage Trust 2006-ACC1
Mortgage Trust 2006-HE2
Mortgage Trust 2006-HE3
Mortgage Trust 2006-NC1
Mortgage Trust 2006-WF1
Mortgage Trust 2006-WMC2
Mortgage Trust 2006-WMC3
Mortgage Trust 2006-WMC4
Mortgage Trust 2006-RM1
Mortgage Trust 2006-CH2

67. The delinquency and foreclosure rates on the underlying mortgages have skyrocketed. The 60+ day delinquencies (including 60+, 30+ day delinquencies, foreclosures and REOs) have increased to as high as 17% of the pools. Some of the pools have 21% in foreclosure.

**FIRST CAUSE OF ACTION**

**Violations of §11 of the 1933 Act Against All Defendants
Except JP Morgan Acceptance**

68. Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein. For purposes of this Cause of Action, plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Cause of Action is based solely on claims of strict liability and/or negligence under the 1933 Act.

69. This Cause of Action is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants except JP Morgan Acceptance.

70. The Registration Statements for the Certificate offerings were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

- 41 -

71.     The Defendant Issuers (the defendants listed in ¶15) are strictly liable to plaintiffs and the Class for the misstatements and omissions.

72.     JP Morgan was the underwriter for the following issuances:

| | |
|---|---|
| J.P. Morgan Alternative Loan Trust 2006-A1 | J.P. Morgan Alternative Loan Trust 2006-A7 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | J.P. Morgan Alternative Loan Trust 2006-S1 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | J.P. Morgan Alternative Loan Trust 2006-S2 |
| J.P. Morgan Alternative Loan Trust 2006-A4 | J.P. Morgan Alternative Loan Trust 2006-S3 |
| J.P. Morgan Alternative Loan Trust 2006-A5 | J.P. Morgan Alternative Loan Trust 2006-S4 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | J.P. Morgan Mortgage Acquisition Trust 2006-A3 |
| J.P. Morgan Mortgage Acquisition Trust 2006-A4 | J.P. Morgan Mortgage Acquisition Trust 2006-A5 |
| J.P. Morgan Mortgage Acquisition Trust 2006-A6 | J.P. Morgan Mortgage Acquisition Trust 2006-A7 |
| J.P. Morgan Mortgage Acquisition Trust 2006-ACC1 | J.P. Morgan Mortgage Acquisition Trust 2006-CH2 |
| J.P. Morgan Mortgage Acquisition Trust 2006-HE2 | J.P. Morgan Mortgage Acquisition Trust 2006-HE3 |
| J.P. Morgan Mortgage Acquisition Trust 2006-NC1 | J.P. Morgan Mortgage Acquisition Trust 2006-RM1 |
| J.P. Morgan Mortgage Acquisition Trust 2006-S2 | J.P. Morgan Mortgage Acquisition Trust 2006-WF1 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC2 | J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC4 | J.P. Morgan Mortgage Acquisition Trust 2007-A1 |
| J.P. Morgan Mortgage Acquisition Trust 2007-A2 | J.P. Morgan Mortgage Acquisition Trust 2007-CH1 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH2 | J.P. Morgan Mortgage Acquisition Trust 2007-S1 |

73.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

74.     By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

75.     Plaintiffs acquired the Certificates pursuant and/or traceable to the Registration Statements and Prospectus Supplements.

76.     Plaintiffs and the Class have sustained damages. The value of the Certificates has declined substantially subsequent to and due to defendants' violations.

77.     At the time of their purchases of the Certificates, plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the summer of 2007. Less than one year has elapsed from the time that plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiffs filed this complaint. Less than three

years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time plaintiffs filed this complaint.

## SECOND CAUSE OF ACTION

### Violations of §15 of the 1933 Act Against the Individual Defendants and JP Morgan Acceptance

78.    Plaintiffs repeat and reallege each and every allegation contained above.

79.    This Cause of Action is brought pursuant to §15 of the 1933 Act against the Individual Defendants and JP Morgan Acceptance.

80.    Each of the Individual Defendants was a control person of JP Morgan Acceptance by virtue of his/her position as a director and/or senior officer of JP Morgan Acceptance.

81.    Each of the Individual Defendants was a culpable participant in the violations of §11 of the 1933 Act alleged in the Causes of Action above, based on their having signed or authorized the signing of the Registration Statements and having otherwise participated in the process which allowed the offerings to be successfully completed.

82.    JP Morgan Acceptance was the depositor for the offerings. The defendants named herein were responsible for routing payments from the borrowers to investors.

83.    JP Morgan Acceptance and the Individual Defendant prepared, reviewed and/or caused the Registration Statements and Prospectus Supplements to be filed and disseminated.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying plaintiffs as Class representatives;

B.    Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

- 44 -

C.    Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

DATED: March 26, 2008

    COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
    SAMUEL H. RUDMAN
    DAVID A. ROSENFELD

    SAMUEL H. RUDMAN

    58 South Service Road, Suite 200
    Melville, NY 11747
    Telephone: 631/367-7100
    631/367-1173 (fax)

    COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
    DARREN J. ROBBINS
    DAVID C. WALTON
    RANDALL J. BARON
    655 West Broadway, Suite 1900
    San Diego, CA 92101-3301
    Telephone: 619/231-1058
    619/231-7423 (fax)

    CAVANAGH & O'HARA
    WILLIAM K. CAVANAGH, JR.
    407 East Adams Street
    Springfield, IL 62701
    Telephone: 217/544-1771
    217/544-9894 (fax)

    **Attorneys for Plaintiffs**

I:\JP Morgan Alt\Pleadings\Cpt JP Morgan Acceptance_NY_State.doc

- 45 -

Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                       :

PLUMBERS' & PIPEFITTERS' LOCAL #562,     :   Index No. 5675/08
SUPPLEMENTAL PLAN & TRUST and PLUMBERS' & :
PIPEFITTERS' LOCAL #562 PENSION FUND, On  :
Behalf of Themselves and All Others Similarly Situated,  :   **STIPULATION**
                                            :   **EXTENDING TIME**
               Plaintiffs,               :

               -against-                  :

J.P. MORGAN ACCEPTANCE CORPORATION I, *et al.* :
                                            :
               Defendants.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

      IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned

counsel on behalf of the respective parties hereto, that the time within which defendants J.P.

Morgan Acceptance Corporation I, J.P. Morgan Securities Inc., David M. Duzyk, Louis

Schioppo Jr., and Christine E. Cole may answer, move, or otherwise respond to the Complaint is

extended until May 12, 2008.

Dated: New York, New York
      April 14, 2008

**RECEIVED**

APR 15 2008
**NASSAU COUNTY**
**COUNTY CLERK'S OFFICE**

Submitted by:

    COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP

By: _Samuel H. Rudman_
    Samuel H. Rudman
    David A. Rosenfeld
    58 South Service Road, Suite 200
    Melville, NY 11747
    (631) 367-7100

    *Attorney for Plaintiffs*

SIDLEY AUSTIN LLP

By:

A. Robert Pietrzak
Patrick M. McGuirk
Dorothy J. Spenner
787 Seventh Avenue
New York, NY 10019
(212) 839-5300

*Attorneys for Defendants J.P. Morgan
Acceptance Corporation I, J.P. Morgan
Securities Inc., David M. Duzyk, Louis
Schioppo Jr., and Christine E. Cole*

2

Exhibit C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

PLUMBERS' & PIPEFITTERS' LOCAL #562   :
SUPPLEMENTAL PLAN & TRUST and   :   Index No. 5675/08
PLUMBERS' & PIPEFITTERS' LOCAL #562   :
PENSION FUND, On Behalf of Themselves   :
and All Others Similarly Situated,   :

                    Plaintiffs,   :   **NOTICE OF FILING OF**
  :   **NOTICE OF REMOVAL**

     vs.   :

J.P. MORGAN ACCEPTANCE CORPORATION I,   :
J.P. MORGAN ALTERNATIVE LOAN TRUST
2006-A1, J.P. MORGAN ALTERNATIVE LOAN   :
TRUST 2006-A2, J.P. MORGAN ALTERNATIVE
LOAN TRUST 2006-A3, J.P. MORGAN   :
ALTERNATIVE LOAN TRUST 2006-A4, J.P.
MORGAN ALTERNATIVE LOAN TRUST 2006-   :
A5, J.P. MORGAN ALTERNATIVE LOAN TRUST
2006-A6, J.P. MORGAN ALTERNATIVE LOAN   :
TRUST 2006-A7, J.P. MORGAN ALTERNATIVE
LOAN TRUST 2006-S1, J.P. MORGAN   :
ALTERNATIVE LOAN TRUST 2006-S2, J.P.
MORGAN ALTERNATIVE LOAN TRUST 2006-S3, :
J.P. MORGAN ALTERNATIVE LOAN TRUST   :
2006-S4, J.P. MORGAN MORTGAGE
ACQUISITION TRUST 2006-A3, J.P. MORGAN   :
MORTGAGE ACQUISITION TRUST 2006-A4, J.P.   :
MORGAN MORTGAGE ACQUISITION TRUST   :
2006-A5, J.P. MORGAN MORTGAGE
ACQUISITION TRUST 2006-A6, J.P. MORGAN   :
MORTGAGE ACQUISITION TRUST 2006-A7, J.P.   :
MORGAN MORTGAGE ACQUISITION TRUST
2006-ACC1, J.P. MORGAN MORTGAGE   :
ACQUISITION TRUST 2006-CH2, J.P. MORGAN   :
MORTGAGE ACQUISITION TRUST 2006-HE2,
J.P. MORGAN MORTGAGE ACQUISITION   :
TRUST 2006-HE3, J.P. MORGAN MORTGAGE
ACQUISITION TRUST 2006-NC1, J.P. MORGAN   :
MORTGAGE ACQUISITION TRUST 2006-RM1,   :

  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Caption continues on following page.

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
J.P. MORGAN MORTGAGE ACQUISITION          :
TRUST 2006-S2, J.P. MORGAN MORTGAGE        :
ACQUISITION TRUST 2006-WF1, J.P. MORGAN    :
MORTGAGE ACQUISITION TRUST 2006-WMC2,      :
J.P. MORGAN MORTGAGE ACQUISITION          :
TRUST 2006-WMC3, J.P. MORGAN MORTGAGE      :
ACQUISITION TRUST 2006-WMC4, J.P.          :
MORGAN MORTGAGE ACQUISITION TRUST          :
2007-A1, J.P. MORGAN MORTGAGE              :
ACQUISITION TRUST 2007-A2, J.P. MORGAN     :
MORTGAGE ACQUISITION TRUST 2007-CH1,       :
J.P. MORGAN MORTGAGE ACQUISITION          :
TRUST 2007-CH2, J.P. MORGAN MORTGAGE       :
ACQUISITION TRUST 2007-S1, J.P. MORGAN     :
SECURITIES INC., DAVID M. DUZYK, LOUIS     :
SCHIOPPO, JR., CHRISTINE E. COLE and EDWIN :
F. McMICHAEL,                              :
                                           :
                        Defendants.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

PLEASE TAKE NOTICE that on April 25, 2008, this action was removed from the

Supreme Court of the State of New York, Nassau County, to the United States District Court for

the Eastern District of New York.  Pursuant to 28 U.S.C. § 1446(d), this Court shall effect the

removal of this action to that court and shall proceed no further unless and until the case is

remanded to this Court.  A copy of the Notice of Removal filed with the United States District

Court for the Eastern District of New York is attached hereto.

Dated: New York, New York
    April 25, 2008

SIDLEY AUSTIN LLP

By: _____

A. Robert Pietrzak
Patrick M. McGuirk
Dorothy J. Spenner
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

*Attorneys for Defendants J.P. Morgan
Acceptance Corporation I, J.P. Morgan
Securities Inc., David M. Duzyk, Louis
Schioppo, Jr., Christine E. Cole, and
Edwin F. McMichael*

3

## CERTIFICATE OF SERVICE

I, Akash R. Desai, hereby certify that on April 25, 2008, I caused a true and correct copy

of the foregoing Notice of Removal, with exhibits annexed thereto, to be served by the method

indicated below upon:

Samuel H. Rudman, Esq.                                    (by hand delivery)
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173

Darren J. Robbins                                        (by Federal Express)
David C. Walton
Randall J. Baron
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

William K. Cavanagh, Jr.                                 (by Federal Express)
Cavanagh & O'Hara
407 East Adams Street
Springfield, IL 62701
Telephone: (217) 544-1771
Facsimile: (217) 544-9894

Attorneys for Plaintiffs

_____
Akash R. Desai

## CERTIFICATE OF SERVICE

I, Akash R. Desai, hereby certify that on April 25, 2008, I caused a true and correct copy

of the foregoing Notice of Removal, with exhibits annexed thereto, to be served by the method

indicated below upon:

Samuel H. Rudman, Esq.                                      (by hand delivery)
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile:  (631) 367-1173

Darren J. Robbins                                          (by Federal Express)
David C. Walton
Randall J. Baron
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: (619) 231-1058
Facsimile:  (619) 231-7423

William K. Cavanagh, Jr.                                   (by Federal Express)
Cavanagh & O'Hara
407 East Adams Street
Springfield, IL 62701
Telephone: (217) 544-1771
Facsimile:  (217) 544-9894

Attorneys for Plaintiffs

                                          _____
                                                  Akash R. Desai