UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PLUMBERS' & PIPEFITTERS' LOCAL #562 SUPPLEMENTAL PLAN & TRUST, et al., On Behalf of Themselves and All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>     v.<br><br>J.P. MORGAN ACCEPTANCE CORPORATION I, et al.,<br><br>     Defendants. | Civil Action No. 08-cv-1713 (ERK) (WDW) (Consolidated with 09-cv-3209)<br><br>**ECF Case**<br><br>DEMAND FOR JURY TRIAL |

**CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

Page

I.      SUMMARY OF THE ACTION ............................................................. 1

II.     JURISDICTION AND VENUE ............................................................ 5

III.    PARTIES ............................................................................................ 5

IV.     BACKGROUND ................................................................................ 10

        A.      The Structuring Of Mortgage Pass-Through Certificates ..................................... 10

        B.      Assessing The Quality Of Mortgage Pass-Through Certificates ......................... 15

        C.      The Depositor's Certificate Offerings ................................................................. 17

        D.      The Rating Agencies' Role In The Securitization Process .................................... 18

V.      THE OFFERING DOCUMENTS CONTAINED MATERIAL
        MISSTATEMENTS AND OMISSIONS REGARDING STATED
        UNDERWRITING STANDARDS ............................................... 27

        A.      The Chase Originators ............................................................... 31

        B.      Countrywide Home Loans ........................................................ 38

        C.      ResMAE Mortgage Corp. ........................................................ 45

        D.      New Century Mortgage Corp. .................................................. 49

        E.      Wells Fargo Bank, N.A. ........................................................... 51

        F.      Additional Originators ............................................................. 56

VI.     THE OFFERING DOCUMENTS CONTAINED MATERIAL
        MISSTATEMENTS AND OMISSIONS REGARDING APPRAISAL
        STANDARDS AND LTV RATIOS ............................................ 62

VII.    THE OFFERING DOCUMENTS CONTAINED MATERIAL
        MISSTATEMENTS AND OMISSIONS REGARDING CREDIT
        ENHANCEMENT ...................................................................... 70

VIII.   THE OFFERING DOCUMENTS CONTAINED MATERIAL
        MISSTATEMENTS AND OMISSIONS REGARDING THE
        CERTIFICATES' RATINGS ...................................................... 71

        A.      The Ratings Were Based On Inaccurate Mortgage Loan Data ............................ 73

        B.      The Rating Agencies Relied On Outdated Models ............................................. 74

IX.      EACH OFFERING DOCUMENT  CONTAINED COMMON
         MATERIAL MISSTATEMENTS AND OMISSIONS.................................................. 82

X.       THE COLLAPSE OF THE CERTIFICATES' PERFORMANCE AND
         VALUE ............................................................................................................................ 84

XI.      CLASS ACTION ALLEGATIONS ........................................................................... 88

XII.     STANDING ................................................................................................................. 89

FIRST CAUSE OF ACTION ............................................................................................... 90

SECOND CAUSE OF ACTION .......................................................................................... 92

THIRD CAUSE OF ACTION .............................................................................................. 94

RELIEF REQUESTED.......................................................................................................... 96

JURY DEMAND ..................................................................................................................... 96

Lead Plaintiff, as defined in paragraph 1 below, alleges the following upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on the investigation of its counsel.  The investigation included, for example:  (i) review and analysis of the offering materials for the Certificates; (ii) interviews of witnesses with first-hand knowledge of the events alleged herein; (iii) examination of JPMorgan Chase & Co. ("JPMorgan") and other Defendants' Securities and Exchange Commission ("SEC") filings, press releases and other public statements; (iv) review and analysis of court filings cited herein;  (v) review and analysis of media reports, congressional testimony and related material; (vi) analysis of the SEC's Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies ("SEC Report"); and (vii) additional documents cited herein.  Many of the facts related to Lead Plaintiff's allegations are known only to the Defendants named herein, or are exclusively within their custody or control.  Lead Plaintiff believes that substantial additional evidentiary support for its allegations will be developed after a reasonable opportunity for discovery.

I.      SUMMARY OF THE ACTION

1.      The Public Employees' Retirement System of Mississippi ("Mississippi PERS" or "Lead Plaintiff") brings this securities class action individually, and on behalf of a class consisting of all persons or entities who purchased or otherwise acquired beneficial interests in the Certificates identified herein issued pursuant and/or traceable to Defendant J.P. Morgan Acceptance Corporation I's (the "Depositor") July 29, 2005 Registration Statement (Reg. No. 333-127020), as amended ("July 2005 Registration Statement"), its December 7, 2005 Registration Statement (Reg. No. 333-130192), as amended ("December 2005 Registration

Statement")[1] and the accompanying prospectuses and prospectus supplements (the "Class").

Lead Plaintiff asserts claims for violations of Sections 11, 12(a)(2) and 15 of the Securities Act

of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  This action involves solely

strict liability and negligence claims and does not allege fraud on the part of any Defendant.

2.     This action arises from the sale of $36.8 billion of mortgage-backed certificates

(the "Certificates") to Lead Plaintiff and the Class pursuant to the Offering Documents.  The

Certificates are securities entitling the holder to payments from pools of mortgage loans (the

"Mortgage Loans").  To facilitate the Certificates' sale, JPMorgan formed the Depositor for the

sole purpose of issuing mortgage-backed securities ("Mortgage-backed Securities" or "MBS").

The Certificates were sold in thirty-three (33) Offerings between May 23, 2006 and September

18, 2007 (collectively, the "Trusts" or "Issuing Trusts").

3.     J.P. Morgan Mortgage Acquisition Corporation (the "Sponsor") and its affiliates

purchased the underlying Mortgage Loans from at least 19 separate originators (the

"Originators"), including, among others:  J.P. Morgan Chase Bank, N.A. and Chase Home

Finance LLC (the "Chase Originators" or "Chase"); Countrywide Home Loans, Inc.

("Countrywide"); ResMAE Mortgage Corp. ("ResMAE"); New Century Mortgage Corp. ("New

Century"); Wells Fargo Bank, N.A. ("Wells Fargo"); Accredited Home Lenders, Inc.

("Accredited"); Ownit Mortgage Solutions ("Ownit"); American Home Mortgage Corp.

---

[1] The July 2005 Registration Statement and December 2005 Registration Statement are
collectively referred to as the "Registration Statements."  All citations to the July 2005
Registration Statement are to the August 15, 2005 amended Registration Statement on Form S-
3/A.  All citations to the December 2005 Registration Statement are to the April 3, 2006
amended Registration Statement on Form S-3/A.  The Registration Statements, Prospectuses
and each of the respective Prospectus Supplements are collectively referred to herein as the
"Offering Documents."  Throughout, all emphasis is added unless otherwise indicated.

("American Home"); Washington Mutual Mortgage Securities Corp. ("WaMu"); and GreenPoint Mortgage Funding, Inc. ("GreenPoint").

4.      Defendants Moody's Investor Services, Inc. ("Moody's"), a division of Moody's Corp.; McGraw-Hill Companies, Inc., through its division, Standard & Poor's Financial Services, Inc. ("S&P"); and Fitch Ratings, Inc. ("Fitch") (collectively the "Rating Agencies") provided ratings for the Certificates.  These ratings, which were expressly included in the Offering Documents, determined, in part, the price at which these Certificates were offered to Lead Plaintiff and the Class.  The Certificates were marketed to institutional investors—public pension funds, banks, insurance companies, and mutual funds—who were prohibited by regulation from purchasing securities not rated "investment-grade."[2]  Based on their purported analysis of the loan pools, the Rating Agencies initially rated over 90% of the Certificates AAA, or the safest investment.  As alleged below, these ratings were unjustifiably high.

5.      The Rating Agencies also held themselves out publicly as participating in structuring and rating the Certificates.  These activities—which were historically reserved for investment banks acting in their capacity as underwriters—departed substantially from the role the Rating Agencies traditionally played in financial markets.

6.      As further detailed below, the Offering Documents contained untrue statements of material fact and omitted material facts necessary to make the statements therein not misleading, regarding:  (1) the underwriting standards purportedly used in connection with the origination of

---

[2] S&P and Fitch's highest investment rating is "AAA," while Moody's highest investment rating is "Aaa."  These ratings signify the highest investment-grade and are considered to be of the "best quality"; commensurately, they carry the smallest degree of investment risk.  For S&P and Fitch, ratings of "AA," "A," and "BBB" represent high credit quality, upper-medium credit quality and medium credit quality, respectively.  Similarly, Moody's provides ratings of Aa, A, and Baa for the same categories.  Any instrument rated lower than BBB (or Baa for ratings provided by Moody's) is considered below investment-grade.

the underlying Mortgage Loans – *see* ¶¶ 62–162; (2) the appraisal standards used to evaluate the properties serving as collateral for the Mortgage Loans and the true loan-to-value ratios – *see* ¶¶ 163–182; (3) the sufficiency of the credit enhancement supporting each Offering – *see* ¶¶ 183–185; and (4) the processes and procedures the Rating Agencies employed to rate the Certificates – *see* ¶¶ 186–208.

      7.     The true facts that were misstated in or omitted from the Offering Documents include:

     (1)    The Originators systematically disregarded their stated underwriting standards when issuing loans to borrowers;

     (2)    The underlying mortgages were based on appraisals that overstated the value of the underlying properties and understated the loan-to-value ratios of the Mortgage Loans;

     (3)    The Certificates' credit enhancement features were insufficient to protect Certificate holders from losses because the underwriting deficiencies rendered the Mortgage Loans far less valuable than disclosed and the credit enhancement features were primarily the product of the Rating Agencies' outdated models.  As such, the level of credit enhancement necessary for the Certificates' risk to correspond to the pre-determined credit ratings was far less than necessary; and

     (4)    The Rating Agencies employed outdated assumptions, relaxed ratings criteria, and relied on inaccurate loan information when rating the Certificates.  S&P's models had not been materially updated since 1999 and Moody's models had not been materially updated since 2002.  These outdated models failed to account for the drastic changes in the type of loans backing the Certificates and the Originators' systemic disregard for their underwriting standards.  Furthermore, the Rating Agencies had conflicts of interest when rating the Certificates.

      8.     As a result, Lead Plaintiff and the Class purchased Certificates that were backed by collateral (*i.e.*, the Mortgage Loans) that was much less valuable and which posed greater risk of default than represented, were not of the "best quality" and were not equivalent to other investments with the same credit ratings.  Contrary to representations in the Offering Documents, the Certificates exposed purchasers to increased risk with respect to delinquencies, foreclosures and other forms of default on the Mortgage Loans.

9.     While roughly 90% of the Certificates were originally rated AAA, the Rating Agencies have now downgraded approximately 84% to "junk" status (below investment-grade). The Certificates are no longer marketable near the prices paid by Lead Plaintiff and the Class.

## II.     JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. § 1331.

11.     Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b) and (c).  Many of the acts and conduct complained of herein occurred in substantial part in this District, including the dissemination of the materially false and misleading statements complained of herein.  In addition, Defendants conduct business in this District.

12.     In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

## III.     PARTIES

13.     Lead Plaintiff (as defined previously) is a governmental defined benefit pension plan qualified under Section 401(a) of the Internal Revenue Code, and is the retirement system for nearly all non-federal public employees in the State of Mississippi.  Mississippi PERS provides retirement, death, and disability benefits to nearly all non-federal public employees in the State of Mississippi.  As of the close of the 2009 fiscal year, the system had over 373,000 active and retired members and $15 billion in net assets held in trust for pension benefits.  As reflected in its Certification, filed March 23, 2009 in this action, Mississippi PERS acquired Certificates pursuant to the Offering Documents.  Mississippi PERS purchased J.P. Morgan

Alternative Loan Trust 2006-A4 and J.P. Morgan Acquisition Trust 2006-RM1 directly from defendant J.P. Morgan Securities (defined below).  Mississippi PERS's purchases were as follows:

| Certificates Purchased | Date | Face Value | Price Per $1.00 of Face Value |
|---|---|---|---|
| J.P. Morgan Mortgage Trust 2006-A1 2A2 | 8/22/2006 | $8,800,000 | $0.993 |
| J.P. Morgan Mortgage Trust 2006-A3 7A1 | 4/13/2006 | $4,635,000 | $0.976 |
| J.P. Morgan Mortgage Trust 2006-A5 2A1 | 4/5/2007 | $3,530,000 | $1.005 |
| J.P. Morgan Mortgage Trust 2007-A1 6A1 | 5/14/2007 | $5,760,000 | $0.982 |
| J.P. Morgan Alternative Loan Trust 2006-A4 A7 | 7/27/2006 | $5,000,000 | $1.003 |
| J.P. Morgan Acquisition Trust 2006-WMC3 A3 | 8/22/2006 | $5,200,000 | $1.000 |
| J.P. Morgan Acquisition Trust 2006-RM1 A2 | 9/21/2006 | $3,600,000 | $1.000 |
| J.P. Morgan Acquisition Trust 2006-CH2 AV2 | 7/26/2007 | $300,000 | $0.997 |

14.     As detailed in its Certification, Mississippi PERS sustained damage as a result of its purchases.  For example, Mississippi PERS purchased Certificates from J.P. Morgan Alternative Loan Trust 2006-A4 Trust at a price of $1.003 that it later sold at a price of $0.400. Additionally, Mississippi PERS purchased Certificates from J.P. Morgan Mortgage Trust 2007-A1 Trust at a price of $0.982 that it later sold at a price of $0.810.

15.     Defendant J.P. Morgan Securities Inc. ("J.P. Morgan Securities") is a Delaware corporation with its principal place of business located at 270 Park Avenue, New York, New York 10017.  J.P. Morgan Securities engages in investment banking activities in the U.S. and is

the primary nonbank subsidiary of JPMorgan.  Its services include debt and equity underwriting, advice on mergers and acquisitions and restructuring, securities dealing and brokerage, and trade execution services, such as market making, equity derivatives, and structured investments, for institutional clients.  J.P. Morgan Securities acted as the "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11).  As the sole underwriter, J.P. Morgan Securities participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Lead Plaintiff and the Class.

16.     Defendant J.P. Morgan Acceptance Corporation I (previously defined as the "Depositor"), a Delaware corporation incorporated on June 27, 1988, is a direct, wholly-owned subsidiary of J.P. Morgan Securities Holdings LLC and served in the role of "Depositor" in the securitization of the Issuing Trusts.  The Depositor was the "Issuer" of the Certificates within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4).  The principal executive offices of the Depositor are located at 270 Park Avenue, New York, New York 10017.  The Depositor filed the following Registration Statements with the SEC on Form S-3, as subsequently amended on Form S-3/A as follows:

| Date Filed | Form Type | Registration Statement No. | Amount Registered |
|---|---|---|---|
| July 29, 2005 | S-3 | 333-127020 | $1,000,000 |
| August 15, 2005 | S-3/A | 333-127020 | $20,000,000,000 |
| December 7, 2005 | S-3 | 333-130192 | $1,000,000 |
| February 8, 2006 | S-3/A | 333-130192 | $1,000,000 |
| March 13, 2006 | S-3/A | 333-130192 | $1,000,000 |
| March 31, 2006 | S-3/A | 333-130192 | $55,957,035,908 |

17.     Defendant David M. Duzyk ("Duzyk") was, during the relevant period, a Director and the President of the Depositor.  Defendant Duzyk signed the July 2005 Registration Statement and the December 2005 Registration Statement.

18.     Defendant Louis Schioppo, Jr. ("Schioppo") was, during the relevant period, the Controller and Chief Financial Officer ("CFO") of the Depositor.  Defendant Schioppo signed the July 2005 Registration Statement and the December 2005 Registration Statement.

19.     Defendant Christine E. Cole ("Cole") was, during the relevant period, a Director of the Depositor.  Defendant Cole signed the July 2005 Registration Statement and the December 2005 Registration Statement.

20.     Defendant Edwin F. McMichael ("McMichael") was, during the relevant period, a Director of the Depositor.  Defendant McMichael signed the July 2005 Registration Statement and the December 2005 Registration Statement.

21.     Defendants Duzyk, Schioppo, Cole and McMichael are collectively referred to herein as the "Individual Defendants."

22.     Defendant The McGraw-Hill Companies, Inc. is a New York corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York 10020.  Standard & Poor's ("S&P," as defined previously), a division of The McGraw-Hill Companies, provides credit ratings, risk evaluation, investment research and data to investors. S&P acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11).  S&P participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Lead Plaintiff and other Class members.  In addition, S&P analyzed certain Certificate offerings to address the likelihood of the receipt of all distributions on the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.  The Complaint does not allege that S&P acted as an expert within the meaning of the Securities Act, 15 U.S.C. § 77k(a)(4).

23.     Defendant Moody's Corp. is a Delaware corporation with its principal place of business located at 250 Greenwich Street, New York, New York 10007.  Moody's Investors Service, Inc. ("Moody's," as defined previously), a division of Moody's Corp., provides credit ratings, research and risk analysis to investors.  Moody's acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11).  Moody's participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Lead Plaintiff and other Class members.  In addition, Moody's analyzed certain Certificate offerings to address the likelihood of the receipt of all distributions on the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.  The Complaint does not allege that Moody's acted as an expert within the meaning of the Securities Act, 15 U.S.C. § 77k(a)(4).

24.     Defendant Fitch, Inc., doing business as Fitch Ratings, is a credit rating agency with its principal offices located at One State Street Plaza, New York, New York 10004.  Fitch provides credit ratings, research and risk analysis to investors.  Fitch acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11).  Fitch participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Lead Plaintiff and other Class members.  In addition, Fitch analyzed certain Certificate offerings to address the likelihood of the receipt of all distributions on the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.  The Complaint does not allege that Fitch acted as an expert within the meaning of Securities Act, 15 U.S.C. § 77k(a)(4).

25.     The Rating Agencies are not being sued herein pursuant to Section 11(a)(4) of the Securities Act as persons who prepared or certified the ratings portion of the Registration

Statements since, pursuant to Securities Act Rule 436(g), the ratings assigned to a class of debt securities shall not be considered part of the Registration Statement "prepared or certified by a person within the meaning of Section 11 of the Securities Act."  Instead, the Rating Agencies acted as underwriters and control persons within the meaning of Sections 11 and 15 of the Securities Act.

26.      Non-defendant J.P. Morgan Acquisition Corp. ("JPM Acquisition"), a Delaware corporation incorporated on July 12, 2002, is a direct, wholly-owned subsidiary of JPMorgan Chase Bank, N.A., and served in the role of "Sponsor" in the creation of the Issuing Trusts and securitization of the Mortgage Loans.  The principal executive offices of JPM Acquisition are located at 270 Park Avenue, New York, New York 10017.

27.      Non-defendant JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), a national banking association, is a wholly-owned bank subsidiary of JPMorgan Chase & Co., a Delaware corporation whose principal office is located in New York, New York.  JPMorgan Chase is a commercial bank offering a wide range of banking services to its customers both domestically and internationally.  It is chartered, and its business is subject to examination and regulation, by the Office of the Comptroller of the Currency.  JPMorgan Chase's main office is located in Columbus, Ohio.  It is a member of the Federal Reserve System and its deposits are insured by the Federal Deposit Insurance Corporation.  JPMorgan Chase acted as the "Servicer" in the securitization of the Issuing Trusts.

IV.     BACKGROUND

A.      The Structuring Of Mortgage
        Pass-Through Certificates

28.      Mortgage pass-through certificates are securities in which the holder's interest represents an equity interest in the "issuing trust."  The pass-through certificates entitle the

holder to payments from pools of mortgage loans.  Although the structure and underlying collateral of the mortgages vary, the basic principle is the same.

29.     First, a "depositor" acquires an inventory of loans from a "sponsor/seller," who either originated the loans or acquired the loans from other loan originators, in exchange for cash.  The type of loans in the inventory may vary, including conventional, fixed or adjustable rate mortgage loans (or mortgage participations), secured by first liens, junior liens, or a combination of first and junior liens, with various lifetimes to maturity.  The depositor then transfers, or deposits, the acquired pool of loans to the issuing trust entity.

30.     The depositor then securitizes the pool of loans so that the rights to the cash-flows from the inventory can be sold to investors.  The securitization transactions are structured such that the risk of loss is divided among different levels of investment, or "tranches."  Tranches are related MBS offered as part of the same pass-through certificate offering, each with a different level of risk and reward.  Any losses to the underlying loans, due to default, delinquency or otherwise, are applied in reverse order of seniority as set forth in the offering materials.  As such, the most senior tranches of pass-through certificates are often rated as the best quality, or "AAA."  Junior tranches, which usually obtain lower ratings, ranging from "AA" to "BBB-," are less insulated from risk, but offer greater potential returns.

31.     However, as the performance of the mortgage loans declines, even the most-senior tranches are exposed to a greater likelihood of loss as the "credit enhancement" provided by the subordinate tranches is eroded.  Once the losses on the lower-ranking tranches reach a certain point the senior certificates will begin experiencing cash flow shortfalls too.  Even if the senior certificates do not immediately experience cash flow shortfalls, the deterioration in the collateral backing the certificates makes the senior certificates more risky.

32.     By working together, the underwriters, the depositor, and the rating agencies are able to ensure that each particular mortgage pass-through certificate tranche will receive a pre-determined rating by pre-determined rating agencies at the time of offering.  Once the tranches are established, the issuing trust passes the certificates back to the depositor, who then passes the certificates to one or more underwriters.  The underwriters offer the various certificates to investors, in exchange for cash that will be passed back to the depositor, minus any fees owed to the underwriters.



33.     Each purchased or acquired certificate represents an equity interest in the issuing trust and the right to future payments of principal and interest on the underlying loans.  Those payments are collected by the loan servicer and distributed, through the issuing trust, to investors at regular distribution intervals throughout the life of the loans.  Mortgage pass-through certificates are offered to the public pursuant to a registration statement and prospectus in accordance with the provisions of the Securities Act.

34.     The Depositor created and structured the Issuing Trusts to issue billions of dollars of Certificates pursuant to the Offering Documents.  For each offering, the Depositor served as the "depositor" and JPM Acquisition served as the "sponsor."  The following chart identifies: (1) each Issuing Trust; (2) the date of its Registration Statement; (3) the date of its Prospectus; (4) the date of its Prospectus Supplement; (5) the aggregate principal balance of its Certificates;

(6) the Originator(s) of the Mortgage Loans; and (7) the Rating Agency that provided ratings for its Certificates.

| Issuing Trust | Registration Statement | Prospectus | Prospectus Supplement | Aggregate Principal Balance | Originator(s) | Rating Agencies |
|---|---|---|---|---|---|---|
| J.P. Morgan Alternative Loan Trust 2006-A1* | July 2005 | 8/25/2005 | 2/24/2006 | $859,434,100 | Chase/ PHH/ WaMu | Fitch Moody's S&P |
| J.P. Morgan Alternative Loan Trust 2006-A2* | December 2005 | 4/24/2006 | 4/27/2006 | $1,100,267,100 | Chase/ Countrywide/ GreenPoint/ M&T/ PHH | Fitch Moody's S&P |
| J.P. Morgan Alternative Loan Trust 2006-A3* | December 2005 | 4/24/2006 | 6/28/2006 | $612,028,300 | American Home/ Chase | Fitch Moody's S&P |
| J.P. Morgan Alternative Loan Trust 2006-A4 | December 2005 | 4/24/2006 | 7/27/2006 | $944,150,100 | Chase/ Countrywide/ PHH | Moody's S&P |
| J.P. Morgan Alternative Loan Trust 2006-A5 | December 2005 | 9/21/2006 | 9/28/2006 | $1,003,625,100 | American Home/ Chase/ Countrywide/ GreenPoint/ PHH | Moody's S&P |
| J.P. Morgan Alternative Loan Trust 2006-A6 | December 2005 | 9/21/2006 | 10/27/2006 | $902,801,100 | Chase/ Countrywide/ PHH | Moody's S&P |
| J.P. Morgan Alternative Loan Trust 2006-A7 | December 2005 | 9/21/2006 | 11/28/2006 | $1,162,982,100 | Chase/ Countrywide/ Flagstar/ PHH | Moody's S&P |
| J.P. Morgan Alternative Loan Trust 2006-S1* | July 2005 | 8/25/2005 | 2/24/2006 | $969,830,245 | Chase/ Countrywide/ GreenPoint/ PHH/ SunTrust | Fitch Moody's S&P |
| J.P. Morgan Alternative Loan Trust 2006-S2* | December 2005 | 4/24/2006 | 4/24/2006 | $491,759,100 | GreenPoint/ M&T/ SunTrust | Moody's S&P |
| J.P. Morgan Alternative Loan Trust 2006-S3* | December 2005 | 4/24/2006 | 6/29/2006 | $1,112,003,100 | Countrywide/ GreenPoint/ M&T/ PHH | Moody's S&P |
| J.P. Morgan Alternative Loan Trust 2006-S4 | December 2005 | 9/21/2006 | 11/28/2006 | $866,231,100 | Chase/ Countrywide/ PHH | Moody's S&P |
| J.P. Morgan Mortgage Acquisition Trust 2006-ACC1* | December 2005 | 4/24/2006 | 5/26/2006 | $682,878,000 | Accredited | Fitch Moody's S&P |
| J.P. Morgan Mortgage Acquisition Trust 2006-CH2 | December 2005 | 9/21/2006 | 11/21/2006 | $1,964,153,000 | Chase | Fitch Moody's S&P |
| J.P. Morgan Mortgage Acquisition Trust 2006-HE2* | December 2005 | 4/24/2006 | 6/23/2006 | $508,790,000 | NovaStar/ Ownit | Fitch Moody's S&P |

| Issuing Trust | Registration Statement | Prospectus | Prospectus Supplement | Aggregate Principal Balance | Originator(s) | Rating Agencies |
|---|---|---|---|---|---|---|
| J.P. Morgan Mortgage Acquisition Trust 2006-HE3 | December 2005 | 9/21/2006 | 10/27/2006 | $780,239,000 | Fieldstone/ NovaStar/ ResMAE | Fitch Moody's S&P |
| J.P. Morgan Mortgage Acquisition Trust 2006-NC1* | December 2005 | 4/4/2006 | 4/5/2006 | $895,148,000 | New Century | Fitch Moody's S&P |
| J.P. Morgan Mortgage Acquisition Trust 2006-RM1 | December 2005 | 9/21/2006 | 9/21/2006 | $877,004,000 | ResMAE | Fitch Moody's S&P |
| J.P. Morgan Mortgage Acquisition Trust 2006-WF1 | December 2005 | 4/24/2006 | 8/29/2006 | $775,165,100 | Wells Fargo | Moody's S&P |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC2* | December 2005 | 4/24/2006 | 6/8/2006 | $1,221,445,000 | WMC | Fitch Moody's S&P |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | December 2005 | 4/24/2006 | 8/22/2006 | $920,327,000 | WMC | Fitch Moody's S&P |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC4 | December 2005 | 9/21/2006 | 12/15/2006 | $1,834,557,000 | WMC | Fitch Moody's S&P |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH1 | December 2005 | 2/26/2007 | 3/7/2007 | $1,799,009,000 | Chase | Fitch Moody's S&P |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH2 | December 2005 | 2/26/2007 | 3/7/2007 | $699,169,000 | Chase | Fitch Moody's S&P |
| J.P. Morgan Mortgage Trust 2006-A1* | July 2005 | 8/25/2005 | 1/26/2006 | $822,144,700 | Chase/ Countrywide/ CTX/ M&T/ PHH/ Wells Fargo | Fitch S&P |
| J.P. Morgan Mortgage Trust 2006-A3*† | December 2005 | 4/24/2006 | 4/25/2006 | $1,584,696,200 | Chase/ PHH | Fitch Moody's S&P |
| J.P. Morgan Mortgage Trust 2006-A4*† | December 2005 | 4/24/2006 | 5/25/2006 | $1,236,035,700 | Chase/ Countrywide/ PHH | Fitch Moody's |
| J.P. Morgan Mortgage Trust 2006-A5† | December 2005 | 4/24/2006 | 7/26/2006 | $1,354,967,000 | Chase/ PHH | Fitch Moody's |
| J.P. Morgan Mortgage Trust 2006-A6† | December 2005 | 9/21/2006 | 9/28/2006 | $908,227,000 | Chase/ Countrywide / PHH | Fitch Moody's |
| J.P. Morgan Mortgage Trust 2006-A7† | December 2005 | 9/21/2006 | 12/21/2006 | $913,619,000 | Chase/ PHH | Fitch Moody's |

14

| Issuing Trust | Registration Statement | Prospectus | Prospectus Supplement | Aggregate Principal Balance | Originator(s) | Rating Agencies |
|---|---|---|---|---|---|---|
| J.P. Morgan Mortgage Trust 2006-S2*† | December 2005 | 4/24/2006 | 6/27/2006 | $1,281,971,592 | Chase/ M&T | Fitch Moody's |
| J.P. Morgan Mortgage Trust 2007-A1† | December 2005 | 9/21/2006 | 1/25/2007 | $3,835,531,000 | Chase | Fitch Moody's S&P |
| J.P. Morgan Mortgage Trust 2007-A2† | December 2005 | 2/26/2007 | 3/28/2007 | $1,025,630,900 | Chase/ Countrywide/ PHH | Fitch Moody's S&P |
| J.P. Morgan Mortgage Trust 2007-S1† | December 2005 | 2/26/2007 | 3/28/2007 | $843,607,692 | Countrywide/ Quicken | Fitch Moody's S&P |

\*      The claims brought against the Rating Agencies herein exclude any claims related to purchases from these Issuing Trusts.
†      These Issuing Trusts were misidentified in the initial complaint filed March 26, 2008 as "J.P. Morgan Acquisition Trust."

B.      Assessing The Quality Of
        Mortgage Pass-Through Certificates

35.      Proper loan underwriting is critical to assessing the borrowers' ability to repay the loans, and a necessary consideration when purchasing and pooling loans.  If the loans pooled in the MBS were to suffer defaults and delinquencies in excess of the assumptions built into the certificate payment structure, the certificate's value diminishes because the risk of non-receipt of the cash flow from the certificates increases.

36.      Likewise, independent and accurate appraisals of the collateralized real estate are essential to ensure that the mortgage or home equity loan can be satisfied in the event of a default and foreclosure on a particular property.  An accurate appraisal is necessary to determine the likely price at which the foreclosed property can be sold and, thus, the amount of money available to pass through to certificate holders.

37.      An accurate appraisal is also critical to calculating the loan-to-value ("LTV") ratio, which is a financial metric commonly used to evaluate the price and risk of MBS and mortgage pass-through certificates.  The LTV ratio expresses the amount of the mortgage loan as a percentage of the value of the collateral property.  For example, if a borrower seeks to borrow $90,000 for a property that is appraised at $100,000, the LTV ratio is 90% ($90,000 divided by

$100,000). However, if the reasonable value of the property is $90,000—instead of an artificially inflated appraisal of $100,000—then the accurate LTV ratio would be 100% ($90,000 divided by $90,000).

38.     In general, as a loan's LTV ratio increases the borrower's likelihood of default also increases:

> The difference between the value of an asset and the principal balance of the loan is called the *borrower's equity*. When the LTV is less than [100%] [i.e., the value of the mortgaged property exceeds the amount borrowed], the borrower has positive equity in the asset and there is an incentive for the borrower not to default. Instead of defaulting, it would be an economic advantage for the borrower [or, in the case of foreclosure, the bank] to sell the asset and pay off the loan, pocketing the residual proceeds. A ratio greater than [100%] means that the amount borrowed exceeds the value of the asset and there is an incentive for the borrower to default.

Frank J. Fabozzi, et al., *Introduction to Structured Finance* 84 (2006).

39.     From the mortgage holder's perspective, a lower LTV ratio provides protection if the collateral property declines in value. For example, a loan with 80% LTV ratio will not risk a loss to the lender until the property underlying the loan drops more than 20%.

40.     A ratio greater than 100% could be caused by a variety of factors. An inflated appraisal could cause an excessive LTV ratio from the first day of the loan. If, as in the example in paragraph 37, a borrower seeks to borrow $90,000 for a property that has an accurately-appraised value of only $80,000, then the LTV ratio would be 112.5%. The borrower then would start with negative equity in the property, increasing the chance that he or she would simply "walk away" in an economic decline. Similarly, even a slight drop in housing prices might cause a loan with a high LTV ratio to exceed the value of the underlying collateral.

41.     Consequently, the LTV ratios of the loans underlying mortgage pass-through certificates are important to investors' assessment of the value of such certificates. Indeed,

prospectuses typically provide information regarding the LTV ratios and guarantee certain LTV ratio limits for the loans that will support the certificates.

      C.     <u>The Depositor's Certificate Offerings</u>

42.     On July 29, 2005, the Depositor filed a Form S-3 Registration Statement (No. 333-127020) with the SEC.  On August 15, 2005, the Depositor filed a Form S-3/A related to the same offering where Defendants indicated their intention to sell approximately $20 billion in mortgage pass-through certificates.  On December 7, 2005, the Depositor filed a Form S-3 Registration Statement (No. 333-130192) with the SEC.  On March 31, 2006, the Depositor filed a Form S-3/A related to the same offering where Defendants indicated their intention to sell approximately $56 billion in mortgage pass-through certificates, including approximately $16 billion of unsold securities from Registration Statement No. 333-127020.  (The March 31, 2006 Form S-3/A constituted a post-effective amendment to Registration Statement No. 333-127020.)

43.     The Certificates for all offerings were issued pursuant to the Registration Statements and an accompanying Prospectus, generally explaining the structure of the Issuing Trusts and providing an overview of the Certificates.  The Registration Statements were prepared by the Depositor, J.P. Morgan Securities and the Rating Agencies, and signed by the Individual Defendants.

44.     The Prospectuses, filed on August 25, 2005, April 4, 2006, April 24, 2006, September 21, 2006 and February 26, 2007, provided that the Issuing Trusts would offer a series of Certificates representing beneficial ownership interests in the related Issuing Trusts and that the assets of each trust would generally consist of a pool or pools of fixed or adjustable interest rate mortgage loans secured by a lien on a one- to four-family residential property.

45.     Subsequently, the Prospectus Supplements were filed with the SEC containing a further description of the mortgage pools underlying the Certificates.  The respective Prospectus

Supplements provided the specific terms of the particular Certificate series offering.  Each

Prospectus Supplement included tabular data concerning the loans underlying the Certificates,

including (but not limited to) the type of loans, the number of loans, the mortgage rate and net

mortgage rate, the aggregate scheduled principal balance of the loans, the purported original

weighted-average combined LTV ratio, and the geographic concentration of the mortgaged

properties.

46.     The Prospectus Supplements identified J.P. Morgan Acceptance Corporation I

(previously defined as the "Depositor") as the depositor for the Certificate offerings.  The

Registration Statements, and each of the respective Prospectus Supplements, identified JPM

Acquisition as the "Sponsor" for the Certificate offerings.  Further, the Prospectus Supplements

stated that "[t]he Sponsor selected the Mortgage Loans for sale to the Depositor from among its

portfolio of mortgage loans."  According to the Offering Documents, JPM Acquisition or its

affiliates acquired the Mortgage Loans from the Originators.

47.     J.P. Morgan Securities, as the Underwriter, sold the Certificates pursuant to the

Prospectus Supplements.  The Registration Statements incorporated by reference the

subsequently filed Prospectuses and Prospectus Supplements.

D.     The Rating Agencies' Role
       In The Securitization Process

48.     Fundamentally, the value for pass-through certificates depends on the ability of

borrowers to repay the principal and interest on the underlying loans and the adequacy of the

collateral in the event of default.  In this regard, rating agencies played an important role in the

sale of such securities to investors.

49.     Columbia professor Joseph Stiglitz, who won the 2001 Nobel Prize in Economic

Sciences, stated the following with regard to the recent crisis created by the proliferation of

mortgage-backed securities:  "I view the rating agencies as one of the key culprits. . . .  They were the party that performed the alchemy that converted the securities from F-rated to A-rated. The banks could not have done what they did without the complicity of the rating agencies."

50.     Each Registration Statement, Prospectus and Prospectus Supplement stated that it was "a condition to the issuance of the Offered Certificates" that they receive certain, specified ratings from the Rating Agencies.  *See, e.g.,* December 2005 Registration Statement (blank form J.P. Morgan Mortgage Trust Prospectus and Prospectus Supplement); Prospectus dated April 24, 2006 at 122; J.P. Morgan Alternative Loan Trust 2006-A4 Prospectus Supplement at S-62.  They also contained representations regarding the nature of the ratings, and the role of the Rating Agencies in the ratings process.  For example, the Offering Documents stated that the ratings addressed "the adequacy of the value of the trust fund assets and any credit enhancement with respect to that class and will reflect that rating agency's assessment solely of the likelihood that holders of a class of securities of that class will receive payments to which those securityholders are entitled under the related agreement."  December 2005 Registration Statement (blank form J.P. Morgan Mortgage Trust Prospectus); Prospectus dated April 24, 2006 at 123.  Further, the ratings took into consideration "the credit quality of the related mortgage pool, including ***any credit support providers, structural and legal aspects associated with such certificates,*** and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by such certificates."  J.P. Morgan Alternative Loan Trust 2006-A4 Prospectus Supplement at S-62; *see also* December 2005 Registration Statement (blank form J.P. Morgan Mortgage Trust Prospectus Supplement).

51.     Rather than rating the Certificates after the structure and composition of the loan pools underlying the Certificates were determined, the Rating Agencies structured the

Certificates from the beginning to conform to a specific set of pre-determined ratings, and engaged with the Sponsor and the Depositor to design all structural and legal aspects of the Certificates.  The Rating Agencies supposedly considered factors such as expected default rates and amount of losses, pool characteristics, and credit enhancement features, such as the structure of the tranches or guarantees from insurance companies against losses from default or prepayment.  By assuming this unique and necessary role, the Rating Agencies had direct and indirect participation in the Certificates' distribution to investors.

52.      As reflected in the chart below, over 90% of the Certificates were originally assigned the highest AAA ratings:

| Issuing Trust | Aggregate Principal Balance | Initially Rated AAA | % |
|---|---|---|---|
| J.P. Morgan Alternative Loan Trust 2006-A1 | $859,434,100 | $813,721,000 | 94.68% |
| J.P. Morgan Alternative Loan Trust 2006-A2 | $1,100,267,100 | $1,036,704,000 | 94.22% |
| J.P. Morgan Alternative Loan Trust 2006-A3 | $612,028,300 | $578,467,200 | 94.52% |
| J.P. Morgan Alternative Loan Trust 2006-A4 | $944,150,100 | $841,310,000 | 89.11% |
| J.P. Morgan Alternative Loan Trust 2006-A5 | $1,003,625,100 | $931,087,000 | 92.77% |
| J.P. Morgan Alternative Loan Trust 2006-A6 | $902,801,100 | $859,239,000 | 95.17% |
| J.P. Morgan Alternative Loan Trust 2006-A7 | $1,162,982,100 | $1,102,956,000 | 94.84% |
| J.P. Morgan Alternative Loan Trust 2006-S1 | $969,830,245 | $922,281,045 | 95.10% |
| J.P. Morgan Alternative Loan Trust 2006-S2 | $491,759,100 | $460,635,000 | 93.67% |
| J.P. Morgan Alternative Loan Trust 2006-S3 | $1,112,003,100 | $1,045,629,000 | 94.03% |

| Issuing Trust | Aggregate Principal Balance | Initially Rated AAA | % |
|---|---|---|---|
| J.P. Morgan Alternative Loan Trust 2006-S4 | $866,231,100 | $780,078,000 | 90.05% |
| J.P. Morgan Mortgage Acquisition Trust 2006-ACC1 | $682,878,000 | $519,159,000 | 76.03% |
| J.P. Morgan Mortgage Acquisition Trust 2006-CH2 | $1,964,153,000 | $1,685,372,000 | 85.81% |
| J.P. Morgan Mortgage Acquisition Trust 2006-HE2 | $508,790,000 | $415,066,000 | 81.58% |
| J.P. Morgan Mortgage Acquisition Trust 2006-HE3 | $780,239,000 | $606,398,000 | 77.72% |
| J.P. Morgan Mortgage Acquisition Trust 2006-NC1 | $895,148,000 | $731,845,000 | 81.76% |
| J.P. Morgan Mortgage Acquisition Trust 2006-RM1 | $877,004,000 | $708,903,000 | 80.83% |
| J.P. Morgan Mortgage Acquisition Trust 2006-WF1 | $775,165,100 | $696,312,000 | 89.83% |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC2 | $1,221,445,000 | $1,002,147,000 | 82.05% |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | $920,327,000 | $763,505,000 | 82.96% |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC4 | $1,834,557,000 | $1,522,902,000 | 83.01% |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH1 | $1,799,009,000 | $1,549,877,000 | 86.15% |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH2 | $699,169,000 | $585,868,000 | 83.79% |
| J.P. Morgan Mortgage Trust 2006-A1 | $822,144,700 | $793,880,700 | 96.56% |
| J.P. Morgan Mortgage Trust 2006-A3 | $1,584,696,200 | $1,501,263,200 | 94.74% |
| J.P. Morgan Mortgage Trust 2006-A4 | $1,236,035,700 | $1,146,214,800 | 92.73% |
| J.P. Morgan Mortgage Trust 2006-A5 | $1,354,967,000 | $1,257,770,900 | 92.83% |

| Issuing Trust | Aggregate Principal Balance | Initially Rated AAA | % |
|---|---|---|---|
| J.P. Morgan Mortgage Trust 2006-A6 | $908,227,000 | $849,372,000 | 93.52% |
| J.P. Morgan Mortgage Trust 2006-A7 | $913,619,000 | $848,765,000 | 92.90% |
| J.P. Morgan Mortgage Trust 2006-S2 | $1,281,971,592 | $1,227,930,111 | 95.78% |
| J.P. Morgan Mortgage Trust 2007-A1 | $3,835,531,000 | $3,664,434,000 | 95.54% |
| J.P. Morgan Mortgage Trust 2007-A2 | $1,025,630,900 | $931,294,200 | 90.80% |
| J.P. Morgan Mortgage Trust 2007-S1 | $843,607,692 | $820,291,592 | 97.24% |
| **TOTAL** | **$ 36,789,426,329** | **$33,200,677,748** | **90.25%** |

53.     In the April 2008 issue of *Mortgage Banking*, critics began to note the role of the

Rating Agencies in providing "structuring advice":

> But serious concerns have also been voiced by members of
> Congress about whether the CRAs' [Credit Rating Agencies]
> business model—where the large investment banks that underwrite
> mortgage-backed securities (MBS) and collateralized debt
> offerings actually pay to have their deals rated by the agencies, and
> the agencies in turn provide feedback to the underwriters on how
> to boost their deals' credit rating to the highly coveted triple-A
> status—may have prejudiced their objectivity and integrity.
>
> "It seems to me that the credit-rating agencies are playing both
> coach and referee," said Sen. Robert Menendez (D-New Jersey),
> during a September 2007 hearing by the Senate Banking
> Committee on the collapse of the subprime market.
>
> Critics also argue that the CRAs are actively involved in the
> structuring of RMBS and CDO deals, and thus can hardly claim
> that their ratings are merely "opinions" on the likelihood that a
> debt security might go into default—or, as one agency official has
> called them, "the world's shortest editorials."
>
> Joseph Mason, an associate professor of finance at Drexel
> University in Philadelphia and a former economist at the Office of
> the Comptroller of the Currency (OCC), says **it is indisputable that**

> **the CRAs provide underwriters with "active structuring advice" on how to get a triple-A credit rating for their deals.**  While the CRAs insist they're merely providing information to the investment bankers during the underwriting process, Mason says they're trying to draw "an artificial line between advice and communication."

54.     An article appearing in *The Financial Times* on October 17, 2008 entitled "When Junk Was Gold," addressed the unique role of the Rating Agencies in structured finance deals such as mortgage-backed securities:

> The first mortgage-backed bonds were created in the late 1980s, well before Clarkson's time, by a trader called "Lewie" Ranieri. Ranieri, the head of the mortgage trading desk at the former investment bank Salomon Brothers, was famous for the huge sums of money he netted for his employer and for the quantity of cheeseburgers he ate.  What he struck upon in structured finance was a process of pure alchemy:  a way of turning myriad messy mortgage loans into standardized, regimented and easy-to-assess bonds.

> Ranieri knew that the magic of structuring was in the packaging. Packaged in the right way, mortgages could come to create a huge, new tradable bond market.  And this is where the rating agencies came in.  Structured bonds, like any other bond, needed ratings in order to be sold.  But with a structured bond, the pools of debt could be built or modified in order to attain a particular rating. This wasn't a matter of disguising the risk, rather a way of reapportioning it and allowing investors with different risk appetites to buy the right product for them.  **"The rating is what gives birth to the structure in the first place," explains Sylvain Raynes, a financial modeling expert who was with Moody's in the 1990s, when Clarkson joined.  In some cases, the ratings are known before the bonds have even been inked.  "You start with a rating and build a deal around a rating," Clarkson told an investment magazine last year.**

55.     The July 2008 SEC Report discussed the Rating Agencies' unique role in influencing the structure of the securitization, particularly structuring the loan pool to obtain the highest credit ratings with the least credit enhancement:

> The three examined rating agencies generally followed similar procedures to develop ratings for subprime RMBS and CDOs.

> *The arranger of the RMBS initiates the ratings process by sending the credit rating agency a range of data on each of the subprime loans to be held by the trust (e.g., principal amount, geographic location of the property, credit history and FICO score of the borrower, ratio of the loan amount to the value of the property and type of loan:  first lien, second lien, primary residence*, secondary residence), the proposed capital structure of the trust and the proposed levels of credit enhancement to be provided to each RMBS tranche issued by the trust.

> *       *       *

> Typically, if the analyst concludes that the capital structure of the RMBS does not support the desired ratings, this preliminary conclusion would be conveyed to the arranger.  The arranger could accept that determination and have the trust issue the securities with the proposed capital structure and the lower rating or adjust the structure to provide the requisite credit enhancement for the senior tranche to get the desired highest rating.  Generally, arrangers aim for the largest possible senior tranche, i.e., to provide the least amount of credit enhancement possible, since the senior tranche—as the highest rated tranche—pays the lowest coupon rate of the RMBS' tranches and, therefore, costs the arranger the least to fund.

*Id.* at 7-8.

56.     In short, the Rating Agencies structured the Certificates and determined the proper amount of "credit enhancement."  These activities departed substantially from the role the Rating Agencies traditionally played in financial markets when they only published ratings that reflected the risk associated with a particular investment instrument.  These unique roles were necessary to the Certificates' distribution.  In fact, the rating of any particular MBS was critical to its issuance because regulations required many institutional investors, such as banks, mutual funds, and public pension funds, to hold only "investment-grade" securities.  Many MBS— including mortgage pass-through certificates—were specifically promoted to institutional investors.  Indeed, the Offering Documents stated that "[t]he securities will be sold primarily to institutional investors."  *See* Prospectus dated September 21, 2006 at 122.

57.     In addition to performing the necessary roles described above, the Rating Agencies exercised substantial control over many parties to the securitization transaction, including the Depositor.  For example, the Depositor's certificate of incorporation provided that it was prohibited from conducting "***any activities other than those related to issuing and selling one or more series of securities, acquiring and selling loans and mortgage-backed securities,*** serving as depositor of the trusts and engaging in activities incidental to the foregoing." Prospectus dated April 24, 2006 at 33.  As detailed herein, however, the Rating Agencies controlled whether pre-determined ratings would be assigned, and therefore whether the Certificates would be ultimately issued.  If the Rating Agencies did not assign the ratings in accordance with the representations in the Offering Documents, the Depositor could not legally issue, market or sell the Certificates.  The Rating Agencies, therefore, controlled the Depositor's sole corporate purpose—the sale of mortgage pass-through securities.

58.     The Rating Agencies also had the ability to control whether the pooling and servicing and master servicing agreements, which govern servicing on the Mortgage Loans, could be amended.  Each agreement could be amended by the depositor, the master servicer and the trustee, provided that the amendment would not adversely affect the interests of any certificate holder.  An amendment, however, was only deemed not to adversely affect the certificate holders if the person requesting the amendment obtained a letter from each Rating Agency stating that "the amendment will not result in the downgrading or withdrawal of the respective ratings then assigned to the related securities."  *Id.* at 75.

59.     The Rating Agencies also had the ability to control the composition of the assets held in the Issuing Trusts' accounts.  Specifically, the Offering Documents stated that the funds deposited in the reserve accounts could be invested in assets ranging from U.S. Treasuries to

guaranteed investment contracts.  Select securities and financial instruments, however, had to be assigned "one of the two highest ratings of each rating agency" and could "not result in the downgrading or withdrawal of the ratings then assigned to those securities by each rating agency rating those securities."  *Id.* at 56.

60.     The Rating Agencies controlled whether the master servicer could be merged or consolidated, and the master servicer's successor, as the Offering Documents prohibited any merger, consolidation or succession of the master servicer that would "adversely affect the then current rating or ratings of the class or classes of securities of that series that have been rated." *Id.* at 72.

61.     Additionally, the Rating Agencies controlled the composition of the loan pools underlying the Certificates subsequent to the closing date as they controlled the process whereby additional loans were added to each Issuing Trust.  Each "subsequent loan" was required to be underwritten in accordance with applicable "eligibility criteria" that were "determined in consultation with the applicable rating agency or rating agencies prior to the issuance of the related series of securities and are designed to ensure that if subsequent loans were included as part of the initial loans, the credit quality of the assets would be consistent with the initial rating or ratings of the securities of that series."  *Id.* at 67.  The Depositor was responsible for certifying that the eligibility criteria for these subsequent loans had been satisfied.  The Offering Documents stated:

> It is a condition precedent to the transfer of any subsequent loans
> to the trust fund that ***the applicable rating agency or rating***
> ***agencies, after receiving prior notice of the proposed transfer of***
> ***the subsequent loans to the trust fund, will not have advised the***
> ***depositor, the seller or the related trustee*** that the conveyance of
> the subsequent loans to the trust fund will result in a qualification,

modification or withdrawal of their current rating of any securities
of that series.

*Id.*

V.    THE OFFERING DOCUMENTS CONTAINED
      MATERIAL MISSTATEMENTS AND OMISSIONS
      REGARDING STATED UNDERWRITING STANDARDS

62.    The Offering Documents provided the "General Underwriting Guidelines" as well

as specific Originators' underwriting guidelines.  The purported goal of the stated underwriting

guidelines was "to evaluate the borrower's credit standing and repayment ability, and the value

and adequacy of the related mortgaged property as collateral."  Prospectus dated August 25,

2005 at 18.

63.    The "General Underwriting Guidelines" explained the process for determining the

borrower's financial information and credit history:[3]

> In general, a prospective borrower applying for a loan is required
> to fill out a detailed application designed to provide to the
> underwriting officer pertinent credit information.  As part of the
> description of the borrower's financial condition, the borrower
> generally is required to provide a current list of assets and
> liabilities and a statement of income and expenses, as well as an
> authorization to apply for a credit report which summarizes the
> borrower's credit history with local merchants and lenders and any

---

[3]  The following description of "General Underwriting Guidelines" is substantially similar to that
contained within each Registration Statement, Prospectus and Prospectus Supplement.  Some
Originators' underwriting guidelines were described solely by the "General Underwriting
Guidelines" contained in the Prospectus Supplements.  This occurred in the J.P. Morgan
Alternative Loan Trust 2006-A2 (M&T); J.P. Morgan Alternative Loan Trust 2006-A4 (Chase;
PHH); J.P. Morgan Alternative Loan Trust 2006-A5 (GreenPoint); J.P. Morgan Alternative Loan
Trust 2006-S1 (Countrywide; GreenPoint; PHH); J.P. Morgan Alternative Loan Trust 2006-S2
(GreenPoint); J.P. Morgan Alternative Loan Trust 2006-S3 (M&T; PHH); J.P. Morgan
Alternative Loan Trust 2006-S4 (PHH); J.P. Morgan Mortgage Acquisition Trust 2006-HE2
(NovaStar); J.P. Morgan Mortgage Acquisition Trust 2006-HE3 (Fieldstone); J.P. Morgan
Mortgage Trust 2006-A1 (Chase; M&T); J.P. Morgan Mortgage Trust 2006-A3 (PHH); J.P.
Morgan Mortgage Trust 2006-A6 (Countrywide); J.P. Morgan Mortgage Trust 2006-A7 (PHH);
J.P. Morgan Mortgage Trust 2007-A2 (Countrywide); J.P. Morgan Mortgage Trust 2007-S1
(Countrywide; Quicken).

> record of bankruptcy.  In most cases, an employment verification is
> obtained from an independent source (typically the borrower's
> employer), which verification reports, among other things, the
> length of employment with that organization, the current salary,
> and whether it is expected that the borrower will continue such
> employment in the future.  If a prospective borrower is self-
> employed, the borrower may be required to submit copies of
> signed tax returns.  The borrower may also be required to authorize
> verification of deposits at financial institutions where the borrower
> has demand or savings accounts.

J.P. Morgan Alternative Loan Trust 2006-A4 Prospectus Supplement at S-20.

      64.    The Mortgage Loans sometimes were originated pursuant to alternative sets of

underwriting criteria under reduced or limited documentation programs:

> The "alternative," "reduced," "stated income/stated assets" and "no
> income/no asset" programs generally require either alternative or
> less documentation and verification than do full documentation
> programs which generally require standard Fannie Mae/Freddie
> Mac approved forms for verification of income/employment, assets
> and certain payment histories.  Generally, an "alternative"
> documentation program requires information regarding the
> mortgagor's income (i.e., W-2 forms, tax returns and/or pay stubs)
> and assets (i.e., bank statements) as does a "full doc" loan,
> however, alternative forms of standard verifications are used.
> Generally, under both "full" and "alternative" documentation
> programs at least one year of income documentation is provided.
> Generally, under a "reduced documentation" program, either no
> verification of a mortgagor's stated income is undertaken by the
> originator or no verification of a mortgagor's assets is undertaken
> by the originator.  Reduced doc loans may also include loans
> having only one year of income verification and loans to
> mortgagors with acceptable payment histories and credit scores but
> no information or verification of the mortgagor's income.  Under a
> "stated income/stated assets" program, no verification of either a
> mortgagor's income or a mortgagor's assets is undertaken by the
> originator although both income and assets are stated on the loan
> application and a "reasonableness test" is applied.  Generally,
> under a "no income/no asset" program, the mortgagor is not
> required to state his or her income or assets and therefore, no
> verification of such mortgagor's income or assets is undertaken by
> the originator.  The underwriting for such mortgage loans may be

> based primarily or entirely on the estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score.

J.P. Morgan Alternative Loan Trust 2006-A4 Prospectus Supplement at S-20.

65.     The Registration Statements generally described these alternative sets of underwriting criteria:

> Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property as collateral.
>
>                           \*       \*       \*
>
> A lender may also originate mortgage loans pursuant to alternative sets of underwriting criteria under reduced or limited documentation programs.  These programs are designed to facilitate the loan approval process.  Under these programs, certain documentation concerning income/employment and asset verification is reduced or excluded.

July 2005 Registration Statement (blank form J.P. Morgan Mortgage Trust Prospectus Supplement); December 2005 Registration Statements (blank form J.P. Morgan Mortgage Trust Prospectus).

66.     However, the General Underwriting Guidelines made clear that these alternative standards were applied in a controlled manner to underwrite the risk in a predictable manner:

> These alternative sets of underwriting criteria are designed to facilitate the loan approval process.  ***Loans underwritten under these programs are generally limited to borrowers who have demonstrated an established ability and willingness to repay the mortgage loans in a timely fashion.***  Permitted maximum loan to value ratios under these programs are generally more restrictive than those under the lender's standard "full" documentation programs.

J.P. Morgan Alternative Loan Trust 2006-A4 Prospectus Supplement at S-21; *see also* July 2005 Registration Statement (blank form J.P. Morgan Mortgage Trust Prospectus Supplement) and

December 2005 Registration Statements (blank form J.P. Morgan Mortgage Trust Prospectus) (containing identical language to the above, except for omitting the words "'full' documentation").

67. According to the Registration Statements, exceptions to a lender's underwriting policies may only be made "after careful consideration of certain mitigating factors." July 2005 Registration Statement (blank form J.P. Morgan Mortgage Trust Prospectus Supplement) and December 2005 Registration Statements (blank form J.P. Morgan Mortgage Trust Prospectus).

68. Each Originator offered a variety of loans, from products such as "Full Documentation" loans (which might require full verification of the borrower's information and a strong credit score) to "No Income No Asset" loans (which might rely only on the applicant's credit score and the collateral of the property). However, the general representation remained the same: loan approval required assurance that, overall, the loan factors supported the loan's quality. As described below, the Offering Documents stated that where one loan factor was deficient, other loan factors were required to provide additional support for the loan.

69. Although each Originator has its own underwriting process, the basic structure was the same for each Originator. To determine a loan's quality, underwriters were supposed to review several common "loan factors": (1) the borrower's credit profile, as usually evidenced primarily by a FICO score;[4] (2) the borrower's financial information included in the loan application, as usually evidenced primarily by income, assets and employment data, which may or may not have been verified; and (3) the borrower's equity in the collateral. The relative importance of each of these factors could vary based on the underwriting standards required for

---

[4] FICO scores are credit bureau risk scores produced from models developed by Fair Isaac Corporation that are used by lenders and others to assess the credit risk of prospective borrowers or existing customers. *See* Fair Isaac Corp., Glossary of Credit Terms, http://www.myfico.com/CreditEducation/Glossary.aspx.

the particular loan product. As detailed below, some underwriting standards allowed borrowers to submit less documentation of their financial information on loan applications, but required correspondingly higher FICO scores and lower maximum LTV ratios (*i.e.,* greater borrower equity).

70.     The Offering Documents contained material misstatements and omissions regarding, *inter alia*, the Originators' underwriting process and standards by which the loans in the Issuing Trusts were originated. Indeed, as detailed below, the Originators systematically disregarded their stated underwriting standards in order to increase loan volume regardless of the borrower's ability to meet its obligations or the adequacy of the property to serve as collateral. These abuses of the underwriting process were prevalent and pervasive throughout the entire mortgage origination industry.

A.     <u>The Chase Originators</u>

71.     The Chase Originators originated the following Offerings: J.P. Morgan Alternative Loan Trust 2006-A1, J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2006-A3, J.P. Morgan Alternative Loan Trust 2006-A4, J.P. Morgan Alternative Loan Trust 2006-A5, J.P. Morgan Alternative Loan Trust 2006-A6, J.P. Morgan Alternative Loan Trust 2006-A7, J.P. Morgan Alternative Loan Trust 2006-S1, J.P. Morgan Alternative Loan Trust 2006-S4, J.P. Morgan Mortgage Trust 2006-A1, J.P. Morgan Mortgage Trust 2006-A3, J.P. Morgan Mortgage Trust 2006-A4, J.P. Morgan Mortgage Trust 2006-A5, J.P. Morgan Mortgage Trust 2006-A6, J.P. Morgan Mortgage Trust 2006-A7, J.P. Morgan Mortgage Trust 2006-S2, J.P. Morgan Mortgage Trust 2007-A1, J.P. Morgan Mortgage Trust 2007-A2, J.P. Morgan Acquisition Trust 2006-CH2, J.P. Morgan Acquisition Trust 2007-CH1, and J.P. Morgan Acquisition Trust 2007-CH2. The total value of loans principally originated by Chase was $15.6 billion. The total value of the Certificates in these Offerings was $25.8 billion.

31

The Rating Agencies have now downgraded the substantial majority of these Certificates to below investment-grade.

72.     The Offering Documents misrepresented and omitted material facts regarding the Chase Originators' underwriting standards.  Specifically, each Prospectus Supplement stated:

> The following is a description of the underwriting policies customarily employed by CHF [Chase Home Finance] with respect to residential mortgage loans which it originated during the period of origination of the Mortgage Loans.  The Mortgage Loans originated by JPMorgan Chase Bank, National Association during such period were also originated using such underwriting policies.  The Chase Originators have represented to the Seller that . . . the Chase Originator Mortgage Loans were originated generally in accordance with such policies.

J.P. Morgan Mortgage Trust 2006-A5 Prospectus Supplement at S-32.

73.     The Offering Documents specifically outlined the Chase Originators' guidelines, along with the corresponding safeguards:

> Pursuant to CHF's Reduced Documentation Program, written verification of the borrower's income is not required.  ***In order to qualify for the program, the borrower must satisfy a 20% down-payment requirement from the borrower's own assets. These assets are verified through bank statements and may be supplemented by third-party verification***.  A residential mortgage credit report, or "in file" report, is obtained and reviewed to determine the borrower's repayment history.  The maximum loan-to-value ratio of any mortgage loan originated under this program is approximately 80% (65% for "cash out" refinancings).
>
> Pursuant to CHF's Streamlined Refinance Program, verification and documentation of application information is reduced for borrowers who refinance fully amortizing mortgage loans serviced by CHF.  ***In order to qualify for this refinance program, the borrower must have demonstrated overall creditworthiness as defined in the program guides***.  In addition, a documented servicing record with respect to such borrower of at least 24 months must be available.  If there are multiple lenders during such 24 month period, CHF must have been the servicer for at least the most recent 12 months.

Pursuant to CHF's "No Doc" program, no employment information, sources of income, income amount or assets are disclosed. Additionally, employment verification is not required. *The underwriting for such mortgage loans is based primarily or entirely on a stronger credit profile (evidenced by a higher minimum FICO credit risk score), a lower maximum product limit and additional due diligence performed on the collateral*.

"Stated Income Stated Asset Program" (which is sometimes referred to as "Simply Signature") is CHF's "reactive" program. While income and assets are not verified, *eligibility and approval are determined by CHF's automated underwriting system and are based on a stronger borrower credit history and profile*.

J.P. Morgan Mortgage Trust 2006-A5 Prospectus Supplement at S-34.[5]

74.    The Chase Originators' underwriting guidelines allowed for exceptions on a limited basis:

> *From time to time*, exceptions and/or variances to CHF's underwriting policies may be made. *Such exceptions and/or variances may be made only if specifically approved on a loan-by-loan basis* by certain credit and-underwriting personnel of the CHF who have the authority to make such exceptions and/or variances. *Exceptions and/or variances may be made only after careful consideration of certain mitigating factors* such as borrower capacity, liquidity, employment and residential stability and local economic conditions.

J.P. Morgan Mortgage Trust 2006-A5 Prospectus Supplement at S-34.

75.    The statements in the Offering Documents related to the Chase Originators' underwriting standards contained material misstatements and omissions because, as described herein, the Chase Originators:  (1) systematically disregarded their stated underwriting standards and regularly made exceptions to their underwriting guidelines in the absence of sufficient compensating factors; and (2) largely disregarded appraisal standards and did not prepare

---

[5]  The description of the Chase Originators' Underwriting Guidelines is substantially similar to that contained within each Prospectus Supplement for Trusts containing Mortgage Loans originated by the Chase Originators.

appraisals in conformity with Fannie Mae or Freddie Mac appraisal standards, as discussed in detail in Section VI. below.

76.     Testifying under oath to the Financial Crisis Inquiry Commission on January 13, 2010, JPMorgan Chairman and CEO James Dimon read a prepared statement.  Mr. Dimon defended the company's financial practices, but admitted that:

> the underwriting standards of our mortgage business should have been higher.  We have substantially enhanced our mortgage underwriting standards, essentially returning to traditional 80 percent loan to value ratios and requiring borrowers to document their income.

Transcript of Hearing before the Financial Crisis Inquiry Commission, Jan. 13, 2010 at 14.  The problems admitted to by Mr. Dimon, which are corroborated and expanded upon by the Confidential Witnesses who provide additional information below, were pervasive and systemic at the Chase Originators.

77.     When Commissioner Holtz-Eagin asked whether JPMorgan conducted stress tests in order to prevent their exposure to these systematic risks and what risk management procedures were in place, Dimon replied:

> In mortgage underwriting, somehow we just missed, you know, that home prices don't go up forever and that it's not sufficient to have stated income in home [loans].

*Id.* at 60.

78.     Later, Dimon told Holtz-Eagin that the increase in Alt-A and subprime loan products allowed loans to be underwritten even if they were based on speculative or falsified data and produced in a sales-driven culture:

> I think it's also true there were some bad products and some bad actors and excess speculation.

*        *        *

34

> Well, I think as it turned out, you know, option ARMs were not a
> great product.  I think certain subprime, Alt-A products weren't
> great products.  I think there were some—there were some
> unscrupulous mortgage salesmen and mortgage brokers.  And, you
> know, some people missold.  And there was a lot of speculation,
> far too many people buying second and third homes using these
> things, as opposed to the place you're going to live.

*Id.* at 65-66.

79.     Finally, when Commissioner Thompson asked Mr. Dimon whether financial

regulators or the financial institutions were to blame, he accepted the fact that JPMorgan, along

with the rest of the industry, was responsible for their own actions.  In discussing what exactly

went wrong, Mr. Dimon explained:

> One of the surprising things about all these things—a lot of the
> things we all talked about—mortgages, SIVs, derivatives—they
> were all known.  They were not a secret out there.  No one put it all
> together.

*Id.* at 78.

80.     The Chase Originators also relied heavily on third parties to originate their loans.

For example, in J.P. Morgan Acquisition Trust 2006-CH2, roughly 24% of the Chase Home

Finance loans came through its call center, while the remainder of the loans came from its

wholesale, correspondence, and retail operations from third-party mortgage brokers.

81.     Mr. Dimon testified that these broker-loans performed markedly worse:  "We've

also closed down most—almost all of the business originated by mortgage brokers where ***credit***

***losses have generally been over two times worse*** than the business we originate ourselves."  *Id.*

at 14.  Further, "there were some unscrupulous mortgage salesmen and mortgage brokers."  *Id.* at

65.

82.     Confidential Witness ("CW") 1 is a former Senior Underwriter at Chase Home

Finance from March 2002 through January 2008.  While the underwriters processing a loan

application were supposed to apply their own judgment to decide whether to extend a loan, according to CW1 this was not the case.  Instead, management at Chase Home Finance would override the decisions of experienced underwriters:  there were "instances where underwriters were firm in their discomfort with the loan, but management would override the underwriter. During those times, the manager or management had to sign off on the loan or put notes in the file identifying why they were approving the loan."  CW1 stated that in 2006, 20% to 30% of the loans that were approved were approved only based on management overriding underwriters' initial rejection of the loans.

83.     When processing loans that required verification of assets, CW1 explained that "we really were not verifying them, what we would do is look to see if a borrower was making, say $15,000 a month, if that's [what] they were listing.  We would hope to see assets that would compare to or be comparable to that type of income."  At the same time, the underwriters were encouraged to make exceptions for the "reasonableness" of the stated income amounts on the applications.

84.     CW2 is a former employee of Chase Home Finance in California.  Between December 2002 and October 2007, CW2 was a Senior Processor, Junior Underwriter, and Compliance Controller.  CW2 stated that the loan processors weren't provided with all of the relevant borrower information:  "there was some information that was being withheld from us."

85.     Even the credit scores—which were the backbone of the underwriting process— were susceptible to manipulation.  CW2 stated that there were loan applications "where they kicked the wife off because she had bad credit.  If we had to run a credit report and her credit wasn't any good, we would just run under the guy's name six months later when they came back and reapplied for the loan."

86.     The prevalence of stated income loans also allowed for loan officers and applicants to manipulate the system.  As CW2 observed, loan officers told applicants what income would be necessary for the loan that the applicant wanted.  When CW2 told the loan officer that a "loan couldn't be approved because there was not sufficient income, the loan officer would come back and say, 'Oh they forgot about this income.' . . . [T]he [borrower] didn't have to tell you anything, you just knew what was going on."

87.     CW2 confirmed that they were encouraged to disregard any reasonableness test for the stated incomes and stated assets on the applications:  "they didn't want us to ask any questions whatsoever and we were to believe just what the person said on the application and their credit score."  In fact, CW2 was encouraged ***not*** to investigate or verify the information in the loan application:  "I checked out a job and [the borrower] just got laid off and stuff; and [the loan officer and manager] got all mad about that too.  They asked why did you have to do that, and I said we have to."

88.     Similarly, CW3, a former loan officer for Chase Home Finance from July 2004 until July 2005, knew that loans were approved even though the employment information stated on loan applications was manipulated to maximize income.  For example, "you had reduced documentation loans where you might provide a pay stub and the way around that was you would wait until the person had a really large check and provides that stub and that's what they would base their income off [of], that stub, so that person could have been working 30 hours for weeks and that one week he worked 60, so they submitted that stub; so there again you were set up to fail.  There were so many ways around things."

89.     The Chase Originators' systematic disregard for their underwriting guidelines led to dramatic downgrades of the Certificates where the Chase Originators acted as an originator.

Currently, approximately 88.1% of the Certificates that were initially rated AAA in the Trusts where the Chase Originators contributed more than 10% of the underlying Mortgage Loans have now been downgraded to below investment-grade.

B.      Countrywide Home Loans

90.      Countrywide originated Mortgage Loans in the following Offerings:  J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2006-A4, J.P. Morgan Alternative Loan Trust 2006-A5, J.P. Morgan Alternative Loan Trust 2006-A6, J.P. Morgan Alternative Loan Trust 2006-A7, J.P. Morgan Alternative Loan Trust 2006-S1, J.P. Morgan Alternative Loan Trust 2006-S3, J.P. Morgan Alternative Loan Trust 2006-S4, J.P. Morgan Mortgage Trust 2006-A1, J.P. Morgan Mortgage Trust 2006-A4, J.P. Morgan Mortgage Trust 2006-A6, J.P. Morgan Mortgage Trust 2007-A2, and J.P. Morgan Mortgage Trust 2007-S1.  The total value of the Countrywide Mortgage Loans was $3.5 billion.  The total value of the Certificates in these Offerings was $12.9 billion.  The Rating Agencies have now downgraded the majority of these Certificates below investment-grade.

91.      The Offering Documents contained the following statements regarding Countrywide's underwriting standards:

> Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

J.P. Morgan Alternative Loan Trust 2006-A4 Prospectus Supplement at S-23.

92.      Countrywide's underwriting guidelines also stated that exceptions "may be made if compensating factors are demonstrated by a prospective borrower" and that their "No Income No Asset" loans were "limited to borrowers with excellent credit histories" and were "generally eligible for sale to Fannie Mae or Freddie Mac."  *Id.* at S-23, S-27.

93.     The statements in the Offering Documents related to Countrywide's underwriting standards contained material misstatements and omissions because, as described herein, Countrywide:  (1) systematically disregarded its stated underwriting standards and regularly made exceptions to its underwriting guidelines in the absence of sufficient compensating factors. Despite assurances that reduced documentation loans were limited to borrowers with excellent credit histories, Countrywide routinely extended these loans to borrowers with weak credit histories; and (2) largely disregarded appraisal standards and did not prepare appraisals in conformity with Fannie Mae or Freddie Mac appraisal standards, as discussed in detail in Section VI. below.

94.     CW4, a Senior Underwriter in Roseville, California, from September 2002 to September 2006, stated that Countrywide would regularly label loans as "prime" even if made to unqualified borrowers (including those who had recently gone through a bankruptcy and were still having credit problems).  According to CW4, Countrywide's lending practices got riskier in 2006 and Countrywide was more lax in enforcing its underwriting policies during that year.

95.     According to CW5, an underwriter from Long Island, New York, between March 2000 and January 2007, Countrywide extended loans to individuals with increasing debt-to-income ratios.  Initially, Countrywide limited debt-to-income ratios to 38%, but this rose to 50%. According to CW5, Countrywide branch managers' compensation was tied to loan origination volume and not the quality of the loans.  Thus, according to CW5, branch managers pushed originators to sell more loans despite the riskiness of these loans.

96.     According to CW6, an underwriter for Countrywide in the Jacksonville, Florida, processing center between June 2006 and April 2007, as much as 80% of the loans originated involved significant variations from the underwriting standards that necessitated a signoff by

management.  CW6 stated that Countrywide was very lax when it came to underwriting guidelines.  Management pressured underwriters to approve loans and this came from "up top" because management was paid based, at least in part, on the volume of loans originated.  CW6's manager told CW6 to approve as many loans as possible and push loans through.  According to CW6, most loans declined by underwriters would "come back to life" when new information would "miraculously appear"—which indicated to CW6 that Countrywide was not enforcing its underwriting standards.

97.    On or about March 10, 2008, the FBI disclosed that it had initiated a probe into Countrywide's mortgage practices, including manipulation of the subprime and non-traditional loan markets, knowledge of and disregard for underwriting inaccuracies and misrepresentations, and Countrywide's specific instructions to underwriters not to scrutinize certain types of loans it issued.  Subsequently, on April 2, 2008, a Federal Bankruptcy Judge overseeing the proceedings of more than 300 Countrywide-related bankruptcies ordered a further inquiry into the misconduct, and specifically, the illegal inflation of fees throughout the loan process that had been occurring at Countrywide.

98.    On April 11, 2008, an amended complaint for violations of the federal securities laws was filed in federal court in the Central District of California against Countrywide.  *See Argent Classic Convertible Arbitrage Fund LP, et al. v. Countrywide Financial Corp., et al.*, No. 07-7097 (C.D. Cal.).  The complaint identified specific deviations from Countrywide's stated underwriting guidelines.  For example, in connection with the "No Income/No Asset Documentation Program," Countrywide represented that "[t]his program is limited to borrowers with excellent credit histories."  However, Countrywide routinely extended loans to borrowers with weak credit and knew that "low doc" or "no doc" loans, particularly when coupled with

40

nontraditional products like ARMs, likely contained misinformation from the borrower.  Because borrowers were advised that their representations would not be verified, Countrywide employees referred to these products as "liar loans."

99.     In addition, numerous Attorneys General have initiated investigations into Countrywide's lending practices and also have alleged that Countrywide systematically departed from its underwriting standards.

100.     The Illinois Attorney General initiated a lawsuit against Countrywide and Angelo Mozilo, Chairman of the Board and Chief Executive Officer through July 1, 2008, contending that the company and its executives sold borrowers costly and defective loans that quickly went into foreclosure.  *See The People of the State of Illinois v. Countrywide Financial Corporation, et al.*, No. 08CH22994 (Cook County Ch. Ct.), (the "Illinois AG Complaint").  Additionally, the Illinois AG Complaint alleges that Countrywide employees were incentivized to increase the number of loan originations without concern for whether the borrower was able to repay the loan.  Countrywide employees did not properly ascertain whether a potential borrower could afford the offered loan, and many of Countrywide's stated income loans were based on inflated estimates of borrowers' income.  For example, according to the Illinois AG Complaint:  (1) a Countrywide employee estimated that approximately 90% of all reduced documentation loans sold out of a Chicago office had inflated incomes; and (2) one of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications.  Furthermore, to supplement an employee's judgment as to whether a potential borrower's income was "reasonable," Countrywide required its employees to utilize a website, www.salary.com.  Even if the stated salary was outside of the

range provided by the website, Countrywide employees could still approve the loan.  The Illinois AG Complaint alleged that the "reasonableness" test contravened proper underwriting practices.

101.     As the Illinois Attorney General explained, "[t]his mounting disaster has had an impact on individual homeowners statewide and is having an impact on the global economy.  It is all from the greed of people like Mozilo."  *The New York Times* reported that the complaint, derived from 111,000 pages of Countrywide documents and interviews with former employees, "paints a picture of a lending machine that was more concerned with volume of loans than quality."  *See* Gretchen Morgenson, "Illinois to Sue Countrywide," *The New York Times,* June 25, 2008.

102.     California's Attorney General also commenced an investigation into Countrywide's lending activities and filed a complaint in the Northwest District of the Superior Court for Los Angeles County, entitled *The People of the State of California v. Countrywide Financial Corporation, et al.*, No. LC081846 (Los Angeles Super. Ct.) (the "California AG Complaint").  The California AG Complaint also alleged that Countrywide departed from its stated underwriting standards.  For example, the Complaint alleged that employees were incentivized to make exceptions to underwriting standards and failed to verify borrower documentation and information.  According to the California AG Complaint, Countrywide used a system called Countrywide Loan Underwriting Expert System ("CLUES"), to provide a loan analysis report that indicated whether the loan was within Countrywide's underwriting guidelines.  CLUES reports indicating a loan was not within Countrywide's underwriting guidelines often were ignored in order to effectuate the loan.

103.    Jerry Brown, California's Attorney General, stated: "Countrywide exploited the American dream of homeownership and then sold its mortgages for huge profits on the secondary market."

104.    Likewise, the Connecticut Attorney General filed a complaint in Superior Court, Judicial District of Hartford, entitled *State of Connecticut v. Countrywide Financial Corporation, et al.*, No. CV08-40390945 (Hartford Super. Ct.), alleging that Countrywide's employees inflated borrowers' incomes in order to qualify them for loans they otherwise would not have received.

105.    Investigations in other states such as Washington, West Virginia, Indiana and Florida confirmed many of the allegations in the Illinois, California and Connecticut complaints.

106.    On July 24, 2008, *The Los Angeles Times* reported that "three big Southland lenders (are) under federal investigation; Sources say IndyMac, Countrywide and New Century [have been] subpoenaed." *The Los Angeles Times* further reported that officials have begun to investigate the value of mortgage-backed securities:

> A federal grand jury in Los Angeles has begun probing three of the nation's largest subprime mortgage lenders in the clearest sign yet that prosecutors are investigating whether fraud and other crimes contributed to the mortgage debacle.
>
> Grand jury subpoenas have been issued in recent weeks and months to Countrywide Financial Corp., New Century Financial Corp. and IndyMac Federal Bank seeking a wide range of information, according to sources with direct knowledge of the subpoenas.
>
> **Officials have said they are beginning to investigate whether securities investors were defrauded about the value of subprime mortgages they purchased**, as well as other possible crimes such as insider trading by corporate officials who sold stock knowing their holdings were about to deflate in value.

107.     On September 30, 2008, MBIA Insurance Corp. ("MBIA") filed a complaint against Countrywide in New York state court, entitled *MBIA Insurance Corp. v. Countrywide, et al.*, No. 08/602825 (N.Y. Sup. Ct.).  The MBIA complaint alleges that Countrywide fraudulently induced it to provide insurance for certain investment certificates.  MBIA was able to obtain approximately 19,000 loan files related to loans backing securities it insured as a result of its contractual agreements with Countrywide.  After reviewing the portfolios and re-underwriting each loan provided by Countrywide, MBIA discovered that there was "an extraordinarily high incidence of material deviations from the underwriting guidelines Countrywide represented it would follow."  *Id.* at ¶ 78.  MBIA discovered that many of the loan applications "lack[ed] key documentation, such as a verification of borrower assets or income; include[d] an invalid or incomplete appraisal; demonstrate[d] fraud by the borrower on the face of the application; or reflect[ed] that any of borrower income, FICO score, or debt, or DTI [debt-to-income] or CLTV, fail[ed] to meet stated Countrywide guidelines (without any permissible exception)."  *Id.* at ¶ 79. Significantly, "MBIA's re-underwriting review . . . revealed that almost 90% of defaulted or delinquent loans in the Countrywide Securitizations show material discrepancies."

108.     On October 6, 2008, Countrywide settled lawsuits brought by eleven Attorneys General, for $8.4 billion.  The settlement provided a program by which existing loans would be modified:

> [B]orrowers were placed in the riskiest loans, including adjustable-rate mortgages whose interest rates reset significantly several years after the loans were made.  Pay-option mortgages, under which a borrower must pay only a small fraction of the interest and principal, thereby allowing the loan balance to increase, also are included in the modification.

109.     Countrywide's systematic disregard for its underwriting guidelines led to dramatic downgrades of the Certificates where Countrywide acted as a principal originator.

Currently, approximately 88.4% of the Certificates that were initially rated AAA in the Trusts where Countrywide contributed more than 10% of the underlying Mortgage Loans have been downgraded to below investment-grade.

> C.     ResMAE Mortgage Corp.

110.    ResMAE originated Mortgage Loans in the J.P. Morgan Acquisition Trust 2006-HE3 and J.P. Morgan Acquisition Trust 2006-RM1 Offerings.  The total value of the loans that ResMAE originated was $1.4 billion.  The total value of the Certificates in these Offerings was $1.7 billion.  The Rating Agencies have downgraded the majority of these Certificates below investment-grade.

111.    The Offering Documents contained the following statements regarding ResMAE's underwriting standards:

> The information set forth in this section contains a brief description of the underwriting guidelines used for Mortgage Loans originated by ResMAE Mortgage Corporation.
>
> *        *        *
>
> The underwriting standards of ResMAE are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.  ResMAE considers, among other things, a mortgagor's credit history, repayment ability and debt service-to income ratio (referred to herein as the "Debt Ratio"), as well as the value, type and use of the mortgaged property.
>
> *        *        *
>
> ResMAE has one underwriting program called the "TotalScore Program."  Within this underwriting program, there are three documentation types, the "Full Documentation," the "Limited Documentation" and the "Stated Income."  While each underwriting program is intended to assess the risk of default, the TotalScore Program makes greater use of credit bureau risk scores (referred to herein as the "Credit Bureau Risk Score").  The Credit Bureau Risk Score is used in conjunction with, among other factors, mortgage payment history and seasoning on bankruptcy

and/or foreclosure and as an aid to, not a substitute for, the underwriter's judgment. The underwriting staff fully reviews each loan to determine whether ResMAE's guidelines for income, assets, employment and collateral are met.

*     *     *

On a case by case basis, ResMAE may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address. A substantial portion of the Mortgage Loans represent such underwriting exceptions.

*     *     *

Under all programs, the income stated must be reasonable and customary for the applicant's line of work; also, a pre-closing audit is conducted to confirm that the borrower is employed as stated on the mortgage application.

*     *     *

The underwriting guidelines of ResMAE are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and generally require an appraisal of the mortgaged property which conforms to Freddie Mac and/or Fannie Mae standards, and if appropriate, a review appraisal. Generally, appraisals are provided by qualified independent appraisers licensed in their respective states. Review appraisals may only be provided by appraisers approved by the Originator. In most cases, ResMAE relies on a statistical appraisal methodology provided by a third-party. Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required in order to become approved to do business with ResMAE. Each Uniform Residential Appraisal Report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. The review appraisal may be a desk

46

> review, field review or an automated valuation report that confirms
> or supports the original appraiser's value of the mortgaged
> premises.

J.P. Morgan Acquisition Trust 2006-RM1 Prospectus Supplement at S-53–S-54.

112.    The statements in the Offering Documents related to ResMAE's underwriting

standards contained material misstatements and omissions because, as described herein,

ResMAE:  (1) systematically disregarded its stated underwriting standards and regularly made

exceptions to its underwriting guidelines in the absence of sufficient compensating factors; and

(2) largely disregarded appraisal standards and did not prepare appraisals in conformity with

Fannie Mae or Freddie Mac appraisal standards, as discussed in detail in Section VI. below.

113.    CW7 was a former area credit manager at ResMAE from 2004 through 2005.

CW7 stated that exceptions to ResMAE's underwriting guidelines accounted for "50 percent" of

all underwritten loans.  Exceptions were mostly requested by "loan officers and sales

[department employees]," who would often take the requests to sales managers for approval."

According to CW7, this created a "dangerous" "conflict of interest" between sales managers,

who had underwriting authority, and loan officers and sales employees who were paid on

commission.

114.    CW8, a former Senior Vice President of ResMAE from 2003 through 2006,

confirmed that "exceptions were not uncommon, there were [a] significant [amount of]

exceptions . . . as much as 50%."  Exceptions depended on "the quality of the individual doing

[the loan], everybody was incentivized by commissions to [generate a high loan] volume."

115.    CW9 was a former regional credit manager at ResMAE from March 2004 though

March 2007.  CW9 stated that she also saw "40% to 50%" of exceptions from the guidelines.

During her last six months of employment at ResMAE, CW9 saw a large percentage of

exceptions that she did not support, as compared to earlier in her career.  The reason for more

exceptions was purely out of "an effort to increase [loan] production," and staff was pressured to increase loan production.

116.    CW9 also noticed problems with stated income loans and appraisals, especially in 2005 and 2006.  According to CW9, she saw "fraud from appraisers, title companies and . . . borrowers.  Yeah, they were altering documents and that kind of stuff; that was very big in 2005 and 2006.  Especially the stated income, they would state that they made this income and they didn't, it was [a] misrepresentation."

117.    According to CW7, stated income loans that listed implausible incomes were "push[ed] . . . through" by the sales department.  "[T]hat's where things got ridiculous, because as underwriters you were told that things have to make sense, you can't have somebody that is a waitress that is making $5,000 a month and we would say we want to go 'full documentation' and sales would say 'no' and push it [the loan approval] through."

118.    CW7 also noted that she witnessed a lot of property flipping and a lot of "straw buyers" that would list the property as "owner occupied" on their loan applications when in fact it was not.  Underwriters were encouraged not to "dig [too] deep" when they suspected flipping was occurring.  There were even several instances where the property "didn't even exist, it was like a vacant lot, but yet we had an address and pictures, but when the review appraiser went out there was no property."

119.    ResMAE's systematic disregard for its underwriting guidelines led to dramatic downgrades of the Certificates where ResMAE acted as an originator.  Currently, approximately 81.5% of the Certificates that were initially rated AAA in the Trusts where ResMAE contributed more than 10% of the underlying Mortgage Loans have been downgraded to below investment-grade.

D.     New Century Mortgage Corp.

120.    New Century originated Mortgage Loans in the J.P. Morgan Acquisition Trust 2006-NC1 Offering.  The total value of the loans New Century principally originated was $895 million.  The Rating Agencies have now downgraded the majority of these Certificates below investment-grade.

121.    The Offering Documents contained the following statements regarding New Century's underwriting standards:

> The New Century Underwriting Guidelines are primarily intended to assess the borrower's ability to repay the related Mortgage Loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the Mortgage Loan. All of the Mortgage Loans were also underwritten with a view toward the resale of the Mortgage Loans in the secondary mortgage market.  While New Century's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, New Century also considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property.

> *       *       *

> The Mortgage Loans have been originated in accordance with the New Century Underwriting Guidelines.  On a case-by-case basis, exceptions to the New Century Underwriting Guidelines are made where compensating factors exist.  It is expected that a substantial portion of the Mortgage Loans will represent these exceptions.

> *       *       *

> An exception may be allowed if the application reflects compensating factors, such as:  low loan-to-value ratio; pride of ownership; a maximum of one 30 day late payment on all mortgage loans during the last 12 months; and stable employment or ownership of current residence of four or more years.  An exception may also be allowed if the applicant places a down payment through escrow of at least 20% of the purchase price of the mortgaged property or if the new loan reduces the applicant's monthly aggregate mortgage payment by 25% or more. Accordingly, a mortgagor may qualify in a more favorable risk

> category than, in the absence of compensating factors, would
> satisfy only the criteria of a less favorable risk category.  It is
> expected that a substantial portion of the Mortgage Loans will
> represent these kinds of exceptions.

J.P. Morgan Mortgage Acquisition Trust 2006-NC1 Prospectus Supplement at S-55.

122.    The above statements were materially false and misleading when made because they failed to disclose that New Century:  (i) systematically failed to follow its stated underwriting standards; (ii) allowed pervasive exceptions to its stated underwriting standards in the absence of compensating factors; and (iii) that "credit risk" and "quality control" were materially disregarded in favor of generating increased loan volume.

123.    New Century operated as one of the nation's largest mortgage finance companies until it collapsed and filed for bankruptcy.  On February 29, 2008, Michael J. Missal, Bankruptcy Court Examiner for New Century, issued a detailed report of the various deficiencies at New Century, including lax mortgage origination standards.  The Examiner's report detailed "serious loan quality issues at [New Century] beginning as early as 2004"; numerous "red flags" relating to loan quality; and the failure of New Century's senior management and board of directors to devote sufficient attention to improving loan quality until it "was too late to prevent the consequences of longstanding loan quality problems in an adversely changing market."

124.    Numerous confidential witnesses corroborate the Examiner's findings.  According to CW10, a former New Century fraud investigator and senior loan underwriter employed from January 1999 until April 2007 and who examined numerous New Century mortgage loans, New Century's problems began when it "started to abandon prudent underwriting guidelines" at the end of 2003 in order to "push more loans through" the system.  According to CW10, New Century, in effect, "stopped underwriting" and adopted an approach that the Company would be "okay if [it] could out run [its] delinquency rate."

125.    According to CW11, a former New Century Senior Vice President employed from July 2005 until April 2006 in Irvine, California, New Century could only meet its increasing year-over-year sales projections by reducing the underwriting standards.  According to CW11, the former Senior Vice President of New Century would approve just about any loan under New Century's "weak" underwriting standards.

126.    According to CW12, a former New Century underwriting unit manager employed from 1998 through October 2006, underwriting standards were loosened in order to increase sales volume.  According to CW12, exceptions to New Century's underwriting standards were "the norm" and employees were told to make loans "work."  At one meeting in the late spring of 2006, CW12 and other underwriters were told by their operations manager that the underwriters had to do what was necessary to increase volume.

127.    New Century's systematic disregard for its underwriting guidelines led to dramatic downgrades of the Certificates where New Century acted as an originator.  Currently, approximately 64.0% of the Certificates in J.P. Morgan Acquisition Trust 2006-NC1 that were initially rated AAA have been downgraded to below investment-grade.

E.    Wells Fargo Bank, N.A.

128.    Wells Fargo originated Mortgage Loans in the J.P. Morgan Acquisition Trust 2006-WF1 and J.P. Morgan Mortgage Trust 2006-A1 Offerings.  The total value of the loans Wells Fargo principally originated was $926 million.  The total value of these Offerings was $1.6 billion.  The Rating Agencies have downgraded the majority of these Certificates below investment-grade.

129.    The Offering Documents contained the following statements regarding Wells Fargo's underwriting standards:

Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral. The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (i.e., the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history. Wells Fargo Bank's guidelines for underwriting may vary according to the nature of the borrower or the type of loan, since differing characteristics may be perceived as presenting different levels of risk.

J.P. Morgan Mortgage Trust 2006-A1 Prospectus Supplement at S-40–S-41.

130.    Wells Fargo's guidelines also stated:

On a case-by-case basis, Wells Fargo Bank may make the determination that the prospective borrower warrants loan parameters beyond those shown above based upon the presence of acceptable compensating factors. Examples of compensating factors include, but are not limited to, loan-to-value ratio, debt-to-income ratio, long-term stability of employment and/or residence, statistical credit scores, verified cash reserves or reduction in overall monthly expenses.

J.P. Morgan Mortgage Acquisition Trust 2006-WF1 Prospectus Supplement at S-22.

131.    Wells Fargo's guidelines also stated:

***For transactions which are determined to be low-risk transactions, based upon the Mortgage Score and other parameters (including the mortgage loan production source), the lowest underwriting authority is generally required.*** For moderate and higher risk transactions, higher level underwriters and a full review of the mortgage file are generally required. Borrowers who have a satisfactory Mortgage Score (based upon the mortgage loan production source) are generally subject to streamlined credit review (which relies on the scoring process for various elements of the underwriting assessments). Such borrowers may also be eligible for a reduced documentation program and are generally permitted a greater latitude in the application of borrower debt-to-income ratios.

J.P. Morgan Mortgage Trust 2006-A1 Prospectus Supplement at S-41–S-40.

132.    The above statements were materially false and misleading when made because they failed to disclose that Wells Fargo:  (i) systematically failed to follow its stated underwriting standards; (ii) allowed pervasive exceptions to its stated underwriting standards in order to generate increased loan volume; and (iii) that "credit risk" and "quality control" were materially disregarded in favor of generating sufficient loan volume as alleged herein and as set forth below.

133.    CW13 was a former employee at Wells Fargo Home Mortgage who was employed as an Underwriter in Riverside, California, from July 2005 through December 2006 and as a Wholesale Underwriter in Huntington Beach, California from March 2009 through June 2009.  Prior to working at Wells Fargo Home Mortgage, CW13 worked at subprime lender Argent Mortgage Company, LLC.  According to a December 7, 2008 article in the *Miami Herald*, Argent employees actively assisted mortgage brokers in falsifying borrowers' financial information.  According to an Argent vice president, "the accuracy of loan applications was not a priority."  The *Miami Herald* examined the applications for 129 loans funded by Argent in Florida and "found at least 103 that contained false and misleading information" and "red flags: non-existent employers, grossly inflated salaries and sudden, drastic increases in the borrower's net worth."

134.    Upon CW13's arrival at Wells Fargo Home Mortgage, CW13 was "shocked" that Wells Fargo Home Mortgage was doing "the same things" as Argent.  CW13 noted that the "pressure from loan officers" to close loans was "intense."  Individuals that were "high producers" were treated favorably:  "Anything they said went.  Anytime an underwriter would overturn one of their loans, it would come back approved by a manager."  "The high producers

that everyone wanted to make happy, caused a lot of bad loans to go through."  CW13 added, "[t]here was a lot of coercion between loan officers and underwriters."

135.    According to CW13, Wells Fargo was approving so many stated income loans that it felt the same as CW13's previous subprime lending job.  CW13 remarked that "[t]he loan officers were stretching the truth.  They would say [to the borrower], 'You need to make this much.'  So of course, the borrower would say, 'Ok, I make that much.'"

136.    According to CW14, a former employee at Wells Fargo Home Mortgage in San Bernardino, California, Wells Fargo Home Mortgage made "tons" of exceptions to its underwriting guidelines.  CW14 was employed as an Underwriter from January 2002 through May 2005 and as a Senior Underwriter from May 2005 until April 2006.  CW14 estimated that 25-30% of the loans had exceptions, most commonly for LTV and the debt-to-income ratio of the borrower.  During CW14's tenure with Wells Fargo Home Mortgage, the frequency and type of exceptions "got more and more ridiculous."  For example, Wells Fargo Home Mortgage would loosen underwriting standards toward the end of the year in order to meet the origination goals.  CW14 stated that "if it got to be around December, they'd relax the guidelines to get more exceptions."  CW14 also noted that Wells Fargo Home Mortgage began to extend stated income loans to "everyone," including, in one instance, a landscaper claiming to have $15,000 in income per month.  CW14 added that "[w]e didn't always feel the [stated] income was reasonable for the stated job" and that "it got to the point where you could have a 620 FICO and get a stated loan."

137.    CW14 also described Wells Fargo Home Mortgage as a "loan-producing machine," and noted that there was pressure from management to close as many loans as possible, independent of their quality or lack thereof:  "[Managers] always said we didn't have to approve loans we didn't want to approve, but if you didn't do them you wouldn't be around very

long.  We knew what we had to do to keep our jobs."  CW14 remarked that "[s]ometimes it felt like I was in sales, because they wanted production, period."

138.    According to CW15, a former Mortgage Specialist and Pricing/Pipeline Administrator for Wells Fargo Home Mortgage in Frederick, Maryland, from February 2002 through November 2006, when CW15 left the Company, they had just begun implementing a program called "courageous underwriting," which CW15 described as "following the guidelines but also finagling the guidelines if it meant getting the loan approved."  "They wanted us to do anything we could to get loans closed.  That was the bottom line."  CW15's managers would "push [CW15] to push the loans through, especially if it was a time when our numbers weren't quite meeting our goals.  They they'd look at things with a little less scrutiny."  CW15 also noted that Wells Fargo relaxed the qualifying test for obtaining underwriting authority, which ensured that more loans would close.  CW15 stated that the test was "engineered" by Wells Fargo "so it was easy to pass."  According to CW15, if a test-taker answered any question incorrectly, he/she could simply log out and then log back in and start again an "unlimited" number of times.

139.    From 1995 through 2004, CW16, a former Wells Fargo Home Mortgage employee who was employed as a Quality Compliance Manager I in San Bernardino, California, from 1995 through 1998, Loss Mitigation Supervisor from 1999 through 2004, and an REO Supervisor from July 2006 through May 2008, worked with third-party originators, and noted that some of the information in the loans was "blatantly falsified."  CW16 noted that there were a lot of exceptions made to the underwriting guidelines and that some loan originators "said they verified employment and income, but after reverification we found out it was wrong, and they hadn't."  Exceptions were made for bank statements as well.  "I remember some bank statements were falsified."  CW16 said there was no indication these practices stopped after 2004.

140.    CW17, a former Wells Fargo Home Mortgage employee who worked as a Senior Mortgage Loan Underwriter in Rancho Bernardo, California, from November 2001 through June 2003, and a Home Mortgage Consultant in Newport Coast, California, from June 2003 through March 2008, stated that exceptions to the underwriting guidelines were made for "loan amounts, LTV, income, pretty much anything and everything—anything you could find to get a loan approved."

141.    CW18 is a former employee at Wells Fargo Home Mortgage in Denver, Colorado, and Springfield, Illinois.  CW18 was employed as a Wholesale Alternative Lending Operations Manager from 2003 through 2005 and as a Site Manager in retail underwriting from 2005 through 2007.  According to CW18, Wells Fargo Home Mortgage developed riskier products over the course of his employment.  The company went "from ultra-conservative, to trying to keep up with the market."  Around 2006, CW18 noted that Wells Fargo Home Mortgage began to offer "more and more types of products," including no-doc loans, which were the "most aggressive."

142.    Wells Fargo's systematic disregard for its underwriting guidelines led to dramatic downgrades of the Certificates where Wells Fargo acted as an originator.  Currently, approximately 75.2% of the Certificates that were initially rated AAA in the Trusts where Wells Fargo contributed more than 10% of the underlying Mortgage Loans have been downgraded to below investment-grade.

F.    Additional Originators

143.    In addition to the Originators identified above, the following entities also originated loans which were included in the Certificate pools:  WMC Mortgage Corp.; PHH Mortgage Corp.; M&T Mortgage Corp.; GreenPoint; NovaStar; Accredited; American Home;

CTX Mortgage Company LLC; Flagstar Bank, FSB; Mortgage, Inc.; Ownit; SunTrust Mortgage, Inc.; and WaMu (collectively the "Additional Originators").

144.    The Prospectus Supplements set forth the underwriting standards for each of the Additional Originators.  These statements were materially untrue and omitted material facts because originators industry-wide systematically failed to follow their stated underwriting guidelines.

145.    By way of background, the traditional mortgage model prior to 1994 involved a bank originating a loan and retaining the credit risk.  Therefore, under the traditional model, the originator had a financial incentive to ensure that:  (1) the borrower had the financial wherewithal to repay the loan; and (2) the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted.

146.    With the advent of securitization, the traditional model gave way to the "originate to distribute" model, where originators sell the mortgages and transfer the credit risk to investors through mortgage-backed securities.  By selling the mortgages to investors, the originators obtained cash, enabling them to issue more loans and generate transaction fees.

147.    Loan fees and sales revenue became the originator's primary profit mechanism, making the sheer quantity of loans issued more important than the quality of any particular loan. To facilitate the issuance of additional loans, lenders began to offer more aggressive loan products such as subprime mortgages, hybrid loans and negative amortization "option ARM" loans, with little or no documentation.  As loan origination quantities increased, loan originators generally failed to follow their stated underwriting and appraisal standards, and other methods of risk assessment.

148.    Wall Street banks, including J.P Morgan, profited from the high-margin business of packaging mortgages and selling them to investors as MBS.  By buying and packaging mortgages, Wall Street enabled the lenders to extend credit even as lending practices deteriorated and dangers in the housing market increased.  At the center of the escalation was Wall Street's partnership with originators.  This relationship was a driving force behind the once-soaring home prices and the spread of exotic loans that are now defaulting and foreclosing in record numbers.

149.    As is now evident, far too much of the lending during that time was neither responsible nor prudent.  Ben Bernanke, Chairman of the Federal Reserve Board, remarked in a March 14, 2008 speech at the National Community Reinvestment Coalition Annual Meeting:

> [t]he deterioration in underwriting standards that appears to have begun in late 2005 is another important factor underlying the current crisis.  A large share of subprime loans that were originated during this time feature high combined loan-to-value ratios and, in some cases, layers of additional risk factors, such as a lack of full documentation or the acceptance of very high debt-to-income ratios.

150.    In its March 2008 policy statement, the President's Working Group on Financial Markets concluded that "[t]he turmoil in financial markets clearly was triggered by a dramatic weakening of underwriting standards for U.S. subprime mortgages, beginning in late 2004 and extending into early 2007."  As U.S. housing prices subsequently declined, the delinquency rate for such mortgages soared.

151.    Many of the Additional Originators' underwriting practices exemplify this "dramatic weakening."  For example, GreenPoint is now a defendant in numerous lawsuits alleging misrepresentations regarding the quality of the loans GreenPoint underwrote and originated.  In *U.S. Bank Nat'l Ass'n, et al., v. GreenPoint Mortgage Funding, Inc.*, No. 09-600352 (N.Y. Sup. Ct.), a consultant concluded that 93% of the loans that GreenPoint sold contained errors, omissions, misrepresentations and negligence related to origination and

underwriting.  The consultant found that GreenPoint loans suffered from serious defects including:

- pervasive misrepresentations and/or negligence with respect to the statement of the income, assets or employment of the borrower;

- misrepresentations of the borrower's intent to occupy the property as the borrower's residence and subsequent failure to so occupy the property;

- inflated appraisal values; and

- pervasive violations of GreenPoint's own underwriting guidelines and prudent mortgage-lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social security numbers, (iii) with credit scores below the required minimum, (iv) with debt-to-income and/or loan-to-value ratios above the allowed maximum or (v) with relationships to GreenPoint or other non-arm's-length relationships.

152.    Additionally, former employees confirm Accredited's lack of underwriting and appraisal standards.  According to CW19, a Corporate Underwriter at Accredited between June 2004 and March 2005, underwriting decisions were frequently overridden by managers on the sales side of the business.  CW19 noted such loans were tracked internally, and it was well-known they performed poorly.  Moreover, according to CW19, by no later than the early part of 2005, Accredited approved risky loans that did not comply with its own underwriting guidelines in an effort to reach monthly production targets.

153.    According to CW20, a Corporate Underwriter at Accredited between August 2003 and February 2006 in Tampa, Florida, decisions to reject loan applications were constantly overridden by Operations Managers and Senior Operations Managers.  According to CW20, "The problem with the whole system was the overrides.  The overrides were rampant.  If the borrower breathed, he got the loan."

154.    According to CW21, a Corporate Underwriter at Accredited in San Diego, California, between May 2002 and November 2006, by 2005, Accredited's underwriters were

being overridden, frequently resulting in loans that did not comply with underwriting guidelines. According to CW21, the number of overrides grew so large that Accredited was forced to institute a system to track such overrides.  The system included a box on the loan file that needed to be checked off by an underwriter if the loan was approved "as a business decision" by a higher-level manager over the recommendation of the underwriter to reject the application.

155.    According to CW22, a Corporate Underwriter at Accredited between June 2000 and March 2007 in both the San Diego, California, and Austin, Texas, offices, "At the end of the month, we were handed loan files and told to just sign them with no audit."

156.    On May 1, 2009, Accredited filed for bankruptcy.  Accredited faced huge demands from banks to repurchase loans.  In bankruptcy filings, Accredited stated that it faces more than $200 million in repurchase claims.  The banks assert that certain loans they purchased are defective and violate the purchase agreements they made with Accredited because they contain serious underwriting deficiencies or borrowers defaulted too quickly.

157.    Likewise, an American Home "Credit Update" presentation from October 2005 set forth revised credit factors which made clear that American Home's underwriting guidelines were to be either relaxed substantially or essentially rendered meaningless, in order to allow American Home to make loans to high-risk borrowers.  Specifically, the Credit Update sets forth the previous "interpretation" of the underwriting guidelines under a heading entitled "What we observed in [our] prior history" alongside the new "interpretation" under a heading entitled "Where We Are Now."  These new "guideline interpretations" included:

- Not requiring verification of income sources on stated income loans;
- Reducing the time that need have passed since the borrower was in bankruptcy or credit counseling;
- Reducing the required documentation for self-employed borrowers; and

- Broadening the acceptable use of second and third loans to cover the full property value.

158.   Indeed, an internal American Home e-mail sent on November 2, 2006, from Steve Somerman, an American Home Senior Vice President of Product and Sales Support in California and co-creator of the American Home's "Choice Point Loans" program, to loan officers nationwide, stated that American Home would make a loan to virtually any borrower, regardless of the borrower's ability to verify income, assets or even employment.

159.   American Home also did not have appropriate controls in place to monitor and enforce compliance with underwriting guidelines.  According to CW23, a staff member in American Home's repurchase department between November 2004 and August 2007, "[T]he underwriters didn't do their jobs.  They were lax, very lax."

160.   Moreover, American Home permitted numerous "exceptions" to its underwriting standards.  CW24, an Assistant Vice President for Direct Consumer Lending in American Home's loan origination business segment between July 2006 and August 2007, explained that exceptions were always being made to the underwriting guidelines.  When CW24's staff raised concern with the sales department about loans that did not meet the underwriting guidelines, the sales department would contact the Melville, New York headquarters to approve an exception to those guidelines so that the loan could be completed.  Examples of such exceptions included reducing the required credit score or increasing the loan-to-value ratio.  CW24 stated that, when the exception at issue involved accepting a reduced credit score, it was commonplace to overrule the objections of the underwriters in order to complete the loan.

161.   According to CW25, a former Senior Underwriter at American Home from 2002 to 2007, underwriters' objections to loans were frequently vetoed.  CW25 stated that underwriters would "say[] 'no way' on a lot of things, 'I would never give a borrower a loan like

this,'" but the loans would be approved nonetheless.  According to CW25, loans would be approved over the underwriter's objection if he refused to put his name on a loan, "[I]t happened more than it should have."

162.    On August 2, 2007, the New Jersey Department of Banking and Insurance issued legal documents ordering American Home to stop doing business in the state and started the paperwork to revoke American Home's mortgage lender license.  On August 6, 2007, American Home was forced to file for bankruptcy protection.

VI.     THE OFFERING DOCUMENTS CONTAINED
        MATERIAL MISSTATEMENTS AND OMISSIONS
        REGARDING APPRAISAL STANDARDS AND LTV RATIOS

163.    The generally accepted standard of appraisal practice in the United States is the Uniform Standards of Professional Appraisal Practice, as adopted by the Appraisal Standards Board of the Appraisal Foundation ("USPAP").  USPAP requires, *inter alia*:

> An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.
>
> In appraisal practice, an appraiser must not perform as an advocate for any party or issue.
>
> An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.
>
> * * *
>
> It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:
>
> 1.    the reporting of a predetermined result (e.g., opinion of value);
>
> 2.    a direction in assignment results that favor the cause of the client;
>
> 3.    the amount of a value opinion;

4.      the attainment of a stipulated result; or

5.      the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

164.    The Offering Documents stated that loan underwriters evaluated information about the mortgaged property's appraised value, as evaluated by a qualified, independent appraiser.  Each appraisal was required to satisfy applicable government regulations and be on forms acceptable to Fannie Mae and Freddie Mac.  For example, the general underwriting guidelines in the Offering Documents stated:

> The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal *in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac*. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with preestablished appraisal procedure guidelines established by the originator.  The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.  Under some reduced documentation programs, the originator may rely on the original appraised value of the mortgaged property in connection with a refinance by an existing mortgagor.

J.P. Morgan Alternative Loan Trust 2006-A4 Prospectus Supplement at S-21.

165.    Likewise, ResMAE's underwriting standards required "an appraisal of the mortgaged property which conforms to Freddie Mac and/or Fannie Mae standards, and if appropriate, a review appraisal.  Generally, appraisals are provided by qualified independent

appraisers licensed in their respective states."  J.P. Morgan Acquisition Trust 2006-RM1

Prospectus Supplement at S-54.

166.    Countrywide explained that it:

> obtains appraisals from independent appraisers or appraisal
> services for properties that are to secure mortgage loans.  The
> appraisers inspect and appraise the proposed mortgaged property
> and verify that the property is in acceptable condition.  Following
> each appraisal, the appraiser prepares a report which includes a
> market data analysis based on recent sales of comparable homes in
> the area and, when deemed appropriate, a replacement cost
> analysis based on the current cost of constructing a similar home.
> All appraisals are required to conform to Fannie Mae or Freddie
> Mac appraisal standards then in effect.

J.P. Morgan Mortgage Trust 2006-A1 Prospectus Supplement at S-24.

167.    The statements in the Offering Documents regarding the appraisals for the

collateral underlying the Certificates contained untrue statements and omissions because

appraisers and originators industry-wide systematically failed to follow accepted appraisal

guidelines, resulting in pervasive appraisal inflation.

168.    Many lenders across the country allowed the sales personnel or account

executives at their retail or in-house origination facilities to order and control appraisals and the

appraisal process.  These sales personnel were typically on a commission-only pay structure and

were therefore motivated to close as many loans as possible.  According to CW2, underwriters at

the Chase Originators received bonuses "not based on the length of the loan or the delinquency

rate.  The bonus was based just on putting through the loan."  To get these loans approved and

increase their bonuses, these personnel would pressure appraisers to appraise properties at

artificially high levels or they would not be hired again, resulting in appraisals being done on a

"drive-by" basis where appraisers issued their appraisals without reasonable bases for doing so.

CW2 frequently saw managers at Chase Home Finance "brow beating" appraisers to get their prices up.

169.     Alan Hummel, Chair of the Appraisal Institute, in his testimony before the Senate Committee on Banking noted that this dynamic created a "terrible conflict of interest" where appraisers "experience systemic problems of coercion" and were "ordered to doctor their reports" or they might be "placed on exclusionary or 'do-not-use' lists."

170.     A 2007 survey of 1,200 appraisers conducted by October Research Corp.—a firm in Richfield, Ohio, who publishes Valuation Review—found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through.  This figure was nearly double the findings of a similar study conducted just three years earlier.  The 2007 study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a higher valuation."  Adding to these problems was the fact that lenders, for originations completed by mortgage brokers, generally lacked knowledge of the accuracy of the appraisals since they were typically located far from the actual property and knew very little about the general area where the property was located.

171.     CW26 worked as a loan officer for Chase Home Finance from 1999 until 2008 in Chicago, Illinois.  Through at least 2004 and perhaps later, CW26 and other loan officers would actually state on the appraisal request the target price in order for the mortgage to be approved.  If they didn't get the price that they needed, they would simply call the appraiser again and "see what they could do to get the price changed and get the loan approved."  There was a strong incentive for the appraiser to get the requested value in order to have repeat business with Chase Home Finance.

172.    According to CW26, around 2005, Chase Home Finance changed the policy so that loan officers could only select appraisal firms from an approved list provided by Chase Home Finance.  The list contained two or three choices of appraisal companies.  CW26 recalled that one of the companies on the approved list was eAppraiseIT.  Chase Home Finance used eAppraiseIT from 2006 through at least when CW26 left in 2008.

173.    It was later discovered that eAppraiseIT had notorious business practices that included inflating appraisals.  On November 1, 2007, New York Attorney General Andrew M. Cuomo filed suit against eAppraiseIT, and its parent corporation, First American Corp.  *People of the State of New York* v. *First Am. Corp. and First Am. eAppraiseIT*, Index No. 406796/2007 (N.Y. Sup. Ct.).  Cuomo's suit alleged that eAppraiseIT colluded with WaMu (one of the Originators who contributed to the Issuing Trusts) to inflate the appraisal values of homes.  According to Cuomo, between April 2006 and October 2007, First American performed 262,000 appraisals for WaMu.  When WaMu loan officers began complaining that valuations by eAppraiseIT's independent roster were coming in too low, the bank allegedly then pressured First American to assign only appraisers on WaMu's approved list when appraising WaMu mortgage-related properties.  WaMu allegedly threatened to take its business elsewhere, and dangled the prospect of greater use of First American's other settlement services, to convince eAppraiseIT to accede to its demands.  In a press release that accompanied the suit, Cuomo stated:

> The independence of the appraiser is essential to maintaining the integrity of the mortgage industry.  First American and eAppraiseIT violated that independence when Washington Mutual strong-armed them into a system designed to ripoff homeowners and investors alike . . . .  The blatant actions of First American and eAppraiseIT have contributed to the growing foreclosure crisis and turmoil in the housing market.  By allowing Washington Mutual to

hand-pick appraisers who inflated values, First American helped
set the current mortgage crisis in motion.

174.     According to CW27, a Senior Loan Processor at Chase Home Finance from
September 2002 until October 2005 in Falls Church, Virginia, there were some "no doc" loans
where the underlying properties were not appraised at all.  The staff would simply consult a
monthly report of average property values in the area and would order an appraisal only if there
was a decline in value of those properties or the requested loan amount exceeded the average
value listed in the report.  If "the price didn't move, then that's what they were going to put the
loan for, without the appraisal."

175.     CW28, a former Staff Review Appraiser at Chase Home Finance from September
2006 until April 2008, stated that "there was no way that what we were doing—and what they
pressured us to do—was conforming to USPAP."  The management department "pushed and
pushed" appraisers to complete the appraisals without the reports required by law.  "The more
reports we could do, the more files and folders they could close out, and get what they were
shooting for."  The system became "a totally unorthodox method of so-called appraisal review."

176.     Mark Zachary, a former Regional Vice President of Countrywide Mortgage
Ventures, LLC, stated that there was a problem with appraisals performed on homes being
purchased with Countrywide loans.  According to Mr. Zachary, the appraiser was being strongly
encouraged to inflate appraisal values by as much as 6% to allow the homeowner to "roll up" all
closing costs.  According to Mr. Zachary, this inflated value put the buyer "upside down" on the
home immediately after purchasing it, *i.e.*, the borrower owed more than the home's worth.
Thus, the borrower was more susceptible to default.  It also put the lender and secondary market
investor at risk because they were unaware of the true value of their asset.  According to Mr.

Zachary, Countrywide performed an audit in January 2007 into these matters which corroborates his story.

177.     According to CW29, the Chief Appraiser at Accredited for five years between 2002 and June 2007, Accredited allowed both corporate underwriters and sales managers to override the decisions of licensed property appraisers.  In many cases, an appraisal reviewer working for Accredited would reject a loan application after concluding that the appraisal submitted with the application was inflated.  According to CW29, the account executive who submitted the loan application would become annoyed by the rejection and appeal the decision to a sales manager who then would overturn the appraisal reviewer's decision without any valid justification.  According to CW29, overrides of appraisers' decisions were rampant:  "As of June 2006, between 12% and 15% of our business was being done through management overrides."

178.     According to CW30, a senior underwriter at the Atlanta, Georgia, branch of Ownit from May 2005 to December 2006, appraisals were "absolutely" higher than the actual value of properties.  For example, CW30 described that appraisals were based on sales that were not true comparables to the subject properties and that "for a good year or two, everyone was riding on totally inflated values."

179.     CW31, a senior underwriter at Ownit's Portland, Oregon, branch from February 2006 until December 2006, stated that at Ownit "if you had a pulse or you could breathe, you got a loan."  CW31 stated that all appraisals were supposed to go through some type of review.  According to CW31, the underwriters did a desk review, but they were not closely scrutinized.  CW31 further stated that none of the appraisals went further than a desk review and if an underwriter questioned the appraisal, management would just sign off on it.

180.    Each of the Prospectus Supplements contained detailed information about the LTV ratios of the loans underlying the trusts.  In a series of charts, investors were provided with LTV ratio data, including information about the number of loans containing LTV ratios within a given range.  The Prospectus Supplement for the J.P. Morgan Alternative Loan Trust 2006-A4, dated July 27, 2006, represented that "[t]he weighted average Loan-to-Value Ratio at origination of the Mortgage Loans is approximately 73.55%, and no Mortgage Loan had a Loan-to-Value Ratio at origination exceeding 100.00%."  *Id.* at S-18.  Further, it contained the following chart detailing the LTV ratios of the mortgage loans underlying the Certificates:

| Range Of Original Loan-To-Value Ratios | Number Of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent Of Aggregate Principal Balance Outstanding |
|---|---|---|---|
| .01-10.00 | 2 | $90,000.00 | 0.01% |
| 10.01-20.00 | 9 | $2,460,290.73 | 0.26% |
| 20.01-30.00 | 28 | $4,502,670.09 | 0.47% |
| 30.01-40.00 | 41 | $13,145,354.49 | 1.38% |
| 40.01-50.00 | 81 | $27,403,065.28 | 2.87% |
| 50.01-60.00 | 143 | $70,233,762.45 | 7.36% |
| 60.01-70.00 | 288 | $142,157,908.84 | 14.90% |
| 70.01-75.00 | 259 | $142,241,363.66 | 14.91% |
| 75.01-80.00 | 1,406 | $513,422,271.38 | 53.81% |
| 80.01-85.00 | 16 | $4,141,984.40 | 0.43% |
| 85.01-90.00 | 86 | $22,285,619.57 | 2.34% |
| 90.01-95.00 | 40 | $8,595,733.34 | 0.90% |
| 95.01-100.00 | 10 | $3,488,817.26 | 0.37% |

*Id.* at Annex A, A-1.

181.    As explained above, the appraisals of the properties underlying the mortgage loans were inaccurate and inflated as appraisals were not based upon the actual values of the properties and not performed in accordance with professional (USPAP) appraisal practices.  As a result of the inflated appraisals, the LTV ratios contained in the Offering Documents materially overstated borrowers' equity in their homes and failed to disclose that the mortgaged properties

(acting as loan collateral) would be inadequate to cover the full loan balance in the event of foreclosure.  For instance, as described above, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000 or 90%.  If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75% ($90,000/$120,000).  Due to the inflated appraisals, the LTV ratios listed in the Prospectus Supplements were artificially low, making it appear that the loans underlying the trusts had greater collateral and thus were less risky than they really were.

182.    The Offering Documents also stated that exceptions to underwriting standards could be granted if the borrower's loan application reflected "compensating factors" including "loan-to-value ratio."  As detailed above, however, the LTV ratios were deflated and inaccurate, therefore the use of this metric as a "compensating factor" further violated the stated underwriting standards.

VII.    THE OFFERING DOCUMENTS CONTAINED
        MATERIAL MISSTATEMENTS AND
        OMISSIONS REGARDING CREDIT ENHANCEMENT

183.    Credit enhancement represents the amount of "cushion" or protection from losses exhibited by a given security.  This cushion is intended to enhance the likelihood that holders of the senior Certificates, and to a limited extent, the holders of the offered subordinate Certificates, will receive regular payments of interest and principal.  With respect to credit enhancement, the Prospectus dated April 24, 2006 stated:

> Credit enhancement may be in the form of a limited financial
> guaranty policy issued by an entity named in the related prospectus
> supplement, the subordination of one or more classes of the
> securities of that series, the establishment of one or more reserve
> accounts, the use of a cross-collateralization feature, use of a
> mortgage pool insurance policy, FHA insurance, VA guarantee,
> bankruptcy bond, special hazard insurance policy, surety bond,
> letter of credit, guaranteed investment contract,
> overcollateralization, interest rate swap agreement, interest rate cap

> agreement or another method of credit enhancement contemplated
> in this prospectus and described in the related prospectus
> supplement, or any combination of the foregoing.

*Id.* at 53.

184.     Additionally, each Prospectus Supplement, if applicable, contained statements

about the available credit enhancement.  For example, the Prospectus Supplement for the J.P.

Morgan Alternative Loan Trust 2006-A4 stated that "[c]redit enhancement for the offered

certificates will consist of subordination, overcollateralization and excess interest" and that the

credit enhancement features are "intended to enhance the likelihood that holders of the senior

and mezzanine certificates will receive regular payments of interest and principal, as applicable."

*Id.* at Cover, S-12.

185.     The above statements lacked any reasonable basis and were inaccurate as they

failed to disclose that the Originators systematically disregarded their underwriting and appraisal

standards and therefore the supposed credit enhancement was deficient.  Further, the Rating

Agencies' models—which determined the level of credit enhancement necessary for a particular

loan pool—had not been updated and could not accurately or adequately reflect the expected

performance of the Certificate mortgage loans.

VIII.   THE OFFERING DOCUMENTS CONTAINED
        MATERIAL MISSTATEMENTS AND OMISSIONS
        REGARDING THE CERTIFICATES' RATINGS

186.     As summarized above, each Registration Statement and Prospectus Supplement

stated that it was "a condition to the issuance of the Offered Certificates" that they receive

certain, specified ratings from the Rating Agencies.  It also contained representations regarding

the nature of the ratings, and the role of the Rating Agencies in the ratings process.  For example,

the Offering Documents stated that the ratings addressed "the adequacy of the value of the trust

fund assets and any credit enhancement with respect to that class and will reflect that rating

agency's assessment solely of the likelihood that holders of a class of securities of that class will receive payments to which those securityholders are entitled under the related agreement." Further, the ratings took into consideration "the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by such certificates."

187.    Each Prospectus Supplement explicitly stated that the issuance of the Certificates was conditioned on the assignment of particular, investment-grade ratings, and listed the ratings in tabular format.  For example, the J.P. Morgan Alternative Loan Trust 2006-A4 Prospectus Supplement included the following chart:

| Class | Initial Class Principal Amount | Initial Interest Rate | Summary Interest Rate Formula | Designation | S&P Rating | Moody's Rating |
|---|---|---|---|---|---|---|
| Class A-1 | $195,000,000 | 5.95% | Fixed-Rate | Super Senior | AAA | Aaa |
| Class A-2 | $30,000,000 | 5.95% | Fixed-Rate | Super Senior/Senior Support | AAA | Aaa |
| Class A-3 | $125,000,000 | 5.50% | Variable-Rate | Super Senior/Sequential | AAA | Aaa |
| Class A-4 | $181,401,000 | 5.46% | Variable-Rate | Super Senior/Sequential | AAA | Aaa |
| Class A-5 | $144,034,000 | 5.55% | Variable-Rate | Super Senior/Sequential | AAA | Aaa |
| Class A-6 | $25,075,000 | 6.30% | Fixed-Rate | Super Senior/Sequential | AAA | Aaa |
| Class A-7 | $79,169,000 | 6.30% | Fixed-Rate | Super Senior/Sequential | AAA | Aaa |
| Class A-8 | $61,631,000 | 6.20% | Fixed-Rate | Super Senior/Lockout | AAA | Aaa |
| Class A-9 | $54,654,000 | 6.30% | Fixed-Rate | Senior Support | AAA | Aa1 |
| Class M-1 | $21,946,000 | 6.30% | Fixed-Rate | Mezzanine | AA | Aa2 |
| Class M-2 | $15,267,000 | 6.30% | Fixed-Rate | Mezzanine | A | A2 |

| Class | Initial Class Principal Amount | Initial Interest Rate | Summary Interest Rate Formula | Designation | S&P Rating | Moody's Rating |
|---|---|---|---|---|---|---|
| Class B-1 | $6,202,000 | 6.30% | Fixed-Rate | Subordinate | BBB | Baa2 |
| Class B-2 | $4,771,000 | 6.30% | Fixed-Rate | Subordinate | BBB- | Baa3 |
| Class A-R | $100 | | | Senior/Residual | AAA | Aaa |

188.     These ratings were unjustifiably high and did not represent the true risk of the Certificates, as they were based on insufficient information and faulty assumptions concerning how many underlying mortgages were likely to default.  As a result, the Certificates were secured by assets that had a much greater risk profile than represented.  Accordingly, the Certificates, despite the fact that the Rating Agencies assigned them investment-grade ratings, were far riskier than other investments with the same ratings.

A.     The Ratings Were Based On
Inaccurate Mortgage Loan Data

189.     The Rating Agencies rated the Certificates based in large part on data about each mortgage loan—including appraisal values, LTV ratios, and borrower creditworthiness and the amount of documentation provided by borrowers to verify their assets and/or income levels.  As discussed above, much of this data was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, and the systemic disregard for the stated underwriting standards.  During Moody's September 2007 "Town Hall Meeting," hosted by Moody's Managing Director, Raymond McDaniel, executives at Moody's acknowledged that the Rating Agencies used inaccurate data to form their ratings:

> We're on notice that a lot of things that we relied on before just
> weren't true. . . .  [W]e relied on reps and warrantees that no loans
> were originated in violation of any state or federal law.  We know
> that's a lie.

*      *      *

There's a lot of fraud that's involved there, things that we didn't see. . . .  We're sort of retooling those to make sure that we capture a lot of the things that we relied on in the past that we can't rely on, on a going forward basis.

*      *      *

[W]e're being asked to figure out how much everybody lied. . . . [I]f all of the information was truthful and comprehensive and complete, we wouldn't have an issue here . . . .

Moody's Town Hall Meeting Transcript, at 16, 58-59.

190.    In response to the "Town Hall Meeting," a Moody's employee noted:

[W]hat really went wrong with Moody's subprime ratings leading to massive downgrades and potential more downgrades to come? We heard 2 answers yesterday:  1. people lied, and 2. there was an unprecedented sequence of events in the mortgage markets.  As for #1, it seems to me that **we had blinders on and never questioned the information we were given**.  Specifically, why would a rational borrower with full information sign up for a floating rate loan that they couldn't possibly repay, and why would an ethical and responsible lender offer such a loan?  As for #2, **it is our job to think of the worst case scenarios and model them. , . . Combined, these errors make us look either incompetent at credit analysis, or like we sold our soul to the devil for revenue, or a little bit of both**.

Moody's Town Hall Meeting Transcript, at 79.

191.    Because Moody's and S&P used flawed information and models, the ratings lacked any reasonable basis, did not accurately reflect the Certificates' true risk, and caused the Certificates to be characterized as investment-grade when in reality they were not.

B.      The Rating Agencies Relied On Outdated Models

192.    The Rating Agencies used models that had not been materially updated since 1999 (for S&P) and 2002 (for Moody's).  As a result, the models were based primarily on the performance of fixed interest loans and failed to consider the performance of subprime, Alt-A,

no- or limited documentation loans, or loans with interest only, option ARM and negative amortization provisions.

193.    An April 2008 issue of *Mortgage Banking* explained that the Rating Agencies' models used statistical assumptions that were too heavily based on the performance of 30-year fixed mortgages—which were not the kinds of mortgages that had been securitized in the prior four years:

> S & P's Coughlin admits that "assumptions that went into decision-making [on credit ratings] were informed by what had happened in the past," and yet in this instance "previous loss data proved to be much less of a guide to future performance."
>
> But why?  Drexel University's Mason believes it's because the CRAs relied on statistical models that were misleading, at best.  "I think their [credit-rating] methodologies were demonstrably insufficient," he says.
>
> "Unlike the traditional rating processes for single-named issuers, which rely on empirical analysis at their core, structured-finance rating analysis is essentially driven by statistical models," write Mason and Rosner in their paper.  And the data that the rating agencies used when evaluating mortgage-backed securities— including those backed by subprime mortgages—were heavily biased by over-reliance on traditional 30-year fixed prime mortgage loans.  But it turns out that a subprime loan, as Mason explains during an interview, is a very different animal.
>
> "This is not your historical mortgage loan," he says.  "This is more like a credit-card loan."  Mason cites the increased popularity during the mortgage boom of so-called option ARMs, which are home loans that give the borrower a variety of monthly payment options and have variable cash-flow characteristics that are more like credit cards.

194.    In an article appearing in *The New York Times* on April 8, 2008, entitled "Triple A Failure," *The New York Times* took note of Moody's April 2007 disclosure that it was "revising" its model which had not been revised since 2002:

> In April 2007, Moody's announced it was revising the model it used to evaluate subprime mortgages.  It noted that the model "was

first introduced in 2002. Since then, the mortgage market has evolved considerably." This was a rather stunning admission; its model had been based on a world that no longer existed.

195. The article explained that when Moody's had analyzed subprime delinquency data in 2007, it had found trends that its 2002 model never accounted for:

> Poring over the data, Moody's discovered that the size of people's first mortgages was no longer a good predictor of whether they would default; rather, it was the size of their first and second loans—that is, their total debt—combined. This was rather intuitive; Moody's simply hadn't reckoned on it. Similarly, credit scores, long a mainstay of its analyses, had not proved to be a "strong predictor" of defaults this time. Translation: even people with good credit scores were defaulting. Amy Tobey, leader of the team that monitored XYZ, told me, "it seems there was a shift in mentality; people are treating homes as investment assets." Indeed. And homeowners without equity were making what economists call a rational choice; they were abandoning properties rather than make payments on them. Homeowners' equity had never been as high as believed because appraisals had been inflated.

196. On October 22, 2008, Frank Raiter, the former Managing Director and head of Residential Mortgage-Backed Securities at S&P from March 1995 through April 2005, testified before the United States House of Representatives Committee on Oversight and Government Reform (the "Raiter Testimony"). Raiter testified that the ratings on S&P deals turn in part on the credit rating of the individual mortgages. It was from this credit analysis that S&P determined: (1) the expected default probability of a loan and (2) the loss that would occur in the event of a default which, in turn, was used to establish the amount of AAA bonds that could be issued against the pool and amount of equity or "credit enhancement" needed to protect the AAA bonds from experiencing losses:

> A mortgage backed security consists of a pool of individual mortgage loans. Depending on the type of mortgage product (i.e., prime-jumbo, subprime, Alt-A or HEL) underlying a given security, the pool could consist of 1,000 to 25,000 loans. The ratings process consists of two distinct operations—the credit

analysis of individual mortgages and a review of the documents governing the servicing of loans and the payments to investors in the securities.

***The credit analysis is focused on determining the expected default probabilities on each loan and the loss that would occur in the event of a default.*** These, in turn, establish the expected loss for the entire pool and determine the amount of AAA bonds that can be issued against the pool. It is analogous to your equity position in your home and the underlying mortgage. The loss estimate determines the equity needed to support the bond – it is intended to protect the AAA bonds from experiencing any losses, much the same as the homeowner's equity stake in a house protects the lender from loss in the mortgage loan.

Raiter Testimony at 3.

197.    Raiter testified that in 1995, S&P developed a sophisticated model to estimate the default and loss of individual loans and pools—a model based on approximately 500,000 loans with performance data going back five or more years. This "LEVELS" Model was updated in early 1999 based on a database of 900,000 loans. Raiter testified further that ***"[i]t was critical to maintain the best models as they were the linchpin of the rating process."*** Raiter Testimony at 4. After the housing boom took off in 2001, S&P developed a far better model in 2001, with updated data in 2003 and 2004, based on approximately 9.5 million loans ***"cover[ing] the full spectrum of new mortgage products, particularly in the Alt-A and fixed/floating payment type categories."*** *Id.*

198.    Nevertheless, S&P failed to implement this updated model, which, in Raiter's view, would have forewarned on the loan-losses from the new loan products, in particular:

[T]he analysts at S&P had developed better methods for determining default which did capture some of the variations among products that were to become evident at the advent of the crisis. It is my opinion that had these models been implemented we would have had an earlier warning about the performance of many of the new products that subsequently lead to such substantial losses. That, in turn, should have caused the loss estimates mentioned above to increase and could have thus caused

> some of these products to be withdrawn from the market as they
> would have been too expensive to put into bonds.

*Id*. at 4.

199.    The SEC Report corroborated Raiter's testimony, finding that the Rating Agencies failed to frequently update their models with new data:  "Based on discussions with the rating agencies examined and documents provided by them, it appears that the parameters of the models were re-estimated by executing the model with new data ***infrequently***."

200.    As Raiter explained, the unfortunate consequences of continuing to use outdated versions of the ratings model included "the failure to capture changes in performance of the new non-prime products" and "the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market."  S&P's current President, Deven Sharma, agreed with Raiter's explanation in his own testimony in front of the House Oversight Committee on October 22, 2008, noting:  "It is by now clear that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work . . . [E]vents have demonstrated that the historical data we used and the assumptions we made significantly underestimated the severity of what has actually occurred."

201.    Executives at Moody's also acknowledged the failure of Moody's ratings models to capture the decrease in lending standards.  In a presentation to Moody's Board of Directors from October 2007, released by the House Oversight Committee on October 22, 2008, Raymond McDaniel, Moody's current Chairman and CEO, noted that underfunding can put ratings accuracy at risk and acknowledged that "Moody's Mortgage Model (M3) needs investment." Brian Clarkson—Moody's former President and Chief Operating Officer—also recognized Moody's failure to incorporate decreased lending standards into their ratings, stating:  "We should have done a better job monitoring that [decrease in underwriting standards]."

202.     On July 8, 2008, the SEC issued a Summary Report of Issues Identified in the

Commission Staff's Examinations of Select Credit Rating Agencies (previously defined as "SEC

Report").  The SEC Report found flaws in the rating agencies' procedures with respect to rating

MBS products, including:

- Relevant ratings criteria were not disclosed;

- None of the rating agencies examined had specific written procedures for rating RMBS and CDOs;

- The rating agencies did not always document significant steps in the rating process – including the rationale for deviations from their models and for rating committee actions and decisions – and they did not always document significant participants in the ratings process;

- Rating agencies do not appear to have specific policies and procedures to identify or address errors in their models or methodologies;

- The rationale for deviations from the model or out-of-model adjustments was not always documented in deal records.  As a result, in its review of rating files, the Staff could not always reconstruct the process used to arrive at the rating and identify the factors that led to the ultimate rating; and

- There was a lack of documentation of rating agency committee actions and decisions.

203.     The SEC Report also found that a number of factors unique to the rating of

mortgage-backed securities may have "exacerbated" conflicts of interest inherent in the fact that

the issuer or arranger pays for the ratings.  These factors include:

- The fact that the arranger of the deal has ***"more flexibility to adjust the deal structure to obtain a desired credit rating as compared to arrangers of non-structured asset classes."***

- With a fast-changing market, rating processes are frequently and quickly changed.  The high concentration of arrangers with the influence to determine the ***choice of rating agency has "heightened the inherent conflicts that exist in the 'issuer pays' compensation model."*** Compensation is calculated by volume of deals and total dollar volume, as a result arrangers prefer fast and predictable ratings processes.

- Rating Agencies may be pressured by arrangers to produce a more ***favorable outcome or reduce credit enhancement levels***, thus reducing ***"the cost of the debt for a given level of cash inflows from the asset***

*pool."* When the arranger also sponsors the RMBS or CDO trust, pressure can influence an agency's decision to update a model when the update would lead to a less favorable outcome.

- *High profit margins may have provided an incentive for rating agencies to encourage the arrangers to route future business its way.* Unsolicited ratings were not available to provide independent checks on the rating agencies' ratings, nor was information regarding the structure of the security or portfolio of assets readily available to parties unrelated to the transaction, especially before issuance.

*Id.* at 31-32.

204.    The SEC found that "key participants" in the securitization process negotiated fees that the rating agency would receive.  *Id.* at 23-24.  The SEC noted, *inter alia*, that analysts are "aware" of the rating firm's "business interests in securing the rating of the deal" as follows:

- *"While each rating agency has policies and procedures restricting analysts from participating in fee discussions with issuers,* these policies still allowed key participants in the ratings process to participate in fee discussions."

- *"Analysts appeared to be aware, when rating an issuer, of the rating agency's business interest in securing the rating of the deal.* The Staff notes multiple communications that indicated that some analysts were aware of the firm's fee schedules, and actual (negotiated) fees.  There does not appear to be any internal effort to shield analysts from emails and other communications that discuss fees and revenue from individual issuers."

- *"Rating agencies do not appear to take steps to prevent considerations of market share and other business interests from the possibility that they could influence ratings or ratings criteria."*

*Id.* at 24-25.

205.    The SEC also noted:

the arranger is often the primary designer of the deal and as such, has more flexibility to adjust the deal structure to obtain a desired credit rating as compared to arrangers of non-structured asset classes.  As well, arrangers that underwrite RMBS and CDO offerings have substantial influence over the choice of rating agencies hired to rate the deals.

206.     Further, there were only a limited number of investment banks who performed the underwriting function in many of the MBS which the Rating Agencies rated:

> there is a high concentration in the firms conducting the underwriting function.  Based on data provided by the three rating agencies examined, the Staff reviewed a sample of 642 deals.  While 22 different arrangers underwrote subprime RMBS deals, ***12 arrangers accounted for 80% of the deals, in both number and dollar volume***…In addition, 12 of the largest 13 RMBS underwriters were also the 12 largest CDO underwriters, further concentrating the underwriting function, as well as the sources of the rating agencies' revenue stream.

207.     One result of this limited number of issuers was that the ratings for structured products became the result of a "market-share war," in which the Rating Agencies repeatedly eased their standards in an effort to capture market share.  In a September 25, 2008 *Bloomberg* article, titled "Race to Bottom at Moody's, S&P Secured Sub-prime's Boom, Bust," a former S&P Managing Director—Richard Gugliada—explained the easing of standards as a "'market-share war where criteria were relaxed'" and admitted, "'I knew it was wrong at the time . . . [i]t was either that or skip the business.  That wasn't my mandate.  My mandate was to find a way.  Find the way.'"  According to Gugliada, when the subject of tightening S&P's ratings criteria came up, the co-director of CDO ratings, David Tesher, said: "Don't kill the golden goose."

208.     Gugliada's comments were further corroborated on October 28, 2008, when former Moody's Managing Director Jerome S. Fons testified before the House Oversight Committee.  Fons testified that due to profit concerns, a loosening of ratings standards took place at his company:  "[T]he focus of Moody's shifted from protecting investors to being a marketing-driven [sic] organization" and "management's focus increasingly turned to maximizing revenues" at the expense of ratings quality.  He explained that issuers of structured securities were free to shop around for the rating agency that would give them the highest rating and "typically chose the agency with the lowest standards, engendering a race to the bottom in

terms of rating quality."  Fons noted that the rating agencies' "drive to maintain or expand

market share made [them] willing participants in this [rating] shopping spree" and made it

"relatively easy for the major banks to play the agencies off one another."  Fons said it was this

business model that "prevented analysts from putting investor interests first."

IX.     EACH OFFERING DOCUMENT
         CONTAINED COMMON MATERIAL
         <u>MISSTATEMENTS AND OMISSIONS</u>

         209.    As summarized in the table below, the Offering Documents contained common

material misstatements and omissions regarding:  (1) the underwriting standards purportedly

used in connection with the origination of the underlying mortgages; (2) the appraisal standards

used to evaluate the properties underlying the mortgages and the true loan-to-value ratios; (3) the

process and procedures the Rating Agencies employed to rate the Certificates; and (4) the

amount of credit enhancement supporting each Offering:

| Issuing Trust | Underwriting Standards | LTV Ratios | Ratings Of The Certificates | Credit Enhancement |
|---|---|---|---|---|
| J.P. Morgan Alternative Loan Trust 2006-A1 | S-33–S-46 (PHH: S-34–S-40; Chase: S-41–S-42; WaMu: S-42–S-46) | S-27–S-30, A-1–A-15 | S-95 | S-8–S-9 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | S-29–S-46 (PHH: S-30–S-36; Chase: S-36–S-38; GreenPoint: S-38–S-41; Countrywide: S-41–S-46) | S-24–S-26, A-1–A-16 | S-97 | S-7–S-8 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | S-26–S-31 (Chase: S-27–S-29; Amer. Home: S-29–S-31) | S-22–S-23, A-1–A-10 | S-67–S-68 | S-7–S-8 |
| J.P. Morgan Alternative Loan Trust 2006-A4 | S-20–S-27 (Countrywide: S-21–S-27) | S-17–S-18, A-1–A-3 | S-62 | S-6–S-7 |
| J.P. Morgan Alternative Loan Trust 2006-A5 | S-23–S-44 (Chase: S-25–S-28; Amer. Home: S-28–S-31; Countrywide: S-31–S-37; PHH: S-37–S-44) | S-20–S-21, A-1–A-6 | S-97–S-98 | S-6–S-8 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | S-24–S-40 (Countrywide: S-25–S-31; Chase: S-31–S-33; PHH: S-33–S-40) | S-20–S-21, A-1–A-6 | S-93 | S-6–S-8 |

| Issuing Trust | Underwriting Standards | LTV Ratios | Ratings Of The Certificates | Credit Enhancement |
|---|---|---|---|---|
| J.P. Morgan Alternative Loan Trust 2006-A7 | S-24–S-42 (Countrywide: S-25–S-31; Chase: S-31–S-33; Flagstar: S-33–S-35; PHH: S-35–S-42) | S-20–S-21, A-1–A-6 | S-97 | S-6–S-8 |
| J.P. Morgan Alternative Loan Trust 2006-S1 | S-37–S-41 (Chase: S-38–S-40; SunTrust: S-40–S-41) | S-11–S-13, S-29–S-34, A-1–A-22 | S-94–S-95 | S-10–S-11 |
| J.P. Morgan Alternative Loan Trust 2006-S2 | S-17–S-21 (SunTrust: S-19–S-20; M&T S-20–S-21) | S-15, A-1–A-3 | S-54 | S-5–S-6 |
| J.P. Morgan Alternative Loan Trust 2006-S3 | S-19–S-29 (Greenpoint: S-20–S-23; Countrywide: S-23–S-29) | S-17, A-1–A-3 | S-65–S-66 | S-6–S-7 |
| J.P. Morgan Alternative Loan Trust 2006-S4 | S-19–S-29 (Countrywide: S-21–S-27; Chase: S-27–S-29) | S-17, A-1–A-3 | S-67–S-68 | S-7–S-8 |
| J.P. Morgan Mortgage Acquisition Trust 2006-ACC1 | S-55–S-59 (Accredited: S-55–S-59) | S-16, S-26–S-53 | S-119 | S-5–S-7 |
| J.P. Morgan Mortgage Acquisition Trust 2006-CH2 | S-82–S-99 (Chase: S-82–S-99) | S-30–S-79 | S-174 | S-8–S-10 |
| J.P. Morgan Mortgage Acquisition Trust 2006-HE2 | S-55–S-58 (Ownit: S-56–S-58) | S-16–S-17, S-24, S-26–S-57 | S-116 | S-5–S-7 |
| J.P. Morgan Mortgage Acquisition Trust 2006-HE3 | S-60–S-69 (ResMAE: S-62–S-65; NovaStar: S-66–S-69) | S-16–S-17, S-25–S-57 | S-127–S-128 | S-6–S-7 |
| J.P. Morgan Mortgage Acquisition Trust 2006-NC1 | S-54–S-59 (New Century: S-54–S-59) | S-16, S-23, S-25–S-51 | S-119 | S-5–S-7 |
| J.P. Morgan Mortgage Acquisition Trust 2006-RM1 | S-52–S-56 (ResMAE: S-52–S-56) | S-16–S-17, S-24, S-26–S-49 | S-116 | S-6–S-8 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WF1 | S-20–S-30 (Wells Fargo: S-22–S-30) | S-17–S-18, A-1–A-2 | S-66–S-67 | S-6–S-7 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC2 | S-55–S-66 (WMC: S-55–S-66) | S-16–S-17, S-24, S-26–S-51 | S-127 | S-5–S-7 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | S-52–S-63 (WMC: S-52–S-63) | S-16–S-17, S-24, S-26–S-49) | S-125 | S-6–S-7 |

| Issuing Trust | Underwriting Standards | LTV Ratios | Ratings Of The Certificates | Credit Enhancement |
|---|---|---|---|---|
| J.P. Morgan Mortgage Acquisition Trust 2006- WMC4 | S-62–S-73 (WMC: S-62–S-73) | S-17, S-23–S-60 | S-134 | S-87 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH1 | S-88–S-111 (Chase: S-88–S-111) | S-21, S-31–S-85 | S-185 | S-8–S-11 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH2 | S-76–S-100 (Chase: S-76–S-100) | S-21, S-30–S-72 | S-173 | S-8–S-11 |
| J.P. Morgan Mortgage Trust 2006-A1 | S-25–S-44 (PHH: S-25–S-31; Countrywide: S-32–S-37; Wells Fargo: S-38–S-44) | S-18, S-20–S-22, A-1–A-14 | S-85–86 | S-6–S-7 |
| J.P. Morgan Mortgage Trust 2006-A3 | S-33–S-36 (Chase: S-34–S-36) | S-22–S-23, S-25–S-30, A-1–A-30 | S-73 | S-8–S-9 |
| J.P. Morgan Mortgage Trust 2006-A4 | S-25–S-41 (Chase: S-26–S-28; Countrywide: S-28–S-34; PHH: S-35–S-41) | S-18, S20–S-23, A-1–A-19 | S-80 | S-6–S-7 |
| J.P. Morgan Mortgage Trust 2006-A5 | S-31–S-41 (Chase: S-32–S-34; PHH: S-35–S-41) | S-20–S-28, A-1–A-23 | S-79 | S-6–S-7 |
| J.P. Morgan Mortgage Trust 2006-A6 | S-31–S-41 (Chase: S-32–S-34; PHH: S-34–S-41) | S-24–S-28, A-1–A-17 | S-90 | S-12–S-13 |
| J.P. Morgan Mortgage Trust 2006-A7 | S-29–S-32 (Chase: S-30–S-32) | S-23–S-27, A-1–A-17 | S-72–S-73 | S-11–S-12 |
| J.P. Morgan Mortgage Trust 2006-S2 | S-35–S-40 (Chase: S-37–S-39; M&T: S-39–S-40) | S-11–S-13, S-23, S-27–S-33, A-1–A-30 | S-81–S-82 | S-10–S-11 |
| J.P. Morgan Mortgage Trust 2007-A1 | S-29–S-31 (Chase: S-29–S-31) | S-22–S-27, A-1–A-23 | S-69 | S-9–S-10 |
| J.P. Morgan Mortgage Trust 2007-A2 | S-30–S-40 (PHH: S-32–S-38; Chase: S-38–S-40) | S-22–S-28, A-1–A-23 | S-82–S-83 | S-10–S-11 |
| J.P. Morgan Mortgage Trust 2007-S1 | S-33–S-35 | S-10–S-12, S-22–S-23, S-27–S-31 | S-81 | S-9–S-10 |

## X.   THE COLLAPSE OF THE CERTIFICATES' PERFORMANCE AND VALUE

210.    The Rating Agencies rated the Certificates pursuant to the following rating system:

| Color code | Number | Definition | Moodys | S & P | Fitch |
|---|---|---|---|---|---|
| | | **Investment Grade** | | | |
| | 10.0 | US Treasuries | *** | *** | *** |
| | 9.5 | Prime, maximum safety | Aaa | AAA | AAA |
| | 9.0 | Very high grade/quality | Aa1 | AA+ | AA+ |
| | 8.5 | " | Aa2 | AA | AA |
| | 8.0 | " | Aa3 | AA- | AA- |
| | 7.5 | Upper medium quality | A1 | A+ | A+ |
| | 7.0 | " | A2 | A | A |
| | 6.5 | " | A3 | A- | A- |
| | 6.0 | Lower medium grade | Baa1 | BBB+ | BBB+ |
| | 5.5 | " | Baa2 | BBB | BBB |
| | 5.0 | " | Baa3 | BBB- | BBB- |
| Color code | Number | Definition | Moodys | S & P | Fitch |
| | | **Speculative grade** | | | |
| | 4.5 | Speculative | Ba1 | BB+ | BB+ |
| | 4.0 | " | Ba2 | BB | BB |
| | 3.5 | " | Ba3 | BB- | BB- |
| | 3.0 | Highly speculative | B1 | B+ | B+ |
| | 2.5 | " | B2 | B | B |
| | 2.0 | " | B3 | B- | B- |
| | 1.5 | Substantial risk | Caa1 | CCC+ | CCC+ |
| | 1.0 | In poor standing | Caa2 | CCC | CCC |
| | 0.5 | " | Caa3 | CCC- | CCC- |
| | 0.0 | Extremely speculative | Ca | CC | CC |
| | 0.0 | Maybe in or extremely close to default | C | C+,C,C- | C+,C,C- |
| | 0.0 | Default | | D | D |

211.    The ratings on virtually all of the Certificates have now been downgraded.  As reflected in the chart below, virtually all of the Certificates that Lead Plaintiff purchased were originally rated "AAA," but have now been downgraded to below investment-grade.

| Tranche | Initial Rating | | | First Downgrade | | | Current Rating | | |
|---|---|---|---|---|---|---|---|---|---|
| | Moody's | S&P | Fitch | Moody's | S&P | Fitch | Moody's | S&P | Fitch |
| J.P. Morgan Alternative Loan Trust 2006-A4 A-7 | Aaa | AAA | Not rated | Caa1 1/29/2009 | CCC 9/2/2009 | Not rated | Caa1*- 1/14/10 | CCC 9/2/09 | Not rated |
| J.P. Morgan Mortgage Acquisition Trust 2006-CH2 A-V-2 | Aaa | AAA | AAA | A2 6/12/2009 | N/A | A 11/24/2008 | A2*- 1/13/2010 | AAA*- 2/2/2010 | BB 6/12/2009 |
| J.P. Morgan Mortgage Acquisition Trust 2006-RM1 A-2 | Aaa | AAA | AAA | Baa3 10/30/2008 | CCC 8/4/2009 | AA 2/28/2008 | Ba3*- 1/13/2010 | CCC 8/4/2009 | B 6/12/2009 |
| J.P. Morgan Mortgage Trust 2006-A1 2A2 | Not rated | AAA | AAA | Not rated | BBB- 7/8/2009 | A*- 4/6/2009 | Not rated | BB- 2/22/2010 | BB 9/10/2009 |
| J.P. Morgan Mortgage Trust 2006-A5 2A1 | Aaa | Not rated | AAA | A1 11/21/2008 | Not rated | BBB*- 4/6/2008 | B3*- 12/17/2009 | Not rated | CCC 9/10/2009 |
| J.P. Morgan Mortgage Trust 2007-A1 6A1 | Aaa | AAA | AAA | Aa3 11/21/2008 | AA 6/8/2009 | AA*- 4/8/2009 | B3*+ 12/17/2009 | AA 6/8/2009 | A 9/10/2009 |

±indicates negative watch
Source:  Bloomberg.

212.    Moreover, the Mortgage Loans supporting the Certificates have experienced

unprecedented rates of delinquencies, foreclosures, real estate owned after the Servicer

foreclosed on the property underlying the Mortgage Loans ("REOs") and bankruptcies.  For

example, as illustrated below, the rates of 60-day or greater delinquencies, foreclosures, REOs

and bankruptcies of the Mortgage Loans underlying the J.P. Morgan Mortgage Trust 2006-A5

Certificates and J.P. Morgan Acquisition Trust 2006-CH2 have skyrocketed in recent years,

whereas the loans underlying the J.P. Morgan Mortgage Trust 2003-A2 certificates—largely originated only three years earlier—have experienced much lower rates of delinquencies, foreclosures, REOs and bankruptcies.



**Loan Performance**

Source: Bloomberg.

213. The J.P. Morgan Acquisition Trust 2006-CH2 Prospectus Supplement highlighted the fact that at issuance only 1.3% of the loans (representing 1.4% of the scheduled principal balance) were between 30-60 days delinquent, and there were no later delinquencies, foreclosures, REOs or bankruptcies. J.P. Morgan Acquisition Trust 2006-CH2 Prospectus Supplement at S-80. The current combined rate of 60-day or greater delinquencies, foreclosures, REOs and bankruptcies for each of the Trusts is provided in the Appendix.

214. As noted above, the Rating Agencies initially assigned the highest ratings of AAA to over 90% of the Certificates. Now only three Certificates in two Trusts—representing only

1.3% of the Mortgage Loans based on the balance at origination—maintain their AAA rating.  In fact, over 84% of the once-AAA Certificate tranches have now been downgraded below investment-grade.  All the Certificates that the Rating Agencies initially rated "AAA" continued to be rated as investment-grade instruments until, at the earliest, April 4, 2008.  The Appendix hereto identifies the original and current ratings for the Certificates sold pursuant to the Offering Documents.

XI.     CLASS ACTION ALLEGATIONS

215.    Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure Rule 23(a) and (b)(3), individually, and on behalf of a class consisting of all persons or entities who purchased or otherwise acquired beneficial interests in the Certificates identified herein issued pursuant and/or traceable to the July 2005 Registration Statement and the December 2005 Registration Statement (the "Class").  This action is properly maintainable as a class action for the following reasons:

A)     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through discovery, Lead Plaintiff believes that there are thousands of members of the proposed Class, who may be identified from records maintained by the Issuing Defendants and/or may be notified of this action using the form of notice customarily used in securities class actions.

B)     Lead Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Lead Plaintiff's claims are typical of the claims of the other members of the Class and Lead Plaintiff has the same interests as the other members of the Class.  Accordingly, Lead Plaintiff is adequately representative of the Class and will fairly and adequately protect the interests of the Class.

    C)  The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

    D)  A class action is superior to all other methods for a fair and efficient adjudication of this controversy.  There will be no difficulty in the management of this action as a class action.  Furthermore, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

  216.  There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member.  The common questions include, *inter alia*, the following:

    A)  Whether Defendants violated the Securities Act;

    B)  Whether statements made by Defendants to the investing public in the Registration Statements, Prospectuses and Prospectus Supplements both omitted and misrepresented material facts about the underlying mortgages; and

    C)  The extent and proper measure of the damages sustained by the members of the Class.

XII. <u>STANDING</u>

  217.  Lead Plaintiff has constitutional standing to advance the claims alleged herein. Mississippi PERS purchased Certificates and has alleged to have been damaged by Defendants, and can assert a claim directly against each Defendant.  Accordingly, Lead Plaintiff has alleged

concrete and particularized invasions of legally protected interests for all of the claims alleged

under the Securities Act.

<u>FIRST CAUSE OF ACTION</u>

For Violation Of § 11 Of The Securities Act
(Against The Depositor, J.P. Morgan Securities,
The Individual Defendants, And The Rating Agencies)

218.     Lead Plaintiff repeats and realleges each and every allegation above as if set forth

in full herein.  For purposes of this Cause of Action, Lead Plaintiff expressly excludes and

disclaims any allegation that could be construed as alleging fraud or intentional misconduct.

This Cause of Action is based solely on claims of strict liability and/or negligence under the

Securities Act.

219.     This Cause of Action is brought pursuant to § 11 of the Securities Act, on behalf

of Lead Plaintiff and the Class, against the Depositor, J.P. Morgan Securities, the Individual

Defendants and the Rating Agencies.  This Cause of Action is predicated upon Defendants' strict

liability for making materially false and misleading statements in the Offering Documents.

220.     The Registration Statements were materially misleading, contained untrue

statements of material fact, omitted to state other facts necessary to make the statements not

misleading, and omitted to state material facts required to be stated therein.

221.     The Depositor, J.P. Morgan Securities, the Individual Defendants and the Rating

Agencies are strictly liable to Lead Plaintiff and the Class for making the misstatements and

omissions in issuing the Certificates.

222.     The Individual Defendants each signed one or both of the Registration

Statements.

223.     J.P. Morgan Securities and the Rating Agencies each acted as an underwriter in

the sale of Certificates, directly and indirectly participated in the distribution of the Certificates

and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates. The Rating Agencies held themselves out publicly in the Offering Documents as structuring and providing pre-determined credit ratings.

224. The Depositor, J.P. Morgan Securities, the Individual Defendants and the Rating Agencies owed the Lead Plaintiff and other Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

225. The Depositor, J.P. Morgan Securities, the Individual Defendants and the Rating Agencies failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

226. The Depositor, J.P. Morgan Securities, the Individual Defendants and the Rating Agencies issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the Registration Statements, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

227. By reason of the conduct alleged herein, the Depositor, J.P. Morgan Securities, the Individual Defendants and the Rating Agencies violated § 11 of the Securities Act, and are liable to Lead Plaintiff and the Class.

228.    Lead Plaintiff and other Class members acquired the Certificates pursuant and/or traceable to the Registration Statements.  At the time Lead Plaintiff and Class members obtained their Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

229.    Lead Plaintiff and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Depositor, J.P. Morgan Securities, the Individual Defendants and the Rating Agencies.

230.    By virtue of the foregoing, Lead Plaintiff and other Class members are entitled to damages, jointly and severally from the Depositor, J.P. Morgan Securities, the Individual Defendants and the Rating Agencies, as set forth in § 11 of the Securities Act.

231.    This action was brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Lead Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

<u>SECOND CAUSE OF ACTION</u>

For Violation Of § 12(a)(2) Of The Securities Act
(Against J.P. Morgan Securities And The Depositor)

232.    Lead Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.  For purposes of this Cause of Action, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional misconduct.  This Cause of Action is based solely on claims of strict liability and/or negligence under the Securities Act.

233.    This Cause of Action is brought pursuant to § 12(a)(2) of the Securities Act, on behalf of Lead Plaintiff and the Class, against J.P. Morgan Securities and the Depositor.

234.    The Depositor promoted and sold Certificates pursuant to the defective Prospectuses for its own financial gain.  The Prospectuses contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

235.    By means of the Prospectuses, the Depositor sold the Certificates to Lead Plaintiff and the Class.  The Depositor's actions of solicitation consisted primarily of the preparation and dissemination of the Prospectuses.

236.    J.P. Morgan Securities and the Depositor owed to Lead Plaintiff, and the other Class members who purchased Certificates pursuant to the Prospectuses, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading.

237.    Lead Plaintiff and other Class members purchased or otherwise acquired Certificates pursuant to the defective Prospectuses.  Lead Plaintiff and other Class members purchased their Certificates directly from J.P. Morgan Securities.  Lead Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Prospectuses.

238.    By reason of the conduct alleged herein, J.P. Morgan Securities and the Depositor violated § 12(a)(2) of the Securities Act, and are liable to Lead Plaintiff and other Class members who purchased Certificates pursuant to the Prospectuses.

239.    Lead Plaintiff and other Class members were damaged by J.P. Morgan Securities and the Depositor's wrongful conduct.  Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in § 12(a)(2) of the Securities Act.  Those Class members who have sold their Certificates are entitled to rescissory damages, as set forth in § 12(a)(2) of the Securities Act.

240.    This action was brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within one year after reasonable discovery of the untrue statements and material omissions and within three years of when the Certificates were sold to the public.  Despite the exercise of reasonable diligence, Lead Plaintiff could not have reasonably discovered the untrue statements in the Offering Documents at an earlier time.

<u>THIRD CAUSE OF ACTION</u>

Violations Of § 15 Of The Securities Act
(Against The Individual Defendants
And The Rating Agencies)

241.    Lead Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.  For purposes of this Cause of Action, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional misconduct. This Cause of Action is based solely on claims of strict liability and/or negligence under the Securities Act.

242.    This Cause of Action is brought against the Individual Defendants and the Rating Agencies as controlling persons, pursuant to Section 15 of the Securities Act.  The Individual Defendants and the Rating Agencies by virtue of his, her or its control, ownership, offices, directorship, and specific acts set forth above was, at the time of the wrongs alleged herein, a controlling person of the Depositors within the meaning of Section 15 of the Securities Act.  The

Individual Defendants and the Rating Agencies had the power to influence, and exercised that power and influence, to cause the Depositors to engage in violations of the Securities Act, as described above. The Individual Defendants' and the Rating Agencies' control, ownership and position made them privy to the material facts concealed from Lead Plaintiff and other Class members.

243. In addition to participating in a necessary role in the Certificates' distribution, the Prospectus Supplements make clear that the Rating Agencies played other important and vital roles regarding the structuring and administration of the Certificates. These roles allowed them to exercise substantial control over many parties to the securitization transaction, including the Depositors.

244. The Rating Agencies also had the ability to exercise, and did exercise, significant control in causing the Depositors to engage in violations of the Securities Act, as described herein. In particular, the Rating Agencies controlled the issuance of the Certificates through their pre-established ratings, the assignment of which was a condition precedent for the issuance of the Certificates. The Offering Documents stated that it was "a condition to the issuance of the Offered Certificates" that they receive certain, specified ratings from the Rating Agencies. Further, the Offering Documents stated that the Depositor was prohibited from conducting "***any activities other than those related to issuing and selling one or more series of securities, acquiring and selling loans and mortgage-backed securities,*** serving as depositor of the trusts and engaging in activities incidental to the foregoing."

245. Additionally, the Rating Agencies also had the ability to exercise, and did exercise, significant control over the Master Servicer's rights and obligations and whether the Pooling and Servicing Agreements could be amended.

246.    By virtue of their wrongful conduct, the Individual Defendants and the Rating Agencies are liable to Lead Plaintiff and other Class members for their sustained damages.

RELIEF REQUESTED

247.    **WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A)    Declaring this action properly maintainable as a class action and certifying Lead Plaintiff as Class representative and Lead Counsel as Class Counsel;

B)    Awarding compensatory and/or rescissory damages in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C)    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D)    Such other relief as the Court may deem just and proper.

JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

Dated:  March 8, 2010

**WOLF POPPER LLP**

By:  ___/s/ James A. Harrod___
       JAMES A. HARROD

MARIAN P. ROSNER
JAMES A. HARROD
845 Third Avenue, 12th Floor
New York, NY 10022
Tel:    (212) 759-4600
Fax:   (212) 486-2093
*mrosner@wolfpopper.com*
*jharrod@wolfpopper.com*

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**

By:  ___/s/ Timothy A. DeLange___
       TIMOTHY A. DeLANGE

DAVID R. STICKNEY
TIMOTHY A. DELANGE
MATTHEW P. JUBENVILLE
12481 High Bluff Drive, Suite 300
San Diego, California 92130
Tel:    (858) 793-0070
Fax:   (858) 793-0323
*davids@blbglaw.com*
*timothyd@blbglaw.com*
*matthewj@blbglaw.com*

-and-

GERALD H. SILK
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:    (212) 554-1400
Fax:   (212) 554-1444

-and-

POND, GADOW & TYLER, P.A.
JOHN GADOW
BLAKE TYLER
502 South President Street
Jackson, MS 39201

*Counsel for Lead Plaintiff and the Class*