UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PLUMBERS' & PIPEFITTERS' LOCAL #562
SUPPLEMENTAL PLAN & TRUST and
PLUMBERS' & PIPEFITTERS' LOCAL #562
PENSION FUND, On Behalf of Themselves
and All Others Similarly Situated,

               Plaintiffs,

      vs.

J.P. MORGAN ACCEPTANCE CORPORATION I,
*et al.*,

               Defendants.

:   08-cv-1713 (ERK) (WDW)
:
:
:
:
:
:   ECF CASE
:
:
:
:
:
:
:
:
:
:
:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# MEMORANDUM OF LAW IN SUPPORT OF
## THE JPMORGAN DEFENDANTS'
## MOTION TO DISMISS THE AMENDED COMPLAINT


### SIDLEY AUSTIN LLP

ATTORNEYS FOR THE JPMORGAN DEFENDANTS

787 SEVENTH AVENUE
NEW YORK, NEW YORK 10019
(212) 839-5300

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 5

ARGUMENT ............................................................................................................. 16

I. The Claims Relating To 25 Of The 33 Offerings At Issue Must Be Dismissed Because Plaintiff Lacks Standing To Assert Claims As To Those Offerings. ................... 17

II. Plaintiff's Claims Must Be Dismissed Because Plaintiff Fails To Plead Any Actionable Misstatements Or Omissions. ................................................................... 20

    A. Plaintiff's Allegations of Misstatements And Omissions Are Not Plausible .................................................................................................... 21

        1. Plaintiff Offers No Factual Allegations Concerning The Majority Of The Originators' Underwriting And Appraisal Standards. .................... 22

        2. Plaintiff's Allegations Based On CWs Do Not Support A Reasonable Inference of Misstatements Or Omissions. ............................... 23

            a. The CWs are not alleged to have occupied positions such that they would possess the information alleged. ........................................... 24

            b. The CW allegations are vague and conclusory, and do not concern specific mortgage loans at issue. .................................................... 26

                (i) The CW allegations concerning underwriting standards are vague and conclusory. ......................................................... 27

                (ii) The CW allegations concerning appraisal standards are vague and conclusory. ......................................................... 28

                (iii) Plaintiff's allegations concerning credit enhancement are vague and conclusory. ......................................................... 28

    B. Plaintiff Fails To Allege Any Actionable Misstatements Or Omissions Relating To Appraisal Standards And LTV Ratios. ................................................. 29

    C. Plaintiff Fails To Allege Any Actionable Misstatements Or Omissions Relating To The Sufficiency of Credit Enhancement. ............................................. 30

    D. Plaintiff Fails To Allege Any Actionable Misstatements Or Omissions Relating To The Ratings Assigned To The Certificates. ......................................... 32

E.  Plaintiff Fails To Allege Any Actionable Misrepresentations Or Omissions Regarding Underwriting Guidelines For The Mortgage Loans..............................34

F.  There Are No Actionable Misrepresentations Or Omissions Because Plaintiff's Sole Remedy Is The Repurchase Of Non-Complying Loans.................39

G.  Plaintiff Does Not Adequately Allege Materiality. .................................................40

III.  Plaintiff's Claims Must Be Dismissed Because Plaintiff Fails To Plead Any Cognizable Economic Loss. ..............................................................................................42

A.  The Complaint Fails to Plead Cognizable Economic Loss Because Plaintiff Received All "Pass-Through" Payments on the Certificates. ....................43

B.  The Complaint Fails To Plead Any Conceivable Economic Loss With Respect To JPMMT 2006-A3 And JPMMAT 2006-WMC3. ..................................45

IV.  Plaintiff's Claims Are Time-Barred. ......................................................................46

V.  Plaintiff's Section 12(a)(2) Claims Concerning Six Trusts Should Be Dismissed Because It Did Not Purchase Those Certificates Directly From Any JPMorgan Defendant....................................................................................................................50

VI.  Plaintiff's Section 15 Claim Must Be Dismissed. ...........................................51

CONCLUSION. ..................................................................................................................54

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC,*
    646 F. Supp. 2d 385 (S.D.N.Y. 2009) ............................................................ 43, 44

*Akerman v. Oryx Commc'ns, Inc.,*
    810 F.2d 336 (2d Cir. 1987) ....................................................................... 19

*Ala. Elec. Pension Fund v. Pharmacia Corp.,*
    554 F.3d 342 (3d Cir. 2009) ....................................................................... 47

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ...................................................................... 16, 17, 21

*Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l, Ltd.,*
    968 F.2d 196 (2d Cir. 1992) ....................................................................... 17

*Barnes v. Osofsky,*
    373 F.2d 269 (2d Cir. 1967) ....................................................................... 19

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..................................................................... 16, 17, 21, 23

*Campo v. Sears Holdings Corp.,*
    2010 WL 1292329 (2d Cir. Apr. 6, 2010) ............................................................ 23

*City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.,*
    2010 WL 1371417 (E.D.N.Y. Apr. 6, 2010) ..................................... 17, 19, 20, 21, 41

*DeMaria v. Andersen,*
    153 F. Supp. 2d 300 (S.D.N.Y. 2001) ............................................................... 52

*Dodds v. Cigna Sec., Inc.,*
    12 F.3d 346 (2d Cir. 1993) ....................................................................... 47

*ECA & Local 134 IBEW Joint Pension Trust v. JPMorgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009) ....................................................................... 40

*Ellison v. Am. Image Motor Co., Inc.,*
    36 F. Supp. 2d 628 (S.D.N.Y. 1999) ............................................................... 52

*First Nationwide Bank v. Gelt Funding Corp.,*
    27 F.3d 763 (2d Cir. 1994) ....................................................................... 44

*Garber v. Legg Mason, Inc.,*
    537 F. Supp. 2d 597 (S.D.N.Y. 2008) ............................................................ 40, 42

*Halperin v. eBanker USA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002) ........................................................................... 35

*Hinerfeld v. United Auto Group*,
  1998 WL 397852 (S.D.N.Y. July 15, 1998) ................................................... 36

*Hoffman v. UBS-AG*,
  591 F. Supp. 2d 522 (S.D.N.Y. 2008) ............................................................ 19

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*,
  936 F.2d 759 (2d Cir. 1991) ........................................................................... 41

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 402 (S.D.N.Y. 2005) ....................................................... 47, 48

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
  93 F. Supp. 2d 424 (S.D.N.Y. 2000) .............................................................. 52

*In re Am. Express Co. Sec. Litig.*,
  2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008) ............................................... 24

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004) .................................................. 18, 42, 51

*In re Bausch & Lomb, Inc. Sec. Litig.*,
  592 F. Supp. 2d 323 (W.D.N.Y. 2008) ........................................................... 24

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
  665 F. Supp. 2d 404 (S.D.N.Y. 2009) ............................................................ 41

*In re Broderbund/Learning Co. Sec. Litig.*,
  294 F.3d 1201 (9th Cir. 2002) .................................................................. 42, 46

*In re Deutsche Telekom AG Sec. Litig.*,
  2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) .................................................. 52

*In re DoubleClick, Inc. Privacy Litig.*,
  154 F. Supp. 2d 497 (S.D.N.Y. 2001) ............................................................ 34

*In re Elan Corp. Sec. Litig.*,
  543 F. Supp. 2d 187 (S.D.N.Y. 2008) ............................................................ 26

*In re First Union Corp. Sec. Litig.*,
  128 F. Supp. 2d 871 (W.D.N.C. 2001) ........................................................... 43

*In re IAC/Interactivecorp Sec. Litig.*,
  2010 WL 996483 (S.D.N.Y. Mar. 19, 2010) ........................................... *passim*

iv

*In re Initial Public Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003) ................................................................46

*In re Lehman Bros. Sec. & ERISA Litig.*,
    2010 WL 545992 (S.D.N.Y. Feb. 17, 2010) ....................................................*passim*

*In re Liquidating Trust of ResMAE Mortgage Corp.*,
    No. 07-10177 (Bankr. D. Del. filed Feb. 12, 2007)................................................49

*In re Livent, Inc. Noteholders Sec. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001) ..........................................................17, 52

*In re Loral Space & Commc'ns Ltd. Sec. Litig.*,
    2004 WL 376442 (S.D.N.Y. Feb. 27, 2004) ....................................................24, 26

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000)..........................................................46

*In re Merrill Lynch & Co., Inc.*,
    273 F. Supp. 2d 351 (S.D.N.Y. 2003) ..........................................................48

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ........................................................42, 50

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010) ................................................................50, 51

*In re N2K Inc. Sec. Litig.*,
    82 F. Supp. 2d 204 (S.D.N.Y. 2000) ..........................................................40

*In re Openwave Sys. Sec. Litig.*,
    528 F. Supp. 2d 236 (S.D.N.Y. 2007) ........................................................47, 48

*In re Orion Sec. Litig.*,
    2009 WL 2601952 (S.D.N.Y. Aug. 20, 2009)....................................................19

*In re SCOR Holding (Switzerland) AG Litig.*,
    537 F. Supp. 2d 556 (S.D.N.Y. 2008) ..........................................................47

*In re Worldcom, Inc.*,
    377 B.R. 77 (S.D.N.Y. 2007) ................................................................52

*Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing &
    Securitization LLC*, No. 08 Civ. 10841, slip op. (S.D.N.Y. Mar. 31, 2010) (Ex. R) ........17, 19

*Konkol v. Diebold, Inc.*,
    590 F.3d 390 (6th Cir. 2009)................................................................24, 27

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
  2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008) .................................................... 52

*Landmen Partners, Inc. v. Blackstone Group, L.P.*,
  659 F. Supp. 2d 532 (S.D.N.Y. 2009) ................................................................ 40

*Lewis v. Casey*,
  518 U.S. 343 (1996) ......................................................................................... 18

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
  594 F.3d 383 (5th Cir. 2010) ...................................................................... 39, 40

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ......................................................................................... 19

*Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*,
  652 F. Supp. 2d 576 (E.D. Pa. 2009)................................................................. 44

*Makarova v. U.S.*,
  201 F.3d 110 (2d Cir. 2000) .............................................................................. 16

*Malin v. XL Capital Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007)................................................................ 27

*Merck & Co., Inc. v. Reynolds*,
  2010 WL 1655827 (U.S. Apr. 27, 2010) ...................................................... 46, 47

*NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*,
  08 Civ. 10783 (Jan. 28, 2010) (Ex. S) ............................................ 18, 19, 20, 44

*N. J. Carpenters Health Fund v. Residential Capital, LLC*,
  2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) ("*N.J. Carpenters I*")..............*passim*

*N. J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*,
  2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) ("*N.J. Carpenters II*") ............*passim*

*N. J. Carpenters Vacation Fund v. The Royal Bank of Scotland Group*,
  *PLC*, 2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010) ("*N.J. Carpenters III*")..................*passim*

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
  98 F.3d 2 (2d Cir. 1996) .............................................................................. 34, 35

*Pani v. Empire Blue Cross Blue Shield*,
  152 F.3d 67 (2d Cir. 1998) ............................................................................... 34

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
  538 F. Supp. 2d 662 (S.D.N.Y. 2008) ........................................................... 33, 35

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
  658 F. Supp. 2d 299 (D. Mass. 2009) ..................................................................*passim*

*Police and Fire Ret. Sys. v. Safenet, Inc.*,
  645 F. Supp. 2d 210 (S.D.N.Y. 2009) ..................................................................53

*Pyramid Holdings, Inc. v. Inverness Medical Innovations, Inc.*,
  638 F. Supp. 2d 120 (D. Mass. 2009) ..................................................................*passim*

*Randall v. Loftsgaarden*,
  478 U.S. 647 (1985) ..................................................................45

*Republic Bank & Trust Co. v. Bear, Stearns & Co., Inc.*,
  2010 WL 1489264 (W.D. Ky. Apr. 13, 2010) ..................................................................21, 38

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ..................................................................35, 51

*Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp. N.V.*,
  941 F. Supp. 1369 (S.D.N.Y. 1996) ..................................................................53

*Staehr v. Hartford Fin. Servs. Group, Inc.*,
  547 F.3d 406 (2d Cir. 2008) ..................................................................48

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ..................................................................20

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ..................................................................41

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
  2010 WL 816623 (S.D.N.Y. Mar. 11, 2010) ..................................................................29, 30, 32

*Yu v. State Street Corp.*,
  2010 WL 668645 (S.D.N.Y. Feb. 25, 2009) ..................................................................33

**STATUTES**

15 U.S.C. § 77k(a) ..................................................................19, 20

15 U.S.C. § 77k(b)(3)(C) ..................................................................34

15 U.S.C. § 77k(e) ..................................................................45

15 U.S.C. § 77l(a)(2) ..................................................................19, 20, 50

15 U.S.C. § 77l(b) ..................................................................45

15 U.S.C. § 77m ..................................................................46, 47

15 U.S.C. § 77o .............................................................................................................21, 52

Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act").....................*passim*

Section 10(b) of the Securities Exchange Act of 1934...................................................47

**OTHER AUTHORITIES**

17 C.F.R. § 229.1110(a) ............................................................................................22

17 C.F.R. § 229.1111(a)(3)........................................................................................40

17 C.F.R. § 230.405..................................................................................................52

70 Fed. Reg. 1506...................................................................................................43

Fed. R. Civ. P. 8................................................................................................17, 24

Fed. R. Civ. P. 12(b)(1) ...................................................................................1, 16, 42

Fed. R. Civ. P. 12(b)(6) .......................................................................................*passim*

Fed. R. Civ. P. 15(c)(1)(B) .......................................................................................50

*Dropping a Brick*, The Economist (May 31, 2008) (Ex. O).........................................11

Emily Freidlander, *Yale's Shiller: U.S. Housing Slump May Exceed Great Depression*,
    Wall St. J. Online (Apr. 22, 2008) (Ex. N).............................................................11

Michael Fratantoni, Ph.D., *et al.*, *Housing & Mortgage Markets: An Analysis*, Mortgage
    Bankers Assoc. (Sept. 6, 2005) (Ex. M)................................................................11

*Treasury's Paulson - Subprime Woes Likely Contained*, Reuters Bus. & Fin. (Apr. 20,
2007) (Ex.P)...........................................................................................................11

Defendants J.P. Morgan Acceptance Corporation I ("JPM Acceptance") and J.P. Morgan Securities Inc. ("JPMSI") and Defendants David M. Duzyk ("Duzyk"), Louis Schioppo, Jr. ("Schioppo"), Christine E. Cole ("Cole"), and Edwin F. McMichael ("McMichael") (collectively, the "Individual Defendants" and together with JPM Acceptance and JPMSI, the "JPMorgan Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Consolidated Class Action Complaint (the "Complaint") of Lead Plaintiff, the Public Employees' Retirement System of Mississippi ("Plaintiff"), pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

The past two years have seen the most stunning collapse of the United States' economy since the Great Depression. The housing market led the way – home values in most parts of the country crumbled, dropping more than 25% in parts of California since 2008 and more than 40% in parts of Florida over the same period. The rest of the country suffered similar declines in the historic downturn.

In 2006 and 2007, Plaintiff purchased mortgage pass-through certificates, a form of mortgage-backed security that gives the holder a right to proceeds of payments made on residential mortgages in an underlying loan pool. Plaintiff, a sophisticated institutional investor, thus invested in the real estate market just as the housing bubble peaked and burst. Now, concerned that the collapse of real estate values could reduce the payments it received as a certificateholder, and despite its being well aware of the risks associated with a nationwide real estate downturn, Plaintiff seeks to avoid losses by having Defendants insure those payments. Hence this lawsuit, by which Plaintiff seeks to recover under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act"). Plaintiff makes sweeping, conclusory, and unsupported allegations that the Defendants made misstatements in securities offering documents about the

1

appraisals performed for, the true loan-to-value ratios of, and the underwriting of the loans in the underlying loan pools, about the sufficiency of the credit enhancement supporting each offering, and about the ratings given the certificates.

Unlike other recent mortgage-backed securities lawsuits, this case is about a large number of offerings involving loans originated by more than a dozen different originators. Plaintiff here seeks to indict the entire securitization industry. But Plaintiff's allegations are completely generic, as they say nothing with respect to any particular loans in the pools and do not provide a single example of a loan that was originated outside of the disclosed standards. Although Plaintiff relies upon confidential witnesses, whom it claims had access to information about a minority of the non-party originators of the mortgage loans at issue, the allegations attributed to those witnesses are vague, conclusory, and insufficient to support claims of falsity. Plaintiff's claims are legally insufficient and must be dismissed.

*First*, the claims relating to 25 of the 33 offerings at issue must be dismissed because Plaintiff did not purchase certificates in those offerings and therefore lacks standing. The law is clear that plaintiffs may not assert 1933 Act claims for losses in securities that they never purchased. Because Plaintiff did not purchase securities in 25 of the 33 offerings, all of its claims based on those offerings must be dismissed.

*Second*, Plaintiff fails to plead any actionable misstatements or omissions. Courts within this Circuit have recently dismissed the same claims asserted here relating to appraisals, credit enhancements and credit ratings. Moreover, the robust disclosures in the offering materials fully informed investors of all material facts regarding the underlying mortgage loans. They specifically warned Plaintiff of departures from underwriting guidelines and that credit ratings should not be relied on too heavily. They further warned that numerous factors, including a

housing price collapse, could have a negative impact on certificateholders' ability to receive pass-through payments.  These risk disclosures bespeak caution, and Plaintiff cannot now be heard to complain that it was unaware of the risks inherent in these investments.  Further, Plaintiff pleads no facts supporting its sweeping allegations that the statements in the offering materials were false or misleading.  Although Plaintiff's allegations are lengthy, they are vague, conclusory, and implausible.  The confidential witnesses they rely on do not appear to have occupied positions such that they would possess the information alleged, and, in any event, are not the source of allegations concerning specific mortgage loans underlying the certificates. There are also no misrepresentations as a matter of law because Plaintiff's sole remedy is the repurchase of non-complying loans.  In addition, Plaintiff does not adequately allege that any misrepresentations were material to the transactions because it does not identify, even roughly, the number or volume of loans in the mortgage pools that allegedly did not comply with the characteristics disclosed in the offering documents.

*Third*, Plaintiff fails to plead any cognizable economic loss.  Plaintiff does not allege that it has failed to receive any pass-through payments from the certificates it purchased, which is the sole economic benefit for which it bargained.  Instead, Plaintiff alleges as damage the risk that the certificates will cease to perform in the future.  A speculative injury is not actionable. Moreover, Plaintiff cannot possibly plead any economic loss as to the certificates issued by two trusts because it sold those certificates without incurring any loss whatsoever – indeed, it profited on one of its sales.  Plaintiff's allegation that it sold certificates that it purchased from two other trusts at a loss does not constitute a cognizable economic loss here because, as explained below, the sole economic benefit in purchasing mortgage-backed certificates are the expected "pass-

3

through" payments, and the offering documents specifically warned investors that a secondary market for the certificates might never develop.

*Fourth*, Plaintiff's claims are time-barred because, assuming the allegations are true, discovery of the misrepresentations should have been made well more than one year before the original complaint in this action was filed on March 26, 2008.  The plethora of public information concerning mortgage fraud, loosening underwriting standards, inflated appraisals, and the mortgage business placed Plaintiff on inquiry notice of its claims well before March 2007, and constructive discovery should have been made by that time.

*Fifth*, Plaintiff's Section 12(a)(2) claims concerning six of the eight remaining trusts must be dismissed because Plaintiff concedes that it did *not* purchase its certificates from those trusts *directly* from any JPMorgan Defendant.

*Finally*, Plaintiff's Section 15 "control person" claims against the Individual Defendants must be dismissed because Plaintiff does not adequately plead any underlying violation of the 1933 Act and, in any event, fails to adequately allege the Individual Defendants' control of JPMorgan Acceptance or culpable participation in the alleged misstatements and omissions.

Through the certificates, Plaintiff invested in the United States real estate market.  That may turn out to have been a bad investment, but Plaintiff was fully informed of the risks.  The Complaint does not allege facts sufficient to support any other conclusion.  Plaintiff's claims should be dismissed with prejudice.  A chart summarizing the grounds for dismissal of Plaintiff's claims by offering is attached as Appendix A to this memorandum.

# FACTUAL BACKGROUND

## Overview Of The Parties And Claims

Plaintiff purports to bring this action individually and on behalf of a class consisting of all persons/entities who purchased or acquired beneficial interests in the mortgage-backed certificates identified in the Complaint (the "Certificates") issued pursuant and/or traceable to JPM Acceptance's July 29, 2005 Registration Statement (Reg. No. 333-127020) and December 7, 2005 Registration Statement (Reg. No. 333-130192), both as amended, and the accompanying prospectuses and prospectus supplements (collectively, the "Offering Documents").  (¶ 1.)[1] Plaintiff asserts violations of Sections 11, 12(a)(2), and 15 of the 1933 Act.  (*Id.*)

Although this action purports to involve Certificates issued in connection with 33 separate public offerings (the "Offerings") conducted by 33 separate issuing trusts (the "Trusts") (¶¶ 2, 34), Plaintiff:

- purchased Certificates in only 8 of the 33 Offerings (¶ 13);[2]
- purchased Certificates issued by only 2 of the Trusts (JPMALT 2006-A4 and JPMMAT 2006-RM1) directly from Defendant JPMSI (¶ 13);
- sold Certificates issued by 2 Trusts (JPMMT 2006-A3 and JPMMAT 2006-WMC3) *without incurring any loss whatsoever* and, with respect to the former, at a *gain* (Ex. A); and
- fails to make any allegations regarding the disclosed originators that underwrote the loans in 7 of the 33 Offerings.

The defendants include JPM Acceptance, JPMSI, and the Individual Defendants. Plaintiff alleges that JPM Acceptance served in the role of "Depositor" in the securitization of the issuing Trusts and, as such, was the "Issuer" of the Certificates within the meaning of Section

---

[1] Paragraph references (¶ __) are to the Complaint.  Exhibit references (Ex. __) are to exhibits to the Declaration of Dorothy J. Spenner, which was filed with this memorandum on May 7, 2010.

[2] Plaintiff alleges that it purchased only the following Certificates, which were backed by separate pools of mortgage loans originated by or acquired from different groups of originators:  J.P. Morgan Mortgage Trust ("JPMMT") 2006-A1 2A2 (this Trust was not mentioned in the original complaint in this action); JPMMT 2006-A3 7A1; JPMMT 2006-A5 2A1; JPMMT 2007-A1 6A1; J.P. Morgan Alternative Loan Trust ("JPMALT") 2006-A4 A7; J.P. Morgan Mortgage Acquisition Trust ("JPMMAT") 2006-WMC3 A3; JPMMAT 2006-RM1 A2; and JPMMAT 2006-CH2 AV2.  Plaintiff improperly refers to J.P. Morgan Mortgage Acquisition Trusts as J.P. Morgan Acquisition Trusts.

2(a)(4) of the 1933 Act.  (¶ 16.)  Plaintiff alleges that JPMSI acted as the sole "Underwriter" of the Certificates and participated in the drafting and dissemination of the prospectus supplements pursuant to which the Certificates were sold.  (¶ 15.)  Plaintiff alleges that each of the Individual Defendants signed the two Registration Statements at issue and was an officer or director of JPM Acceptance during the relevant time period.  (¶¶ 17-20.)  Plaintiff alleges that Duzyk was President (¶ 17), that Schioppo was Controller and Chief Financial Officer (¶ 18), that Cole was a Director (¶ 19), and that McMichael was a Director (¶ 20), of JPM Acceptance.

Plaintiff asserts its Section 11 claim against JPM Acceptance, JPMSI, and the Individual Defendants, asserts its Section 12(a)(2) claim against JPM Acceptance and JPMSI, and asserts its Section 15 claim against the Individual Defendants.  The Complaint also asserts claims against Defendants Moody's Investor Services, Inc. ("Moody's"); McGraw-Hill Companies, Inc., through its division, Standard & Poor's Financial Services, Inc. ("S&P"); and Fitch Ratings, Inc. ("Fitch") (collectively, the "Rating Agencies").  (¶ 4.)  Plaintiff alleges that the Rating Agencies provided "unjustifiably high" ratings for the Certificates and that their stated participation in structuring and rating the Certificates "departed substantially from the role the Rating Agencies traditionally played."  (¶¶ 4-5.)  Although Plaintiff alleges that the mortgage loans underlying the Certificates were purchased from at least 19 separate originators (the "Originators"), but the Originators are not named as parties in this action.  (¶ 3.)

**The Certificates**

The Certificates were created by "securitizing" separate pools of mortgage loans.  (¶ 30.) For each Offering, the "Sponsor" of the issuing Trust, non-party J.P. Morgan Mortgage Acquisition Corp., acquired a group of mortgage loans from loan originators.  (¶¶ 3, 26.)  The Sponsor sold the loans to the Depositor, JPM Acceptance, which, in turn, established the issuing

Trust and placed the loans in the Trust in exchange for mortgage pass-through certificates that represent fractional interests in the Trust and give the holder a right to a portion of the proceeds of the loans. (¶¶ 28-33.) Thus, the value of a mortgage-backed security (unlike corporate stock) does not depend on the profitability of its issuer, but is tied to the stream of principal and interest payments made on the underlying pool of mortgage loans. (¶ 33.)

The certificates issued by each Trust were divided into separate classes or "tranches" that are tiered such that losses due to loan default, delinquency, or otherwise are absorbed by bonds sequentially in reverse order of their seniority. (¶ 30.) As such, the most senior tranches are often rated as the best quality, and junior tranches, which usually obtain lower ratings, are less insulated from risk. (¶ 30.)

Plaintiff alleges that "as the performance of the mortgage loans declines, even the most-senior tranches are exposed to a greater likelihood of loss as the 'credit enhancement' provided by the subordinate tranches is eroded. Once the losses on the lower-ranking tranches reach a certain point the senior certificates will begin experiencing cash flow shortfalls too." (¶ 31.) "Even if the senior certificates do not immediately experience cash flow shortfalls, the deterioration in the collateral backing the certificates makes the senior certificates more risky." (¶ 31.) Plaintiff alleges that virtually all of the senior, AAA-rated Certificates that it purchased have now been downgraded to below investment-grade (¶ 211), and that the mortgage loans supporting the Certificates "have experienced unprecedented rates of delinquencies, foreclosures, real estate owned after the Servicer foreclosed on the property underlying the Mortgage Loans ("REOs") and bankruptcies" (¶ 212). Notably, however, the Certificates purchased by Plaintiff received forms of limited protection from losses caused by loan defaults, including credit

enhancements in the form of subordination, overcollateralization, limited cross-collateralization, excess interest, and/or interest rate swaps.[3]

Because these credit enhancements protected the Certificates from the impact of defaults in the underlying loans, Plaintiff does not allege that it has failed to receive any payments on the Certificates or that they have performed differently during the economic downturn than similar instruments. Rather, Plaintiff alleges "damages" based on downgrades and delinquencies, as well as from a reduction in the price at which Plaintiff sold two of the Certificates (¶ 14), despite that Plaintiff sold other of the Certificates at no loss whatsoever (Ex. A), that Plaintiff was advised that there might not be a liquid market for the Certificates,[4] and that the purpose of the Certificates was to provide an income stream, not secondary market value (¶ 28).[5]

**The Robust Disclosures In The Offering Documents**

Plaintiff is a sophisticated investor: at the close of the 2009 fiscal year, it had $15 billion in net assets held in trust. (¶ 13.)

The Offering Documents detailed the nature and quality of the pool of mortgage loans held by each Trust, including type of loans, number of loans, mortgage rate and net mortgage rate, aggregate scheduled principal balance of the loans, original loan-to-value ("LTV") ratio, and geographic concentration of the mortgaged properties. (¶ 45.) The Offering Documents could not have been clearer that a significant number of loans were originated pursuant to alternative sets of underwriting criteria under reduced or limited documentation programs that required little or no verification of information in a borrower's loan application, including the borrower's assets, income, or employment. (*See* ¶ 64.) They also disclosed that "exceptions"

---

[3] *See, e.g.*, Exs. B, at i; C, at i; D, at i; E, at i; F, at i; G, at i; H, at i; I, at i.
[4] *See, e.g.*, Exs. B, at S-14; J, at 1, 7; K, at 7.
[5] *See, e.g.*, Exs B, at S-5-6; C, at S-6-7; D, at S-5-6; E, at S-5; F, at S-6-7; G, at S-4-5; H, at S-4-5; I, at S-8.

would be made even to "low doc" and "no doc" guidelines.  (*See* ¶¶ 64-65.)  Indeed, they

informed investors that:

- Originators' loan policies permitted "low-doc" or "no-doc" loans requiring little or no verification of a borrowers assets or income and a substantial number of "low-doc" and "no-doc" loans comprised the mortgage pools in each trust;[6]
- Credit enhancements – *i.e.*, subordinated tranches of the securitization structures designed to absorb initial losses in the mortgage pools – could prove inadequate to protect senior certificateholders from losses, including losses caused by fraud or negligence by loan originators;[7]
- Credit ratings were subject to change at any time and were not recommendations to buy or sell the certificates;[8] and
- The certificates were potentially illiquid investments for which a secondary market might never exist.[9]

In fact, each Prospectus Supplement disclosed that, as a general matter, the loan pools

were made up of particularly risky loans – the majority of loans were made under "stated

documentation," "stated income, stated asset," "stated income, full asset," "limited

documentation," "reduced," "simply signature," "streamlined," "no income verifier," "no

income/no assets verifier," or "no documentation" programs (collectively "low-doc or no-doc

loans").[10]  The Prospectus Supplements disclosed exactly how many loans were originated with

less than full documentation of the borrower's income, as well as the range of LTV ratios and

FICO scores for all of the loans.[11]  As explained in the Offering Documents, such factors may

---

[6] *See, e.g.*, Exs. B, at S-25-44, A-3; C, at S-32-36, A-4, A-23; D, at S-32-41, A-4; E, at S-19-27, A-2; F, at S-34, S-82-99; G, at S-29, S-52-56; H, at S-30, S-52-63; I, at S-28-31, A-4.

[7] *See, e.g.*, Exs. B, at S-12-13; C, at S-16-18; D, at S-14-15; E, at S-12-13; F, at S-17; G, at S-13; H, at S-13; I, at S-16-17; J, at 7-8; K, at 7-8; L, at 6-7.

[8] *See, e.g.*, Exs. B, at S-2 n.10, S-85; C, at S-2 n.12, S-73; D, at S-2 n.10, S-79; E, at S-2 n.10, S-62; F, at S-2 n.7, S-174; G, at S-2 n.6, S-116; H, at S-2 n.6, S-125; I, at S-3 n.13, S-69.

[9] *See, e.g.*, Exs. B, at S-14; J, at 1, 7; K, at 7.

[10] *See, e.g.*, Exs. B, at A-3 (roughly 47% of aggregate principal balance consisted of low-doc or no-doc loans); C, at A-4, A-23 (roughly 48% of aggregate principal balance in Aggregate Pool I consisted of low-doc or no-doc loans; roughly 14% of aggregate principal balance in Aggregate Pool II consisted of low-doc or no-doc loans); D, at A-4 (roughly 43% of aggregate principal balance consisted of low-doc or no-doc loans); E, at A-2 (roughly 84% of aggregate principal balance consisted of low-doc or no-doc loans); F, at S-34 (roughly 56% of aggregate principal balance consisted of low-doc or no-doc loans); G, at S-29 (roughly 54% of aggregate principal balance consisted of low-doc or no-doc loans); H, at S-30 (roughly 73% of aggregate principal balance consisted of low-doc or no-doc loans); I, at A-4 (roughly 26% of aggregate principal balance consisted of low-doc or no-doc loans).

[11] *See, e.g.*, Exs. B, at A-2; C, at A-6, A-22; D, at A-3; E, at A-1-2; F, at S-31; G, at S-27-28; H, at S-28; I, at A-1-2.

increase the risk of delinquencies.[12]  Plaintiff thus had access to a wealth of data for all of the loans in the offerings.

In addition to the details about the loan pools, the Prospectus Supplements also disclosed the credit rating given to each tranche and contained lengthy and detailed risk disclosures. Among other things, the risk disclosures warned investors that a downturn in the housing market might interrupt payments, that higher risk loans were more likely to default, that there were a number of different underwriting programs, and that exceptions would be made to each.[13]  What is clear from the risk disclosures is that the Prospectus Supplements provided detailed information about the inherent risks in the types of collateral and documentation programs used for origination of the loans.

Further, to the extent that any loans did not conform to the disclosed characteristics, the Offering Documents disclosed that the seller or the originator would repurchase the non-conforming loan or substitute a qualified mortgage loan.[14]  They stated that the "*sole remedy* available to security holders" for any alleged non-complying loans would be to request that the loan (not certificate) seller, or the originator, "repurchase or substitute a similar mortgage loan."[15]  Plaintiff does not allege that it has made any such request, much less that such request has been refused.

## Plaintiff's Allegations Of Misstatements And Omissions

Plaintiff's claims must be considered in light of the overall economic environment.  From 1997 through 2006, housing prices increased at an "unusually rapid rate," far "more quickly than

---

[12] *See, e.g.*, Exs. B, at S-11, S-14; C, at S-15, S-18; D, at S-13-14, S-16; E, at S-12; F, at S-20-22; G, at S-16-18; H, at S-13, S-16-18; I, at S-15.

[13] *See, e.g.*, Exs. B, at S-1-2, S-10-15, S-25-44; C, at S-1-2, S-15-19, S-33-36; D, at S-1-2, S-13-16, S-31-41; E, at S-1-2, S-10-15; S-19-27; F, at S-1-3, S-15-25, S-82-99; G, at S-1-2, S-11-21, S-52-56; H, at S-1-2, S-11-21; S-52-63; I, at S-1-3, S-15-18, S-28-31.

[14] *See, e.g.*, Exs. J, at 30-32, 65; K, at 30-32, 65; L, at 28-30, 63.

[15] *Id.* (emphasis added).

is customary" nationwide.[16]  In fact, home prices nationwide "rose about 85% from 1997 to 2006 adjusted for inflation," making it the "biggest national housing boom in U.S. history."[17]  Seeking to capitalize on the housing market, Plaintiff invested in mortgage-backed securities.

The unusually steep increase in house prices came to an abrupt end in 2006 when began the single largest decline in single-home values in this country's recorded history.[18]  Even in the midst of the downturn, however, people did not grasp the full extent of the decline.[19]  Ultimately, the rate at which house prices fell led to a sharp rise in loan defaults.[20]  Plaintiff cannot claim to have been surprised by these events, however, as the possibility that these events might occur was disclosed in the Offering Documents.

Now seeking to avoid the consequences of its investments, Plaintiff alleges that the Offering Documents contained untrue statements of material fact and omitted material facts necessary to make the statements therein not misleading regarding:  (1) the underwriting standards purportedly used in connection with the underlying mortgage loans (¶¶ 62-162); (2) the appraisal standards used to evaluate the properties serving as collateral for the mortgage loans and the true LTVs (¶¶ 163-182); (3) the sufficiency of the credit enhancement supporting each offering (¶¶ 183-85); and (4) the processes and procedures the Rating Agencies employed to rate the Certificates (see ¶¶ 186-208).  (¶ 6.)

With respect to underwriting standards, Plaintiff claims that although the Offering Documents disclosed that the mortgage loans sometimes were originated pursuant to alternative sets of underwriting criteria and described those alternative sets of criteria, they nonetheless

---

[16] Ex. M at 6.
[17] Ex. N.
[18] Ex. O.
[19] See, e.g., Ex. P ("U.S. Treasury Secretary Henry Paulson said on Friday the housing market correction appears to be at or near its bottom and that troubles in the subprime mortgage market will not likely spread throughout the economy.").
[20] See Ex. O.

contained material misstatements and omissions in that the Originators "systematically disregarded" their stated underwriting guidelines by making "exceptions" to their underwriting policies "in the absence of *sufficient* compensating factors." (*See* ¶¶ 7, 75, 93, 112, 132 (emphasis added).)  As Plaintiff acknowledges, each Originator applied its own judgment as to whether a prospective borrower warranted an exception to its guidelines.  (*See id.*)  Indeed, each Originator determined, in its sole discretion, whether each borrower's total mix of compensating factors was sufficient to warrant an exception.  (*See id.*)  Plaintiff's claims fail for that reason alone.

In addition, although Plaintiff's claims concern the practices of at least 19 Originators (¶¶ 3, 34), Plaintiff offers factual allegations as to only 8 Originators – "The Chase Originators," Countrywide Home Loans, ResMAE Mortgage Corp., New Century Mortgage Corp., Wells Fargo Bank, N.A., GreenPoint, Accredited, and American Home (¶¶ 71-142, 151, 152-56, 157-162) – and in conclusory fashion asserts that the "abuses of the underwriting process were prevalent and pervasive throughout the entire mortgage origination industry." (¶ 70; *see* ¶¶ 144, 147, 149.)  Plaintiffs' allegations as to the 8 above Originators are based almost exclusively on confidential witnesses, who are described as former employees of those Originators.[21]

With respect to appraisal standards and LTV ratios, Plaintiff claims that although the Offering Documents disclosed the Originators' appraisal standards and practices, they nonetheless contained untrue statements and omissions "because appraisers and originators industry-wide systematically failed to follow accepted appraisal guidelines, resulting in

---

[21] Plaintiff's allegations concerning "The Chase Originators" are also purportedly based on the testimony of JPMorgan Chase & Co. Chairman and CEO James Dimon before the Financial Crisis Inquiry Commission. (¶¶ 76-81.)  Mr. Dimon's testimony is taken completely out of context, however, and cannot be read to support that "The Chase Originators" systematically disregarded its stated underwriting standards.  Plaintiff's reliance on Mr. Dimon's statement that "the underwriting standards of our mortgage business should have been higher" (¶ 76) simply does not support any reasonable inference that the Offering Documents misrepresented  the underwriting guidelines of "The Chase Originators."

pervasive appraisal inflation." (¶ 167; *see* ¶¶ 163-67.) Again, Plaintiff focuses on just a few Originators – "The Chase Originators," Countrywide, Accredited, and Ownit (¶¶ 168-79) – and asserts in conclusory fashion that because appraisals were inflated, the LTV ratios in the Offering Documents were artificially low and materially overstated borrowers' loan equity in their homes (¶ 181). Again, Plaintiffs' allegations as to these Originators are based almost entirely on confidential witnesses.

Plaintiff's allegations of alleged misstatements and omissions concerning credit enhancement are based entirely on Plaintiff's allegations regarding underwriting and appraisal standards and credit ratings. Plaintiff alleges that credit enhancement represents the amount of "cushion" or protection from losses exhibited by a given security (¶ 183), and that credit enhancement-related statements in the Offering Documents "lacked any reasonable basis and were inaccurate as they failed to disclose that the Originators systematically disregarded their underwriting and appraisal standards and therefore the supposed credit enhancement was deficient" (¶ 185). Plaintiff further claims that the Rating Agencies' models, which determined the necessary level of credit enhancement, had not been updated and could not accurately reflect the expected performance of the underlying mortgage loans. (¶ 185.)

As for credit ratings, Plaintiff claims that the ratings assigned to the Certificates were unjustifiably high and did not represent the true risk of the Certificates because they were based on inaccurate mortgage loan data and the Rating Agencies relied on outdated models. (¶¶ 186-208.) These allegations are based on hindsight statements of Moody's executives (¶¶ 189-90), and hindsight news articles, testimony, SEC reports, and a Moody's presentation (¶¶ 193-208).

**<u>Plaintiff's Allegations Based On Confidential Witnesses</u>**

Plaintiff's allegations concerning underwriting standards, appraisal standards, and, by incorporation, credit enhancement are based predominately on purported information provided by 31 confidential witnesses (the "Confidential Witnesses" or "CWs"), who are described as former employees of a minority of the Originators.  As an initial matter, nowhere in the Complaint does any CW provide a single example of an underwriting or appraisal determination about a borrower that contradicts the Offering Documents.  Moreover, none of the CWs offer any information about the following 11 Originators referenced in the Complaint:

- Flagstar Bank, FSB (originated 10% or more of the loans in 1 of 33 Offerings);
- Greenpoint Mortgage Funding (originated 10% or more of the loans in 2 of 33 Offerings);
- M&T Mortgage Corp. (originated 10% or more of the loans in 2 of 33 Offerings);
- NovaStar Mortgage Inc. (originated 10% or more of the loans in 1 of 33 Offerings);
- PHH Mortgage (originated 10% or more of the loans in 10 of 33 Offerings);
- SunTrust Mortgage, Inc. (originated 10% or more of the loans in 2 of 33 Offerings);
- Washington Mutual Mortgage Securities Corp. (originated 10% or more of the loans in 1 of 33 Offerings);
- WMC Mortgage Corp. (originated 10% or more of the loans in 3 of 33 Offerings);
- CTX Mortgage Co., LLC (originated 10% or more of the loans in 1 of 33 Offerings);
- Fieldstone (originated 10% or more of the loans in 1 of 33 Offerings); and
- Quicken (originated 10% or more of the loans in 1 of 33 Offerings).

(¶¶ 3, 34.)  Four of these Originators (M&T, PHH, WMC, and CTX) originated loans underlying the Certificates issued by the 8 Trusts that Plaintiff purchased.  (¶ 34.)  Thus, Plaintiff offers no factual allegations as to the majority of the Originators' underwriting standards and appraisal standards, including as to the very Certificates that it purchased.

Indeed, although Plaintiff relies on many CWs, those CWs purport to provide information about only the following 8 Originators:

- "The Chase Originators" (CWs 1-3 & 26-28) (*see* ¶¶ 82-89, 168, 171-72, 174-75);

14

- Countrywide Home Loans (CWs 4-6) (*see* ¶¶ 94-96);
- ResMAE Mortgage Corp. (CWs 7-9) (*see* ¶¶ 113-115);
- New Century Mortgage Corp. (CWs 10-12) (*see* ¶¶ 124-26);
- Wells Fargo Home Mortgage (CWs 13-18) (*see* ¶¶ 133-41);
- Accredited (CWs 19-22 & 29) (*see* ¶¶ 152-55, 177);
- American Home Mortgage (CWs 23-25) (*see* ¶¶ 159-61); and
- Ownit Mortgage Solutions (CWs 30-31) (*see* ¶¶ 178-79).

Half of these Originators – New Century Mortgage Corp., Accredited, American Home

Mortgage, and Ownit – did *not* originate loans underlying the Certificates that Plaintiff

purchased. (*Compare* ¶ 13 *with* ¶ 34.) And, Plaintiff's allegations regarding appraisals are

based on only 6 CWs, and one named witness, who purportedly worked for only 4 alleged

Originators -- Chase Home Finance, Countrywide, Accredited, and Ownit. (¶¶ 168-79.)

Notably, Plaintiff does not allege any information concerning the specific loans in the

pools underlying the Certificates at issue, let alone those that Plaintiff purchased. Moreover,

Plaintiff's descriptions of the CWs do not support the inference that the CWs would possess the

generic information alleged. Indeed, the CWs' roles are not described at all apart from their

titles. For example, it strains credulity that CW6, who is described solely as "an underwriter for

Countrywide in the Jacksonville, Florida processing center" would know that "as much as 80%

of the loans originated involved significant variations from underwriting standards" or that

"Countrywide was very lax when it came to underwriting guidelines." (¶ 96.)

In addition, many – if not the vast majority – of the loans at issue were originated in

geographic locations other than those in which the CWs purportedly worked. For example,

although CWs 30 and 31 worked for Ownit in Atlanta, Georgia and Portland, Oregon,

respectively, the aggregate loan pool data for the one Offering involving Originator Ownit makes

clear that only 2.9% of the outstanding loan balance was originated in Georgia and only 3.1%

was originated in Oregon.[22]  Such allegations cannot support that the loans at issue systematically deviated from the Originators' standards.

The CW allegations also are consistently vague and conclusory with respect to both underwriting and appraisal standards.  (*See, e.g.*, ¶¶ 96, 136, 139, 160, 175, 178.)  First, the allegations do not address any particular loans (or appraisals), let alone loans underlying the Certificates at issue.  Moreover, the allegations do not concern the Originators' determinations of whether a borrower's compensating factors were sufficient to warrant a deviation from underwriting guidelines.  Nor do they concern the appraisers' determinations of value.  Indeed, nowhere in the Complaint does any CW provide a single example of an underwriting or appraisal determination about a borrower that contradicts the Offering Documents; there is no example of any exception being granted without compensating factors.  Thus, the allegations include no facts supporting *any* deviation from guidelines, let alone any *systematic* deviation.

## ARGUMENT[23]

Dismissal for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) is required where, as in the case of lack of standing here, "the district court lacks the statutory or constitutional power to adjudicate."  *Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000).

Dismissal is also required where, as here, a complaint fails to state a claim under Fed. R. Civ. P. 12(b)(6).  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although the Court must accept all well-pleaded allegations as true, a complaint must state a claim that rises above the speculative level, and "[t]hreadbare recitals of the elements of a cause of action, supported by

---

[22] *See* Ex. Q, at S-32.
[23] The JPMorgan Defendants incorporate by reference and adopt the arguments set forth in the Rating Agencies' memorandum of law that are applicable to them.

16

mere conclusory statements, do not suffice." *Id.* at 1949. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 1950 (quoting Fed. R. Civ. P. 8(a)(2)). If a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Courts are required to credit neither unsupported inferences, *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l, Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992), nor factual allegations that are "contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001). In deciding a motion to dismiss, "the court determining the motion may rightfully consider written documents attached to the complaint as well as documents incorporated thereto by reference and those of which plaintiff had knowledge and relied upon in commencing the action." *City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.*, 2010 WL 1371417, at *5 (E.D.N.Y. Apr. 6, 2010) (Wexler, J.).

Under these standards, the Complaint must be dismissed with prejudice.

**I.      THE CLAIMS RELATING TO 25 OF THE 33 OFFERINGS AT ISSUE MUST BE DISMISSED BECAUSE PLAINTIFF LACKS STANDING TO ASSERT CLAIMS AS TO THOSE OFFERINGS.**

In a series of recent decisions, district courts in the Second Circuit and elsewhere have routinely dismissed Section 11 and 12(a)(2) claims relating to mortgage-backed securities for offerings in which the plaintiff did not purchase certificates. *See, e.g., City of Ann Arbor*, 2010 WL 1371417, at *7-8 (Wexler, J.) (dismissing claims related to 16 of 18 offerings); *Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization LLC*, No. 08 Civ.

10841, slip op. at 1 (S.D.N.Y. Mar. 31, 2010) (Ex. R) (dismissing claims related to offerings in which named plaintiffs did not purchase); *N. J. Carpenters Health Fund v. Residential Capital, LLC*, 2010 WL 1257528, at *4 (S.D.N.Y. Mar. 31, 2010) ("*N.J. Carpenters I*") (dismissing claims related to 55 of 59 offerings); *N. J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*, 2010 WL 1473288, at *3-4 (S.D.N.Y. Mar. 29, 2010) ("*N.J. Carpenters II*") (dismissing claims related to 3 of 4 offerings); *N. J. Carpenters Vacation Fund v. The Royal Bank of Scotland Group, PLC*, 2010 WL 1172694, at *7-8 (S.D.N.Y. Mar. 26, 2010) ("*N.J. Carpenters III*") (dismissing claims related to 13 of 15 offerings); *In re Lehman Bros. Sec. & ERISA Litig.*, 2010 WL 545992, at *3 (S.D.N.Y. Feb. 17, 2010) (dismissing claims related to 88 of 94 offerings); *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, 08 Civ. 10783, Jan. 28, 2010 Tr. at 2, 40 (S.D.N.Y. Jan. 28, 2010) (Ex. S) (dismissing claims related to 15 of 17 offerings); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 303 (D. Mass. 2009) (dismissing claims related to 6 of 8 offerings).  This Court should do the same here.

Standing is a constitutional prerequisite to the Court's exercise of subject matter jurisdiction. *See Lewis v. Casey*, 518 U.S. 343, 349 (1996); *In re Lehman Bros.*, 2010 WL 545992, at *2; *Nomura*, 658 F. Supp. 2d at 303.  The standing inquiry "is particularly important in securities litigation, where strict application of standing principles is needed to avoid vexatious litigation and abusive discovery." *Nomura*, 658 F. Supp. 2d at 303.  "The burden to establish standing rests on the party asserting its existence." *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 245 (S.D.N.Y. 2004).  Accordingly, a plaintiff must allege "facts demonstrating that it is a proper party to invoke judicial resolution of the dispute." *Id.* Where plaintiff cannot demonstrate "actual injury" caused by the defendants, it does not have

18

standing to sue. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he plaintiff must have suffered an 'injury-in-fact' . . . which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'") (internal citations and quotations omitted).

Section 11 expressly limits recovery to "any person acquiring such security." 15 U.S.C. § 77(k)(a). The only persons capable of suffering "actual injury," therefore, are those who allege that they acquired the specific securities in question. *See Barnes v. Osofsky*, 373 F.2d 269, 273 (2d Cir. 1967) ("[A]n action under § 11 may be maintained 'only by one who comes within a narrow class of persons, *i.e.*, those who purchase securities that are the direct subject of the prospectus and registration statements.'"); *see, e.g.*, *City of Ann Arbor*, 2010 WL 1371417, at *7 (holding that plaintiffs suffered no injury as to certificates that they did not purchase); *Iron Workers*, No. 08 Civ. 10841, slip op. at 1 (Ex. R.); *N.J. Carpenters I*, 2010 WL 1257528, at *4 ("a plaintiff must have purchased in the particular offering in order to have standing to challenge related material misstatements and omissions"); *N.J. Carpenters II*, 2010 WL 1473288, at *4; *N.J. Carpenters III*, 2010 WL 1172694, at *8; *In re Lehman Bros.*, 2010 WL 545992, at *3; *NECA-IBEW*, Tr. at 6 (Ex. S); *Nomura*, 658 F. Supp. 2d at 303; *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 530-31 (S.D.N.Y. 2008).

Section 12(a)(2) likewise expressly limits recovery to "the person purchasing such security." 15 U.S.C. § 77l(a)(2); *see Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 344 (2d Cir. 1987) ("Section 12 imposes liability on persons who offer or sell securities and only grants standing to 'the person purchasing such security' from them."); *In re Orion Sec. Litig.*, 2009 WL 2601952, at *2 (S.D.N.Y. Aug. 20, 2009) (dismissing Section 12 claim because plaintiffs failed to allege that defendants "sold, or successfully solicited sales of, . . . shares *to Plaintiff*"). Thus, under Section 12(a)(2), "named plaintiffs are incompetent to allege an injury caused by the

purchase of [securities] that they themselves never purchased." *Nomura*, 658 F. Supp. 2d at 303; *see City of Ann Arbor*, 2010 WL 1371417, at *7-8 (dismissing Section 11 and 12(a)(2) claims); *NECA-IBEW*, Tr. at 6 (Ex. S) (same).

Here, the Complaint expressly incorporates Plaintiff's sworn certification submitted in support of its lead plaintiff motion (the "Certification"), which contains a schedule listing Plaintiff's transactions in the Certificates. (*See* ¶¶ 13-14; Ex. A.)[24]  Neither the Certification nor the Complaint contains any allegation that Plaintiff acquired securities issued in 25 of the 33 Offerings in question.[25]  Because Plaintiff has not alleged that it purchased the securities issued in any of those 25 Offerings, Plaintiff cannot allege any actual injury arising from them.  This Court should reach the same result as the other courts that have recently addressed this issue – it should dismiss, with prejudice, Plaintiff's claims related to the 25 Offerings in which it did not purchase Certificates.

## II.   PLAINTIFF'S CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS.

The Complaint must be dismissed because it does not plead any actionable misrepresentations or omissions relating to the mortgage pools underlying the Certificates.  *See* 15 U.S.C. § 77k(a) (Section 11 of 1933 Act, which requires that a registration statement contained a material misrepresentation or omission); 15 U.S.C. § 77l(a)(2) (Section 12(a)(2) of 1933 Act, which requires that a "prospectus or oral communication" used in connection with the

---

[24] "[D]ocuments incorporated into the complaint by reference" are among the "sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).
[25] Those 25 Offerings are:  JPMALT 2006-A1; JPMALT 2006-A2; JPMALT 2006-A3; JPMALT 2006-A5; JPMALT 2006-A6; JPMALT 2006-A7; JPMALT 2006-S1; JPMALT 2006-S2; JPMALT 2006-S3; JPMALT 2006-S4; JPMMT 2006-A4; JPMMT 2006-A6; JPMMT 2006-A7; JPMMT 2006-S2; JPMMT 2007-A2; JPMMT 2007-S1; JPMMAT 2006-ACC1; JPMMAT 2006-HE2; JPMMAT 2006-HE3; JPMMAT 2006-NC1; JPMMAT 2006-WF1; JPMMAT 2006-WMC2; JPMMAT 2006-WMC4; JPMMAT 2007-CH1; JPMMAT 2007-CH2.  (*See* ¶¶ 34, 52, 209 (listing 33 Trusts).)

sale of a security contained a material misrepresentation or omission); 15 U.S.C. § 77o (Section

15 of 1933 Act, which requires a primary violation).

### A.    Plaintiff's Allegations of Misstatements And Omissions Are Not Plausible.

Although Plaintiff's allegations are lengthy, they do not contain sufficient factual matter

to state a claim to relief that is plausible on its face, as required by *Iqbal* and *Twombly*.

Plaintiff's allegations of misstatements and omissions in the Offering Documents are based

almost exclusively on the purported statements by the CWs, but those allegations are generic and

conclusory.  The Complaint makes no allegations that connect the CW statements to the loans

underlying the Certificates that Plaintiff allegedly purchased in this case.  *See City of Ann Arbor*,

2010 WL 1371417, at *10 (Wexler, J.) (holding that plaintiffs must "plead how [the alleged]

statements and/or omissions are tied to the loans in which they invested").  Plaintiff thus fails to

state a claim that is plausible, rather than conceivable.  *Cf. Republic Bank & Trust Co. v. Bear,*

*Stearns & Co., Inc.*, 2010 WL 1489264, at *6 (W.D. Ky. Apr. 13, 2010) (dismissing

misrepresentation claims as "implausible given that Bear Stearns disclosed the originators' lax

lending standards and the fact that exceptions even from these lenient rules were permitted").

Plaintiff's allegation of systematic departures from standards is based almost exclusively

on the accounts of CWs, rather than on the performance of the Certificates, delinquency rates, or

documentary evidence.  Thus, in this case, it is critical to examine the nature of the CW

allegations as well as the law concerning such allegations.  Upon doing so, it is clear that the CW

allegations do not speak to – and indeed have nothing to do with – the majority of the Originators

at issue, and are hopelessly vague and conclusory.  Such allegations cannot serve as the basis for

any plausible claim of misstatements or omissions.  *See, e.g., In re IAC/Interactivecorp Sec.*

*Litig.*, 2010 WL 996483, at *7 (S.D.N.Y. Mar. 19, 2010) (Holwell, J.) (finding uncorroborated

and sketchy confidential witness statements insufficient); *Pyramid Holdings, Inc. v. Inverness*

*Med. Innovations, Inc.*, 638 F. Supp. 2d 120, 126 (D. Mass. 2009) (finding that confidential witness allegations failed to provide a meaningful degree of specificity or contextualizing information).

### 1. Plaintiff Offers No Factual Allegations Concerning The Majority Of The Originators' Underwriting And Appraisal Standards.

Plaintiff's allegations of misstatements and omissions regarding underwriting standards, appraisal standards, and credit enhancement are clearly not plausible because Plaintiff makes no allegations whatsoever as to the majority of the Originators' standards. *None* of the CWs offer any information about 11 of the 19 Originators mentioned in the Complaint. *See supra* at 14. Four of these Originators (M&T, PHH, WMC, and CTX) originated loans underlying the Certificates issued by the 8 Trusts that Plaintiff purchased. (¶¶ 13, 34.)  In fact, 100% of the loans in JPMMAT 2006-WMC3 (purchased by Plaintiff) were originated by WMC.  (¶ 34.) Thus, Plaintiff fails to state any claims with respect to this Offering, as its CW allegations could not possibly apply to those loans.

The CWs purport to provide information related to only 8 Originators. *See supra* at 14. Almost half of these Originators -- New Century Mortgage Corp., Accredited, American Home Mortgage, and Ownit -- *are not disclosed as having originated loans underlying the Certificates that Plaintiff purchased.*[26]  And, Plaintiff's allegations regarding appraisals are based on only 7 CWs, who purportedly worked for only 3 alleged Originators -- Chase Home Finance, Accredited, and Ownit.  The latter two, again, are not disclosed as having originated any loans underlying Plaintiff's Certificates.  Thus, the CW allegations do not provide plausible factual support for the allegation that all of the Originators systematically disregarded their policies.

---

[26] Under SEC Regulation AB, issuers are only required to disclose loan originators who originate 10% or more of the loans in an offering.  17 C.F.R. § 229.1110(a).

2.   **Plaintiff's Allegations Based On CWs Do Not Support A Reasonable Inference of Misstatements Or Omissions.**

Plaintiff's CW allegations suffer from a number of deficiencies, rendering them insufficient to "nudge[] [Plaintiff's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. The CW statements are not corroborated by any other facts and do not provide sufficient detail to support Plaintiff's sweeping allegations. Confidential witnesses statement "without any facts that may corroborate [them]" are "[s]ketchy at best [and] do not provide enough detail to nudge plaintiffs' claims across the line from conceivable to plausible." *In re IAC/Interactivecorp Sec. Litig.*, 2010 WL 996483, at *7 (dismissing Section 11 and 15 claims). Indeed, the Second Circuit recently expressed reservations about the weight afforded to confidential witness allegations on motions to dismiss. *See Campo v. Sears Holdings Corp.*, 2010 WL 1292329, at *3 n.4 (2d Cir. Apr. 6, 2010) (affirming dismissal of securities fraud claims after court-ordered depositions of confidential witnesses referenced in complaint).

In *Pyramid Holdings, Inc.*, 638 F. Supp. 2d at 126, the District of Massachusetts granted a motion to dismiss Section 11, 12(a)(2), and 15 claims because confidential witnesses' accounts in the complaint did not support allegations of misstatements or omissions. The plaintiff alleged that defendant Inverness, at the time of its secondary public offering, was experiencing major problems that it failed to disclose regarding integration of acquired companies. *Id.* at 123. The plaintiff cited the accounts of twenty confidential witnesses, all former Inverness employees. *Id.* The court held that plaintiff failed to plead actionable 1933 Act claims because its subjective and generalized allegations were insufficient, the confidential witness allegations failed to provide a meaningful degree of specificity and/or lacked contextualizing information, and while some of the allegations offered a modicum of quantitative information, that information was insufficient to draw any meaningful conclusions about integration problems. *Id.* at 127-28.

As in *In re IAC* and *Pyramid*, the CW allegations here are insufficient to draw any plausible connection between the misconduct alleged and the loans underlying the Certificates.

> a.  The CWs are not alleged to have occupied positions such that they would possess the information alleged.

Plaintiff's description of the CWs makes clear that they did not occupy positions that would provide them with knowledge about the Originators' systematic practices, let alone any specific information that contradicts the disclosures in the Offering Documents.  Courts have discounted confidential witness allegations in the securities fraud context where the witnesses were not "described . . . with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *In re Loral Space & Commc'ns Ltd. Sec. Litig.*, 2004 WL 376442, at *11 (S.D.N.Y. Feb. 27, 2004); *see Konkol v. Diebold, Inc.*, 590 F.3d 390, 399 (6th Cir. 2009) (discounting allegations where complaint did not allege dates of employment, job description, employment location/sector, or interaction with defendants); *see also In re Am. Express Co. Sec. Litig.*, 2008 WL 4501928, at *7 (S.D.N.Y. Sept. 26, 2008) ("None of the confidential sources specifically states that any Individual Defendant had information or access to information . . . that contradicted the Company's statements in 2001"); *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 342 (W.D.N.Y. 2008) (same).

Although the Complaint does not allege fraud and is therefore not subject to heightened pleading standards, Federal Rule of Civil Procedure 8 nonetheless demands that the Court discount confidential witness allegations that do not support any meaningful conclusions regarding the alleged conduct.  Plaintiff's descriptions of the CWs are generic and essentially meaningless – indeed, the CWs' roles are not described at all apart from their titles.  These descriptions do not support that the CWs would possess the generic information alleged.  For

instance, Plaintiff describes CW1 as a "former Senior Underwriter at Chase Home Finance." (¶ 82.) That title alone, without further description of function and activities, does not provide a basis for that person knowing that "in 2006, 20% to 30% of the loans that were approved were approved only based on management overriding underwriters' initial rejection of loans." (¶ 82.) There is likewise no credible basis for CW6, who is described solely as "an underwriter for Countrywide in the Jacksonville, Florida processing center," having reason to know that "as much as 80% of the loans originated involved significant variations from underwriting standards" or that "Countrywide was very lax when it came to underwriting guidelines." (¶ 96.) Nor is it believable that CW7, as "a former area credit manager at ResMAE from 2004 through 2005," would know that "exceptions to ResMAE's underwriting guidelines accounted for '50 percent' of all underwritten loans" (¶ 113) or that CW15, a "former Mortgage Specialist and Pricing/Pipeline Administrator for Wells Fargo Home Mortgage" would know that "the qualifying test for obtaining underwriting authority . . . was 'engineered' by Wells Fargo 'so it was easy to pass'" (¶ 138). In sum, it is simply not plausible that former employees who appear to rank far below senior management or executive positions would know universal statistics about their employer's underwriting practices or deviations.

Moreover, it is telling that Plaintiff does not allege, as to any of the CWs, any information concerning the specific loans in the pools underlying the Certificates at issue, let alone those that Plaintiff purchased. Plaintiff's descriptions of the CWs do not support that the CWs would possess such information, because the Offering Documents make clear that many – if not the vast majority – of the loans at issue were originated in geographic locations other than those in which the CWs purportedly worked. For instance, although CW5 is alleged to have worked for Countrywide Home Loans in Long Island, New York (¶ 95), the aggregate loan pool

data for the 10 Offerings involving Originator Countrywide (including two Offerings purchased by Plaintiff) reveals that less than 12% – and as little as 3.5% – of the outstanding loan balance was originated in New York.[27]   And while CW15 is alleged to have worked for Wells Fargo Home Mortgage in Frederick, Maryland (¶ 138), the aggregate loan pool data for the 2 Offerings involving Originator Wells Fargo (one of which was purchased by Plaintiff) reveals that less than 4% of the outstanding loan balance was originated in Maryland.[28]   Likewise, although CWs 30 and 31 are alleged to have worked for Ownit in Atlanta, Georgia and Portland, Oregon, respectively, the aggregate loan pool data for the one Offering involving Originator Ownit makes clear that only 2.9% of the outstanding loan balance was originated in Georgia and only 3.1% was originated in Oregon.[29]   Again, the descriptions of the CWs simply do not support Plaintiff's core allegation that the loans at issue systematically deviated from the Originators' stated underwriting or appraisal standards.

> **b.**   The CW allegations are vague and conclusory, and do not concern specific mortgage loans at issue.

The courts in *In re IAC* and *Pyramid* found that confidential witness allegations did not support 1933 Act claims because they were subjective generalizations that failed to provide a meaningful degree of specificity and/or lacked contextualizing information.  *In re IAC/Interactivecorp Sec. Litig.*, 2010 WL 996483, at *7; *Pyramid*, 638 F. Supp. 2d at 127-28. Courts have likewise rejected such allegations in the securities fraud context as vague and conclusory.  *See, e.g.*, *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220-21 (S.D.N.Y. 2008) (rejecting informants' statements as "far too vague with respect to what information was actually communicated and what conclusions any defendant actually reached"); *In re Loral Space &*

---

[27] *See* Exs. B, at A-2; E, at A-2; T, at A-3; U, at A-3; V at A-3; W, at A-2; X, at A-2; Y, at A-2, A-5; Z, at A-3.
[28] *See* Exs. AA, at A-2; B, at A-2, A-9.
[29] *See* Ex. Q, at S-32.

*Commc'ns*, 2004 WL 376442, at *11 (rejecting confidential witness' conclusory statement because "[w]hile the plaintiffs conclusorily allege that the defendants knew that the delay . . . made the subscriber projections unrealistic, they provide no factual basis for that assertion"); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 140 (D. Conn. 2007) (allegation, based on confidential witness reports, that accounting problems were "well known" to defendant's management team was not sufficient); *Konkol*, 590 F.3d at 400-01 (rejecting witness allegations that practices were "obvious" and "openly known within the Company" because they were not connected to the defendants).

Again, although the Complaint does not allege fraud, these cases are instructive in their assessment of witness allegations, and this Court should, as courts did in *In re IAC* and *Pyramid* in the 1933 Act context, reject the CW allegations because they are far too vague and conclusory.

> (i)     The CW allegations concerning underwriting standards are vague and conclusory.

There can be no question that the CWs' allegations concerning underwriting standards are vague and do not provide sufficient detail or context to support Plaintiff's sweeping claim that *any*, much less *all*, of the Originators *systematically* disregarded their stated underwriting standards. (*See, e.g.*, ¶¶ 84, 94, 96, 113-14, 125, 136, 139, 152, 159, 160.) First, the allegations do not address any particular loans, let alone loans underlying the Certificates at issue. And, they have nothing to do with the majority of the Originators at issue. Moreover, the allegations do not concern the Originators' determinations of whether a borrower's compensating factors were sufficient to warrant a deviation from underwriting guidelines. Indeed, nowhere in the Complaint does any CW provide a single example of an underwriting (or appraisal) determination about a borrower that contradicts the Offering Documents. The allegations lack any context as to how many exceptions were made, where geographically they were made, or the

27

circumstances under which they were made, including profiles of the borrowers who received exceptions.  Indeed, the Complaint is devoid of *factual* allegations supporting that exceptions were made for borrowers who did not meet the criteria disclosed in the Offering Documents, which is the core of the Complaint.  Thus, the allegations include no facts supporting *any* deviation from guidelines, let alone any *systematic* deviation.

The CWs' statements that "exceptions were not uncommon," and that the Originators "always" made exceptions and "were lax" are nothing more that the same types of subjective generalizations that were held to be insufficient in *In re IAC* and *Pyramid*.  And although some of the CW allegations offer some modicum of quantitative information, even that information does not support the allegation of *systematic* deviation from underwriting standards.

<blockquote>(ii)     The CW allegations concerning appraisal standards are vague and conclusory.</blockquote>

Plaintiff's CW allegations concerning appraisal standards fare no better.  Again, the allegations have nothing to do with specific loans or appraisals or with the majority of the Originators.  Moreover, the allegations do not concern the appraisers' determination of value.  None of the CWs provide a single example of an appraisal determination that contradicts the Offering Documents.  The CWs' appraisal allegations amount to nothing more than isolated generalizations that appraisals did not conform with standards.  (*See, e.g.*, ¶¶ 168, 175, 177-79.)  The allegations include no facts supporting *any* deviation from guidelines, let alone any *systematic* deviation.

<blockquote>(iii)    Plaintiff's allegations concerning credit enhancement are vague and conclusory.</blockquote>

Plaintiff alleges that the statements in the Offering Documents relating to credit enhancement lacked any reasonable basis and were inaccurate because they failed to disclose that the Originators systematically disregarded their underwriting and appraisal standards.

(¶ 185.)  These allegations are based entirely on the vague and conclusory CW allegations discussed above, and therefore should likewise be rejected.

**B.      Plaintiff Fails To Allege Any Actionable Misstatements
Or Omissions Relating To Appraisal Standards And LTV Ratios.**

Plaintiff's claims of misstatements and omissions relating to appraisal standards and LTV ratios must be dismissed for additional reasons.  District courts in the Second Circuit have recently addressed such allegations in the mortgage-backed securities context and have uniformly dismissed them.  *See N.J. Carpenters II*, 2010 WL 1473288, at *7-8 (dismissing 1933 Act claims related to appraisals and LTV ratios as non-actionable opinions where complaint failed to allege that the speaker did not truly believe the statements when made); *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 2010 WL 816623, at *4-5 (S.D.N.Y. Mar. 11, 2010) (same).  As Judge Kaplan of the Southern District of New York recently explained:

> First, neither an appraisal nor a judgment that a property's value supports a particular loan amount is a statement of fact.  Each is instead a subjective opinion based on the particular methods and assumptions the appraiser uses.  A subjective opinion is actionable under the [1933] Act only if the amended complaint alleges that the speaker did not truly have the opinion at the time it was made public.  The amended complaint is devoid of any such allegation.

*Tsereteli*, 2010 WL 816623, at *4.  Judge Kaplan also rejected plaintiff's reliance on a report stating that IndyMac Bank's appraisals were not in conformance with USPAP because the report was wholly conclusory and did not support the allegation that the loans in the pool underlying the certificates at issue were made on the basis of nonconforming appraisals.  *Id.* at *4.  He held the plaintiff's claim relating to LTV ratios failed because it was "completely derivative of the improper appraisal practices claim."  *Id.* at *5.  Judge Crotty followed Judge Kaplan's holding in dismissing the appraisal and LTV ratio claims in *N.J. Carpenters II*, 2010 WL 1473288, at *7-8.

Plaintiff's allegations concerning appraisal practices and LTV ratios are insufficient for the same reasons.  Plaintiff claims that the Offering Documents disclosed the Originators'

appraisal standards and practices, but contained untrue statements and omissions "because appraisers and originators industry-wide systematically failed to follow accepted appraisal guidelines, resulting in pervasive appraisal inflation." (¶ 167; *see* ¶¶ 163-67.)  Plaintiff relies on the CWs' accounts with respect to a small handful of Originators (¶¶ 168-79), and conclusorily asserts that because appraisals were inflated, the LTV ratios in the Offering Documents were artificially low and materially overstated borrowers' equity in their homes (¶ 181). *Tsereteli* and *N.J. Carpenters II* clearly hold, however, that appraisals are non-actionable opinions where, as here, the Complaint fails to allege that the appraisers did not truly believe the appraisals when they were made.  As set forth above, the CW allegations regarding appraisals are completely generic, vague, and conclusory, just as the report was in *Tsereteli*, and therefore are insufficient to support Plaintiff's allegation the loans in the pools underlying the Certificates were made on the basis of appraisals that did not conform to accepted guidelines.

> ### C.   Plaintiff Fails To Allege Any Actionable Misstatements Or Omissions Relating To The Sufficiency of Credit Enhancement.

Plaintiff's claims of misstatements and omissions relating to the sufficiency of credit enhancement supporting each Offering also must be dismissed for additional reasons.  District courts in the Second Circuit have recently addressed such allegations in the mortgage-backed securities context and have uniformly dismissed them.  *See N.J. Carpenters II*, 2010 WL 1473288, at *7-8 (dismissing claims related to credit enhancement because offering documents bespoke caution and specifically mentioned the potential inadequacy of credit enhancement and because adequacy of credit enhancements are non-actionable opinions); *N.J. Carpenters III*, 2010 WL 1172694, at *13-14 (same); *In re Lehman Bros.*, 2010 WL 545992, at *5-6 (dismissing claims related to credit enhancement because whether the credit enhancements were adequate to

support the certificates' ratings were not a statement of fact but of opinion, and complaint was devoid of allegations that the rating agencies did not truly hold their opinions).

Plaintiff's claims concerning credit enhancement are insufficient for the same reasons. Plaintiff alleges that statements in the Offering Documents about the available credit enhancement "lacked any reasonable basis and were inaccurate as they failed to disclose that the Originators systematically disregarded their underwriting and appraisal standards and therefore the supposed credit enhancement was deficient." (¶ 185.) Plaintiff further claims that the Rating Agencies' models, which determined the necessary level of credit enhancement, had not been updated and could not accurately reflect the expected performance of the underlying mortgage loans. (¶ 185.) As in *N.J. Carpenters II & III*, these claims must be dismissed because the Offering Documents bespoke caution and specifically disclosed the potential inadequacy of credit enhancement. Indeed, the Offering Documents expressly included disclosures such as the following:

> POTENTIAL INADEQUACY OF CREDIT ENHANCEMENT
> The certificates are not insured by any financial guaranty insurance policy. The subordination and loss allocation features described in this prospectus supplement are intended to enhance the likelihood that holders of more senior classes of certificates will receive regular payments of interest and principal, as applicable, but are limited in nature and may be insufficient to cover all losses on the mortgage loans. None of the depositor, the master servicer, any servicer, the securities administrator, the trustee nor any of their respective affiliates will have any obligation to replace or supplement any credit enhancement or to take any other action to maintain the rating of the certificates.[30]

These disclosures clearly warned investors about potential credit enhancement insufficiency.

---

[30] Ex. B, S-12-13; *see* Exs. C, at S-16-18; D, at S-14-15; E, at S-12-13; F, at S-17; G, at S-13; H, at S-13; I, at S-16-17; J, at 7-8; K, at 7-8; L, at 6-7.

As Judge Kaplan explained in *In re Lehman Bros.*, Plaintiff's credit enhancement allegations also must be dismissed because they are based on allegations concerning the Rating Agencies' models, and whether the credit enhancements were sufficient to support the Certificates' ratings are non-actionable opinions unless the Complaint alleges – which it does not – that the Rating Agencies did not truly hold their opinions at the time the ratings were made.

### D.      Plaintiff Fails To Allege Any Actionable Misstatements Or Omissions Relating To The Ratings Assigned To The Certificates.

As explained in detail in the Rating Agencies' brief, Plaintiff's claims of misstatements and omissions relating to the ratings assigned to the Certificates must be dismissed for a number of reasons.  District courts in the Second Circuit have recently addressed such allegations, including allegations that the Rating Agencies relied on outdated rating models and had conflicts of interest, and have uniformly dismissed them for the following reasons:

- The offering documents at issue bespoke caution in disclosing the risks of relying on ratings;
- There were no allegations that the offerings at issue did not receive the stated credit ratings or that the ratings were incorrect at the time offered;
- Credit ratings are statements of opinion, not fact, because they predict future value and reliability and are therefore not actionable unless it is alleged – which it was not – that the rating agencies did not truly hold those opinions at the time;
- There was no affirmative legal obligation that required disclosure of the particulars of the actual methodologies and models used by the rating agencies because the offering documents did not describe the rating agencies' processes or models, but only some of the considered factors;
- There was no duty to disclose conflicts of interest between rating agencies and underwriters because such conflicts were well-known, considered, and published in SEC reports; and
- The rating agencies' role in structuring mortgage-backed certificates is well-known and not material as a matter of law.

*See N.J. Carpenters I*, 2010 WL 1257528, at *6-7; *N.J. Carpenters II*, 2010 WL 1473288, at *7-8; *N.J. Carpenters III*, 2010 WL 1172694, at *14; *Tsereteli*, 2010 WL 816623, at *5-6; *In re*

*Lehman Bros.*, 2010 WL 545992, at *4; *see also Nomura*, 658 F. Supp. 2d at 309 (hindsight comments by rating agencies did not support inference of falsity).

Here, Plaintiff's allegations relating to the Certificates' ratings are no different from those found insufficient in the cases cited above, and therefore must fail for the same reasons. (*See* ¶¶ 186-208.) The Offering Documents here disclosed all material risks associated with reliance on credit ratings:

- "There is no assurance that any rating will remain in effect for any given period of time or that it may not be lowered or withdrawn entirely by the rating agency in the future . . . ."[31]
- "The ratings are not recommendations to buy, sell or hold these certificates. A rating may be changed or withdrawn at any time by the assigning agency."[32]
- "If the residential real estate markets should experience an overall decline in values, the rates of delinquencies, foreclosures and losses could be higher than those now generally experienced," and the increased losses could be "borne, at least in part, by the holder of one or more classes of the securities."[33]

Moreover, Plaintiff's allegations of ratings downgrades constitute impermissible fraud by hindsight. *See Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y. 2008) (plaintiff may not plead fraud by hindsight). As shown above, the fact that downgrades might occur was explicitly disclosed in the Offering Documents. Indeed, it is not surprising that the Rating Agencies have downgraded thousands of mortgage-backed securities given the significant downturn in the housing market discussed above. Tellingly, Plaintiff does not – because it cannot – point to any facts indicating that any downgrade was the result of disclosure of information regarding improper loan underwriting or appraisals. There is thus nothing in the Complaint that evidences any misrepresentation in the Offering Documents involving the ratings for the Certificates. *See Yu v. State Street Corp.*, 2010 WL 668645, at *6 (S.D.N.Y. Feb. 25,

---

[31] Ex. L, at 140; *see* Exs. J, at 123; K, at 123.

[32] Exs. B, S-2 n.10, S-85; C, at S-2 n.12, S-73; D, at S-2 n.10, S-79; E, at S-2 n.10, S-62; F, at S-2 n.7, S-174; G, at S-2 n.6, S-116; H, at S-2 n.6, S-125; I, at S-3 n.13, S-69.

[33] Ex. L, at 18; *see* Exs. J, at 22; K, at 22.

2009) ("[T]he accuracy of offering documents must be assessed in light of information available at the time they were published. A backward-looking assessment of the infirmities of mortgage-backed securities, therefore, cannot help Plaintiffs' case.").

As in the cases cited above, the Complaint is devoid of allegations that the Offerings did not receive the stated credit ratings, that the ratings were incorrect at the time they were offered, or that the Rating Agencies did not truly hold their respective ratings opinions at the time they were made. Thus, the claims related to ratings must be dismissed.[34]

### E.   Plaintiff Fails To Allege Any Actionable Misrepresentations Or Omissions Regarding Underwriting Guidelines For The Mortgage Loans.

Plaintiff's claims relating to underwriting guidelines also are not actionable in light of the clear disclosures in the Offering Documents. In considering Plaintiff's claims, the Offering Documents "must be read as a whole" to determine whether they were false or misleading on their effective date. *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (dismissing 1933 Act claims because "[t]he prospectuses warn investors of exactly the risk plaintiffs claim was not disclosed"). As the Second Circuit has made clear, a plaintiff cannot

---

[34] Plaintiff also does not allege that any of the JPMorgan Defendants had any involvement in determining the ratings or that their reliance on the ratings was unreasonable. To the extent Plaintiff claims the Rating Agencies are experts, Section 11(b)(3)(C) provides that a defendant is entitled to rely on any part of the registration statement purporting to be made on the authority of an expert and that the defendant will not be liable if "he had no reasonable ground to believe and did not believe, at the time such part of the registration statement became effective, that the statements therein were untrue." 15 U.S.C. § 77k(b)(3)(C). The Section 11(b)(3)(C) reliance defense imposes no affirmative duty to investigate; it only asks whether a defendant had a reason to disbelieve the statements so as to render its entitlement to rely on them otherwise unreasonable. Though Section 11(b)(3)(C) reliance is an affirmative defense, the Second Circuit has made clear that "an affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998). Here, the Complaint does not allege that any of the JPMorgan Defendants were aware of any "red flags" that would have rendered their reliance on the ratings unreasonable. The JPMorgan Defendants' reliance defense is therefore apparent from the face of Plaintiff's pleading. See *In re DoubleClick, Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 508 (S.D.N.Y. 2001) ("[A] court may properly dismiss a claim on the pleadings when an affirmative defense appears on its face"). At a minimum, therefore, Plaintiff's allegations relating to the ratings must be dismissed as against all of the JPMorgan Defendants. See 15 U.S.C. § 77k(b)(3)(C).

pursue claims when its losses are allegedly due to events that it had been warned of in a prospectus:

> Not every bad investment is the product of misrepresentation. The fact that interest rates did not rise, and that therefore the Trusts for a period decreased in value as the prospectuses indicated they might, only shows that the investment may have turned out to be a bad one. To show misrepresentation, the complaint must offer more than allegations that the portfolios failed to perform as predicted.

*Id.* at 8; *see Panther Partners, Inc.*, 538 F. Supp. 2d at 664 ("these [offering] documents are not guarantees of an offering's subsequent success, nor do they insure investors against the vicissitudes of technology and industry, nor the volatility of the stock market itself").

Plaintiff here ignores both that the Certificates they purchased were backed by obviously risky loans and also the robust risk disclosures in the Offering Documents. The Offering Documents, taken as a whole, clearly warned Plaintiff of the very risks that have come to pass. Those risk disclosures are fatal to Plaintiff's claims. *See Olkey*, 98 F.3d at 8; *Panther Partners, Inc.*, 538 F. Supp. 2d at 664. The Offering Documents "bespoke caution," rendering Plaintiff's allegations not actionable. *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Under the bespeaks caution doctrine, 'alleged misrepresentations in a stock offering are immaterial as a matter of law if it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.'"); *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("certain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of the adequate cautionary language set out in the same offering").

Plaintiff alleges that the Offering Documents failed to disclose that the Originators "systematically disregarded" their stated underwriting guidelines by making "exceptions" to their

underwriting policies "in the absence of *sufficient* compensating factors." (*See* ¶¶ 7, 75, 93, 112, 132 (emphasis added).)  But the disclosures contained in the Offering Documents demonstrate that the Originators made a significant number of exceptions to stated underwriting guidelines, and whether "compensating factors" were "sufficient" to warrant an exception in any particular instance constitutes a subjective, non-actionable opinion. *See Hinerfeld v. United Auto Group*, 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998) (dismissing Section 11 and 12 claims because "claims of material omissions are contradicted by disclosures made on the face of the prospectus").

First, in alleging that loans were improperly underwritten, Plaintiff fails to recognize one simple truth:  so long as the underwriting guidelines applicable to the particular loan documentation type were accurately disclosed in the Prospectus Supplements – and there is no allegation that they were not – the Offering Documents were not misleading.  Despite pages of allegations purportedly supporting its assertion that mortgage originators "disregarded" underwriting guidelines, Plaintiff does not address the fact that the Prospectus Supplements said explicitly that *there would be exceptions to the guidelines*.  Plaintiff articulates no plausible facts to infer that the documentation programs were not followed and that the exceptions were anything more than that – exceptions precisely as disclosed.  In light of the clear disclosures in the Offering Documents, Plaintiff's allegations are insufficient to state a claim.

As Plaintiff alleges, each Originator had its own documentation programs, with underwriting guidelines for each.  The Prospectus Supplement for each Offering set forth the underwriting guidelines for each principal originator's documentation programs, as well as the fact that exceptions would be made to those guidelines.[35]  In particular, the Offering Documents

---

[35] *See, e.g.*, Exs. B, at S-25-44; C, at S-33-36; D, at S-31-41; E, at S-19-27; F, at S-82-99; G, at S-52-56; H, at S-52-63; I, at S-28-31.

disclosed that borrower income and assets were either not considered or not verified under certain documentation programs, and that in some cases loans were made based solely on the credit score of the borrower and the value of collateral.[36]   In many of those instances, investors were warned that not only did the loans not comply with Fannie Mae or Freddie Mac's underwriting guidelines generally, but that there would also be exceptions to those already less-than-stringent limited documentation programs.[37]

Plaintiff asserts that the Offering Documents were misleading because of so-called "disregard" for underwriting standards in originating loans.  (¶¶ 7, 70, 75, 89, 93, 109).  But this cannot have been a surprise because prospective investors *were explicitly told that originators would grant exceptions from stated underwriting guidelines*.[38]  For example, ResMAE disclosed that it maintained discretion to determine that "based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting . . . guidelines . . . warrants an underwriting exception," and that "[a] *substantial portion of the Mortgage Loans represent such underwriting exceptions*."[39] Likewise, JPMorgan Chase Bank, N.A. disclosed that "a *significant number of the mortgage loans underwritten . . . will have been originated with such underwriting exceptions* based on compensating factors."[40]  Other Originators made similar disclosures, including New Century, Wells Fargo, and WMC.[41]

In addition to the underwriting program disclosures, Plaintiff's claims are also belied by warnings contained in the Offering Documents, which stated in no uncertain terms that external

---

[36] *Id.*

[37] *See id.*; *see also* F, at S15 ("The Underwriting Standards of the Originator Are Not as Stringent as those of Fannie Mae and Freddie Mac, Which May Result in Losses"); G, at S-11 (same); H, at S-11 (same); J, at 14-15 ("[L]oans originated according to underwriting guidelines that are not as strict as Fannie Mae or Freddie Mac guidelines may be likely to experience rates of delinquency, foreclosure and bankruptcy that are higher than those experienced by loans underwritten in accordance with Fannie Mae or Freddie Mac guidelines."); K, at 14-15 (same).

[38] *Id.*

[39] Ex. G, at S-54 (emphasis added).

[40] Exs. F, at S-82, S-88; BB, at S-88-89, S-95; CC, at S-77, S-83 (emphasis added).)

[41] *See* Exs. B, at S-44; II, at S-53; AA, at S-30; DD, at S-55; EE, at S-55; FF, at 60 of 208.

market factors and specific loan characteristics could impact the receipt of pass-through payments and/or the value of Plaintiff's Certificates.[42]  Plaintiff was warned that deteriorating economic conditions, particularly in the real estate market, could cause their Certificates to lose value.[43]  In light of all of these disclosures, Plaintiff's allegation that the Offering Documents omitted information about "systematic" departures from stated underwriting guidelines – which is no more than the claim that many Originators made frequent exceptions to their policies – is not actionable.  In fact, district courts have recently dismissed misrepresentation claims relating to mortgage-backed securities based on similar types of disclosures.  *See Republic Bank & Trust Co.*, 2010 WL 1489264, at *6 (dismissing misrepresentation claims as "implausible given that Bear Stearns disclosed the originators' lax lending standards and the fact that exceptions even from these lenient rules were permitted"); *Nomura*, 658 F. Supp. 2d at 307 (dismissing 1933 Act allegations based on the "fusillade of cautionary statements" regarding underwriting standards in the offering materials and holding that plaintiffs' argument that they were "not on notice of the originator's 'soft' underwriting practices beg[ged] credulity").  This Court should do the same.

In addition, while the Offering Documents disclosed that exceptions to underwriting policies would be based on compensating factors, the relative *sufficiency* of such factors in each instance constitutes a subjective, non-actionable opinion.  JPMorgan Chase Bank, N.A., for example, disclosed that it "*may* determine that, based on compensating factors," a prospective borrower warrants an exception to stated guidelines (including the guidelines governing "low doc" and "no doc" loans), and that the mix of compensating factors "*may* include, *without limitation*, relatively low loan-to-value ratio, relatively low debt-to-income ratio, stable

---

[42] *See, e.g.*, Exs. B, at S-10-15, S-18; C, at S-15-19, S-23; D, at S-13-16, S-20; E, at S-9-16, S-21; F, at S-15-25, S-29; G, at S-11-21, S-24-25; H, at S-11-21, S-24-25; I, at S-15-18, S-22; J, at 6-16; K, at 6-15.
[43] *Id.*

employment and time in the same residence."[44]  Thus, each Originator's determination as to what

constituted a compensating factor and whether the total mix of factors proved *sufficient* to

warrant an exception was within that Originator's complete discretion and, at its core, was the

expression of an opinion not unlike an appraisal or a credit rating.  *See, e.g., In re Lehman Bros.*,

2010 WL 545992, at *6 (credit rating reflects an "opinion by each ratings agency that it believed,

based on the methods and models used," that the totality of factors "was sufficient to support the

rating assigned to it").  For such an opinion to be actionable, the complaint must allege that the

Originators did not truly hold those opinions at the time.  *Id.*; *see also N.J. Carpenters II*, 2010

WL 1473288, at *7 (holding that statements of opinion are not actionable unless the complaint

alleges that the opinions were not truly held).  Plaintiff makes no such allegations.

**F.     There Are No Actionable Misrepresentations Or Omissions Because
         Plaintiff's Sole Remedy Is The Repurchase Of Non-Complying Loans.**

Even if Plaintiff was correct that there were material misrepresentations or omissions

regarding the loans backing the Certificates – which its allegations do not support – under the

Offering Documents, the sole remedy for breach of any representations or warranties is for the

seller to repurchase or replace that specific loan.  The Offering Documents disclose a

"repurchase or substitute" provision, under which the seller of the loans to the Depositor, or the

Originator, must repurchase any non-complying loans or substitute a qualified loan in its place.[45]

The Offering Documents advise investors that this repurchase or substitute provision constitutes

the "sole remedy available to certificate holders" for non-complying loans.[46]  This "sole remedy"

provision negates Plaintiff's 1933 Act claims, as the Fifth Circuit recently held.  *Lone Star Fund*

*V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 389 (5th Cir. 2010).

---

[44] Ex. F, at S-82, S-88 (emphasis added); *see also* BB, at S-88-89, S-95; CC, at S-77, S-83.
[45] *See, e.g.*, Exs. J, at 30-32, 65; K, at 30-32, 65; L, at 28-30, 63.
[46] *Id.*

In *Lone Star*, the Fifth Circuit found that an identical "sole remedy" provision appearing in a prospectus for an essentially identical offering precluded the 1933 Act claims because the sole remedy provision "change[s] the nature of [the issuer's] representation." *Id.* at 390. The court found that the issuer had represented that "the mortgages *should* be non-delinquent, but if some mortgages were delinquent then [defendants] would either repurchase them or substitute performing mortgages into the trusts." *Lone Star*, 594 F.3d at 389 (emphasis in original). The court affirmed the dismissal of plaintiffs' Section 11, 12(a)(2) and 15 claims, because plaintiffs, as sophisticated investors, had "no basis to ignore these provisions or their consequences." *Id.*

This reasoning applies equally to the Certificates purchased by Plaintiff. The Offering Documents for the Certificates set forth Plaintiff's "sole remedy," a key component of the deal structure, for any breach of a representation or warranty regarding a loan. Thus, there is no misrepresentation upon which Plaintiff can base a claim and the Complaint must be dismissed. *Lone Star*, 594 F.3d at 389-90.[47]

### G.    Plaintiff Does Not Adequately Allege Materiality.

Plaintiff's allegations also fail because they are insufficient to meet the materiality requirement of the 1933 Act. *See, e.g., ECA & Local 134 IBEW Joint Pension Trust v. JPMorgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (dismissing 1933 Act claims). Materiality requires "a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable

---

[47] Plaintiff's failure to allege that any of the JPMorgan Defendants had actual knowledge of any non-complying loans in the mortgage pools raises a separate ground for dismissal. Under Section 1111 of SEC Regulation AB, offering materials for mortgage-backed securities must disclose only "known" deviations from stated underwriting guidelines. 17 C.F.R. § 229.1111(a)(3); *see also In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 207 (S.D.N.Y. 2000), *aff'd*, 202 F.3d 81 (2d Cir. 2000). Because there is no duty to disclose *unknown* non-complying loans, and Plaintiff's claims are based on omissions, they must be dismissed. *See Landmen Partners, Inc. v. Blackstone Group, L.P.*, 659 F. Supp. 2d 532, 545 (S.D.N.Y. 2009) (dismissing 1933 Act claims where SEC regulation required disclosure of "known trends" but plaintiff did not allege knowledge of omitted information); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 614 (S.D.N.Y. 2008) (same).

[investor]." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). "The central inquiry . . . is . . . whether defendants' representations, taken together and in context, would have [misled] a reasonable investor about the nature of the investment." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 761 (2d Cir. 1991) (quotation omitted).

*Britannia Bulk Holdings* is instructive. There, plaintiff alleged that the offering documents for the stock of Britannia, a shipping company, were misleading because "Britannia misstated or failed to disclose . . . that Britannia used FFAs [forward freight agreements] to hedge against increases, and not merely decreases, in charter rates." *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 406 (S.D.N.Y. 2009). The court dismissed plaintiff's Section 11 and 12(a)(2) claims because "the Complaint specifies only one FFA [out of 37] as being inconsistent with its characterization of Britannia's disclosures" and "Plaintiff does not allege that any FFA other than the Armada FFA hedged against increases in charter rates." *Id.* at 416. The court rejected the plaintiff's attempt to "blunt the impact of this deficiency" by asserting that it had identified "simply one example" because "[i]t is the Complaint's allegations and not vague assertions . . . that must be able to withstand a motion to dismiss." *Id.* at *416 n.8.

Here, Plaintiff does not identify even one loan in the mortgage pools that did not comply with the characteristics of the loans disclosed in the Offering Documents, let alone any rough number of non-complying loans. *See City of Ann Arbor*, 2010 WL 1371417, at *10 (Wexler, J.) (holding that plaintiffs must "plead how [the alleged] misstatements and/or omissions are tied to the loans in which they invested"). Even if some non-complying loans were included in the loan pools and were not cured by "repurchase or substitute," Plaintiff does not allege that the number

of non-complying loans reached material levels relative to the large number of loans held in the pools.[48]

Moreover, Plaintiff's Certificates, as senior bonds, were protected against losses by various forms of credit enhancement.  Consequently, they will not experience an interruption of payments unless a *substantial* number of loans in the underlying pools have defaulted, *and* the defaults are not cured.  A small number of non-complying loans relative to the protection against losses provided by credit enhancement could not, therefore, have a material effect on the Certificates.  But Plaintiff has not – and cannot – allege that a sufficient number of non-complying loans were included in the pools to overcome the Certificates' credit enhancement.  Without such allegations to establish materiality, Plaintiff cannot state a claim.  *See Garber*, 537 F. Supp. 2d at 613 (dismissing claims based on failure to disclose increase expenses because plaintiff failed to "describe in any way the magnitude of the increase").

### III.    PLAINTIFF'S CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFF FAILS TO PLEAD ANY COGNIZABLE ECONOMIC LOSS.

The Complaint should be dismissed under Rule 12(b)(1) and/or 12(b)(6) for the independent reason that Plaintiff does not plead a legally cognizable economic loss, an essential element of each of its claims.  *See In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1203-05 (9th Cir. 2002) (dismissing Section 11 and 12(a)(2) claims for failure to plead cognizable loss); *In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, 381 F. Supp. 2d 192, 245-46 (S.D.N.Y. 2004) (dismissing Section 11 claim for failure to plead cognizable loss); *see In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 253 (S.D.N.Y. 2003)

---

[48] Although Plaintiff has alleged that a large number of loans in the pools are delinquent (¶ 212), Plaintiff cannot satisfy the materiality requirement merely by alleging loan delinquencies – especially in light of the overall collapse of the real estate market.  Rather, Plaintiff must allege facts showing that a material number of loans did not comply with the disclosures in the Offering Documents.

("Where it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses, dismissal of the complaint . . . is proper.").

### A.   The Complaint Fails to Plead Cognizable Economic Loss Because Plaintiff Received All "Pass-Through" Payments on the Certificates.

Plaintiff fails to allege cognizable loss because it does not dispute that it has received all required "pass-through" payments from the Certificates, which is the sole economic benefit for which it bargained.  The Offering Documents warned investors that a secondary market for the Certificates might never develop and that "you may not be able to sell your certificates readily or at prices that will enable you to realize your desired yield.  The market values of the certificates are likely to fluctuate; these fluctuations may be significant and could result in significant losses to you."[49]  Plaintiff concedes that "[c]ach purchased or acquired certificate represents an equity interest in the issuing trust and the right to future payments of principal and interest on the underlying loans" (¶ 33) and that each Certificate's "value" is thus solely a function of such pass-through payments (¶¶ 35, 48).  Plaintiff could not reasonably have expected any other benefit.

Unlike stock in which "'shares are purchased for the purpose of investment and their true value to the investor is the price which they may later be sold,'" asset-backed securities are securitized contract rights that provide investors "with the expectation that they would receive a stream of . . . payments for the life of the securitization."  *AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 646 F. Supp. 2d 385, 403 (S.D.N.Y. 2009); *see In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 894 n.22 (W.D.N.C. 2001) ("Valuation of mortgage-backed securities . . . is an exercise in estimating expected future cash flows.").[50]  Plaintiff thus suffers

---

[49] Ex. B, at S-14; *see also* J, at 1, 7; K, at 7.
[50] The SEC has similarly noted that "[a]sset-backed securities . . . differ from corporate securities" in that " investors are generally interested in . . . the timing and receipt of cash flows from those assets and the structure for distribution of those cash flows." *Asset-Backed Securities*, Securities Act Release No. 33-8518, 70 Fed. Reg. 1506, 1508-11 (Jan. 7, 2005).

actionable damages only if there is a failure to distribute the pass-through payments, not if there is some alleged decline in the market or resale value of the Certificates. *AIG Global*, 646 F. Supp. 2d at 403 (plaintiffs suffered losses "not [because of] a decrease in market price, but [because of] a decrease in the amount of money returned to them").

Plaintiff does not allege that it has failed to receive any pass-through payments. Instead, it merely alleges an increase in the risk that the Certificates will not perform in the future based on published credit rating downgrades. (¶¶ 8, 9, 31, 35; *see* Compl. Appx.) That kind of speculative injury is not actionable. *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994) ("[W]e reject [plaintiff's] novel theory that it was damaged simply by being undersecured when, with respect to those loans not yet foreclosed, the actual damages it will suffer, if any, are yet to be determined."); *Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 590-92 (E.D. Pa. 2009) (dismissing securities fraud claims because investor in mortgage-backed certificates failed to allege diminished payments).

In the face of warnings that the Certificates may be illiquid, the allegation that "[t]he Certificates are no longer marketable near the prices paid by Lead Plaintiff and the Class" does not state an actionable loss. (¶ 9.) In dismissing similar 1933 Act claims, a court in this Circuit recently expressed grave doubt that a decline in market value can constitute cognizable loss:

> [P]laintiff alleges that 'the certificates are no longer marketable at prices anywhere near the prices paid by plaintiff.' . . . It is unclear that that allegation in the face of a specific warning in the offering documents about the possibility in any event that the certificates may not be resalable raises question about whether the plaintiff has suffered any injury. Plaintiff alleges that it is 'exposed to much more risk with respect to both the timing and absolute cash flow paid under the certificates that it purchased.' But perhaps this establishes a risk, but a risk is not itself injury. The current complaint does not appear to allege facts permitting an inference that the plaintiff suffered a cognizable loss.

*NECA-IBEW*, Tr. at 42 (Ex. S). Here, the distribution of pass-through payments was the sole economic benefit for which Plaintiff bargained. Thus, its allegation that it sold two

Certificates (the 2006-A4 A7 and the 2007-A1 6A1) in the secondary market at prices below par value (¶¶ 13-14) fails to allege cognizable economic loss.

Finally, even assuming *arguendo* that heightened risk of future nonperformance may constitute cognizable economic loss, the Complaint contains no allegation that the Certificates are subject to such risk.  For example, Plaintiff alleges that the loan pools underlying JPMMT 2006-A1, JPMMT 2006-A3, JPMMT 2006-A5, and JPMMT 2007-A1 each have "Current 60-day Delinquency, Foreclosure, REO, & Bankruptcy" delinquency or default rates of *less than* 17%, and as low as 5.2%, of all outstanding loans in the Trusts.  (*See* Compl. Appx. at 13-14, 19.)  Plaintiff conspicuously fails to allege that such modest rates are at all predictive of less-than-expected pass-through payments on the Certificates.  Plaintiff's reliance on the Certificates' current credit ratings as the exclusive measure of such risk also is grossly misplaced, particularly in light of its own allegations that such ratings were unreliable.  (*See* ¶¶ 188-208.)

## B.     The Complaint Fails To Plead Any Conceivable Economic Loss With Respect To JPMMT 2006-A3 And JPMMAT 2006-WMC3.

Even if the sale of Certificates were an appropriate measure of loss, which it is not, this Court must still dismiss Plaintiff's claims arising from the JPMMT 2006-A3 and JPMMAT 2006-WMC3 Offerings because Plaintiff made money on the sale of its JPMMT 2006-A3 Certificate and broke even on the sale of its JPMMAT 2006-WMC3 Certificate.

To the extent that sales are relevant in the context of mortgage-backed securities, both Sections 11 and 12(a)(2) expressly preclude recovery in the case of a sale at or above the amount paid for a security.  *See* 15 U.S.C. § 77k(e) (damages are limited to the difference between purchase and sale price); *Randall v. Loftsgaarden*, 478 U.S. 647, 656 (1985) (same as to § 12(a)(2)).  And, both statutes preclude recovery where the misstatement did not cause a loss.  15 U.S.C. §§ 77k(e), 77l(b).  Thus, a plaintiff who sold at a profit, or at cost, cannot establish any

cognizable losses, and a complaint alleging no loss must be dismissed for failure to state a claim under either statute.  *See, e.g., In re Broderbund/Learning Co.*, 294 F.3d at 1203-05; *In re AOL Time Warner*, 381 F. Supp. 2d at 246-47; *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 347 (S.D.N.Y. 2003); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1262 (N.D. Cal. 2000).

Here, Plaintiff plainly has not suffered damages from the JPMMT 2006-A3 and JPMMAT 2006-WMC3 Offerings.  On April 13, 2006, Plaintiff purchased a JPMMT 2006-A3 Certificate bearing CUSIP number 46628KAV2 ("KAV2"), with a face amount of $4,635,000 and priced at approximately $0.97 on the dollar.  (Ex. A.)  On February 1, 2007, Plaintiff sold KAV2 at a price of approximately $0.983 on the dollar, realizing a profit.[51]  Separately, on August 26, 2006, Plaintiff purchased a JPMMAT 2006-WMC3 Certificate bearing CUSIP number 46629KAD1 ("KAD1"), with a face amount of $5,200,000 and priced at par.  (Ex. A.)  On January 10, 2007, Plaintiff sold KAD1 at par in the same face amount, and therefore suffered no loss upon sale of the Certificate.  Because Plaintiff has no losses stemming from these Offerings, it may not assert claims based on them.  Accordingly, at least its claims in connection with those Offerings must be dismissed.

## IV.     PLAINTIFF'S CLAIMS ARE TIME-BARRED.

Plaintiff's claims are also time-barred.  Section 11, 12(a)(2) and 15 claims must be brought "within one year after the discovery of the untrue statement, or the omission or after such discovery should have been made by exercise of reasonable diligence."  15 U.S.C. § 77m.  This language makes clear that both actual and constructive discovery of the facts giving rise to the action trigger the one-year statute of limitations.  *See Merck & Co., Inc. v. Reynolds*, 2010

---

[51] The face value was approximately $400,000 higher on the date of purchase than the date of sale.  The difference resulted from the paydown of outstanding principal amounts (*i.e.*, pass-through payments to Plaintiff).  (Ex. A.)

WL 1655827, at *17 (U.S. Apr. 27, 2010) (Scalia, J., concurring) (noting that § 77m includes both actual and constructive discovery as triggers);[52] *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993).

In assessing constructive notice, inquiry notice (*i.e.*, a duty of inquiry) arises when the available facts would lead a reasonably diligent plaintiff to investigate a potential cause of action. *See Dodds*, 12 F.3d at 350 (inquiry notice arises once "circumstances would suggest to an investor of ordinary intelligence the probability that she had been defrauded"); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 245 (S.D.N.Y. 2007) ("[a] duty to inquire arises 'when the circumstances would suggest to an investor of ordinary intelligence the probability' that she has a cause of action"); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005) (information that may be held to constitute inquiry notice/storm warnings includes financial, legal, or other data, such as public disclosures and other similar lawsuits). Regardless of when inquiry notice arises, the 1933 Act statute of limitations lapses one year after a reasonably diligent plaintiff would have discovered the necessary facts. *See* 15 U.S.C. § 77m.

Notably, constructive discovery is easier to establish on a motion to dismiss 1933 Act claims because scienter is not an element and thus constructive discovery turns on the misstatements alone. *See, e.g.*, *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 580 (S.D.N.Y. 2008); *Ala. Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 348 n.4 (3d Cir. 2009).

Plaintiff here filed its original complaint on March 26, 2008. Thus, the relevant date for determining whether constructive discovery of the claims here should have been made by

---

[52] In *Merck & Co., Inc.*, 2010 WL 1655827, at *14, the Supreme Court recently clarified that constructive discovery triggers the statute of limitations for Securities Exchange Act Section 10(b) claims and noted that the 10(b) statute of limitations lapses two years after a *reasonably diligent plaintiff* would have discovered the necessary facts, whether or not the plaintiff actually investigated.

exercise of reasonable diligence is March 26, 2007.  A wealth of information was publicly available well before then that put Plaintiff on inquiry notice of the lending practices and other facts and circumstances upon which its claims are based.  It is clear from the face of the Complaint and publicly available documents that Plaintiff had notice of the unmistakable storm warnings alerting it to its claims long over a year before the commencement of this action.  A reasonably diligent plaintiff would have investigated, sought out and spoken to confidential witnesses (including the 31 CWs relied on in the Complaint), and constructively discovered the alleged facts supporting Plaintiff's claims by March 26, 2007.  Thus, Plaintiff's 1933 Act claims should be dismissed.  *See In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 378-79 (S.D.N.Y. 2003) ("Courts in this district routinely dismiss securities fraud claims on statute of limitations grounds at the pleading stage where, as here, the facts necessary to trigger inquiry notice are apparent on the face of the complaint, the documents cited therein and other public documents."); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d at 245-48 (dismissing 1933 Act claims as time-barred); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d at 432 (same).[53]

Numerous prominent press reports predating March 26, 2007 detailed precisely the same originator lending practices upon which Plaintiff bases its claims.  These press reports began in May 2005 and are summarized in Appendix B to this memorandum.  (*See* Appx. B.)  They alleged that such practices were common among *the very same originators* whose loans comprise the pools underlying Plaintiff's Certificates.  For example, on February 8, 2007, TheStreet.com, a widely-read internet provider of financial news, reported that the share prices for originators Accredited, Countrywide, Novastar, New Century, and Washington Mutual

---

[53] The Court may "take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice as well as other matters."  *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

dropped because of investor fears of bad subprime loans.  (*Id.* at 7.)  Two days later, the New York Times reported:

> Countrywide Financial said foreclosures hit their highest level since at least 2002, while delinquencies were at a five-year high.  The news increased concern over the erosion of the housing market after two of the top three subprime mortgage lenders warned Thursday about the impact of bad loans on their earnings.

(*Id.*)  The following month, several prominent articles attributed Countrywide's poor mortgage credit quality to its underwriting standards.  (*See id.* at 9.)  Countrywide originated approximately 70% of the loans underlying the Certificate that Plaintiff purchased for JPMALT 2006-A4, and approximately 34% of the loans underlying the Certificate that Plaintiff purchased for JPMMT 2006-A1.[54]  These reports of "bad loans" impacting a wide swath of mortgage originators put Plaintiff on notice of its claim regarding alleged industry-wide abandonment of underwriting guidelines, including by those Originators whose loans underlay Plaintiff's Certificates.  And these are not isolated reports – they are but a few examples of the surfeit of public information about the Originators' supposed deviation from prudent underwriting standards, which are the core allegations in the Complaint.  (*See* Appx. B.)

Further, Plaintiff was on inquiry notice of its potential claims concerning JPMMAT 2006-RM1 no later than February 12, 2007, when ResMAE filed for bankruptcy.  *In re Liquidating Trust of ResMAE Mortgage Corp.*, No. 07-10177 (Bankr. D. Del. filed Feb. 12, 2007).  The offering materials for JPMMAT 2006-RM1 clearly state that 100% of the loans in the loan pool underlying Plaintiff's Certificate were originated by ResMAE.[55]  On February 15, 2007, The Wall Street Journal reported that ResMAE's bankruptcy filing was necessitated by the large number of repurchase demands made by buyers of mortgages ResMAE originated that later defaulted.  (*See* Appx. B at 8.)

---

[54] Exs. E, at S-4; B, at S-4.
[55] Ex. G, at S-3.

These were unmistakable storm warnings that placed Plaintiff on inquiry notice of its claims long before it filed its original complaint on March 26, 2008. Once on inquiry notice, a plaintiff exercising reasonable diligence would have constructively discovered the alleged misrepresentations no later than March 26, 2007. Thus, Plaintiff's 1933 Act claims are time-barred.[56]

## V.    PLAINTIFF'S SECTION 12(a)(2) CLAIMS CONCERNING SIX TRUSTS SHOULD BE DISMISSED BECAUSE IT DID NOT PURCHASE THOSE CERTIFICATES DIRECTLY FROM ANY JPMORGAN DEFENDANT.

Section 12(a)(2) provides an express right of action only against a purchaser's immediate seller. 15 U.S.C. § 77l(a)(2) (seller "shall be liable . . . *to the person* purchasing such security *from him*") (emphasis added). "An individual is a 'statutory seller'. . . if he: (1) 'passed title, or other interest in the security, to the buyer for value,' or (2) 'successfully solicited the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner.'" *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (citing *Pinter v. Dahl*, 486 U.S. 622, 643-47 & n.21 (1988)). Section 12(a)(2) contains an express privity requirement, such that "only a defendant from whom the plaintiff purchased securities may be liable." *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d at 255 (quoting *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 49 (2d Cir. 1991)). In light of this, a plaintiff must allege that it purchased securities *directly* from a defendant statutory seller and does not have standing to sue a defendant that was not its direct "seller." *In re Morgan Stanley*, 592 F.3d at 359; *see also Nomura*, 658 F. Supp. 2d at 305.

---

[56] At the very least, the claims relating to newly added offering, JPMMT 2006-A1, are time-barred because they do not arise out of the conduct, transaction, or occurrence set out in the original complaint and therefore do not relate back to it. *See* Fed. R. Civ. P. 15(c)(1)(B); (Orig. Compl. ¶ 23 (class includes purchasers of only the certificates of the trust series identified in original complaint), ¶¶ 15, 64 (trusts do not include JPMMT 2006-A1).)

Plaintiff alleges that of the 8 Certificates it purchased, only 2 were purchased directly from a JPMorgan Defendant (JPMALT 2006-A4 and JPMMAT 2006-RM1).  (¶ 13.)  Plaintiff does not allege that JPMSI successfully solicited its purchase of its other 6 Certificates.  Nor does Plaintiff allege that it purchased Certificates directly from JPMorgan Acceptance, or that JPMorgan Acceptance successfully solicited any purchases.  Thus, with respect to the other 6 Trusts – JPMMT 2006-A1; JPMMT 2006-A3; JPMMT 2006-A5; JPMMT 2007-A1; JPMMAT 2006-WMC3; and JPMMAT 2006-CH2 – Plaintiff's Section 12(a)(2) claim against both JPMSI and JPMorgan Acceptance must be dismissed.  *See In re Morgan Stanley*, 592 F.3d at 359.[57]

## VI.   PLAINTIFF'S SECTION 15 CLAIM MUST BE DISMISSED.

First, the Section 15 "control person" claim against the Individual Defendants must be dismissed because Plaintiff fails to state an underlying violation of Section 11 or 12(a)(2) by JPM Acceptance.  Section 15 requires an underlying violation, and, as explained in detail above, Plaintiff has failed to allege such a violation here.  *Rombach v. Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004); *Nomura*, 658 F. Supp. 2d at 310.

In addition, Plaintiff's conclusory allegations do not come close to meeting the standard for pleading control person liability.  Section 15 attaches liability to "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable."  15 U.S.C. § 77o. Control is defined as "the power to direct or cause the direction of the management and policies

---

[57] Plaintiff's Section 12(a)(2) claims concerning the 4 Trusts as to which Plaintiff still holds Certificates must also be dismissed because Plaintiff has not alleged that it sold or offered to tender those Certificates.  A plaintiff asserting a Section 12(a)(2) claim may be entitled to one of two forms of relief:  damages or rescission.  *See AOL Time Warner*, 381 F. Supp. 2d at 246.  Where a plaintiff still owns the security at the time of the filing of a lawsuit, rescission is the only available remedy, and tender is a condition to seeking rescission.  *Id.* at 247.  The Complaint and Certification reflect that only 4 of Plaintiff's Certificates have been sold, and thus Plaintiff still owns the other 4 Certificates it purchased.  (¶ 14; Ex. A.)  Plaintiff's only available remedy for these 4 Certificates is rescission, and Plaintiff has not alleged any offer to tender them.  Thus, the Section 12(a)(2) claim as to Trusts JPMMT 2006-A1; JPMMT 2006-A5; JPMMAT 2006-RM1; and JPMMAT 2006-CH2 should be dismissed.  *See AOL Time Warner*, 381 F. Supp. 2d at 247 (rejecting plaintiff's contention that "an explicit request for rescission is not required" and dismissing § 12(a)(2) claim with prejudice).

of a person, whether through the ownership of voting securities, by contract, or otherwise." 17

C.F.R. § 230.405. Although some district courts in this Circuit have concluded that culpable

participation is not an element for claims under Section 15,[58] others have come to the more well-

reasoned conclusion, based on Second Circuit cases, that Section 15 claims require culpable

participation. These courts have held that "[i]n order to state a Section 15 claim, a plaintiff must

[not only] adequately allege '(1) a primary violation by a controlled person; (2) control of the

primary violator by the defendant; [but also] (3) that the controlling person was in some

meaningful sense a culpable participant in the primary violation.'" *Ladmen Partners, Inc. v.

Globalstar, Inc.*, 2008 WL 4449280, at *10 (S.D.N.Y. Sept. 30, 2008) (citing *Boguslavsky v.

Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)); *see also DeMaria v. Andersen*, 153 F. Supp. 2d 300,

314 (S.D.N.Y. 2001) (same), *aff'd*, 318 F.3d 170 (2d Cir. 2003); *In re Livent Noteholders Sec.

Litig.*, 151 F. Supp. 2d 371, 441-42 (S.D.N.Y. 2001). Courts have interpreted this requirement as

necessitating particularized facts as to the controlling person's culpable participation in the

violation. *See, e.g., Demaria*, 153 F. Supp. 2d at 314 (citing cases); *In re Am. Bank Note

Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 441 (S.D.N.Y. 2000). Thus, "a person may

not allege 'controlling person' status merely by reciting a corporate officer's title without

alleging actual control and the nature of the controlling person's 'culpable participation' in the

[conduct ascribed to the controlled person]." *Ellison v. Am. Image Motor Co., Inc.*, 36 F. Supp.

2d 628, 642 (S.D.N.Y. 1999).

Plaintiff does not adequately plead that any Individual Defendant controlled JPM

Acceptance, let alone that s/he was a culpable participant in the alleged wrongful conduct.

Plaintiff's only factual allegations are that the Individual Defendants were either officers or

---

[58] *See In re Worldcom, Inc.*, 377 B.R. 77, 102-03 (S.D.N.Y. 2007); *In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597, at *5-6 (S.D.N.Y. Feb. 20, 2002).

directors of JPM Acceptance and signed the Registration Statements.  (¶¶ 17-20.)  Based on

these allegations, Plaintiff conclusorily contends that "the Individual Defendants . . . had the

power to influence, and exercised that power and influence, to cause the Depositors to engage in

violations of the [1933] Act" and that "the Individual Defendants' . . . control, ownership and

position made them privy to the material facts concealed."  (¶ 242.)  This is insufficient.  Titles

and signatures are not a sufficient basis from which to infer control.  *See Police & Fire Ret. Sys.*

*v. Safenet, Inc.*, 645 F. Supp. 2d 210, 242 (S.D.N.Y. 2009) (director defendants not liable under §

15 as a result of their titles because plaintiff must plead facts from which control status can be

inferred where defendant does not clearly occupy control status); *Sloane Overseas Fund, Ltd. v.*

*Sapiens Int'l Corp. N.V.*, 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996) (dismissing § 15 and § 20

claims, stating "'[a] person's status as an officer, director, or shareholder, absent more, is not

enough to trigger liability under § 20'"); *N.J. Carpenters I*, 2010 WL 1257528, at *7 (dismissing

§ 15 claims because plaintiff did not sufficiently allege actual control– *i.e.,* the practical ability to

direct actions).  Here, Plaintiff's allegations regarding the Individual Defendants' power and

access to information are devoid of any factual basis and thus insufficient to infer control, let

alone any meaningful or culpable participation.

## CONCLUSION

For the foregoing reasons, and the applicable reasons set forth by the Rating Agencies,

the Complaint should be dismissed with prejudice.

Dated:  New York, New York
      May 7, 2010

SIDLEY AUSTIN LLP

By: _____
    A. Robert Pietrzak
    rpietrzak@sidley.com
    Dorothy J. Spenner
    dspenner@sidley.com
    Owen H. Smith
    osmith@sidley.com
    787 Seventh Avenue
    New York, New York 10019
    Telephone: (212) 839-5300
    Facsimile: (212) 839-5599

*Attorneys for Defendants J.P. Morgan
Acceptance Corporation I, J.P. Morgan
Securities Inc., David M. Duzyk, Louis
Schioppo, Jr., Christine E. Cole, and Edwin F.
McMichael*

54

**APPENDIX A**

*Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corporation I, et al.*

**GROUNDS FOR DISMISSAL OF CLAIMS BY OFFERING**

| Offering | No Article III or Statutory Standing | No § 12 Standing Despite Purchase | Sale At Gain Or Cost | No Allegations Of Missing Payments | No Allegations Re: Disclosed Originators | No Actionable Misrepresentations Or Omissions | Time-Barred | No Control Person Liability |
|---|---|---|---|---|---|---|---|---|
| JPMALT 2006-A1 | X | | | X | | X | X | X |
| JPMALT 2006-A2 | X | | | X | | X | X | X |
| JPMALT 2006-A3 | X | | | X | | X | X | X |
| JPMALT 2006-A4 | | | | X | | X | X | X |
| JPMALT 2006-A5 | X | | | X | | X | X | X |
| JPMALT 2006-A6 | X | | | X | | X | X | X |
| JPMALT 2006-A7 | X | | | X | | X | X | X |
| JPMALT 2006-S1 | X | | | X | | X | X | X |
| JPMALT 2006-S2 | X | | | | X[1] | X | X | X |
| JPMALT 2006-S3 | X | | | X | | X | X | X |
| JPMALT 2006-S4 | X | | | X | | X | X | X |
| JPMMT 2006-A1 | | X | | X | | X | X | X |
| JPMMT 2006-A3 | | X | X | X | | X | X | X |
| JPMMT 2006-A4 | X | | | X | | X | X | X |

[1] No CW allegations for originators SunTrust Mortgage, Inc., M&T Mortgage Corp., or GreenPoint Mortgage Funding, Inc.

| Offering | No Article III or Statutory Standing | No § 12 Standing Despite Purchase | Sale At Gain Or Cost | No Allegations Of Missing Payments | No Allegations Re: Disclosed Originators | No Actionable Misrepresentations Or Omissions | Time-Barred | No Control Person Liability |
|---|---|---|---|---|---|---|---|---|
| JPMMT 2006-A5 | | x | | x | | x | x | x |
| JPMMT 2006-A6 | x | | | x | | x | x | x |
| JPMMT 2006-A7 | x | | | x | | x | x | x |
| JPMMT 2006-S2 | | x | | x | | x | x | x |
| JPMMT 2007-A1 | x | | | x | | x | x | x |
| JPMMT 2007-A2 | x | | | x | | x | x | x |
| JPMMT 2007-S1 | x | | | x | | x | x | x |
| JPMMAT 2006-ACC1 | | x | | x | | x | x | x |
| JPMMAT 2006-CH2 | x | | | x | | x | x | x |
| JPMMAT 2006-HE2 | x | | | x | | x | x | x |
| JPMMAT 2006-HE3 | x | | | x | | x | x | x |
| JPMMAT 2006-NC1 | | | | x | | x | x | x |
| JPMMAT 2006-RM1 | | | | x | | x | x | x |
| JPMMAT 2006-WF1 | x | | | x | | x | x | x |
| JPMMAT 2006-WMC2 | x | | | x | $x^2$ | x | x | x |
| JPMMAT 2006-WMC3 | | x | x | x | $x^3$ | x | x | x |

2

[2] No CW allegations for originator WMC Mortgage Corp.
[3] No CW allegations for originator WMC Mortgage Corp.

NY1 7295019v.2

| Offering | No Article III or Statutory Standing | No § 12 Standing Despite Purchase | Sale At Gain Or Cost | No Allegations Of Missing Payments | No Allegations Re: Disclosed Originators | No Actionable Misrepresentations Or Omissions | Time-Barred | No Control Person Liability |
|---|---|---|---|---|---|---|---|---|
| JPMMAT 2006-WMC4 | x | | | x | x[4] | x | x | x |
| JPMMAT 2007-CH1 | x | | | x | | x | x | x |
| JPMMAT 2007-CH2 | x | | | x | | x | x | x |

[4] No CW allegations for originator WMC Mortgage Corp.

3

NY1 7295019v.2

**APPENDIX B**

*Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corporation I, et al.*

## CHRONOLOGY OF SELECTED PUBLICLY AVAILABLE MATERIALS
### FROM MAY 2005 THROUGH MARCH 2007[1]

| DATE | EVENT |
|------|-------|
| May 2005 | • The Chicago Tribune reports that "many in the mortgage business are beginning to think lenders have already gone too far in promoting inventive – but untested– interest-only (IO) loans, 40-year mortgages, payment option schemes, stated-interest financing, loans that allow for negative amortization and other wild and wooly products." The report further describes how executives at GreenPoint Mortgage Funding, Inc. and other sub-prime lenders have characterized their subprime lending practices as a "free-for-all" and risky because it was unclear whether borrowers would be able to pay their mortgages. Lew Sichelman, *Innovative Home Loans Stir Worries Among Critics*, Chi. Trib., May 22, 2005. |
| | • Nobel Prize-winning economist Paul Krugman explains that he sees "signs that America's housing market, like the stock market at the end of the last decade, is approaching the final, feverish stages of a speculative bubble." Paul Krugman, *Running Out of Bubbles*, N.Y. Times, May 27, 2005. |
| June 2005 | • The Wall Street Journal reports that "five years after the stock market's peak, the economy faces other threatening imbalances: a potential housing bubble, rock-bottom saving rates and a gargantuan trade deficit." Gregg Ip, *Side Effects:  In Treating U.S. After Bubble, Fed Helped Create New Threats – Low Rates Bolstered Economy, But Housing, Foreign Debt Appear Out of Balance – Greenspan's Legacy at Stake*, Wall St. J., June 9, 2005. |
| July 2005 | • The Kansas City Star reports that "[h]ome mortgage fraud and inflated appraisals are becoming a national epidemic, fueled by low interest rates and the hot housing market, federal law enforcement authorities say." Paul Wenske, *As Home Prices Soar, So Does Mortgage Fraud*, Kansas City Star, July 4, 2005. |
| | • The Wall Street Journal reports that mortgage lenders are continuing to loosen their standards, despite the risk of increased defaults.  The report discusses the practices of Chase Home Finance, Countrywide Home Loans, and Wells Fargo. Ruth Simon, *Mortgage Lenders Loosen Standards – Despite Growing Concerns, Banks Keep* |

[1] Plaintiff commenced this action on March 26, 2008.   The media reports and other public information described in this Appendix demonstrate that Plaintiff was at least on inquiry notice of the misrepresentations and omissions alleged in the Complaint well before March 26, 2007. Plaintiff's claims are therefore barred by the one-year statute of limitations set forth in Section 13 of the Securities Act of 1933.   In order to reduce volume, the JPMorgan Defendants have not submitted copies of the media reports and other publicly available materials cited herein with their motion papers.   The JPMorgan Defendants have collected and compiled these materials and will provide them upon request.

| DATE | EVENT |
|---|---|
| | *Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005. |
| | • The WashingtonPost.com summarizes findings from the Mortgage Asset Research Institute, which reports that during the housing boom no income, no asset verification mortgages were routinely extended to applicants with unstable credit profiles and insufficient incomes to qualify for home purchases. "In one case highlighted in the report, a Florida mortgage broker worked hand in hand with a borrower, changing the applicant's supposed income as he shopped for loans from different lenders. When challenged, the broker said: 'I thought that with stated income loans you could claim an income as high as necessary' to obtain the loan needed." Kenneth R. Harney, *Lies are Growing in Loan Process*, WashingtonPost.com, July 30, 2005. |
| November 2005 | • The Wall Street Journal reports on the sharp rise in "low-doc" or "no-doc" loans - loans which allow borrowers to skip some or all of the traditional requirements for verifying income and assets. Barbara Grunkemeyer, deputy comptroller for credit risk at the Office of the Comptroller of the Currency, told the Journal, "I think there's a good reason why no-doc and low-doc loans are called liars' mortgages." The article discusses Countrywide Financial Corp.'s "Fast & Easy" loan program and New Century's loan program for people who have "difficulty verifying their income through conventional methods." New Century reported that in the first half of 2005 about 48 percent of its loans were less than fully documented. James R. Hagerty & Ruth Simon, *Loans Too Easy To Obtain, Some Experts Claim: Low-Docs, No-Docs Being Used More*, Wall St. J., Nov. 20, 2005. |
| December 2005 | • The Los Angeles Times reports that "[r]eal estate fraud is surging, fueled by a booming housing market, feverish refinancing activity and lax regulation . . . ". *Real Estate Fraud Booms; Mortgage Scams Thrive Amid Soaring Home Prices, Little Regulation and, in Some Cases, Complicit Borrowers. Higher Rates Result*, L.A. Times, Dec. 5, 2005. |
| | • The Chicago Tribune reports that the FBI notes that mortgage fraud has soared in recent years: "One of the faster-growing types of white-collar crime, mortgage fraud has surged in recent years because of record low interest rates, a hot home-buying market and a huge number of refinancings." Andrew Sajac and David Jackson, *FBI Wants Loan Brokers to Fight Mortgage Fraud*, Chi. Trib., Dec. 15, 2005. |
| April 2006 | • **Lead Plaintiff purchases certificate 7A1 from J.P. Morgan Mortgage Trust 2006-A3 on Apr. 13. (Compl. ¶ 13.)** |
| | • The Los Angeles Times reports that the Comptroller of the Currency "issued an alarm . . . about mortgages with artificially low starting payments" and further quotes the Chairman of a mortgage origination company as |

2

| DATE | EVENT |
|------|-------|
| | saying "[w]e hear lots and lots of stories of institutions inappropriately underwriting the loans and selling them off so the risk shifts to someone else." Scott Reckard, *Regulator Warns About Nontraditional Mortgages; Many Borrowers Need Better Warnings That Payments Will Jump, Comptroller Says*, L.A. Times, Apr. 21, 2006. |
| May 2006 | • The Boston Herald reports that "[d]emonstrators shouting 'predatory lenders, criminal offenders' barged into a New Century Mortgage Corp. office . . ." Laura Crimaldi, *Protesters Drive Home Message to "Predatory" Mortgage Company*, Boston Herald, May 24, 2006. |
| June 2006 | • The Chicago Tribune reports on the increase of false appraisals and states that "perhaps one-third of the valuations [in Illinois] are bogus." Lew Sichelman, *Slowing Market May Bring Out Scammers*, Chi. Trib., June 11, 2006. |
| July 2006 | • The New York Times describes the growing problem of mortgage fraud and "fraud for profit," which involves the falsification of mortgage application documents by applicants or predatory lenders. Bob Tedeschi, *Mortgages: The Growing Problem of Fraud*, N.Y. Times, July 9, 2006.<br><br>• **Lead Plaintiff purchases certificate A7 from J. P. Morgan Alternative Loan Trust 2006-A4 on July 27. (Compl. ¶ 13.)** |
| August 2006 | • **Lead Plaintiff purchases certificate 2A2 from J.P. Morgan Mortgage Trust 2006-A1 on Aug. 22. (Compl. ¶ 13.)**<br><br>• **Lead Plaintiff purchases certificate A3 from J.P. Morgan Acquisition Trust 2006-WMC3 on Aug. 22. (Compl. ¶ 13.)**<br><br>• The Chicago Tribune reports that "[a]ppraisers, dependent on loan officers for their livelihoods, say they often feel pressure to come up with a number that will allow a home purchase or refinancing to proceed." James R. Hagerty & Ruth Simon, *Inflated Appraisals Affecting Sales*, Refi's, Chi. Trib., Aug. 27, 2006.<br><br>• The New York Times reports that the recent study of 100 stated-income mortgages by the Mortgage Asset Research Institute revealed that "90 percent of those who apply for stated-income loans exaggerate their income by 5 percent or more. Nearly 60 percent exaggerate their income by more than 50 percent." Bob Tedeschi, *When the Truth Goes Begging*, N.Y. Times, Aug. 27, 2006.<br><br>• The Wall Street Journal reports that the deterioration in the subprime mortgage market may spread to higher credit mortgage borrowers, and that originator Washington Mutual disclosed in an SEC filing that it had |

3

| DATE | EVENT |
|------|-------|
| | "bungled the underwriting for option ARMs, improperly measuring some of its customer's debt-to-income ratios for 2004 and most of 2005." Jesse Eisinger, Long & Short: *Mortgage Market Begins to See Cracks as Subprime Loan Problems Emerge*, Wall St. J., Aug. 30, 2006. |
| September 2006 | • The New York Times reports that "[d]efault rates are inching up, credit ratings agencies have become more cautious and regulators have threatened to crack down on loose lending standards. Yet even as analysts and officials have been ringing warning bells about exotic mortgages for months and fresh housing data has indicated that the risks are rising, investors have seen little reason to abandon the bonds backed by these home loans. To the contrary, they have increased their exposure to the securities." Vikas Bajaj, *Mortgages Grow Riskier, and Investors Are Attracted*, N.Y. Times, Sept. 6, 2006. |
| | • The Denver Post reports that "exotic" mortgage loan products "that require no proof of income," including several offered by originator Wells Fargo Home Mortgage Inc., have resulted in increased foreclosures. Greg Griffin, David Olinger & Jeffrey A. Roberts, *Foreclosing on the American Dream*, Denver Post, Sept. 17, 2006. |
| | • **Lead plaintiff purchases certificate A2 from J.P. Morgan Acquisition Trust 2006-RM1 on Sept. 21. (Compl. ¶ 13.)** |
| | • The Wall Street Journal reports, in an article discussing a law suit filed by originator Countrywide against lenders that sold Countrywide allegedly bad loans, that "[m]ortgage fraud, involving loans obtained by providing false information, has mushroomed in recent years as lenders have pushed for speedier loan approvals in an effort to remain competitive and milk maximum profits from the now-fading housing boom. The Federal Bureau of Investigation reported that mortgage fraud led to losses of $1 billion in 2005, up from $429 million a year earlier. Some of the fraud that slipped through during the boom is only now starting to surface." James R. Hagerty & Michael Hudson, *Town Residents Say They Were Mortgage Fraud Targets*, Wall St. J., Sept. 28, 2006. |
| December 2006 | • The Center for Responsible Lending issues a report predicting that "one out of five subprime mortgages originated during the past two years will end in foreclosure" and states that "loose underwriting" is one of the factors contributing to the subprime foreclosure rate increase. Ellen Schloemer, Wei Li, Keith Ernst & Kathleen Keest, *Losing Ground: Foreclosures in the Subprime Market and Their Cost to Homeowners*, Center for Responsible Lending, Dec. 2006, *available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/foreclosure-paper-report-2-17.pdf |
| | • The Wall Street Journal reports on a surge in mortgage delinquencies in the last few months and states that |

4

| DATE | EVENT |
|---|---|
| | mortgage origination fraud is part of the problem. Ruth Simon & James R. Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged as Housing Market Soared: Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006. |
| | • Originator Ownit Mortgage Solutions shuts down its business. David Colker & Annette Haddad, *Ownit a Victim of Sub-Prime Shakeout; The Mortgage Lender Closes Suddenly Amid a Cooling Housing Market and Funding Troubles*, L.A. Times, Dec. 7, 2006. |
| | • Lehman Brothers analyst report concludes that "mortgage collateral performance [will] deteriorate significantly in 2007." *Lehman Bros. Mortgage Outlook for 2007: Bracing for a Credit Downturn*, Dec. 12, 2006. |
| | • The Wall Street Journal reports that a UBS research report predicts that "[t]his year is shaping up to be one of the worst years for mortgage delinquencies . . . ." Karen Richardson, *Double Trouble for Mortgage Shares: Dual-Loan Borrowers Pose Added Risk*, Wall St. J., Dec. 12, 2006. |
| | • Reuters reports a decline in value of the main ABX subprime mortgage index "pressured by concerns over ailing subprime mortgage lenders and their loans, issued primarily in 2006." The report further states "Volatility has heightened recently with subprime lenders like Ownit Mortgage Solutions shuttering businesses and underlying loans defaulting at an alarming rate." Nancy Leinfuss, *U.S. Asset Backed Spreads Hold Weaker, New Deals Widen*, Reuters, Dec. 13, 2006. |
| | • The American Banker reports that originator Fieldstone's share price has plummeted 67% in the last year due in part to losses on new loans and that Fieldstone had to renegotiate agreements with its creditors. Kate Berry, *Fieldstone REIT Amended Credit: A Straw in the Wind?*, Am. Banker, Dec. 26, 2006. |
| | • Originator Ownit Mortgage Solutions, Inc. files a voluntary petition for Chapter 11 bankruptcy in federal court in California. *In re Ownit Mortgage Solutions, Inc.*, No. 06-12579 (Bankr. C.D. Cal. filed Dec. 28, 2006). *See* Paul Muolo, *Subprime Firm Files for Bankruptcy; Not Only is it a Top 20 Ranked Subprime Funder But a Wall Street Firm Owned About 20% of It*, National Mortgage News, Jan. 8, 2007; *US Subprime Loan Defaults at Highest This Decade*, Reuters, Feb. 2, 2007 ("California's Ownit Mortgage Solutions Inc., once the 16th largest subprime lender, in December filed for bankruptcy protection."). |
| January 2007 | • **Lead Plaintiff sells certificate A3 from J.P. Morgan Acquisition Trust 2006-WMC3 on Jan. 10 at no loss. (Decl. of James A. Harrod in Supp. of the Mot. to Appoint the Public Employees' Retirement System of Miss. as Lead Pl.'s Choice of Counsel, Ex. A.)** |

5

| DATE | EVENT |
|---|---|
| | • Moody's issues report discussing the fact that "[m]ortgages backing securities issued in late 2005 and early 2006 have had sharply higher rates of foreclosure, real estate owned (REO) and loss than previously issued securities at similar, early points in their lives." Joseph A. Rocco, *Early Defaults Rise in Mortgage Securitizations*, Moody's Investors Service, Jan. 18, 2007. |
| | • Moody's issues report noting that "[t]he change in landscape in 2006 for the sub-prime mortgage business was a result of the excesses of the past whereby favorable market conditions led lenders to loosen their origination guidelines and underwriting practices in an effort to capture market share." Debash Chatterjee, *et al.*, *2006 Review and 2007 Outlook: Home Equity ABS*, Moody's Investors Service, Jan. 22, 2007. |
| | • The New York Times reports that "mortgage lenders became more generous last year, giving 100 percent financing and allowing borrowers to state their incomes with little or no documentation in an effort to bolster volume according to industry experts." The article also notes that "[b]anking regulators have increasingly voiced concerns about the loosening of lending practices by subprime lenders," and that "[l]ate last year some demanded that applicants be more closely vetted before being qualified for adjustable-rate and other risky loans." Vikas Bajaj & Christine Haughney, *Tremors at the Door*, N.Y. Times, Jan. 26, 2007. |
| | • Originator Fieldstone, a "top 25 ranked non-prime lender," puts itself up for sale after posting a $45 million dollar third quarter loss due to "accelerated delinquencies." *Fieldstone Dons a 'For Sale' Sign*, Mortgage Line, Jan. 26, 2007. |
| February 2007 | • The Washington Post reports the results of a nationwide survey of 1,200 appraisers conducted by October Research Corp., which found that "90 percent of appraisers reported that mortgage brokers, real estate agents, lenders and even consumers have put pressure on them to raise property valuations to enable deals to go through." And "75 percent of appraisers reported 'negative ramifications' if they refused to cooperate and come in with a higher valuation." Kenneth R. Harney, *Appraisers Under Pressure to Inflate Values*, Wash. Post, Feb. 3, 2007. |
| | • The Realty Times reports that the same October Research Corp. survey "found that nine out of 10 appraisers said they've recently been intimidated or otherwise pressured to raise valuations on homes - a 64 percent increase in complaints since a similar survey in 2003." Kenneth R. Harney, *Appraisers Say Pressure on Them to Fudge Values is Up Sharply*, Realty Times, Feb. 5, 2007. |
| | • Senator Christopher J. Dodd, in a hearing before the U.S. Senate Committee on Banking, Housing and Urban Affairs regarding predatory lending practices, states that "[t]oday there are too many incentives in the subprime |

6

| DATE | EVENT |
|------|-------|
| | mortgage market to make loans that put borrowers at too great a risk of failure. For example, over half of subprime mortgages are stated income loans, loans which the industry often refers to as liars' loans." Senator Dodd continued: "The question is, who's lying? According to a survey of over 2,000 mortgage brokers, 43 percent of the brokers who make these loans do so because they know that their borrowers don't have the income to qualify for the loan in the first place." *Preserving the American Dream: Predatory Lending Practices and Home Foreclosures: Hearing Before the S. Comm. On Banking, Housing and Urban Affairs* (Feb. 7, 2007) (Statement of Christopher J. Dodd, Chairman, U.S. Senate Comm. on Banking, Housing and Urban Affair). |
| | • Martin Eakes, CEO for the Center for Responsible Lending and Center for Community Self-Help, testifying at a hearing before the U.S. Senate Committee for Banking, Housing and Urban Affairs regarding predatory lending practices, states that "[i]t is widely recognized today, even within the mortgage industry, that lenders have become too lax in qualifying applicants for subprime loans. Especially troubling is the practice of qualifying borrowers without any verification of income, not escrowing for property taxes and hazard insurance, and failing to account for how borrowers will be able to pay their loan once the payment adjusts after the teaser period expires." *Preserving the American Dream: Predatory Lending Practices and Home Foreclosures: Hearing Before the S. Comm. on Banking, Housing and Urban Affairs* (Feb. 7, 2007) (Statement of Martin Eakes, CEO, Center for Responsible Lending and Center for Community Self-Help). |
| | • A class action is filed against New Century Financial Corp., parent corporation of originator New Century Mortgage Corp., on behalf of purchasers of New Century shares, alleging violations of Sections 11 and 12(a) of the 1933 Securities Act and Sections 10(b) and 20(a) of the 1934 Securities Exchange Act. *In re New Century Sec. Litig.*, No. 07-CV-00931 (C.D. Cal. filed Feb. 8, 2007). |
| | • TheStreet.com reports that share prices for originators Accredited, Countrywide Financial, Novastar, New Century Financial, and Washington Mutual dropped between 2% – 29% because of investors fears of bad subprime loans. Laurie Kulikowski, *Subprime Worries Spread*, TheStreet.com, Feb. 8, 2007. |
| | • The New York Times reports that "Countrywide Financial said foreclosures hit their highest level since at least 2002, while delinquencies were at a five-year high. The news increased concern over the erosion of the housing market after two of the top three subprime mortgage lenders warned Thursday about the impact of bad loans on their earnings." *Jump in Foreclosures Upsets Wall St.*, N.Y. Times, Feb. 10, 2007. |
| | • Originator ResMAE Mortgage Corp. files a voluntary petition for Chapter 11 bankruptcy in Delaware. *In re* |

7

| DATE | EVENT |
|------|-------|
|  | *Liquidating Trust of ResMAE Mortgage Corp.*, No. 07-10177 (Bankr. D. Del. filed Feb. 12, 2007). *See ResMAE Files Chap. 11, Credit Suisse to Buy Assets*, Reuters, Feb. 13, 2007 (reporting ResMAE's Chapter 11 bankruptcy filings). |
|  | • The Wall Street Journal reports that ResMae Mortgage Corporation was forced into bankruptcy because of repurchase demands made by buyers of mortgages ResMae originated that later defaulted.  Carrick Mollenkamp, James R. Hagerty & Ruth Simon, *U.S. Subprime Industry is Seeing a Fast Shakeout*, Wall St. J., Feb. 15, 2007. |
|  | • The Washington Post asks "Could lax underwriting standards during the housing boom years - no verification of applicants' incomes or assets, low or no down payments, and big mortgages to people already saddled with heavy consumer debt - finally be coming home to roost?"  The report specifically discusses originator Ownit Mortgage Solutions going out of business because of $100 million worth of buyback demands on loans Ownit originated.  Kenneth R. Harney, *Subprime Market's Sinking Fortunes*, Wash. Post, Feb. 17, 2007. |
|  | • Dow Jones Newswires reports that one of the ABX indexes, "[a] benchmark index of derivatives of subprime mortgages widened sharply to record weak levels Wednesday, fueled by a continuing spate of bad news around loans to home buyers with shaky or inadequate credit histories."  Aparajita Saha-Bubna, *Risky Slice of ABX Index Widens Sharply on Novastar*, Dow Jones Newswires, Feb. 21, 2007. |
|  | • Reuters reports that Wells Fargo has cut jobs related to subprime mortgages due to problems in the subprime sector, and that shares in originator NovaStar Mortgage, Inc. fell after the originator posted a fourth quarter loss and stated that it may realize no taxable income from 2007 to 2011.  *Wells Fargo Cuts 320 Subprime Mortgage Jobs*, Reuters, Feb. 21, 2007. |
|  | • Originator NovaStar Financial Inc. reports $14.4 million quarterly loss related to subprime loans.  Vikas Bajas & Julie Creswell, *Home Lenders Hit by Higher Default Rates*, N.Y. Times, Feb. 22, 2007. |
|  | • The Boston Globe reports that originator Novastar Financial Inc.'s share price plunged 42% after it posted a fourth quarter loss and stated it would not make money on its mortgage investments for the next five years.  The article further states that "[m]ore than 20 subprime lenders have shut down, scaled back, or been sold in the past five months amid rising late payments and lower prices for new loans."  *Novastar Fin. Inc.*, Boston Globe, Feb. 22, 2007. |
|  | • The New York Times reports in an article discussing originators Novastar Financial and New Century Financial (parent company to originator New Century Mortgage Corp.) that "the default rate jumped for loans made in |

8

| DATE | EVENT |
|---|---|
| | 2006, as lenders allowed more borrowers to take out loans without documenting their incomes or making a down payment. Also, analysts note, homeowners who encountered financial problems had a tougher time refinancing or selling their properties because home prices were no longer rising in many parts of the country." Vikas Bajaj & Julie Creswell, *Home Lenders Hit by Higher Default Rates*, N.Y. Times, Feb. 22, 2007. |
| | • Reuters reports that shares in subprime lenders have been declining because of industry wide problems.  The report references problems with the following originators: Accredited Home Lenders, Inc.; NovaStar Mortgage, Inc.; Ownit Mortgage Solutions, Inc.; and ResMAE Mortgage Corp.  Dan Wilchins, *Update 2-Freefall in US Mortgage Lenders' Shares Deepens*, Reuters, Feb. 23, 2007. |
| | • The Wall Street Journal reports in relation to originator Novastar that "a compilation of data showed that as of the end of January, there had been a perilous rise in delinquencies in the pools of mortgages NovaStar had packaged and sold."  Herb Greenberg, *MarketWatch Weekend Investor: Don't Forget, Higher Reward Comes With a Higher Risk*, Wall St. J., Feb. 24, 2007. |
| March 2007 | • **Lead Plaintiff sells certificate 7A1 from J.P. Morgan Mortgage Trust 2006-A3 on Mar. 1 at no loss. (Decl. of James A. Harrod in Supp. of the Mot. to Appoint the Public Employees' Retirement System of Miss. as Lead Pl.'s Choice of Counsel, Ex. A.)** |
| | • Reuters reports that Countrywide Financial Corp. disclosed in a SEC filing the previous week that 19% of its non-prime receivables were delinquent. *Countrywide Non-Prime Delinquencies Jump*, Reuters, Mar. 1, 2007. |
| | • The Los Angeles Times reports that New Century Financial Corp. is under criminal investigation regarding how the company accounted for losses when it was forced to buy back soured loans in 2006, and whether its executives profited by selling stock while misleading other shareholders.  "New Century, the largest independent sub-prime lender, shocked Wall Street last month when it said that it would restate results for the last year, erasing $268 million in profit it had reported."  E. Scott Reckard & Jonathan Peterson, *Troubles for Sub-Prime Lenders Grow*, L.A. Times, Mar. 3, 2007. |
| | • The New York Times reports that mortgage lenders, "'[l]ooking to expand their reach and their profits . . . were far too willing to lend, as evidenced by the creation of new types of mortgages" and that "[m]ortgages requiring little or no documentation became known colloquially as 'liar loans.'"  Gretchen Morgenson, *Crisis Looms in Mortgages*, N.Y. Times, Mar. 11, 2007. |
| | • A Credit Suisse analyst report reveals that "a study by the Mortgage Asset Research Institute sampling 100 stated income [low documentation] loans found that 60% of borrowers had 'exaggerated' their income by more |

9

| DATE | EVENT |
|---|---|
| | than 50%." *Mortgage Liquidity du Jour: Underestimated No More*, Credit Suisse, Mar. 12, 2007. |
| | • Reuters reports that "Many [subprime] lenders lowered their underwriting standards too far, and as a result more than two dozen quit or sold their businesses, or went bankrupt." The report goes on to list problems with the following originators: Accredited Home Lenders, Inc.; Countrywide Home Loans; New Century Mortgage Corp.; NovaStar Mortgage, Inc.; Ownit Mortgage Solutions, Inc.; ResMAE Mortgage Corp.; WMC Mortgage Corp. *Factbox – U.S. Mortgage Lenders*, Reuters, Mar. 12, 2007. |
| | • The Wall Street Journal reports that New Century Financial Corp., parent corporation of New Century Mortgage Corp., had "become a symbol of excess lending to subprime borrowers" and that the "company has imploded over the past few months as defaults surged and accounting misdeeds surfaced." James Hagerty, *et al., Home Stretch: At a Mortgage Lender, Rapid Rise, Faster Fall – Wall Street Fueled Growth at New Century; A Party-Hard Culture*, Wall St. J., Mar. 12, 2007. |
| | • Reuters reports on a potential wave of bankruptcies at some of the largest subprime mortgage originators, and notes that subprime delinquencies are surging. *Analysis, Bankrupt Subprimes to Worsen Credit Crunch, Not ABS*, Reuters, Mar. 13, 2007. |
| | • Bloomberg News reports that the Securities and Exchange Commission has opened an investigation into New Century Financial Corp., parent corporation of New Century Mortgage Co. The report further states that New Century Financial did not have the money to meet its repurchase obligations on bad loans it originated. Adrian Cox, *New Century Says U.S. SEC Opens Probe, Seeks Papers*, Bloomberg News, Mar. 13, 2007. |
| | • Reuters reports that Countrywide Financial Corp., the largest U.S. mortgage lender, said on Monday that "foreclosures rose to a five-year high and turmoil in the subprime market may hurt earnings, and its shares fell." Jonathan Stempel & Dan Wilchins, *Countrywide Says Subprime Turmoil May Harm Results*, Reuters, Mar. 13, 2007. |
| | • The Massachusetts Division of Banks issues a cease and desist order against originator New Century Mortgage Corp. blocking New Century from issuing new loans in the state. Patriot Ledger Staff, *New Century Told to Halt New Mortgages, Wholesale Lenders Cancel Lines of Credit to Company*, The Patriot Ledger (Quincy, Ma.), Mar. 14, 2007. |
| | • Reuters reports that "U.S. lawyers have already sued subprime lenders including New Century Financial Corp. and NovaStar Financial Inc. and their top executives for securities fraud, claiming they misled investors about the companies' finances and had lax guidelines for approving mortgages for borrowers with poor credit |

10

| DATE | EVENT |
|---|---|
| | histories." Martha Graybow, *Class-Action Lawyers Pounce in US Subprime Crisis*, Reuters, Mar. 14, 2007. |
| | • The Cincinnati Enquirer reports that "New Century [Financial Corp.] provides a glaring and disturbing look at the problems associated with predatory lending." John Newberry, *Mortgage Lender is Restricted in Ohio*, Cincinnati Enquirer, Mar. 15, 2007 (quotation marks omitted). |
| | • Bloomberg News reports that New York State Attorney General Andrew Cuomo's office "is probing subprime lenders, whose borrowers have fallen behind on their mortgages at the highest rate in four years." Karen Freifeld, *New York General Probing Subprime Lenders*, Bloomberg News, Mar. 15, 2007. |
| | • Reuters reports that U.S. state regulators are "zeroing" in on subprime lenders, with several specifically targeting New Century Financial Corp. – "the biggest name associated with the crisis that has roiled markets and poses a threat to the economy." So far regulators in Massachusetts, New York, New Jersey, and New Hampshire have issued cease-and-desist orders against New Century Financial Corp., barring the lender from making new loans in their states. Anastasija Johnson, *U.S. State Regulators Zero on Subprime Lenders*, Reuters, Mar. 16, 2007. |
| | • The Associated Press reports that New York state regulators suspended the license of New Century Financial Corp. after it failed to provide $39 million in funding for 121 approved loans. "The [New York] Department of Banking also ordered New Century to "cease and desist from making new loans in the state, as nearly 2,000 loan applications in New York state, valued at $647 million, are already awaiting approval, and the troubled lender appears to have trouble meeting its obligations." *Cuomo Launches Probe of Subprime Lenders*, Crain'sNewYorkBusiness.com, Mar. 16, 2007. |
| | • Originator Fieldstone announces that "its loan delinquencies were up sharply in fiscal 2006 and it swung to to to [sic] a fiscal-year net loss of $68.4 million from net income of $99.4 million for the prior year." *Fieldstone Notes 'Sharp Increase' in Delinquencies*, Dow Jones Newswires, Mar. 19, 2007. |
| | • CNNMoney.com reports that the Standard & Poor's estimates that the Alt-A market (loans made to people with good credit scores who borrow with little or no verification of income or "alternative documentation") has gone from less than $20 billion in loans in the fourth quarter of 2003 to more than $100 billion in each of the last three quarters. Chris Isidore, *'Liar Loans': Mortgage Woes Beyond Subprime*, CNNMoney.com, Mar. 19, 2007. |
| | • A class action lawsuit is filed against originator Accredited Home Lenders, Inc. and certain of its officers and directors alleging violations of Sections 10(b) and 20(a) of the 1934 Securities Exchange Act, *Atlas v.* |

11

| DATE | EVENT |
|------|-------|
| | *Accredited Home Lenders Holding Co.*, No. 07-CV-00488 (S.D. Cal. filed Mar. 16, 2007). *See Shareholder Class Action Filed Against Accredited Home Lenders Holding Co. by the Law Firm of Schiffrin Barroway Topaz & Kessler, LLP*, PRNewswire, Mar. 22, 2007. |
| | • Senator Christopher J. Dodd begins a U.S. Senate Committee Hearing on the mortgage crisis by stating "You cannot pick up a newspaper lately without seeing another story about the implosion of the subprime mortgage market." *Mortgage Market Turmoil: Causes and Consequences: Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs*, (Mar. 22, 2007) (statement of Christopher J. Dodd, Chairman, U.S. Senate Comm. on Banking, Housing, and Urban Affairs) *available at* http://banking.senate.gov/public/index.cfm?FuseAction=Hearings.Hearing&Hearing_ID=4ccca4e6-b9dc-40b1-bab5-137b3a77364d. |
| | • Bloomberg News reports that borrowers were late on more than 13 percent of subprime mortgage payments last quarter, the highest delinquency rate since September 2002. James Tyson, Craig Torres and Alison Vekshin (Bloomberg News), *Fed Admits to Subprime Inactions; "We Could Have Done More Sooner" Bank Director Tells Senate Amid Fears Crisis Will Spread*, Toronto Star, Mar. 23, 2007. |
| | • The Los Angeles Times reports that Countrywide Financial Corp., along with other defendants, has been sued for mortgage fraud by a group of homeowners. Bloomberg News, *Wall Street Round Up, Countrywide, IndyMac Sued by Homeowners*, L.A. Times, Mar. 23, 2007. |
| | • The New York Times reports that automated underwriting is becoming increasingly popular. "[B]y retrieving real-time credit reports online, then using algorithms to gauge the risk of default, [automated underwriting software allows] subprime lenders . . . to grow at warp speed." Critics of the software say that "the push for speed influenced some lenders to take shortcuts, ignore warning signs or focus entirely on credit scores." The Times reports that by mid-2004 Countrywide Financial Corp. was using an automated underwriting system to double the number of loans it made, to 150,000 monthly. Lynnley Browning, *Automated Underwriting Software helped Fuel a Mortgage Book*, N.Y. Times, Mar. 23, 2007. |

12