UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PLUMBERS' & PIPEFITTERS' LOCAL #562 SUPPLEMENTAL PLAN & TRUST, et al., On Behalf of Themselves and All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>            v.<br><br>J.P. MORGAN ACCEPTANCE CORPORATION I, et al.,<br><br>        Defendants. | Civil Action No. 08-cv-1713 (ERK) (WDW) (Consolidated with 09-cv-3209)<br><br><br>**ECF Case** |

**LEAD PLAINTIFF THE PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI'S OPPOSITION TO THE RATING AGENCIES' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................ii-vi

I.     INTRODUCTION ...........................................................................................1

II.    SUMMARY OF ALLEGATIONS ..................................................................3

     A.    The Rating Agencies' Role In The Certificate
          Offerings .........................................................................................3

     B.    The Certificates' Ratings ................................................................5

III.    LEGAL STANDARD .....................................................................................8

IV.    ARGUMENT ..................................................................................................9

     A.    The Rating Agencies Controlled The Depositor.............................9

     B.    The Rating Agencies Are Liable As Underwriters ........................12

          1.    Underwriters Are Those Who Participate In
                 A Security's Distribution .....................................................12

          2.    SEC Rule 436(g)(1) Does Not Preclude
                 Lead Plaintiff's Claims ......................................................17

     C.    The Offering Documents Contained Untrue
          Statements And Omissions .............................................................18

          1.    The Certificates' Ratings Were Unjustifiably
                 High.....................................................................................18

          2.    Defendants Had A Duty To Disclose The
                 Omitted Information ............................................................21

           3.    Lead Plaintiff Is Not Required To Allege
                 Scienter ...............................................................................22

          4.    The Misstatements And Omissions
                 Regarding The Certificates' Ratings Were
                 Not Publicly-Known ...........................................................23

           5.    The Bespeaks Caution Doctrine Is
                 Inapplicable.........................................................................24

     D.    Lead Plaintiff's Claims Are Timely...............................................26

V.    CONCLUSION .............................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
  651 F. Supp. 155 (S.D.N.Y. 2009)..................................................................20, 23, 25

*In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*,
  2007 U.S. Dist. LEXIS 66911 (S.D.N.Y. Sept. 10, 2007)......................................15

*In re AES Corp. Sec. Litig.*,
  825 F. Supp. 578 (S.D.N.Y. 1993) .........................................................................22

*In re AOL Time Warner Sec. and ERISA Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004) ....................................................................25

*Arista Records, LLC v. Doe 3*,
  604 F.3d 110 (2nd Cir. 2010)....................................................................................8

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009)....................................................................................8, 9, 11

*Bano v. Union Carbide Corp.*,
  361 F.3d 696 (2d Cir. 2004).....................................................................................26

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................ passim

*Caiola v. Citibank, N.A.*,
  295 F.3d 312, 331 (2d Cir. 2002) ...........................................................................21

*In re Donald J. Trump Casino Sec. Litig.*,
  7 F.3d 357 (3d Cir. 1993) ........................................................................................25

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
  511 F. Supp. 2d 742 (S.D. Tex. 2005) ...................................................................17

*In re Flag Telecom Holdings, Ltd., Sec. Litig.*,
  618 F. Supp. 2d 311 (S.D.N.Y. 2009) ....................................................................25

*In re Fuwei Films Sec. Litig.*,
  634 F. Supp. 2d 419 (S.D.N.Y. 2009).......................................................................9

*Glazer v. Formica Corp.*,
  964 F.2d 149 (2d Cir. 1992) ....................................................................................21

*In re Global Crossing, Ltd. Sec. Litig.*,
    322 F. Supp. 2d 319 (S.D.N.Y. 2004) .................................................................9

*In re Global Crossing, Ltd. Sec. Litig.*,
    2005 WL 1875445 (S.D.N.Y. Aug. 5, 2005) ........................................................11

*Harden v. Raffensperger, Hughes & Co.*,
    65 F.3d 1392 (7th Cir. 1995) ...................................................................2, 13

*Heller v. Goldin Restructuring Fund, L.P.*,
    590 F. Supp. 2d 603 (S.D.N.Y. 2008) ...............................................................25

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983) ...........................................................................18, 22

*In re Indymac Mortgage-Backed Sec. Litig.*,
    No. 09 Civ. 4583 (LAK) (S.D.N.Y. Feb. 5, 2010) ...........................................10, 11

*Ingenito v. Bermec Corp.*,
    441 F. Supp. 525 (S.D.N.Y. 1977) ...................................................................12

*In re Initial Pub. Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003) .............................................................9, 11

*In re Initial Pub. Offering Sec. Litig.*,
    358 F. Supp. 2d 189 (S.D.N.Y. 2004) ...............................................................25

*Jaser v. N.Y. Prop. Ins. Underwriting Ass'n*,
    815 F.2d 240 (2d Cir. 1987) .........................................................................28

*LC Capital Partners, L.P. v. Frontier Ins. Group, Inc.*,
    318 F.3d 148 (2d Cir. 2003) .........................................................................26

*In re Lehman Bros. Sec. & ERISA Litig.*,
    681 F. Supp. 2d 495 (S.D.N.Y. 2010) .......................................................10, 11, 16

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) .........................................................................27

*Lin v. Interactive Brokers Group, Inc.*,
    574 F. Supp. 2d 408 (S.D.N.Y. 2008) ...............................................................19

*McFarland v. Memorex Corp.*,
    493 F. Supp. 631 (N.D. Cal. 1980) ...............................................................15, 16

*Merck & Co., Inc. v. Reynolds*,
    130 S. Ct. 1784 (2010) ...............................................................................26

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ....................................................................22

*Milman v. Box Hill Sys. Corp.*,
    72 F. Supp. 2d 220 (S.D.N.Y. 1999)......................................................................19

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
    643 F. Supp. 2d 366 (S.D.N.Y. 2008) ....................................................................22

*N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Group, PLC*,
    2010 U.S. Dist. LEXIS 29711 (S.D.N.Y. Mar. 26, 2010) ...........................10, 11, 16

*Newman v. Warnaco Group, Inc*.,
    335 F.3d 187 (2d Cir. 2003) ..................................................................................26

*Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*,
    840 F. Supp. 243 (S.D.N.Y. 1993) .........................................................................26

*In re NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009).......................................................................8

*Olkey v. Hyperion 1999 Term Trust*,
    98 F.3d 2 (2d Cir. 1996)) .......................................................................................25

*Owens v. Gaffken & Barriger Fund, LLC*,
    2009 WL 3073338 (S.D.N.Y. Sept. 21, 2009) .......................................................11

*P. Stolz Family P'ship L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004).....................................................................................25

*Pinter v. Dahl*,
    486 U.S. 622 (1988)...............................................................................................12

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
    2009 WL 3149775 (D. Mass. Sept. 30, 2009) ..................................................20, 21

*Pub. Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*,
    2010 WL 2175875 (S.D.N.Y. June 1, 2010) ..........................................................27

*In re Refco, Inc. Sec. Litig.*
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)...............................................................14, 15

*In re Refco, Inc. Sec. Litig.*
    2008 WL 3843343 (S.D.N.Y. Aug. 14, 2008).................................................14, 15, 16

*Resnik v. Swartz*,
    303 F.3d 147 (2d Cir. 2002) ..................................................................................22

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004).................................................................22, 25

*In re Scottish Re Group Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007).................................................................9

*SEC v. Chinese Consol. Benevolent Ass'n*,
120 F.2d 738 (2d Cir. 1941).................................................................12, 14, 16

*SEC v. Culpepper*,
270 F.2d 241 (2d Cir. 1959).................................................................13, 16

*SEC v. Holschuh*,
694 F.2d 130 (7th Cir. 1982) .................................................................13

*SEC v. Kern*,
425 F.3d 143 (2d Cir. 2005).................................................................2, 12, 14, 16

*SEC v. Van Horn*,
371 F.2d 181 (7th Cir. 1966) .................................................................13

*Special Situations Fund, III, L.P. v. Cocchiola*,
2007 U.S. Dist. LEXIS 56627 (D.N.J. Aug. 2, 2007).................................................................13

*Staehr v. Hartford Fin. Servs. Group*,
547 F.3d 406 (2d Cir. 2008) .................................................................26

*TSC Indus. v. Northway, Inc.*,
426 U.S. 438 (1976).................................................................18, 19, 22, 24

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
2010 WL 816623 (S.D.N.Y. Mar. 11, 2010) .................................................................20

*In re Twinlab Corp. Sec. Litig.*,
103 F. Supp. 2d 193 (E.D.N.Y. 2000) .................................................................18

*Virginia Bankshares, Inc. v. Sandberg*,
501 U.S. 1083 (1991).................................................................22

*In re Vivendi Universal, S.A. Sec. Litig.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003).................................................................2, 9, 11

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*,
2009 WL 3517630 (W.D. Wash. Oct. 27, 2009) .................................................................22

*In re Wells Fargo Mortgage-Backed Certificates Litig.*,
2010 U.S. Dist. LEXIS 39825 (N.D. Cal. Apr. 22, 2010) ............................................. passim

*In re Worldcom, Inc. Sec. Litig.*,
   346 F. Supp. 2d 628 (S.D.N.Y. 2004)..................................................................21

## STATUTES, RULES & REGULATIONS

15 U.S.C. § 77b(a)(11)........................................................................................12

15 U.S.C. § 77k(a) .......................................................................................12, 18

15 U.S.C. § 77m.................................................................................................26

17 C.F.R. § 230.405 ...................................................................................2, 9, 10

17 C.F.R. § 230.408(a) ......................................................................................21

17 C.F.R. § 230.436(g)(1)..................................................................................17

Federal Rules Of Civil Procedure
   Rule 8(a)........................................................................................................8
   Rule 15(a)......................................................................................................28

The Public Employees' Retirement System of Mississippi ("Lead Plaintiff") respectfully submits this memorandum of law in support of its opposition to The Rating Agencies' Motion To Dismiss The Consolidated Class Action Complaint ("RA Mot.").  Dkt. No. 54.

## I.      INTRODUCTION

Between 2005 and 2006, Defendant J.P. Morgan Acceptance Corporation I (the "Depositor"), with the participation of Moody's Investor Services, Inc. ("Moody's"), McGraw-Hill Companies, Inc., through its division Standard & Poor's ("S&P"), and Fitch, Inc. ("Fitch") (collectively, "Rating Agencies"), issued $36.8 billion in mortgage-backed certificates ("Certificates") to investors.[1]  The Certificates were offered pursuant to a July 29, 2005 Registration Statement, as amended ("July 2005 Registration Statement"), a December 7, 2005 Registration Statement, as amended ("December 2005 Registration Statement") and their accompanying prospectuses and prospectus supplements ("Offering Documents").  The Offering Documents contained untrue statements and omissions for which the Rating Agencies are liable under Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. § 77k, 77o ("Securities Act").

The Rating Agencies played a prominent role in the distribution of the Certificates.  They assigned credit ratings to each Certificate which purportedly analyzed, *inter alia*, the "structural and legal aspects associated with such certificates …"  ¶50.  In addition, because it was "a condition to the issuance of the Offered Certificates" that they receive a certain set of predetermined ratings, the Rating Agencies provided issuers with active structuring advice in order to assure a particular outcome.  ¶¶50, 53.  It was imperative that the Certificates received the highest ratings possible because Defendants marketed the Certificates "primarily to

---

[1]  ¶¶1-5.  References to "¶__" are to the Consolidated Class Action Complaint ("Complaint").  Dkt. No. 47. "Defendants" refers collectively to: (1) the Depositor and J.P. Morgan Securities Inc. ("Underwriter") (together, the "J.P. Morgan Defendants"); (2) David M. Duzyk, Louis Schioppo, Jr., Christine E. Cole, Edwin F. McMichael (the "Individual Defendants"); and (3) the Rating Agencies.

institutional investors" which are often prohibited from holding non-investment-grade securities. ¶¶4, 56. Here, with the Rating Agencies' guidance, over 90% of the Certificates were assigned AAA ratings.

The Certificates' ratings, however, were based on inaccurate mortgage loan data, stale assumptions about likelihood of borrower delinquencies and defaults and models which failed to consider the increasing diversity of mortgage loan products in the market. ¶¶188-192. The SEC found that, in rating mortgage-backed securities such as the Certificates, the Rating Agencies: (1) had no specific written procedures; (2) failed to document or provide rationale for deviations from their models; (3) had no specific procedures to identify or address errors in their models or methodologies; and (4) suffered from "exacerbated" conflicts of interest compared to those inherent in the issuer-pays model. ¶¶202-07. The cumulative effect of these factors was that the ratings were unjustifiably high. ¶¶4, 188. The Rating Agencies have now downgraded 84% of the Certificates originally rated AAA to junk, and none of the Certificates are marketable at near the prices paid by Lead Plaintiff and the Class. ¶9.

Having engaged in activities necessary to the distribution of these Certificates, the Rating Agencies are liable as "underwriters," as defined in Section 2(a)(11) of the Securities Act. *See SEC v. Kern*, 425 F.3d 143, 152 (2d Cir. 2005); *Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1400 (7th Cir. 1995). In addition, the Rating Agencies are liable as control persons under Section 15 as their active structuring advice gave them the "power to direct or cause the direction of the management and policies of" the Depositor. *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 188 (S.D.N.Y. 2003); 17 C.F.R. § 230.405.

The Rating Agencies, while acknowledging that the Complaint is subject to Rule 8's notice pleading standard, contend that Lead Plaintiff's allegations should nevertheless be

dismissed.[2]   A complaint, however, can be dismissed only if its allegations are insufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Here, the Rating Agencies were one of the central actors in the distribution of billions of dollars in supposedly AAA investments which have now been downgraded to junk.  ¶¶9, 71. Columbia professor Joseph Stiglitz, who won the 2001 Nobel Prize in Economic Sciences, stated with regard to the recent economic crisis: "I view the rating agencies as one of the key culprits … They were the party that performed the alchemy that converted the securities from F-rated to A-rated.  The banks could not have done what they did without the complicity of the rating agencies."  ¶49.  Lead Plaintiff's claims are far more than "plausible," and the Rating Agencies' motion should be denied.  *Twombly*, 550 U.S. at 570.

II.     SUMMARY OF ALLEGATIONS

    A.     The Rating Agencies' Role
         In The Certificate Offerings

The Rating Agencies played a unique and necessary role in the distribution of over $36.8 billion in Certificates.  The process started when J.P. Morgan Mortgage Acquisition Corporation (the "Sponsor") and its affiliates purchased large volumes of residential mortgage loans from numerous originators.  ¶¶3, 26, 29, 34.  The Sponsor then transferred a pool of loans to the Depositor who "deposited" them into an issuing trust and divided the cash flows into Certificates, or tranches.  ¶29.  Senior tranches were purportedly more protected from loss, and offered lower returns, while junior tranches offered higher risk, but greater returns.  ¶30.  The

---

[2]  The Rating Agencies join in the JPMorgan Defendants' Motion To Dismiss The Amended Complaint on the following issues: (1) Lead Plaintiff lacks standing with respect to the offerings in which no named Plaintiff purchased Certificates; (2) Lead Plaintiff has not alleged any legally cognizable loss; and (3) Lead Plaintiff has not alleged any actionable misstatement or omission.  RA Mot. at 2 n.3.  For law and facts opposing these arguments, Lead Plaintiff respectfully refers the Court to the concurrently-filed Lead Plaintiff the Public Employees' Retirement System of Mississippi's Opposition To The JPMorgan Defendants' Motion To Dismiss The Amended Complaint ("J.P. Morgan Opp.").  "J.P. Morgan Mot." refers to the JPMorgan Defendants' Motion To Dismiss The Amended Complaint.  Dkt. No. 58.

Offering Documents stated that the Depositor was prohibited from conducting "any activities other than those related to issuing and selling one or more series of securities, acquiring and selling loans and mortgage-backed securities, serving as depositor of the trusts and engaging in activities incidental to the foregoing." ¶57.

The Offering Documents stated that each Certificate's credit rating purportedly addressed "the likelihood that holders of a class of securities of that class will receive payments to which those securityholders are entitled under the related agreement." ¶50. The Offering Documents did not disclose, however, that the Rating Agencies provided the Sponsor and Depositor with active "structuring advice" during the rating process. ¶53. The Sponsor and Depositor initiated the ratings process by sending the Rating Agencies a range of data on each loan to be held by the trust, the proposed capital structure and the proposed levels of credit enhancement. ¶55. *Id.*

The Rating Agencies then performed analysis on the loans to determine if the proposed structure supported the desired ratings. *Id.* If not, the Depositor could either accept the lower ratings or agree to adjust the capital structure and/or content of the mortgage pools. *Id.* A Moody's financial modeling expert named Sylvain Raynes confirmed this process, stating: "The rating is what gives birth to the structure in the first place…You start with a rating and build a deal around a rating." ¶54. Joseph Mason, an associate professor of finance at Drexel University and a former economist at the Office of the Comptroller of the Currency, said that it is indisputable that the Rating Agencies provided issuers with "active structuring advice" as to how to obtain triple-A ratings for their deals.[3]

---

[3] ¶53. The Rating Agencies continued to play an active role in each securitization even after the Certificates were distributed. For example, the Rating Agencies controlled the process whereby additional loans could be added to each loan pool following the closing date. ¶61. The Rating Agencies also controlled whether the pooling and servicing and master servicing agreements could be amended. ¶58.

These ratings were essential to the Certificates' successful distribution because the Offering Documents stated that it was "a condition to the issuance of the Offered Certificates" that they receive a certain set of specified ratings. ¶¶50, 186. Further, without the investment-grade ratings, banks, mutual funds and public pension funds which are required to hold only investment-grade securities would be unable to purchase the Certificates. ¶¶4, 56. Indeed, the Offering Documents stated that "[t]he securities will be sold primarily to institutional investors." ¶56. Here, the Rating Agencies assigned AAA ratings – the highest rating, indicating the least risk – to over 90% of the Certificates.[4]

B.    The Certificates' Ratings

The Certificates' ratings were based on inaccurate mortgage loan data, outdated models and stale assumptions about likelihood of borrower delinquencies and defaults. ¶¶188-192. As a result, the ratings were unjustifiably high and the Certificates were far riskier than other investments with the same ratings. ¶¶4, 188.

The inputs to the Rating Agencies' models included standard mortgage loan metrics such as principal amount, geographic location of the property, credit history/FICO score of the borrower, loan-to-value ("LTV") ratio, appraisal value, type of loan and the amount of documentation provided by the borrower to verify assets and/or income levels. ¶55. Moody's executives have acknowledged that much of this information was inaccurate as its models failed to capture a systematic erosion of lending standards. ¶201. Brian Clarkson, Moody's former President and Chief Operating Officer, recognized that Moody's failed to incorporate decreased

---

[4] ¶52. The highest ratings are "AAA" and "Aaa," respectively. These ratings signify the highest investment-grade, the best quality and the least risk. Ratings of "AA," "A," and "BBB" represent high credit quality, upper-medium credit quality and medium credit quality, respectively. These ratings are considered "investment-grade ratings." Any instrument rated lower than "BBB" or "Bbb" is considered below investment-grade. ¶¶4, 210.

lending standards into its ratings, stating: "We should have done a better job monitoring that [decrease in underwriting standards]." *Id.* Another Moody's executive stated:

> We're on notice that a lot of things that we relied on before just weren't true. . . . [W]e relied on reps and warrantees that no loans were originated in violation of any state or federal law. ***We know that's a lie.***

¶189 (emphasis added).

In addition to inaccurate inputs, the models that the Rating Agencies relied on were outdated, and failed to account for an increasing diversity of mortgage loan products in the market. For example, *The New York Times* summarized the reason that Moody's revised their securitization model:

> Moody's discovered that the size of people's first mortgages was no longer a good predictor of whether they would default; rather, it was the size of their first and second loans – that is, their total debt – combined. ***This was rather intuitive; Moody's simply hadn't reckoned on it.*** Similarly, credit scores, long a mainstay of its analyses, had not proved to be a 'strong predictor' of defaults this time.

¶195 (emphasis added).

Frank Raiter, the former Managing Director and head of Residential Mortgage-Backed Securities Ratings at S&P, confirmed that its modeling for securitizations was not updated on a timely basis, despite the fact that by early 2004, S&P had developed a modern ratings model that considered nearly 10 million loans and "covered the full spectrum of new mortgage products, particularly in the Alt-A and fixed/floating payment type categories."[5] ¶197.

On July 8, 2008, following its investigation into the Rating Agencies' role in rating mortgage-backed securities, the Securities and Exchange Commission ("SEC") issued *The Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit*

---

[5] S&P's Deven Sharma agreed with Raiter's testimony, noting: "It is by now clear that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work." ¶200.

*Rating Agencies* ("Summary Report").  The Summary Report found numerous flaws in the

Rating Agencies' procedures, including:

- Relevant ratings criteria were not disclosed;

- None of the rating agencies examined had specific written procedures for rating RMBS;

- The rating agencies did not always document significant steps in the rating process – including the rationale for **deviations from their models** and for rating committee actions and decisions – and they did not always document significant participants in the ratings process;

- Rating agencies do not appear to have specific policies and procedures **to identify or address errors in their models or methodologies**;

- The rationale for deviations from the model or out-of-model adjustments was not always documented in deal records. As a result, in its review of rating files, the Staff could not always reconstruct the process used to arrive at the rating and identify the factors that led to the ultimate rating;

- There was a lack of documentation of rating agency committee actions and decisions; and

- [A] number of factors unique to the rating of mortgage-backed securities may have "exacerbated" conflicts of interest inherent in the fact that the issuer or arranger pays for the ratings.[6]

¶¶202-03 (emphasis added).

Richard Gugliada, a former S&P Managing Director, explained the easing of standards as

a "'market share war where criteria were relaxed'" and admitted, "'I knew it was wrong at the

time . . . [i]t was either that or skip the business.  That wasn't my mandate.  My mandate was to

find a way. Find the way.'"  ¶207.  These comments were further corroborated when former

---

[6] These factors include that: (1) the arranger of the deal has "more flexibility to adjust the deal structure to obtain a desired credit rating as compared to arrangers of non-structured asset classes"; (2) with a fast-changing market, rating processes are frequently and quickly changed.  The high concentration of arrangers with the influence to determine the choice of rating agency has "heightened the inherent conflicts that exist in the 'issuer pays' compensation model"; (3) compensation is calculated by volume of deals and total dollar volume, as a result arrangers prefer fast and predictable ratings processes; (4) rating agencies may be pressured by arrangers to produce a more favorable outcome or reduce credit enhancement levels, thus reducing "the cost of the debt for a given level of cash inflows from the asset pool."  When the arranger also sponsors the RMBS or CDO trust, pressure can influence an agency's decision to update a model when the update would lead to a less favorable outcome; and (5) high profit margins may have provided an incentive for rating agencies to encourage the arrangers to route future business its way.  ¶203.

Moody's Managing Director Jerome S. Fons testified that issuers of structured securities were free to shop around for the rating agency that would give them the highest rating and "typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality."[7]

The cumulative effect of the inaccurate data, outdated models and exacerbated conflicts of interest was that the Certificates' ratings were unjustifiably high.  ¶¶4, 188.  Approximately 84% of the initially AAA Certificates have been downgraded to "junk."  The Certificates are no longer marketable near the prices paid by Lead Plaintiff and the Class.  ¶¶9, 214.

III.   LEGAL STANDARD

Securities Act claims are governed by the notice pleading standard set forth in Fed. R. Civ. P. 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 276 (S.D.N.Y. 2009).  As the Supreme Court recently reaffirmed, "the pleading standard Rule 8 announces does not require 'detailed factual allegations.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("The plausibility standard is ***not*** akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.").  A complaint need only allege "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "[T]he notion that *Twombly* imposed a heightened standard that requires a complaint to include specific evidence, factual allegations in addition to those required by Rule 8…is belied by the *Twombly* opinion itself."  *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119-20 (2nd Cir. 2010) (rejecting

---

[7] ¶208.  Fons went on to note that "[T]he focus of Moody's shifted from protecting investors to being a marketing-driven [sic] organization" and "management's focus increasingly turned to maximizing revenues" at the expense of ratings quality.  *Id.*  He also stated that the rating agencies' "drive to maintain or expand market share made [them] willing participants in this [rating] shopping spree" and made it "relatively easy for the major banks to play the agencies off one another."  *Id.*  Fons said it was this business model that "prevented analysts from putting investor interests first."  *Id.*

defendants' contention that *Twombly* and *Iqbal* require the pleading of specific evidence or extra facts beyond what is necessary to make a claim plausible).

Here, the Complaint states a plausible claim as it contains detailed factual allegations regarding, *inter alia*, the Rating Agencies' roles as control persons and underwriters and their resulting liability for the untrue statements and omissions in the Offering Documents.

## IV.   ARGUMENT

### A.   The Rating Agencies Controlled The Depositor

To plead a claim under Section 15, "a plaintiff must allege (1) a primary violation by a controlled person and (2) direct or indirect control by the defendant of the primary violator." *See, e.g., In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 435 (S.D.N.Y. 2009); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 349 (S.D.N.Y. 2004).  Whether a person is a "controlling person" within the meaning of Section 15 is a "fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 401 (S.D.N.Y. 2007).   "[S]ection 15 claims need only satisfy the minimal pleading standards of Rule 8." *Vivendi*, 381 F. Supp. 2d 188 (noting that "'naked allegations of control will typically suffice' to plead an adequate § 15 claim to withstand a motion to dismiss") (quoting *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 352 (S.D.N.Y. 2003)).

As detailed in the J.P. Morgan Opp., the Depositor committed primary violations of both Sections 11 and 12(a)(2) because it issued the Certificates pursuant to Offering Documents which contained materially untrue statements and omissions.  *See* J.P. Morgan Opp. at Section III.  Lead Plaintiff has also alleged that the Rating Agencies had the power to – and did – "cause the direction of the management and policies" of the Depositor "***by contract, or otherwise.***" 17 C.F.R. § 230.405 (emphasis added); *Vivendi*, 381 F. Supp. 2d at 187-88.  Specifically, the

Offering Documents stated that the Depositor was prohibited from conducting "any activities other than those related to" issuing and selling mortgage-backed securities. ¶57. Yet it was the Rating Agencies who determined the number of classes or tranches and the amount of credit enhancement. ¶¶53-56. In short, without the Rating Agencies directing the Depositor's activities and dictating its policies, the Certificates would not have been issued, marketed or sold. ¶57. The Rating Agencies controlled the Depositor's sole corporate purpose – the formation and sale of mortgage pass-through securities.

The Rating Agencies contend that these allegations do not exhibit "the hallmarks generally considered adequate to plead 'control.'" RA Mot. at 23. They miss the point. The purported "hallmarks" of control – such as stock ownership in the controlled entity – are not the exclusive means to plead control. *See* 17 C.F.R. § 230.405 (control can be shown "through ownership of voting securities, by contract, *or otherwise*" (emphasis added)). Here, the Rating Agencies controlled the Depositor's ability to legally issue, market and sell the Certificates – its sole corporate purpose.

Notably, no case that the Rating Agencies cite from this circuit has rejected the theory of control that Lead Plaintiff articulates here. *See* RA Mot. at 23 (citing *In re Lehman Bros. Sec. & ERISA Litig.*, 681 F. Supp. 2d 495, 501 (S.D.N.Y. 2010) ("*Lehman MBS*"); *N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Group, PLC*, 2010 U.S. Dist. LEXIS 29711, at *6 (S.D.N.Y. Mar. 26, 2010) ("*RBS MBS*"); *In re Indymac Mortgage-Backed Sec. Litig.*, No. 09 Civ. 4583 (LAK), slip. op. at 1 (S.D.N.Y. Feb. 5, 2010) ("*IndyMac MBS*")). For example, in *Lehman MBS*, Judge Kaplan only addressed whether the Rating Agencies controlled Lehman – *i.e.*, the investment bank underwriter liable under Section 11(a)(5). The court wrote:

> This complaint, fairly read, alleges only that the Rating Agencies had the power to influence Lehman with respect to the composition of the pools of mortgages to

be securitized and the credit enhancements the Rating Agencies regarded as necessary to obtain the desired ratings.

681 F. Supp. 2d at 501.   The issuer/depositor in *Lehman MBS* was an entity identified as Structured Asset Securities Corporation, not Lehman itself.   *Lehman MBS* gave no consideration to the Rating Agencies' control over Structured Asset Securities Corporation and relied heavily on a factual allegation that does not exist in this case: *i.e.,* that Lehman "'controlled every aspect of the securitization and underwriting process.'"   *Id.* at 500.   *Lehman MBS* also applied an erroneous legal standard for control, namely that Plaintiff must allege that "decision making power lay entirely with the Rating Agencies."[8]

Similarly, *RBS MBS* did not reach the issue of the Rating Agencies' control.   There, the district court dismissed the control person allegations solely on the mistaken belief that plaintiffs had to allege a primary violation ***by the Rating Agencies*** in order to state a control person claim: "Since Plaintiffs have failed to allege primary liability against the Rating Agency Defendants, their claims under section 15 must also be dismissed."   U.S. Dist. LEXIS 29711, at *26.   This is also the incorrect legal standard, because Lead Plaintiff must plead that ***the Depositor*** – not the Rating Agencies – committed a primary violation.

Here, Lead Plaintiff has sufficiently alleged that the Depositor committed a primary violation and that the Rating Agencies controlled the Depositor's primary corporate purpose. Nothing more is necessary to properly plead a Section 15 claim.[9]

---

[8] *Id.* at 501.  *IndyMac MBS* simply adopts the court's opinion in *Lehman* without further discussion. Accordingly, it is similarly inapposite.  No. 09-cv-04583, slip op. at 1.

[9]  *Iqbal*, 129 S. Ct. at 1950.  The Rating Agencies' cases are either easily distinguished or support Lead Plaintiff's position.  For example, *In re Global Crossing, Ltd. Sec. Litig.*, 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005), and *Owens v. Gaffken & Barriger Fund, LLC*, 2009 WL 3073338, at *12 (S.D.N.Y. Sept. 21, 2009), stand for the proposition that "[c]onclusory allegations of control are insufficient as a matter of law."  RA Mot. at 22-23.  While this Circuit and others have disagreed – *see, e.g., Vivendi*, 381 F. Supp. 2d 187-88 (naked control person allegations will typically suffice); *Initial Pub. Offering*, 241 F. Supp. 2d at 352.  Lead Plaintiff's allegations that the Ratings Agencies completely controlled the Depositor's corporate purpose are far beyond conclusory.

B.       The Rating Agencies Are Liable As Underwriters

1.       Underwriters Are Those Who
         Participate In A Security's Distribution

Section 11 provides a cause of action against every underwriter with respect to a security offered pursuant to a registration statement which contains "an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a); § 77k(a)(5).  The legislative history of the Securities Act confirms the broad definition of "underwriter":

> Persons…who participate in any underwriting transaction or who have a direct or indirect participation on such a transaction…***The test is one of participation in the underwriting undertaking*** rather than that of a mere interest in it.

H.R. Conf. Rep. No. 73-152, at 24 (1933) (emphasis added); *cf. Pinter v. Dahl*, 486 U.S. 622, 650 n.26 (1988) (liabilities and obligations expressly grounded in participation are found in numerous places in the Securities Act, including the provisions defining underwriter in Section 2(a)(11)).  There are two distinct forms of participation: an underwriter may: (1) "buy[] securities directly or indirectly from the issuer and resell[] them"; or (2) may "perform[] some act that facilitates the issuer's distribution."  *Ingenito v. Bermec Corp.*, 441 F. Supp. 525, 536 (S.D.N.Y. 1977); 15 U.S.C. § 77b(a)(11).

While acknowledging that the term underwriter is meant to "sweep up all" who play a role in the distribution of securities, RA Mot. at 7-8, the Rating Agencies imply that only those who act as direct "conduits" between the issuer and the investors have a role in distribution.  *Id.* This is not accurate.  The definition of "underwriter" does ***not*** include only those who purchased from the issuer with a view to their resale.  Rather, the Second Circuit has defined underwriter to encompass those who are "engaged in steps necessary to the distribution" of securities.  *Kern*, 425 F.3d at 152 (quoting *SEC v. Chinese Consol. Benevolent Ass'n*, 120 F.2d 738, 741 (2d Cir.

-12-

1941)); *see also SEC v. Culpepper*, 270 F.2d 241, 246 (2d Cir. 1959) (stating that "the underlying policy of the [Securities] Act, that of protecting the investing public through the disclosure of adequate information, would be seriously impaired if we held that a dealer must have conventional or contractual privity with the issuer in order to be an 'underwriter'"). Courts elsewhere have agreed. *See Harden*, 65 F.3d at 1400-01; *Special Situations Fund, III, L.P. v. Cocchiola*, 2007 U.S. Dist. LEXIS 56627, at *16 (D.N.J. Aug. 2, 2007) ("To be an underwriter under the Securities Act, it is not necessary for a person to undertake the risk that they will be left holding unsold shares . . . Nor must a party actually sell shares to the public to be an underwriter under the Securities Act, mere participation in an offering is enough."). For example, in *Harden*, 65 F.3d 1392, the defendant was retained to perform due diligence on the registration statement and recommend a minimum yield. At no point did the defendant purchase, offer, or sell any securities. *Id*. at 1395. Nonetheless, the Seventh Circuit found that the defendant was a Section 11 underwriter because "its role . . . was 'necessary to the distribution of [the] securities.'"[10]

Here, the Rating Agencies did not purchase securities, but participated in "steps necessary" to the Certificates' distribution. Indeed, the Rating Agencies engaged in activities which "departed substantially from the role the Rating Agencies traditionally played in financial markets." ¶¶5, 56. For example, the Rating Agencies "structured the Certificates from the beginning to conform to a specific set of pre-determined ratings, and engaged with the Sponsor and the Depositor to design all structural and legal aspects of the Certificates." ¶51. But for the

---

[10] *Id*. at 1401 (quoting *SEC v. Holschuh*, 694 F.2d 130, 139 n. 13 (7th Cir. 1982)); *accord SEC v. Van Horn*, 371 F.2d 181 (7th Cir. 1966). After its holding, the *Harden* court set forth in *dicta* an "*additional* and substantial reason[]" why qualified independent underwriters were "underwriters": the NASD's rule requiring qualified independent underwriters to be subject to Section 11 liability. 65 F.3d at 1401. This "additional" reason was independent of the court's determination of underwriter liability, which was based on its interpretation of "the text of the statute itself" and cases interpreting its scope, and not on the NASD rule. *Id*. at 1399-1400.

Rating Agencies' role in structuring the securities, the Depositor would not have been able to offer the Certificates for sale.  ¶¶32, 49, 50-51, 186-87 (the Rating Agencies "performed the alchemy that converted the securities from F-rated to A-rated.  The banks could not have done what they did without the complicity of the rating agencies").  Collectively, these allegations show that the Rating Agencies were instrumental to the Certificates' distribution and therefore fall squarely within the Second Circuit's definition of underwriter.  *See Chinese Consol.*, 120 F.2d at 741; *Kern*, 425 F.3d at 152.

Nonetheless, the Rating Agencies attempt to compare this case to two factually distinguishable cases: *In re Refco, Inc. Sec. Litig.* ("*Refco I*"), 503 F. Supp. 2d 611, 629 (S.D.N.Y. 2007), and *In re Refco, Inc. Sec. Litig.* ("*Refco II*"), 2008 WL 3843343, at *4 (S.D.N.Y. Aug. 14, 2008).  RA Mot. at 8.  In *Refco I*, defendants purchased unregistered bonds and "immediately resold the bonds" to the plaintiffs.  503 F. Supp. 2d at 620.  Later, Refco permitted the holders of the unregistered bonds to exchange them for registered bonds.  Plaintiffs alleged that the purchasers of the unregistered bonds were "underwriters" of the registered bonds.  *Id.* at 629.  The court dismissed plaintiffs' claims because the only "underwriter" allegation included in the complaint was a single-sentence "reproduction of the statutory requirement of 'direct or indirect participation.'"  *Id.* at 631.  In their amended complaint, the *Refco* plaintiffs alleged that the purchasers of the unregistered bonds and their lawyers were liable as underwriters because they commented on draft registration statements for the registered offering.  *Refco II*, 2008 WL 3843343, at *4.  The Court concluded that the defendants were not liable as underwriters, as "participation" under Section 2(a)(11) does not include those who "merely comment[ed] on a draft of a registration statement. . . ."  *Id.*

-14-

By contrast, Lead Plaintiff here presents numerous factual allegations in support of its contention that the Rating Agencies' participation was necessary to the Certificates' distribution, including that they: (1) provided "active structuring advice" on achieving triple-A ratings, ¶53; (2) "determined the proper amount of 'credit enhancement,'" and structured the loan pools to obtain "the highest credit ratings with the least credit enhancement," ¶¶55-56; (3) "considered factors such as expected default rates and amount of losses, pool characteristics, and credit enhancement features, such as the structure of the tranches or guarantees from insurance companies against losses from default or prepayment," ¶51; (4) "participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold," ¶¶22-24; and (5) "provid[ed] pre-determined credit ratings" even before the Certificates were issued, ¶¶7, 22-24, 32, 51, 57, 223.  These factual allegations bear no resemblance to the single sentence "reproduction of the statutory requirement" for participation that the court found inadequate in *Refco I*.[11]

The Rating Agencies argue that they are not underwriters because the Offering Documents "never name the Rating Agencies as 'underwriters.'"  RA Mot. at 9.  This argument is meritless.  Nothing in the Securities Act, and no case the Rating Agencies cite, suggests that underwriters can escape liability merely because they are not identified in the Offering Documents.  On this point, *Refco II* and *McFarland* actually support Lead Plaintiff's claims.

---

[11] 503 F. Supp. 2d at 631.  The Rating Agencies also attempt to equate the factual allegations here with the "bare pleading" in *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, 2007 U.S. Dist. LEXIS 66911 (S.D.N.Y. Sept. 7, 2007).  RA Mot. at 8.  In *Adelphia*, plaintiffs only alleged in general legal conclusions that the defendants extended loans to their affiliated underwriting banks, "induced and structured" public offerings, and had "direct or indirect participation" in the distribution of securities.  2007 U.S. Dist. LEXIS 66911, at *25-27.  These claims, devoid of any additional factual detail, are simply not comparable to the specific factual allegations that Lead Plaintiff has included in the Complaint.  The Rating Agencies' reliance on *McFarland v. Memorex Corp.*, 493 F. Supp. 631, 644 (N.D. Cal. 1980), RA Mot. at 7, is similarly inapposite.  In *McFarland*, the court held that accountants who had reviewed registration statements were only liable if they were identified to the public and, even then, were only liable for "those figures which [they] certifie[d]."  493 F. Supp. at 643.  Here again, the Rating Agencies did far more than merely review and certify the figures contained in the Offering Documents.  ¶¶51-57.

Both courts reasoned that Section 11 liability extends to those who "hold themselves out to the public as professionals," and the public has a reasonable expectation that they have "investigated the offering with which [they are] involved." *McFarland*, 493 F. Supp. at 646. Judge Lynch dismissed the lawyers in *Refco II* because they were "behind the scenes" and never "held themselves out in any respect." 2008 WL 3843343, at *4. The court in *McFarland* dismissed the passive warrant holders because they had none of these "qualifying indicia of underwriters." 493 F. Supp. at 646. Here, the Complaint specifically alleges that the Rating Agencies were prominently and repeatedly identified in the Offering Documents, and "held themselves out publicly … as structuring and providing pre-determined credit ratings." ¶¶5, 223.

The Rating Agencies correctly note that *Lehman MBS* and *RBS MBS* have found that rating agencies' involvement in mortgage-backed securities offerings does not warrant treatment as underwriters. But even if correctly decided under the facts alleged in those cases, it is Second Circuit precedent, not district court decisions, which bind this Court. Although the Second Circuit has not decided what level of rating agency participation gives rise to underwriter liability, its prior decisions recognize that an underwriter only need perform "step necessary to the distribution." *See Chinese Consol.*, 120 F.2d at 741; *Culpepper*, 270 F.2d at 246; *Kern*, 425 F.3d at 152. Accepting the Complaint's allegations as true, which the Court is obliged to do at this phase, Lead Plaintiff has stated a claim, "plausible on its face," that the Rating Agencies acted as underwriters. *Twombly*, 550 U.S. at 570.

2.      SEC Rule 436(g)(1) Does
Not Preclude Lead Plaintiff's Claims

The Rating Agencies argue that SEC Rule 436(g) absolves them of all Securities Act liability for any materially untrue statements or omissions in the Offering Documents.[12]   RA Mot. at 9-10.  This is incorrect.  Rule 436's title – "Consents required in special cases" – makes clear that 436(g)'s application is limited to cases in which Nationally Recognized Statistical Rating Organizations ("NRSRO") would otherwise be liable as "experts" under § 11(4). Specifically, Rule 436(g) states that ratings: "shall not be considered *a part of the registration statement prepared or certified by a person* within the meaning of sections 7 and 11 of the Act." SEC Regulation C, Rule 436(g)(1), 17 C.F.R. § 230.436(g)(1) (emphasis added).  Rule 436(g)'s legislative history confirms that it only exempts "the rating organization from liability *as an expert* under Section 11 of the Securities Act for security ratings included in registration statements."  *Disclosure of Security Ratings in Registration Statements*, SEC Release Nos. 33-6336, 34-18012, 46 Fed. Reg. 42024 (Aug. 18, 1981) (emphasis added).  Rule 436(g) does not apply to underwriters.  Here, the Rating Agencies are not being sued as experts pursuant to Section 11(a)(4), but as Section 11(a)(5) underwriters.[13]   Therefore, they are strictly liable for all untrue statements and omissions in the Offering Documents.[14]

---

[12] The Rating Agencies rely on *dicta* from *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 511 F. Supp. 2d 742, 817 n.77 (S.D. Tex. 2005), to support their argument.  RA Mot. at 10.  There, however, plaintiffs did not allege violations of Section 11, nor did defendants invoke Rule 436(g).  *Id*. at 809.  In a footnote, the court cited Rule 436(g), but did not apply it to the facts or rely upon it in reaching its conclusions.  *Id*. at 817 n.77.

[13] ¶¶22-24.  The Rating Agencies' argument that, "to state a claim, Plaintiff was required to allege that the Rating Agencies were named, and consented to be named, as endorsing the Registration Statements" is a red herring, as nothing in Section 11(a)(5) requires that underwriters consent to be named in order for liability to attach.  RA Mot. at 11.

[14] Likewise, Rule 436(g) does not operate to exempt the Individual Defendants (who signed the Offering Documents), the Depositor (who issued the Certificates) or J.P. Morgan (who underwrote the Certificates) from liability for the unjustifiably high ratings.  This conclusion was recently confirmed in *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 2010 U.S. Dist. LEXIS 39825, at *42-43 (N.D. Cal. Apr. 22, 2010) ("*Wells Fargo MBS*"), where the court held that plaintiffs had adequately pled the ratings as untrue statements as to issuers, individual defendants and underwriters.  *See infra*, at 17-19.

-17-

C.   The Offering Documents Contained
     Untrue Statements And Omissions

As underwriters and control persons, the Rating Agencies are strictly liable under the Securities Act for the untrue statements and omissions.  In addition to the unjustifiably high ratings, the Offering Documents contained materially untrue statements and omissions regarding: (1) the underwriting standards purportedly used in connection with the origination of the underlying mortgage loans; (2) the appraisal standards used to evaluate the properties serving as collateral for the mortgage loans and the true loan-to-value ratios; (3) the sufficiency of the credit enhancement supporting each Offering; and (4) the ratings of the Certificates.  ¶¶6-7.  Lead Plaintiff respectfully refers the Court to Section III of the J.P. Morgan Opp. for facts and law establishing these untrue statements and omissions.

1.   The Certificates' Ratings Were Unjustifiably High

Section 11 liability exists where a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  This represents a "stringent standard of liability" and "places a relatively minimal burden on a plaintiff."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).  The plaintiff need only "allege that he purchased the security and that the registration statement contains false or misleading statements concerning a material fact."  *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 201 (E.D.N.Y. 2000).

A misstated or omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  Materiality is a mixed question of law and fact which is typically

-18-

left for the jury to decide.  *Id.* at 449.  A "complaint may not properly be dismissed pursuant to 12(b)(6). . .on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 228 (S.D.N.Y. 1999) (citation omitted).

Here, the Certificates' ratings constituted an affirmative misrepresentation of the character and investment risk of the Certificates.  Defendants failed to disclose that the ratings were based on inaccurate mortgage loan data, outdated models and stale assumptions about likelihood of borrower delinquencies and defaults.  ¶¶188-92.  Moreover, at the time the Certificates were issued, updated models were developed, but not implemented and the Rating Agencies updated their models "infrequently." ¶¶197-99.  The SEC also found that the Rating Agencies failed to document or provide rationale for ***deviations from models*** or to identify or address errors in their models.  ¶202.  Investors were unaware that the Rating Agencies suffered from "exacerbated" conflicts of interest which "may have prejudiced their objectivity and integrity" and that the Rating Agencies were willingly participating in "a race to the bottom in terms of rating quality."  ¶¶53, 208.  As a result, the ratings were unjustifiably high and the Certificates were far riskier than other investments with the same ratings.[15]

Although the Rating Agencies insist that "several courts have recently spoken and dismissed identical [ratings] misstatement claims," RA Mot. at 2, several courts have also

---

[15] ¶188.  The Rating Agencies' citation to *Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408 (S.D.N.Y. 2008), actually supports Lead Plaintiff's position.  In *Lin*, defendants argued that they had no duty to disclose alleged misstatements as they had no knowledge of the misstatements at the time investors purchased in the initial public offering.  *Id.* at 421-22.  The court recognized that whether the defendants had knowledge was a factual inquiry, and ordered discovery on the issue.  *Id.* at 422-23.

recently upheld ratings as actionable misstatements.[16]   For example, the court in *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 155, 175 (S.D.N.Y. 2009), recently found that inflated ratings were actionable misstatements.   Additionally, in *Wells Fargo MBS* – one of the cases that the Rating Agencies repeatedly cite – the court held that plaintiffs had adequately pled the falsity of ratings based on allegations nearly identical to those here.   2010 U.S. Dist. LEXIS 39825, at *42-43.   Like Lead Plaintiff here, the *Wells Fargo MBS* plaintiffs cited the SEC Summary Report and "statements by executives of defendants Moody's and Standard & Poor's in which the executives admitted that they were aware at the time the subject ratings were made that the agencies' rating models were outdated." *Id.*   The court concluded that plaintiffs' complaint was "sufficient to establish an actionable misstatement with respect to the rating process." *Id.* at *43.

The Rating Agencies' reliance on *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 309-10 (D. Mass. 2009) – an out-of-circuit district court decision which is currently on appeal – is misplaced.   RA Mot. at 16-17.   In *Nomura*, the court dismissed plaintiffs' allegations because they rested on "uncited and undated after-the-fact admissions and laments by purported insiders."   658 F. Supp. 2d at 309.   Here, in addition to the allegations that the ratings were based on inaccurate mortgage data, outdated models and conflicts of interest, Lead Plaintiff includes the Summary Report's extensive findings and testimony by management-level Rating Agency personnel.   ¶¶199, 202-06. Contrary to the Rating Agencies' contentions, these facts are not "uncited and undated" allegations.   Likewise, these facts all existed at the time of the Certificates' issuance and

---

[16] The Rating Agencies also fail to note that *Lehman MBS*, *IndyMac MBS* and *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 2010 WL 816623 (S.D.N.Y. Mar. 11, 2010) ("RAST MBS"), are currently being appealed.

therefore are not the result of hindsight.  Further, sworn testimony before Congress can hardly be called a collection of "laments by purported insiders."  *Nomura* does not require Lead Plaintiff to include allegations regarding Defendants' subjective belief, and is not binding on this Court.

> ### 2.      Defendants Had A Duty To
> Disclose The Omitted Information

The Rating Agencies contend they had no duty to disclose the truth about the assumptions and processes used for rating the Certificates or about the exacerbated conflicts of interest created by their compensation.  RA Mot. at 19.  Defendants are wrong.  The Offering Documents included select information regarding the structure and ratings of the Certificates. Defendants therefore had a duty to disclose all information likely to materially affect those structures and ratings.[17]  Despite this duty, the Offering Documents failed to disclose specific information – the use of outdated and unreliable models, deviations from such models and the Rating Agencies' exacerbated conflicts of interest – which directly affected whether the Certificates' ratings accurately represented the investment risk of the Certificates.[18]  Defendants do not – because they cannot – cite SEC regulations or other authority which permit the non-disclosure of material information of this nature.[19]  These omissions relate directly to the ratings'

---

[17]  *See* 17 C.F.R. § 230.408(a) (stating that "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made, not misleading."). *See also Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) (noting that once a party chooses to discuss material issues, he or she "ha[s] a duty to be both accurate and complete"); *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992) ("[W]hen a corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate."); *In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 687 (S.D.N.Y. 2004).

[18]  The Rating Agencies had a "duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  ¶224.

[19]  The 1994 SEC Release which the Rating Agencies cite has no bearing on the Rating Agencies' disclosure requirements.  In fact, the release states that it was "intended to enhance security rating disclosures so that investors clearly understand what terms of a security are being rated and the limitations, if any, on the rating, and are advised on a current basis of material rating changes."  Disclosure of Security Ratings, Exchange Act Release No. 33-7086,

credibility, and their disclosure would have materially affected the total mix of information regarding the Certificates' risk and value.[20]

3.    Lead Plaintiff Is Not
      Required To Allege Scienter

It is well-settled that Section 11 does not require investors to allege scienter.  *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004) (citing *Herman & MacLean*, 459 U.S. at 382).  The Rating Agencies attempt to import a scienter requirement, and argue that in order to adequately plead falsity, Lead Plaintiff must plead that Defendants did not subjectively believe the ratings when issued.  RA Mot. at 16 (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095 (1991)).  This "subjective falsity standard," however, does not apply to verifiable factual statements.[21]  Therefore, because the ratings are factual statements that the underlying mortgage pools had been evaluated, and – in the case of 90% of the Certificates – designated AAA, Lead Plaintiff does not have to plead subjective falsity.  The statements in the Offering Documents concerning the ratings were untrue and cannot now be characterized as opinions to avoid liability.  The court in *Wells Fargo MBS* recently upheld plaintiffs' ratings allegations without

---

1994 SEC LEXIS 2652, 59 FR 46304, at *19-20 (Aug. 31, 1994).  With this as its stated purpose, the Release does not support a limitation on the disclosure of material information.

[20] *TSC Indus.*, 426 U.S. at 449.  The Rating Agencies' cases are readily distinguishable or support Lead Plaintiff's position.  In *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 375 (S.D.N.Y. 2008), the court held that the alleged disclosures fell under specifically granted exceptions which are not applicable here.  In *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003), the court held that plaintiff had failed to allege facts sufficient to show a duty to disclose a relationship between the mutual fund and its broker dealer, a relationship which had been "well-recognized for decades."  *Id.* at 249.  As stated herein, the extensive details surrounding the structuring relationship between the Rating Agencies and investment banks was not disclosed until mid- to late 2008.  Finally, *Resnik v. Swartz*, 303 F.3d 147 (2d Cir. 2002), stands for the unremarkable proposition that the securities laws impose a duty to disclose the omitted information – a concept with which Lead Plaintiff agrees.

[21] *In re AES Corp. Sec. Litig.*, 825 F. Supp. 578, 589 (S.D.N.Y. 1993) (applying a "subjective falsity standard" to "statements of fact would be tantamount to reading a scienter requirement into sections 11 and 12(2) which is contrary to the text of these statutes").  *See also In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 2009 WL 3517630, at *21-22 (W.D. Wash. Oct. 27, 2009) (finding that statements that internal control reports were audited "in accordance with the PCAOB's standards" and that financial statements were presented "in conformity with accounting principles generally accepted in the United States of America" were opinions).

any allegations whatsoever regarding the Rating Agencies' subjective belief of falsity.  2010 U.S. Dist. LEXIS 39825, at *42-43.

Moreover, even Defendants acknowledge that ratings are actionable if the Rating Agencies could not have genuinely or reasonably believed that their ratings were accurate.  *See Abu Dhabi*, 651 F. Supp. 2d at 176 (finding that the credit ratings were actionable misstatements because "plaintiffs have sufficiently pled that the Rating Agencies did not genuinely or reasonably believe that the ratings they assigned … were accurate and had a basis in fact."). Here, numerous facts confirm that Defendants could not have genuinely or reasonably believed that the Certificates' ratings were accurate including: (1) former Rating Agency managing directors at both Moody's and S&P admitting that the models failed "to capture changes in performance of the new non-prime products," ¶200; (2) a 2007 confidential presentation to Moody's board of directors which similarly reflects a contemporaneous knowledge that the models were outdated, ¶201; and (3) a former Moody's managing director stating that "[T]he focus of Moody's shifted from protecting investors to being a marketing-driven [*sic*] organization" and "management's focus increasingly turned to maximizing revenues" at the expense of ratings quality. ¶208.  These allegations, coupled with the Complaint's allegations regarding the collapse in Certificate value and ratings shortly after issuance, ¶¶210-14, confirm that it is more than plausible that Defendants did not have a basis to genuinely or reasonably believe that the ratings were accurate. *Abu Dhabi*, 651 F. Supp. 2d at 175-76.

### 4. The Misstatements And Omissions Regarding The Certificates' Ratings Were Not Publicly-Known

The Rating Agencies contend that they can escape liability because facts including that "the Rating Agencies were engaged and paid by the issuers of the securities they rate" and "the conflicts of interest inherent in the Rating Agencies' model" were known to the market at the

time of the Certificates' issuance.  RA Mot. at 18-19.  This argument misses the point.  Lead Plaintiff does not assert that the mere fact that the Rating Agencies were paid by issuers is a material omission.  Nor does it assert that select conflicts inherent in the issuer-pays model were unknown to the public.  Rather, Lead Plaintiff alleges that the **_unknown_** facts about the Rating Agencies' compensation arrangement, if disclosed, would have materially affected the total mix of information available.  For example, investors were unaware until long after the offerings that the Rating Agencies committed to a pre-determined rating before they were engaged.  ¶¶51, 57.  Moreover, the degree to which the MBS compensation model "exacerbated" existing conflicts of interest was unknown to investors until the publication of the Summary Report in July 2008.  If investors had known that the Rating Agencies were not merely rating the Certificates – but serving as the party creating and structuring them as well – the "total mix" of information available to investors would have been dramatically altered.  *TSC Indus.*, 426 U.S. at 449.

5.    <u>The Bespeaks Caution Doctrine Is Inapplicable</u>

The Offering Documents contained risk disclosures related to the ratings which generally asserted that: (1) the ratings are not recommendations to buy, sell or hold the Certificates; (2) the ratings do not guarantee payment; and (3) a downgrade could affect the Certificates' liquidity and market value.  The Rating Agencies argue that these warnings rendered the misstatements and omissions regarding the Certificates' ratings inactionable as a matter of law under the "bespeaks caution" doctrine.  RA Mot. at 20-21.  The Rating Agencies are mistaken.

The ratings purported to reflect the **_present_** risk of the Certificates based on **_historical_** facts such as the borrower's credit, employment and payment history, and **_historical_** delinquency and default statistics.  Likewise, the existence of, but failure to implement, updated models and data and the Rating Agencies' exacerbated conflicts of interest were **_existing, but undisclosed_**,

-24-

facts at the time the Certificates were issued. ¶203. Accordingly, they were misrepresentations of present or historical fact to which the "bespeaks caution" doctrine does not apply. *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 617 (S.D.N.Y. 2008). "[C]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."[22] "It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004).

Even if the misstatements and omissions regarding the ratings were forward-looking – and they were not – the boilerplate disclosures in the Offering Documents are not ***meaningful*** cautionary language. "[C]autionary language must be specific, prominent and must directly address the risk that plaintiffs' claim was not disclosed."[23] "The requirement that the cautionary language match the specific risk is particularly important, considering that most, if not all, security offerings contain cautionary language."[24] Here, the disclosures related to the ratings are far too general to qualify as "meaningful." The Rating Agencies do not – and cannot – cite any disclosures warning that the risk of the Certificates was far greater than the ratings represented. Further, they cannot point to any statement disclosing that they were using inaccurate loan data, failed to implement updated models or deviated from their models. Indeed, courts recently have found that disclosures nearly identical to those at issue here were "insufficient to protect the Rating Agencies from liability for promulgating misleading ratings." *Abu Dhabi*, 651 F. Supp.

---

[22] *In re AOL Time Warner Sec. and ERISA Litig.*, 381 F. Supp. 2d 192, 223 (S.D.N.Y. 2004) (citing *Rombach*, 355 F.3d at 173).

[23] *In re Flag Telecom Holdings, Ltd., Sec. Litig.*, 618 F. Supp. 2d 311, 322 (S.D.N.Y. 2009) (citing *Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2, 5-6 (2d Cir. 1996)).

[24] *Flag Telecom*, 618 F. Supp. 2d at 322. *See also In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371-72 (3d Cir. 1993); *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 211-12 (S.D.N.Y. 2004) (generalized disclosures will not shield defendants as cautionary language "must 'warn investors of exactly the risk that plaintiffs' claim was not disclosed.'").

2d at 176 (disclaimer that "[a] credit rating represents a Rating Agency's opinion regarding credit quality and is not a guarantee of performance or a recommendation to buy, sell or hold any securities" was insufficient); *see also Wells Fargo MBS*, 2010 U.S. Dist. LEXIS 39825, at \*42-43 (upholding ratings as actionable misstatements).

D.    Lead Plaintiff's Claims Are Timely

Section 13 of the Securities Act provides that "[n]o action shall be maintained to enforce any liability created under [Section 11] of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.  The statute of limitations is "an affirmative defense . . . on which the defendant has the burden of proof."  *Bano v. Union Carbide Corp.*, 361 F.3d 696, 710 (2d Cir. 2004).  A plaintiff is on notice only when "circumstances would suggest to an *investor of ordinary intelligence* the probability" that he or she has a claim.[25]   "[W]hether a plaintiff had sufficient facts to place it on inquiry notice is 'often inappropriate for resolution on a motion to dismiss.'"  *LC Capital Partners, L.P. v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 156 (2d Cir. 2003).  Defendants bear a heavy burden in establishing a timeliness defense on a motion to dismiss.[26]

The Rating Agencies argue that the Complaint cites "news reports and public events occurring before July 24, 2008 that *should have* put Plaintiff on notice."  RA Mot. at 14-15

---

[25] *Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 411 (2d Cir. 2008) (emphasis added); *accord Merck & Co., Inc. v. Reynolds*, 130 S. Ct. 1784 (2010) ("the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'"); *see also Newman v. Warnaco Group, Inc*., 335 F.3d 187, 194-95 (2d Cir. 2003) ("Inquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct.").

[26] *See, e.g., Bano*, 361 F.3d at 710; *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 249 (S.D.N.Y. 1993) ("defendants bear a 'heavy burden' in establishing that the plaintiff was on inquiry notice as a matter of law" as "[i]nquiry notice exists only when 'uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct'") (citations omitted).

(emphasis added).  With the exception of string-citing paragraphs from the Complaint, the Rating Agencies do not provide legal or factual support for this position.  This technique is insufficient to meet their heavy burden, because information which triggers notice must be "company-specific" and "relate directly" to the misrepresentations and omissions at issue.[27]  In fact, many of the recent mortgage-backed securities cases that the Rating Agencies repeatedly cite have denied motions to dismiss on statute of limitations grounds.  *See RBS MBS*, 2010 WL 1172694, at *9 (denying motion to dismiss on statute of limitations grounds where "[n]one of the articles are directly related to the . . . Trusts specifically at issue"); *Wells Fargo MBS*, 2010 U.S. Dist. LEXIS 39825, at *24-25 (denying motion to dismiss on statute of limitations grounds and holding that "whether this press coverage was sufficient to put a reasonable investor on notice of his claims is a factual question not appropriate for resolution on a motion to dismiss"); *Pub. Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.,* 2010 WL 2175875, at *2 (S.D.N.Y. June 1, 2010).  Here, none of the paragraphs cited by the Rating Agencies specifically identifies J.P. Morgan, the Certificates at issue in this litigation, or that such Certificates were anything less than AAA-related securities.  The Rating Agencies have failed to satisfy their burden, having, at best, created a factual issue not appropriate for determination on a motion to dismiss.

V.    CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court deny the Rating Agencies' Motion To Dismiss The Consolidated Class Action Complaint.  In the event the Court dismisses all or part of Lead Plaintiff's allegations, Lead Plaintiff respectfully requests leave to replead.  Fed. R. Civ. P. 15(a) sets forth a policy in favor of granting leave to amend,

---

[27] *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168-71 (2d Cir. 2005) (emphasis in original); *see also RBS MBS*, 2010 WL 1172694, at *9 (holding that "[a]lthough Defendants point to a number of publicly available documents generally related to the weakening and outright disregard for underwriting guidelines by subprime originators, this information alone does not 'relate directly' to the misrepresentations and omissions alleged in the Consolidated Amended Complaint").

stating that "[t]he court should freely give leave when justice so requires."  *Jaser v. N.Y. Prop. Ins. Underwriting Ass'n*, 815 F.2d 240, 243 (2d Cir. 1987) (reversing denial of request for leave to amend pursuant to "liberal policy").

Dated:  June 21, 2010

**WOLF POPPER LLP**

By:   */s/ James A. Harrod*
      JAMES A. HARROD

MARIAN P. ROSNER
JAMES A. HARROD
845 Third Avenue, 12th Floor
New York, NY 10022
Tel:    (212) 759-4600
Fax:    (212) 486-2093
*mrosner@wolfpopper.com*
*jharrod@wolfpopper.com*

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

By:   */s/ David R. Stickney*
      DAVID R. STICKNEY

DAVID R. STICKNEY
TIMOTHY A. DELANGE
MATTHEW P. JUBENVILLE
12481 High Bluff Drive, Suite 300
San Diego, California 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323
*davids@blbglaw.com*
*timothyd@blbglaw.com*
*matthewj@blbglaw.com*
     -and-
DAVID WALES
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444
*dwales@blbglaw.com*

**POND, GADOW & TYLER, P.A.**
JOHN GADOW
BLAKE TYLER
502 South President Street
Jackson, MS 39201

*Counsel for Lead Plaintiff and the Class*