UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PLUMBERS' & PIPEFITTERS' LOCAL #562 SUPPLEMENTAL PLAN & TRUST, et al., On Behalf of Themselves and All Others Similarly Situated,<br><br>                Plaintiffs,<br><br>        v.<br><br>J.P. MORGAN ACCEPTANCE CORPORATION I, et al.,<br><br>                Defendants. | Civil Action No. 08-cv-1713 (ERK) (WDW) (Consolidated with 09-cv-3209)<br><br><br>**ECF Case** |

**LEAD PLAINTIFF THE PUBLIC EMPLOYEES' RETIREMENT SYSTEM
OF MISSISSIPPI'S MEMORANDUM OF LAW IN OPPOSITION TO
THE JPMORGAN DEFENDANTS' MOTION TO DISMISS THE
<u>CONSOLIDATED CLASS ACTION COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ....................................................................... 1

FACTUAL BACKGROUND .......................................................................... 5

    Underwriting Guidelines............................................................................ 7

    Appraisal Standards, LTV Ratios and Credit Enhancement................................. 13

    Credit Ratings ........................................................................................ 14

ARGUMENT ........................................................................................... 14

I.      STANDARD OF REVIEW ................................................................. 14

II.    STANDING ...................................................................................... 16

    A.    Plaintiff Has Standing To Bring The Claims In The Complaint .............. 16

        1.    Claims On Behalf Of Absent Purchasers ..................................... 16

        2.    Plaintiff Purchased Pursuant To The Same Registration
             Statements As Absent Class Members ......................................... 20

    B.    Plaintiff Has Standing To Assert Section 12(a)(2) Claims ...................... 21

III.   MATERIAL MISSTATEMENTS AND OMISSIONS......................................... 22

    A.    Systematic Disregard Of Underwriting Guidelines ................................. 23

        1.    The Complaint Sufficiently Links The Improper
             Origination Allegations To The Certificates................................. 25

        2.    The Complaint's Improper Origination Allegations Are
             Material .................................................................................. 27

        3.    The Complaint's Allegations of Improper Origination
             Practices Are Not "Vague And Conclusory"................................. 29

        4.    The Offering Documents' Risk Disclosures Are Insufficient....... 34

             i.    Disclosing Exceptions Does Not Bespeak Caution .......... 36

             ii.    Disclosing Alternative Documentation Loans Does
                 Not Bespeak Caution ....................................................... 37

             iii.   Disclosing Potential Future Economic Risks Does
                 Not Bespeak Caution ....................................................... 38

B.      Appraisal Standards ................................................................. 40

C.      Ratings ...................................................................................... 44

IV.     ECONOMIC LOSS ............................................................................... 47

V.      RECOVERY NOT LIMITED BY "CURE" PROVISIONS ............................... 51

VI.    STATUTE OF LIMITATIONS ............................................................. 53

A.      Unrelated Lawsuits and General News Articles Do Not Establish Inquiry Notice .......................................................................... 55

B.      The Claims As To The JPMorgan Mortgage Trust 2006-A1 Are Timely ....................................................................................... 58

VII.   THE COMPLAINT'S SECTION 15 ALLEGATIONS ARE ADEQUATE ....... 60

CONCLUSION.......................................................................................... 62

## <u>TABLE OF AUTHORITIES</u>

### CASES

*In re 2007 Novastar Fin., Inc. Sec. Litig.,*
    No. 07-0139-CV-W-ODS, 2008 WL 2354367 (W.D. Mo. June 4, 2008) . . . . . . . . . . . 39

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.,*
    651 F. Supp. 2d 155 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Adair v. Bristol Tech. Sys.,*
    179 F.R.D. 126 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC,*
    646 F. Supp. 2d 385 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*American Pipe & Constr. Co. v. Utah,*
    414 U.S. 538 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*In re Ambac Fin. Group, Inc. Sec. Litig.,*
    No. 08 CIV. 411 (NRB), 2010 WL 727227 (S.D.N.Y. Feb. 22, 2010) . . . . . . . . . . . . 40

*In re AOL Time Warner, Inc. Sec. and ERISA Litig.,*
    381 F. Supp. 2d 192 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Arista Records LLC v. Doe,*
    604 F.3d 110 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 27

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 30

*In re BankAmerica Corp. Sec. Litig.,*
    210 F.R.D. 694 (E.D. Mo. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Sajida Bano, et al. v. Union Carbide Corp.,*
    361 F.3d 696 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Barnes v. Osofsky,*
    373 F.2d 269 (2d Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 25, 29

*Bielski v. Cabletron Sys. (In re Cabletron Sys.)*,
    311 F.3d 11 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*In re Blech Sec. Litig.*,
    No. 94 Civ. 7696 (RWS), 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) . . . . . . . . . . . 19

*Berwecky v. Bear, Stearns & Co.*,
    197 F.R.D. 65 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Blum v. Yaretsky*,
    457 U.S. 991 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Broderbund/Learning Co. Sec. Litig.*,
    294 F.3d 1201 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 51

*California Pub. Employees' Ret. Sys. v. Caboto-Gruppo Intesa BCI (In re Worldcom Sec. Litig.)*,
    496 F.3d 245 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*,
    No. 00-4285 (GEB), 2002 WL 33934282 (D.N.J. Jun. 26, 2002) . . . . . . . . . . . . . . . . . 60

*Campo v. Sears Holdings Corp.*,
    No. 09-3589-cv, 2010 WL 1292329 (2d Cir. Apr. 6, 2010) . . . . . . . . . . . . . . . . . . . . . . 33

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
    504 F.3d 229 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C*,
    433 F.3d 181 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*CIT Group, Inc. Sec. Litig.*,
    No. 08 Civ. 6613 (BSJ), 2010 WL 2365846 (S.D.N.Y. Jun. 10, 2010) . . . . . . . . . . 60, 61

*City of Ann Arbor Employees' Retirement System v. Citigroup Mortg. Loan Trust Inc.*,
    No. CV 08-1418, 2010 WL 1371417 (E.D.N.Y. Apr. 6, 2010) . . . . . . . . . . . . . . . . . 26, 53

*Cleveland v. Caplaw Enters.*,
    448 F.3d 518 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Commercial Union Assurance Co. v. Milken*,
    17 F.3d 608 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 21, 39

*In re Countrywide Fin. Corp. Deriv. Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 40

*Doody v. E.F. Hutton & Co.*,
    587 F. Supp. 829 (D. Minn. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Dorchester Investors v. Peak Int'l Ltd.*,
    134 F. Supp. 2d 569 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
    No. 98 Civ.4318 (HB), 2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000) . . . . . . . . . . . . . 19

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Eisenberg v. Gagnon*,
    766 F.2d 770 (3d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Elan Corp. Sec. Litig.*,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    352 F. Supp. 2d 429 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 59, 61

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    618 F. Supp. 2d 311 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Foman v. Davis*,
    371 U.S. 178 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Freudenberg v. E*Trade Finan. Corp.*,
    No. 07 Civ 8538, 2010 WL 1904314 (S.D.N.Y. May 11, 2010) . . . . . . . . . . . . . . . 4, 40

*Garber v. Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*In re Global Crossing, Ltd. Sec. Litig.*,
  322 F. Supp. 2d 319 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 62

*Goldkrantz v. Griffin*,
  No. 97 Civ. 9075, 1999 WL 191540 (S.D.N.Y. Apr. 5, 1999),
  *aff'd*, 201 F.3d 431 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Goldman v. Belden*,
  754 F.2d 1059 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*In re Grand Theft Auto Video Game Consumer Litig. (No. II)*,
  No. 06 MD 1739 (SWK) (MHD), 2006 WL 3039993 (S.D.N.Y. Oct. 25, 2006) . . . . . . 17

*Grasty v. Amalgamated Clothing & Textile Workers Union*,
  828 F.2d 123 (3d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Gratz v. Bollinger*,
  539 U.S. 244 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Halperin v. eBanker USA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 35

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hevesi v. Citigroup, Inc.*,
  366 F.3d 70 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Hicks v. Morgan Stanley & Co.*,
  No. 01 Civ. 10071 (HB), 2003 WL 21672085 (S.D.N.Y. July 16, 2003) . . . . . . . . . 17, 19

*Hoffman v. UBS-AG*,
  591 F. Supp. 2d 522 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hoxworth v. Blinder, Robinson & Co.*,
  980 F.2d 912 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Hunt v. Alliance North Am. Gov't Income Trust, Inc.*,
  159 F.3d 723 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*In re IAC/Interactivecorp Sec. Litig.*,
    No. 04 Civ. 7447 (RJH), 2010 WL 996483 (S.D.N.Y. Mar. 19, 2010) . . . . . . . . . . . . 33

*In re Initial Public Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Jaser v. N.Y. Prop. Ins. Underwriting Ass'n*,
    815 F.2d 240 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Kalliope R. ex rel. Irene D. v. New York State Dept. of Educ.*,
    No. 09-CV-1718 (JFB) (WDW), 2010 WL 2243278 (E.D.N.Y. Jun. 1, 2010) . . . . . 14, 25

*Landmen Partners Inc. v. Blackstone Group, L.P.*,
    659 F. Supp. 2d 532 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*LC Capital Partners, L.P. v. Frontier Ins. Group*,
    318 F.3d 148 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 57

*In re Lehman Bros. Sec. & ERISA Litig.*,
    684 F. Supp. 2d 485 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Lindsay v. Morgan Stanley (In re Morgan Stanley Info. Fund Sec. Litig.)*,
    592 F.3d 347 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
    594 F.3d 383 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*In re Loral Space & Commc'ns Ltd. Sec. Litig.*,
    No. 01 Civ. 4388 (JGK), 2004 WL 376442 (S.D.N.Y. Feb. 27, 2004) . . . . . . . . . . . . 33

*Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*,
    652 F. Supp. 2d 576 (E.D. Pa. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Mass. Bricklayers and Masons Fund v. Deutsche Alt-A Secs.*,
    No. CV 08-3178, 2010 WL 1370962 (E.D.N.Y. Apr. 6, 2010) . . . . . . . . . . . . . . . . 26, 53

*Maywalt v. Parker & Parsley Petroleum Co.*,
    147 F.R.D. 51 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*McAnaney v. Astoria Fin. Corp.*,
    No. 04-cv-1101 (JFB) (WDW), 2007 WL 2702348 (E.D.N.Y. Sept. 12, 2007) . . . . . . . 20

*McMahan & Co. v. Wherehouse Entm't*,
65 F.3d 1044 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Merck & Co., Inc. v. Reynolds*,
130 S. Ct. 1784 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*In re Merrill Lynch & Co., Research Reports Sec. Litig.*,
272 F. Supp. 2d 243 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Miller v. Lazard, Ltd.*,
473 F. Supp. 2d 571 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re MobileMedia Sec. Litig.*,
28 F. Supp. 2d 901 (D.N.J. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Mobley v. Acme Mkts., Inc.*,
473 F. Supp. 851 (D. Md. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Moody's Corp. Sec. Litig.*,
599 F. Supp. 2d 493 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Morin v.Trupin*,
747 F. Supp. 1051 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Nat'l Austl. Bank Sec. Litig.*,
No. 03 Civ. 6537 (BSJ), 2006 WL 3844463 (S.D.N.Y. Nov. 8, 2006) . . . . . . . . . . . . . . 20

*N.J. Carpenters Vacation Fund v. Royal Bk of Scotland Grp., PLC*,
No. 08-CV-5093 (HB), 2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010) . . . . . . . . . *passim*

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
No. 08 CV 8781 (HB), 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) . . . . . 16, 25, 26, 60

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
No. 08 Civ. 5653 (PAC), 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) . . . . . . . . *passim*

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Newby v. Enron Corp. (In re Enron Corp. Sec. Derivative & ERISA Litig.)*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Newman v. Warnaco Group, Inc.*,
335 F.3d 187 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*,
  840 F. Supp. 243 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Norman v. Conn. State Bd. of Parole*,
  458 F.2d 497 (2d Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Philip Servs. Corp. Sec. Litig.*,
  383 F. Supp. 2d 463 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Pinter v. Dahl*,
  486 U.S. 622 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
  163 F.R.D. 200 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*P. Stolz Family P'ship L.P. v. Daum*,
  355 F.3d 92 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Pub. Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*,
  No. 08 Civ 10841 (JSR), 2010 WL 2175875 (S.D.N.Y. Jun. 1, 2010) . . . . . 16, 54, 57, 60

*Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*,
  638 F. Supp. 2d, 120 (D. Mass. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Quaak v. Dexia, S.A.*,
  445 F. Supp. 2d 130, 149 (D. Mass. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Randall v. Loftsgaarden*,
  478 U.S. 647 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 48

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Rehman v. State Univ. of N.Y.*,
  596 F. Supp. 2d 643 (E.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 39, 44, 46

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Rusyniak v. Gensini*,
  629 F. Supp. 2d 203 (N.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*In re Scottish Re Group Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Staehr v. Hartford Fin. Servs. Group, Inc.*,
    547 F.3d 406 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 55, 56, 57

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*In re StockerYale Sec. Litig.*,
    453 F. Supp. 2d 345 (D.N.H. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Tedesco v. Mishkin*,
    689 F. Supp. 1327 (S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Tokio Marine & Fire Ins. Co. v. Employers Ins. Of Wausau*,
    786 F.2d 101 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Tooley v. Napolitano*,
    556 F.3d 836 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
    No. 08 Civ. 10637 (LAK), 2010 WL 816623 (S.D.N.Y. Mar. 11, 2010) . . . . . . . . *passim*

*In re Twinlab Corp. Sec. Litig.*,
    103 F. Supp. 2d 193 (E.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 46

*United States ex rel. Polansky v. Pfizer, Inc.*,
    No. 04-CV-0704 (ERK), 2009 WL 1456582 (E.D.N.Y. May 22, 2009)
    (as Amended Jun. 1, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 60

*In re Wells Fargo Mortgage-Backed Certificates Litig.*,
    No. C09-01376 (SI), 2010 WL 1661534 (N.D. Cal. Apr. 22, 2010) . . . . . . . . . . . . *passim*

*In re WorldCom, Inc. Sec. Litig.*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

## OTHER AUTHORITIES

7AA Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure* § 1785.1 (3d ed. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions*, § 2.7 (4th ed. 2009) . . . . 18, 20

S. Rep. No. 47-73 (1st Sess. 1933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2 T.L. Hazen, *Treatise on the Law of Securities Regulation* § 12.24(1) (4th ed. 2002) . . . . . . . 62

## STATUTES AND RULES

15 U.S.C. § 77k(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 51

15 U.S.C. § 77l(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 21, 48

15 U.S.C. § 77m . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

15 U.S.C. §77n . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

15 U.S.C. § 77o . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

17 C.F.R. § 230.405 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Fed. R. Civ. P. 8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 25

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Civ. P. 15(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Fed. R. Civ. P. 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Lead Plaintiff, the Public Employees' Retirement System of Mississippi ("Plaintiff" or "MissPERS"), respectfully submits this Memorandum of Law in Opposition to the Motion of the JPMorgan Defendants To Dismiss the Consolidated Class Action Complaint ("Motion" or "Motion to Dismiss") [Dkt. No. 57].[1]

## PRELIMINARY STATEMENT

The Securities Act of 1933 (the "Securities Act") provides a "harsh, nearly strict-liability rule designed to make sure those involved in securities offerings meticulously prepare the registration statement." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1170 n.47 (C.D. Cal. 2008) ("*Countrywide Securities*").   Congress implemented this harsh remedy because the Securities Act "[aims] . . . to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation [and] to place adequate and true information before the investor." *Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986) (quoting S. Rep. No. 47, 73d Cong. at 1 (1st Sess. 1933)).

The Complaint sufficiently alleges that Defendants[2] misrepresented the underwriting and appraisal standards pursuant to which the Mortgage Loans (defined below) underlying the Certificates (defined below) were originated, the value and adequacy of the mortgaged properties acting as loan collateral, and the ratings process and methods used in assigning the vast majority

---

[1]  The Consolidated Class Action Complaint ("Complaint") is cited herein as "¶ _."  The Memorandum of Law In Support of the JPMorgan Defendants' Motion to Dismiss the Amended [*sic*] Complaint [Dkt. No. 58] is cited herein as "JPM Br."  Any emphasis in quotations is added and any internal quotation marks, citations, footnotes and brackets are omitted unless otherwise indicated.

[2]  For purposes of this Memorandum, unless otherwise noted, "Defendants" refers collectively to (1) J.P. Morgan Acceptance Corporation I ("JP Morgan Acceptance" or the "Depositor"), (2) J.P. Morgan Securities Inc. ("JP Morgan Securities" or the "Underwriter"), and (3) David M. Duzyk, Louis Schioppo, Jr., Christine E. Cole, Edwin F. McMichael (the "Individual Defendants").  The Complaint also names as defendants Moody's Investor Services, Inc. ("Moody's"), McGraw-Hill Companies, Inc., through its division Standard & Poor's ("S&P"), and Fitch, Inc. ("Fitch") (collectively, "Rating Agencies" or the "Rating Agency Defendants").  For law and facts opposing the Rating Agencies' Motion To Dismiss The Consolidated Class Action Complaint ("RA Mot.") [Dkt. No. 54] Lead Plaintiff respectfully refers the Court to the concurrently-filed Lead Plaintiff The Public Employees' Retirement System Of Mississippi's Opposition To The Rating Agencies' Motion To Dismiss The Consolidated Class Action Complaint ("RA Opp.").

of the Certificates' coveted "AAA" ratings.   As detailed below, the Complaint's factual allegations are based on, among other things, knowledgeable confidential witnesses, government investigations and reports, testimony from Congressional hearings, and other lawsuits and news reports.   The Complaint also details the extremely poor performance of the Mortgage Loans backing the Certificates and the vast downgrades leaving over 80% of the Certificates with a credit rating reflecting their now "junk" status.   These facts, when viewed together, clearly state a plausible claim sufficient to overcome a Fed. R. Civ. P. 12(b)(6) motion.   Despite these overwhelming facts establishing the plausibility of Plaintiff's claims, Defendants assert a host of arguments aimed at avoiding liability for their untrue statements and omissions.   Defendants' challenges to the Complaint should be rejected.

Defendants contend that the Complaint's allegations are immaterial because they fail to **prove** that the widespread underwriting deficiencies alleged in the Complaint affected the Mortgage Loans.   JPM Br. at 3, 40-42.   Defendants also claim that the confidential witness statements are "vague and conclusory" because they do not "link" the deficient underwriting practices to specific Mortgage Loans.   *Id*. at 25.

Defendants are wrong.   The departures from underwriting standards were not only pervasive, but clearly affected the Mortgage Loans at issue here.   This is confirmed by the Mortgage Loans' poor performance and the subsequent credit rating downgrades of the Certificates.   Courts facing similar arguments have explicitly rejected that such a "matching" of loans to allegations is required.   *See, e.g.*, *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, No. 08 Civ. 10637 (LAK), 2010 WL 816623, at *3 (S.D.N.Y. Mar. 11, 2010) ("*Tsereteli MBS*").

Next, Defendants assert that they are absolved of liability because the Offering Documents (defined below) purportedly contained "risk disclosures" that warned investors about (1) loans originated pursuant to exceptions, (2) loans originated under alternative documentation programs, and (3) possible future problems in the housing market. *See* JPM Br. at 9-10, 36-38. None of these generalized warnings, some of which warned only of "future" risks, were sufficiently specific about the precise misstatements or omission contained in the Offering Documents to "bespeak caution" of the undisclosed risks set forth in the Complaint. *See Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002). Moreover, Plaintiff alleges that the Originators made exceptions without considering compensating and mitigating factors, as represented in the Offering Documents. In fact, such "compensating" factors were not considered because the Originators disregarded their underwriting guidelines to increase loan volume.

Defendants also attack the propriety of Plaintiff's allegations regarding appraisals, loan-to-value ratios and credit ratings. The Complaint, however, includes detailed accounts from confidential witnesses and additional, corroborating facts indicating industry-wide home appraisal inflation. Likewise, Plaintiff's allegations relating to the credit ratings assigned to the Certificates demonstrate that such ratings were based on outdated assumptions, relaxed ratings criteria, inaccurate loan information and grossly understated the true level of credit risk. Strikingly similar allegations concerning appraisals, loan-to-value ratios and credit ratings were recently upheld by the court in *In re Wells Fargo Mortgage-Backed Certificates Litigation*, No. C 09-01376 (SI), 2010 WL 1661534, at *11-12 (N.D. Cal. Apr. 22, 2010) ("*Wells Fargo MBS*").

Defendants also assert that the Offering Documents so obviously contained false and misleading statements that Plaintiff should have asserted its claims sooner (*i.e.*, the claims are

time barred)—in fact, that the claims were probable by some unspecified time before March 26, 2007. *See* JPM Br. at 47-48. Defendants are wrong. Securities Act claims on behalf of Certificate purchasers were not probable until, at the earliest, April 4, 2008, when the Rating Agencies first downgraded certain of the investment-grade Certificates to below-investment grade. ¶ 214. Given that the original complaint ("Original Complaint") was filed in 2008, the claims are timely. *See* Defendants' Notice of Removal, April 25, 2008 [Dkt. No. 1]. Moreover, the various lawsuits, general news articles and transcript upon which Defendants rely in their attempt to demonstrate inquiry notice make no mention of the Certificates at issue in this litigation.

Defendants also inappropriately blame the "economic downturn" for the skyrocketing delinquencies and foreclosures affecting the Mortgage Loans. JPM Br. at 1, 11, 42 n.48. If, at trial, Defendants wish to attempt to blame other factors for Plaintiff's losses, they may do so. Such contentions, however, are improperly considered on a motion to dismiss.[3] In fact, numerous courts have rejected similar attempts to blame plaintiffs' losses on the recent economic downturn.[4]

Nor do Defendants' hyper-technical arguments about contractual "cure" provisions, or that the Individual Defendants were not "control persons," reasonably countenance dismissal. As described below, courts faced with the same issues raised here have repeatedly rejected Defendants' arguments. Accordingly, Defendants' Motion to Dismiss should be denied.

---

[3] *See, e.g.*, *Countrywide Securities*, 588 F. Supp. 2d at 1173-74 (rejecting defendants' argument that Countrywide's decline was due to an "'unprecedented' external 'liquidity crisis'" rather than on the abandonment of underwriting guidelines and poor loan production quality alleged in the complaint, because such a "wasteful" argument was inappropriate on a motion to dismiss. "It will be the fact-finder's job to determine which losses were proximately caused by Countrywide's misrepresentations and which are due to extrinsic or insufficiently linked forces.").

[4] *See, e.g.*, *Freudenberg v. E*Trade Finan. Corp.*, No. 07 Civ. 8538, 2010 WL 1904314, at *1, *19 (S.D.N.Y. May 11, 2010) (rejecting defendants' argument that "the losses incurred were the result of a 'worldwide economic catastrophe'").

## FACTUAL BACKGROUND

This securities class action arises from Defendants' sale of mortgage pass-through certificates ("Certificates") through Offering Documents[5] that contained untrue statements and omitted material facts. Plaintiff asserts claims for violations of Sections 11, 12(a)(2) and 15 of the Securities Act against JP Morgan Acceptance, JP Morgan Securities, the Individual Defendants who signed the Offering Documents, and the Rating Agencies that provided credit ratings and structured the Certificate offerings.

Before the proliferation of securitized residential loans, the traditional mortgage model involved a bank loaning money to a borrower and also retaining the risk that the borrower would default. ¶ 145. Under the traditional model, the loan originator had financial incentives to use prudent underwriting practices to ensure that the borrower had the ability to repay the note and that the underlying property was sufficiently valuable to serve as collateral. *Id.* With the proliferation of securitizations the traditional model gave way to the "originate to distribute" model. ¶ 146. Under this model, the originator sold its mortgages into the secondary market, where the loans were pooled together, securitized and sold to investors in the form of mortgage-backed securities. *Id.* Securitization meant that the originators were no longer required to hold loans to maturity, and the credit risk was transferred to investors. *Id.* Such selling of mortgages undermined the Originators'[6] incentives to follow prudent underwriting practices. ¶ 147. Loan fees and sales revenue became the Originators' primary profit mechanism, making the sheer quantity of loans more important than the quality of the loans. *Id.* This model was highly lucrative for Wall Street banks during the housing boom, including for JPMorgan Chase & Co.

---

[5]   "Offering Documents" refers collectively to the July 29, 2005 Registration Statement, December 2005 Registration Statement, and the various Prospectuses and Prospectus Supplements identified in the Complaint. ¶¶ 1 n.1, 34

[6]   "Originators" refers to the 19 mortgage loan originators identified in the Complaint. ¶¶ 3, 34, 143.

("JPMorgan"), which profited from the high-margin business of packaging mortgages and selling them to investors as mortgage-backed securities.  ¶ 148.

JPMorgan established J.P. Morgan Acquisition Corp. ("JP Morgan Acquisition" or the "Sponsor"), who purchased an enormous volume of mortgage loans (the "Mortgage Loans") from various loan Originators for resale to investors in the form of mortgage-backed securities. ¶ 3.  Another JPMorgan subsidiary, Defendant JP Morgan Acceptance, securitized the Mortgage Loans so that the rights to cash flow from the loans could be sold to investors.  ¶ 30.  From May 23, 2006 until September 18, 2007, Defendant JP Morgan Securities sold $36.8 billion of Certificates to investors in thirty-three (33) different trusts (collectively, the "Trusts" or "Issuing Trusts"), issued by JP Morgan Acquisition pursuant to the Offering Documents (the "Offerings").  ¶ 2.  The Certificates were sold primarily to institutional investors, such as Plaintiff here, who purchased the Certificates as purportedly safe, investment-grade securities. ¶¶ 4, 56.

The Certificates were collateralized by residential mortgages, meaning the investors' interest and principal payments depended on payments from borrowers on the underlying mortgages.  ¶ 48.  The quality of the underlying loans and the value of the collateral were, therefore, material information.  ¶¶ 35-36.  The Offering Documents purported to provide such information by describing the Originators and the "Underwriting Guidelines" applied in providing the Mortgage Loans to borrowers (¶¶ 62-69, 71-74, 90-92, 110-11, 120-21, 128-31, 143-44); the appraisal practices used to value the mortgaged properties and the Loan-to-Value ("LTV") ratios assigned to those properties (¶¶ 163-66, 180); the level of credit enhancement included in the issuing trusts (¶¶ 183-84); and the credit rating methods and ratings assigned to the Certificates by the Rating Agencies (¶ 186).

As alleged in the Complaint, however, the Offering Documents' descriptions of the Mortgage Loans contained untrue statements of material fact, or omitted to state material facts necessary to make statements about the underlying loans and their origination not misleading.

Underwriting Guidelines

The Offering Documents stated that the underwriting guidelines required Originators to assess borrower creditworthiness and repayment ability through an examination and verification of borrower assets, credit history and employment.  ¶¶ 62, 65, 91, 111, 121, 129.  In truth, however, the guidelines were systematically disregarded.  ¶¶ 7, 70, 75, 93, 112, 122, 132, 144. The Complaint details the unsound and reckless underwriting practices by which the Mortgage Loans underlying the Certificates were originated.  ¶¶ 76-88; 94-108; 113-18; 123-26; 133-41; 146-62.

*The Chase Originators*[7]

Former Chase employees admitted that whenever the underwriting guidelines required an additional check or verification of borrower information, underwriters found ways around these requirements.  With respect to reduced documentation loans requiring the borrower to verify their income via a pay stub, rather than an entire W-2, "the way around that was you would wait until the person had a really large check and provides that stub and that's what they would base their [annual] income off of, that stub, so that person could have been working 30 hours for weeks and that one week he worked 60, so they submitted that stub; so there again you were set up to fail.  There were so many ways around things."  ¶ 88.  Credit score requirements could also be manipulated easily.  "If we had to run a credit report [for a couple applying for a loan] and [the wife's] credit wasn't any good, we would just run under the [husband's] name six months

---

[7]  Chase Home Finance ("Chase" or the "Chase Originators") originated a total of $15.6 billion of the Mortgage Loans.  ¶ 71.

later when they came back and reapplied for the loan" to ensure that the loan wasn't rejected a second time. ¶ 85. Loan officers even told applicants the level of income they needed to falsely state in their applications in order to be approved for loans. ¶ 86.

Even when borrower information was required to be fully verified, underwriters "really were not verifying [that information]" and would find ways around such verification requirements. ¶ 83. With respect to verification of assets, underwriters would look at borrowers' stated incomes (which were often unverified and subject to manipulation, ¶ 86) and "hope to see assets that would compare to or be comparable to [the listed] income." ¶ 83.

Management and loan officers resisted the underwriters' attempts to enforce the stated underwriting guidelines or reject obvious instances of data manipulation. Instead of applying reasonableness tests to stated borrower information, underwriters were told "[not] to ask any questions whatsoever and we were to believe just what the person said on the application." ¶ 87. Sometimes the data was so unreasonable that underwriters disobeyed management and attempted to verify information. "The borrower didn't have to tell you anything, you knew [manipulation] was going on." ¶ 86. "I checked out a job [that the borrower put on his loan application as current] and [discovered that the borrower] just got laid off and stuff; and the loan officer and manager got all mad about that too. They asked why did you have to do that, and I said we have to." ¶ 87. Many times when underwriters did their jobs and rejected loans, "management would override the underwriter" and approve the loan anyway. ¶ 82.

On January 13, 2010, James Dimon, the CEO of JPMorgan (the parent of the Chase Originators) admitted to the Financial Crisis Inquiry Commission that "there were some unscrupulous mortgage salesmen and mortgage brokers" that "missold" loan products to borrowers. ¶ 78. As a result, JPMorgan had "closed down most—almost all of our business

originated by mortgage brokers where credit losses have generally been over two times worse than the business we originate ourselves." ¶ 81. These third-party loans were among those packaged together and sold to Certificate purchasers, including the Plaintiff in this Action. ¶ 80.

*Countrywide Home Loans*[8]

Former Countrywide employees admitted that because branch managers' compensation was tied to loan origination volumes and not the quality of the loans produced, managers pressured originators to push through as many loans as possible despite the riskiness of these loans. ¶¶ 95-96. When underwriters resisted the pressure and rejected risky loans, those loans would often "come back to life" when new, qualifying information would "miraculously appear" in the loan file. ¶ 96. Furthermore, the former employees admitted that Countrywide mislabeled as "prime" loans made to unqualified borrowers, including those who recently declared bankruptcy, ¶ 94, and generally did not enforce underwriting standards, ¶ 96.

Countrywide's improper loan origination practices have been widely corroborated and documented by various governmental investigations and lawsuits. In March 2008, the FBI disclosed that it had initiated a probe into Countrywide's mortgage lending practices. ¶ 97. In April 2008, a Federal Bankruptcy Judge overseeing the proceedings of more than 300 Countrywide-related bankruptcies ordered an official inquiry into misconduct occurring at Countrywide. *Id*. In addition, numerous State Attorneys General, including those from California, Connecticut and Florida initiated investigations into Countrywide's lending practices and subsequent lawsuits alleging that Countrywide systematically departed from its stated underwriting standards. ¶¶ 99-105. In October 2008, Countrywide settled lawsuits brought by eleven Attorneys General for $8.4 billion. ¶ 108.

---

[8] Countrywide Home Loans ("Countrywide") originated a total of $3.5 billion of the Mortgage Loans. ¶ 90

*ResMAE Mortgage Corporation*[9]

Former ResMAE employees admitted that "everybody was incentivized by commissions to generate high loan volume," and that exceptions to underwriting standards became commonplace as a way to "increase [loan] production," even when underwriters did not support their use. ¶¶ 113-15. Another way to increase loan production was to accept misstated borrower financial information on loan applications. This occurred with respect to stated income loans, where underwriters noticed that borrower "would state that they made this income [necessary to qualify for a loan] and they didn't, it was a misrepresentation." ¶ 116. Borrowers applying for stated income loans often listed implausibly high incomes on loan amounts. ¶ 117. Nevertheless, the sales department "pushed through" such loans and ensured that they were approved. *Id.* Similar misrepresentations occurred with respect to the status of the mortgaged property; sometimes a property listed as "owner occupied" was really being used as a "flip" investment and other times the property did not even exist. ¶ 118. Underwriters who noticed these practices were encouraged not to "dig [too] deep." *Id.* Underwriters also noticed "fraud from appraisers, title companies and borrowers." ¶ 116.

*New Century Mortgage Corporation*[10]

New Century's mortgage loan origination improprieties were detailed in the report of the Bankruptcy Court Examiner after New Century collapsed and filed for bankruptcy. ¶ 123. According to the Examiner's report, there were "serious loan quality issues at New Century beginning as early as 2004." *Id.* Former New Century employees admitted that New Century's problems began when it "started to abandon prudent underwriting guidelines" at the end of 2003 in order to "push more loans through" the system. ¶ 124. New Century effectively "stopped

---

[9] ResMAE Mortgage Corporation ("ResMAE") originated a total of $1.4 billion of the Mortgage Loans. ¶ 110.

[10] New Century Mortgage Corp. ("New Century") originated a total of $895 million of the Mortgage Loans. ¶ 120.

underwriting" and gambled that it would be okay if it could "outrun [its loan] delinquency rate." *Id*. However, this tactic lead to New Century further reducing its underwriting standards in order to meet yearly sales projections. ¶ 125. Exceptions became "the norm" and underwriters were told to make loans "work" and do whatever was necessary to increase loan production volume. ¶ 126.

*Wells Fargo Bank, N.A.*[11]

Former Wells Fargo employees admitted that Wells Fargo was a "loan-producing machine," ¶ 137, where the "pressure from loan officers [to close loans] was intense," ¶ 134. Management pressured underwriters to close as many loans as possible, independent of their quality. ¶ 137. "[Management] wanted us to do anything we could to get loans closed. That was the bottom line." ¶ 138. Underwriters were encouraged to "finagl[e] the guidelines if it meant getting the loan approved." *Id*. Some borrower information was "blatantly falsified" on loan applications, ¶ 139, and exceptions "got more and more ridiculous," ¶ 136. Exceptions to underwriting guidelines were made for "loan amounts, LTV, income, pretty much anything and everything—anything you could find to get a loan approved." ¶ 140. If underwriters refused to cooperate, they knew they "wouldn't be around very long"; "[w]e knew what we had to do to keep our jobs." ¶ 137.

"There was [also] a lot of coercion between loan officers and underwriters" that "caused a lot of bad loans to go through." ¶ 134. For example, "[t]he loan officers were stretching the truth. They would say [to the borrower], 'You need to make this much [to qualify for the loan].' So of course, the borrower would say, 'Ok, I make that much.'" ¶ 135. When an underwriter would question that stated amount and overturn the loan, "it would come back approved by the

---

[11] Wells Fargo Bank, N.A. ("Wells Fargo") originated a total of $926 million of the Mortgage Loans. ¶ 128.

manager." ¶ 134. "Anything [loan officers] said went" because "everyone wanted to make [them] happy. *Id*. Such loans were approved even though "[w]e didn't always feel the [stated] income was reasonable for the stated job." ¶ 136. One former Wells Fargo underwriter recounted that "[s]ometimes it felt like I was in sales, because they wanted production, period." ¶ 137.

*Accredited Home Lenders, Inc.*

Former Accredited Home Lenders, Inc. ("Accredited") employees admitted that the company approved risky loans that did not comply with its own underwriting guidelines in an effort to reach monthly production targets. ¶ 152. In the event that underwriters did not approve such risky loans, managers on the sales side of the business frequently overrode those decisions and approved the loans anyway. *Id*. "The problem with the whole system was the overrides. The overrides were rampant. If the borrower breathed, he got the loan." ¶ 153. The number of overridden loans grew so large that Accredited instituted a system to track the overrides separately. ¶¶ 152, 154. It became well known inside the company that these overridden loans performed poorly. ¶ 152. Ultimately, underwriters were being "handed loan files and told to just sign them with no audit." ¶ 155.

Accredited filed for bankruptcy in May 2009. ¶ 156. In its bankruptcy filings, Accredited stated that it faced more than $200 million in loan repurchase claims from banks that purchased loans from Accredited that were defective, contained serious underwriting deficiencies and exhibited immediate borrower defaults.

*American Home Mortgage Corporation*

An internal email sent in late 2006 from American Home Mortgage Corporation's ("American Home") Senior Vice President of Product and Sales Support admitted that American

Home would make loans to virtually any borrowers, regardless of the borrower's ability to verify income, assets or employment.   ¶ 158.   Former American Home employees stated that underwriters "didn't do their jobs" and were "lax, very lax" about enforcing American Home's underwriting guidelines.   ¶ 159.   In addition, exceptions and management overrides of previously rejected loan applications were common.   ¶ 160.   Underwriters would "say 'no way' on a lot of things, 'I would never give a borrower a loan like this,'" but the loans would be approved anyway.   ¶ 161.   "It happened more than it should have."   *Id.*

*GreenPoint Mortgage Funding, Inc.*

GreenPoint Mortgage Funding, Inc. ("Greenpoint") is a defendant in numerous lawsuits alleging misrepresentations regarding the quality of loans GreenPoint underwrote and originated. ¶ 151.   A consultant in one case concluded that 93% of the loans GreenPoint sold contained errors, omissions, misrepresentations and negligence related to origination and underwriting.   *Id.* The serious defects alleged included pervasive violations of GreenPoint's own underwriting guidelines and prudent mortgage-lending practices and inflated appraisal values for mortgaged properties.   *Id.*

Appraisal Standards, LTV Ratios and Credit Enhancement

The Offering Documents contained detailed, untrue, descriptions of the supposed valuation of the properties through standard appraisals and the LTV ratio of the loans.   ¶¶ 163-66.   As described more fully below (*see* Section III.B., *infra*), contrary to these representations, loans were frequently based on inflated appraisals and understated LTV ratios.   ¶¶ 167-82. Moreover, statements in the Offering Documents about "credit enhancement" were materially false and omitted the true facts about the failure of Originators to follow their stated underwriting and property appraisal standards.   ¶ 185.

<u>Credit Ratings</u>

The Offering Documents contained untrue statements that the ratings assigned to the Certificates "will reflect that rating agency's assessment solely of the likelihood that holders of a class of securities of that class will receive payments to which those securityholders are entitled under the related agreement."  ¶¶ 50, 186.  The ratings take into consideration "the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by such certificates."  *Id*.

As described more fully below (*see* Section III.C., *infra*) and in the RA Opp., the Offering Documents failed to disclose that the Rating Agencies used inaccurate mortgage loan data, ¶¶ 189-91, and outdated and unreliable methodologies and models, ¶¶ 192-208. Accordingly, the Certificates' ratings were unjustifiably high.  ¶¶ 4, 188.

The Certificates, which were initially rated "AAA" by the Rating Agencies, ¶¶ 4, 52, 211, 214, have since been downgraded to "junk."  ¶¶ 9, 211, 214.  Further, the delinquency, foreclosure and bank ownership rates on the underlying mortgages have soared.  ¶¶ 212-13; Appendix to the Complaint.  Given the significant downgrades and delinquencies, Plaintiff's Certificates have lost substantial value.

## **ARGUMENT**

## I.      **STANDARD OF REVIEW**

"In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff."  *Kalliope, R. ex rel. Irene D. v. N.Y. State Dep't. of Educ.*, No. 09-CV-1718 (JFB) (WDW), 2010 WL 2243278, at *2 (E.D.N.Y. June 1, 2010) (citing *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006)).

Claims brought pursuant to Sections 11 and 12(a)(2) of the Securities Act are governed by the notice pleading standard set forth in Fed. R. Civ. P. 8(a).  *See Lindsay v. Morgan Stanley (In re Morgan Stanley Info. Fund Sec. Litig.)*, 592 F.3d 347, 358 (2d Cir. 2010).  To satisfy Rule 8(a), a complaint "need only state 'a short and plain statement of the claim showing that the pleader is entitled to relief,'" where "[e]ach allegation should be 'simple, concise, and direct,' with no technical form of pleading required."  *United States ex rel. Polansky v. Pfizer, Inc.*, No. 04-CV-0704 (ERK), 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009) (as Amended June 1, 2009) (Korman, J.) (quoting Fed. R. Civ. P. 8(a)(2), 8(d)(1)).

Thus, in the context of Plaintiff's Securities Act claims, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  To satisfy the plausibility standard, a complaint need not provide "heightened fact pleading of specifics," but must simply provide enough factual allegations to "raise a right to relief above the speculative level" and "nudge[] [its] claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 555, 570; *see also Iqbal*, 129 S. Ct. at 1949 ("As the Court held in *Twombly*, . . . the pleading standard Rule 8 announces does not require 'detailed factual allegations.'").[12]

Section 11 of the Securities Act provides a private cause of action against issuers, underwriters and other participants in any public securities offering made pursuant to a

---

[12]  *See Arista Records LLC v. Doe*, 604 F.3d 110, 119-20 (2d Cir. 2010) ("[T]he notion that *Twombly* imposed a heightened standard that requires a complaint to include specific evidence, factual allegations in addition to those required by Rule 8 . . . is belied by the *Twombly* opinion itself."  "Nor did *Iqbal* heighten the pleading requirements."); *Tooley v. Napolitano*, 556 F.3d 836, 839 (D.C. Cir. 2009) ("*Twombly* leaves the longstanding fundamentals of notice pleading intact.").

registration statement that "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  Section 11 imposes a "stringent standard of liability" that is "virtually absolute, even for innocent misstatements."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).  A plaintiff "need only show a material misstatement or omission to establish his *prima facie* case," which "places a relatively minimal burden on a plaintiff."  *Id*. at 382.  Section 12(a)(2) of the Securities Act provides similar liability for untrue statements and omissions in a prospectus.  *See* 15 U.S.C. § 77l(a)(2).  "[U]nlike securities fraud claims pursuant to section 10(b) of the Securities Exchange Act of 1934, . . . plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation."  *Morgan Stanley Info. Fund*, 592 F.3d at 359 (citing *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004)).[13]

## II.    STANDING

### A.    Plaintiff Has Standing To Bring The Claims In The Complaint

Defendants do not challenge Plaintiff's standing to represent absent purchasers in the Offerings in which it purchased.  Rather, Defendants attempt to challenge Plaintiff's standing for other Certificates that were issued pursuant to the same Registration Statements.

#### 1.    Claims On Behalf Of Absent Purchasers

Defendants "confuse standing and the typicality requirement of Rule 23(a)(3)."  *Grasty v. Amalgamated Clothing & Textile Workers Union*, 828 F.2d 123, 130 n.8 (3d Cir. 1987).

---

[13]  Applying these pleading standards, several courts in this Circuit have sustained plaintiffs' claims of systematic abandonment of underwriting standards in class actions on behalf of purchasers of mortgage pass-through certificates.  *See Pub. Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*, No. 08 Civ 10841 (JSR), 2010 WL 2175875, at *5 (S.D.N.Y. Jun. 1, 2010) ("*Merrill Lynch MBS*"); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781 (HB), 2010 WL 1257528, at *6 (S.D.N.Y. Mar. 31, 2010) ("*Residential Capital MBS*"); *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5653 (PAC), 2010 WL 1473288, at *7 (S.D.N.Y. Mar. 29, 2010) ("*DLJ Mortgage MBS*"); *N.J. Carpenters Vacation Fund v. Royal Bk of Scotland Grp., PLC*, No. 08-CV-5093 (HB), 2010 WL 1172694, at *12-13 (S.D.N.Y. Mar. 26, 2010) ("*RBS MBS*"); *Tsereteli MBS*, 2010 WL 816623, at *3; *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 493-94 (S.D.N.Y. 2010) ("*Lehman Brothers MBS*"); *see also Wells Fargo MBS*, 2010 WL 1661534, at *11.

Because Plaintiff has standing to advance claims based on its *own* purchases, any challenge to its ability to bring claims on behalf of *absent* class members is not a question of "standing" but of Plaintiff's fitness to represent a defined class, and is therefore inappropriate for resolution on a motion to dismiss. *See Hicks v. Morgan Stanley & Co*., No. 01 Civ. 10071 (HB), 2003 WL 21672065, at *5 (S.D.N.Y. July 16, 2003) (explaining that, once the plaintiff establishes individual standing, the ability to represent absent purchasers is a question of typicality); *see also Mobley v. Acme Mkts., Inc*., 473 F. Supp. 851, 858-59 (D. Md. 1979) ("[d]efendant has confused standing with typicality;" issues concerning the class should not be addressed on a motion to dismiss); *In re Grand Theft Auto Video Game Consumer Litig. (No. II)*, No. 06 MD 1739 (SWK) (MHD), 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006) (named plaintiffs individually have standing; the question "whether their injuries are sufficiently similar to those of the purported Class . . . is, at least in the first instance, appropriately answered through the class certification process").

"The class-action device was designed as 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982). If the named plaintiff has *individual* standing to bring claims on his or her own behalf, inquiries regarding the plaintiff's ability to represent *absent* plaintiffs is examined under Fed. R. Civ. P. 23.[14] As the Second Circuit explains:

> To establish Article III standing in a class action … for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant, and at that point standing is satisfied and only then will the inquiry shift to a class action analysis.

---

[14]   Defendants' standing challenges under Section 11 are limited to their argument that Plaintiff cannot represent absent purchasers; Defendants do not argue that Plaintiff lacks standing with respect to its own purchases under Section 11.

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007) ("*Cent. States II*") (quoting 1 Alba Conte & Herbert B. Newberg, Newberg on Class Actions, § 2.6, n.3 (4th ed. 2002)).[15]

In this case, Plaintiff alleges that it purchased securities in or traceable to one or more of the relevant Offerings, and suffered damages as a result.  ¶¶ 13-14.  Plaintiff has therefore met the requirements of Article III and Securities Act standing.  *See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 ("Cent. States I"); *Barnes v. Osofsky*, 373 F.2d 269, 273 (2d Cir. 1967); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 274 n.7 (3d Cir. 2006).  And, as the Complaint makes clear in ¶ 217, "Mississippi PERS purchased Certificates and has alleged to have been damaged by Defendants, and can assert a claim directly against each Defendant."  *See Cent. States II*, 504 F.3d at 241.  Therefore, "standing is satisfied and . . . the inquiry shift[s] to a class action analysis."  *Id.*

Courts routinely employ this reasoning when dealing with cases involving securities.  For example, in *In re Prudential Securities, Inc. Limited Partnerships Litigation*, 163 F.R.D. 200 (S.D.N.Y. 1995)—approved in *Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82-83 (2d Cir. 2004)—the court used an ordinary Rule 23 analysis to permit plaintiffs who had invested in a small subset of 700 partnerships to represent absent class members who had invested in the remaining

---

[15]  *See also* 7AA Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure* § 1785.1 (3d ed. 2005) ("Representative parties who have direct and substantial interest have standing; the question whether they may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation.").  To be sure, there has been some confusion distinguishing Article III standing and Rule 23 typicality.  In *Blum v. Yaretsky*, 457 U.S. 991 (1982), the Supreme Court held that certain named plaintiffs did not have "standing" to represent a subset of absent class members because those class members suffered a different injury from that experienced by the named plaintiffs.  *See id.* at 1001-02.  The same year, the Supreme Court used a Rule 23 typicality analysis to address the same issue.  *Gen. Tel. Co.*, 457 U.S. at 158-60.  For this reason, the Supreme Court acknowledged that "there is tension in our prior cases" regarding the distinction between typicality and standing.  *Gratz v. Bollinger*, 539 U.S. 244, 263 n.15 (2003) (citing *Blum* and *Gen. Tel.*).  Without resolving the confusion, *Gratz* explained that whether characterized as Rule 23 or Article III, the question of a named plaintiff's ability to represent *absent* class members depends on whether the named plaintiff's injury "implicate[s] a significantly different set of concerns" than the class's injuries, *id.* at 265, an inquiry facially similar to the test for Rule 23 typicality.

partnerships.  *See Prudential*, 163 F.R.D. at 208; *see also Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir. 1992) (investors in 15 securities permitted to advance Section 12 claims on behalf of purchasers of 21 securities); *Eisenberg v. Gagnon*, 766 F.2d 770, 784 (3d Cir. 1985) (investors in two partnerships permitted to represent investors in three different partnerships); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ.4318 (HB), 2000 WL 1357509, at *3 (S.D.N.Y. Sept. 20, 2000) ("[C]lass representatives need not have invested in each security so long as the plaintiffs have alleged a single course of wrongful conduct with regard to each security.  Courts have not addressed this concern *vis a vis* the doctrine of standing, but rather have examined such concerns pursuant to Rule 23(a)(3)'s typicality requirement.").[16]

Plaintiff acknowledges that recent decisions have ruled that the complaints in those cases must include multiple, separate plaintiffs for each mortgage-backed certificate.  *See* JPM Br. at 17-18 (citing cases).  None of these decisions, however, mentions or follows the Second Circuit's opinion in *Cent. States II* explaining that to establish standing a plaintiff need only allege that "'for every named defendant there [is] at least one named plaintiff who can assert a claim directly against that defendant,'" 504 F.3d at 241.  Here, Plaintiff makes clear that it can assert a claim directly against each Defendant, which is all that the Second Circuit requires. ¶ 217.

---

[16]  *See also Hicks*, 2003 WL 21672085, at *5 (because the plaintiff had Section 11 standing individually, inquiries regarding the plaintiff's ability to represent absent Section 12 claimants concerned "typicality rather than standing"); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 911 n.7 (D.N.J. 1998) (plaintiffs have standing to bring their own Section 11 and 12 claims; "Concerns over whether stock purchasers should represent notes purchasers are better addressed at the time of class certification."); *In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS), 2003 WL 1610775, at *17 (S.D.N.Y. Mar. 26, 2003) (seven named representatives could represent purchasers of all securities because "[t]here need not be a class representative for every Blech security, as long as all the securities are part of a common fraudulent or manipulative scheme"); *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 70-71 (S.D.N.Y. 2000); *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 56-57 (S.D.N.Y. 1993) (named plaintiffs who invested in two partnerships could represent those who had invested in a third partnership); *Tedesco v. Mishkin*, 689 F. Supp. 1327, 1335-36 (S.D.N.Y. 1988) ("to satisfy the typicality requirement, it is not necessary for the named plaintiffs to have invested in all of the investment vehicles" where "complaint alleges a single pattern of fraud").

Defendants also cite cases holding that Section 11 requires the plaintiff to allege purchases traceable to the offering at issue.  *See, e.g.*, *Barnes*, 373 F.2d at 273.  But these cases only address the standing requirements for individual, or named, plaintiffs to advance claims on their own behalf; none purports to address the conditions under which named plaintiffs who have standing to bring their own claims may then represent a class of absent purchasers.[17]

If the Court determines that Plaintiff does not have standing to assert certain claims, dismissal with prejudice is not warranted.  Rather, the appropriate remedy is amendment of the Complaint to cure the deficiency.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 455-457 (S.D.N.Y. 2005) ("*Flag Telecom I*") (dismissing original complaint on standing, granting leave to amend and denying subsequent motion to dismiss on timeliness grounds); *see also Quaak v. Dexia, S.A.*, 445 F. Supp. 2d 130, 149 (D. Mass. 2006) (permitting the addition of an additional class representative where it would not prejudice the defendant); *McAnaney v. Astoria Fin. Corp.*, No. 04-cv-1101 (JFB) (WDW), 2007 WL 2702348, at *13 (E.D.N.Y. Sept. 12, 2007) (citing *Norman v. Conn. State Bd. of Parole*, 458 F.2d 497, 499 (2d Cir. 1972)); *In re Nat'l Austl. Bank Sec. Litig.*, No. 03 Civ. 6537 (BSJ), 2006 WL 3844463, at *3 (S.D.N.Y. Nov. 8, 2006).  Therefore, in the event the Court grants Defendants' motion to dismiss on standing, Plaintiff respectfully requests leave to amend the Complaint to allow for other Class members to serve as plaintiffs.

### 2.     Plaintiff Purchased Pursuant To The Same Registration Statements As Absent Class Members

Even if Defendants are correct that purchasers of securities pursuant to one registration statement cannot represent absent plaintiffs who purchased pursuant to a different registration

---

[17]  Defendants cite *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522 (S.D.N.Y. 2008).  There, the court correctly held that in most instances, standing must be examined before typicality, but failed to recognize that any consideration of plaintiffs' ability to represent *absent* plaintiffs (rather than bring claims based on their own purchases) is, in fact, a typicality question and not a standing question.  *See Newberg* § 2.7, at 2-40-41.

statement, here, all of the Offerings were issued pursuant to two Registration Statements, and Plaintiff bought from each.  ¶¶ 1, 13, 34.  In *Countrywide Securities*, the court examined just such a situation and held that purchasers of securities based on an initial shelf registration statement could serve as representatives for purchasers from other offerings, "[s]o long as (1) the securities are traceable to the same initial shelf registration and (2) the registration statements share common 'parts' that (3) were false and misleading at each effective date."  588 F. Supp. 2d at 1166.[18]  Here, the Complaint alleges that the Prospectus and Prospectus Supplements—which were incorporated by reference into the relevant Registration Statement, and thus were common "parts" of the Registration Statements contained common misrepresentations.[19]  The Prospectus Supplements, Prospectuses and Registration Statements each contained common, often identical, misrepresentations.  Therefore, Plaintiff may represent absent purchasers.

## B.   Plaintiff Has Standing To Assert Section 12(a)(2) Claims

Separately, Plaintiff brings a claim under §12(a)(2) of the Securities Act.  Liability under §12(a)(2) flows from false statements in a prospectus (and verbal false statements).  15 U.S.C. §77l(a)(2); *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 577-78 (1995).  A plaintiff must allege that it bought securities directly from a defendant to have standing under §12(a)(2).  Here, the Complaint alleges, and Defendants concede, that Plaintiff purchased J.P. Morgan Alternative Loan Trust 2006-A4 Certificates and J.P. Morgan Acquisition Trust 2006-RM1 Certificates directly from defendant JP Morgan Securities.  ¶ 13; JPM Br. at 51.  This is sufficient.  *See In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 400 (S.D.N.Y. 2007) (finding sufficient standing under §12(a)(2) where plaintiffs "allege[d] that defendants, including the Underwriter

---

[18] The court did not consider, nor was it apparently argued, that the ability of a named plaintiff to represent absent purchasers is governed by Rule 23.

[19] Plaintiff also alleges that there are false statements in the Registration Statements pursuant to which *all* of the Offerings were conducted.  ¶¶ 65-67.  These allegations are thus common to all of the Offerings.

Defendants, sold the securities as part of the Offerings, and plaintiffs acquired securities in the Offerings").[20]

## III.   MATERIAL MISSTATEMENTS AND OMISSIONS

The Complaint clearly alleges that Defendants made untrue statements and omitted material information in the Offering Documents concerning the: (A) underwriting guidelines purportedly followed by the Originators; (B) value of the underlying mortgaged properties, in terms of LTV ratios and the appraisal standards by which such mortgaged property values were measured; (C) level of credit enhancement calculated to afford a certain pre-determined level of protection to investors; and (D) rating methodologies and models used by the Rating Agencies to evaluate and assign credit ratings to the Certificates.   In each instance the disclosures in the Offering Documents were untrue or incomplete when made.

Specifically, the Complaint describes the reckless loan origination and appraisal practices, the Rating Agencies' deficient rating practices, and the poor performance of the Mortgage Loans shortly after their origination.   Taken together, these facts are more than sufficient to support the plausibility of the Complaint's allegations.[21]

---

[20]   If this Court finds that the Complaint does not sufficiently plead tender under Section 12 for J.P. Morgan Acquisition Trust 2006-RM1, Plaintiff should be granted leave to replead tender.  *See, e.g.*, *Morin v. Trupin*, 747 F. Supp. 1051, 1063 (S.D.N.Y. 1990) (plaintiff who failed to "plead at least an offer of tender" in its consolidated and amended complaint was granted "[l]eave to replead . . . consistent with the tender requirement.").

[21]   Defendants contend that they only had a duty to disclose "known" deviations from stated underwriting guidelines.  JPM Br. at 40 n.47.  As numerous courts have held, the phrase "to the extent known" does not apply where, as here, the claims are based on "affirmative misstatement[s]."  *See, e.g.*, *Lehman Brothers MBS*, 684 F. Supp. 2d 485, 493-94 ("Regulation AB requires the truthful disclosure of the 'underwriting criteria used to originate or purchase the pool assets,' and the complaint alleges that the loans were originated using criteria different than those stated in the offering Documents.  As this claim relies on Section 11 of the Securities Act, and not Section 10(b) of the Exchange Act or Rule 10b-5, the Individual Defendants' knowledge is immaterial."); *RBS MBS*, 2010 WL 1172694, at *11 (holding that "[p]laintiffs' allegations about the loan underwriting guidelines are not precluded by this regulation" because the "Plaintiffs allege not only that RBS Defendants failed to disclose information about the underwriting guidelines, but that the statements about the guidelines were themselves incorrect because the originators 'totally disregarded' them.").  Defendants' cases, *Landmen Partners Inc. v. Blackstone Group, L.P.*, 659 F. Supp. 2d 532 (S.D.N.Y. 2009) and *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008), are distinguishable because "the pleadings in [those] case[s] focused on what the registration statement *failed to disclose*, and not that the disclosures themselves were incorrect misstatements."  *Garber*, 537 F. Supp. 2d at 614.

A.     <u>**Systematic Disregard Of Underwriting Guidelines**</u>

The Complaint identifies statements in the Offering Documents that describe the underwriting standards purportedly employed by various of the Originators to originate the Mortgage Loans.  For example, the Offering Documents contained representations that pursuant to the disclosed underwriting guidelines the Originators evaluated loan applicants' credit standing, repayment ability, and the value and adequacy of the related mortgaged properties as collateral.  ¶¶ 62, 65, 91, 111, 121, 129.  Loans were only approved if, overall, these factors sufficiently supported the required level of credit quality.  ¶ 68.  Originators could also make "exceptions" to their stated underwriting guidelines, but only after consideration of certain "mitigating" or "compensating" factors.  ¶¶ 67, 74, 92, 111, 121, 130.[22]

These statements were materially untrue because, industry wide, loan originators (including the Originators identified in the Complaint) "systematically disregarded" their underwriting guidelines in order to produce as many low-quality loans as possible that could be quickly securitized and dumped onto unsuspecting investors with the assistance of the Rating Agencies (who assigned these low-quality securities undeserved "AAA" ratings that investors craved).  *See* ¶¶ 146-48 (describing the problems with the "originate to distribute model").  The Originators made "traditional" loans without considering the borrowers' ability to repay, issued "alternative criteria" loans to unqualified borrowers, and granted exceptions to their underwriting standards without considering compensating factors.  ¶¶ 7, 70, 75, 93, 112, 122, 132, 144, 147.

The Complaint includes allegations based on each of the following:

---

[22]   Defendants claim that the Offering Documents' disclosures concerning possible exceptions to the underwriting guidelines sufficiently warned investors about the systematic abandonment of underwriting guidelines so as to render Plaintiff's claims inactionable.  *See* JPM Br. at 35-37.  Defendants are wrong.  *See* Section III.A.4.i., *infra*.

- <u>Witness Accounts</u>: The Complaint includes detailed accounts from numerous confidential witnesses ("CWs") and statements by management detailing the Originators' systematic abandonment of their underwriting practices.[23]

- <u>Loan Defaults and Certificate Downgrades</u>:  The performance of the Mortgage Loans underlying the Certificates bears out that the underwriting guidelines in the Offering Documents were not followed.  The combined rate of delinquency, foreclosure, bank ownership and bankruptcy on the underlying mortgages (the "Default Rate") has risen steadily since the Certificates were issued.   ¶¶ 212; Appendix to the Complaint.  As of March 8, 2010, the average Default Rate of the Mortgage Loans was 34.7%.  *See* Appendix to the Complaint.  Over the same time period, loans originated several years earlier have not exhibited such appreciably high rates of default.  *See* ¶ 212.  Moreover, the ratings on virtually all of the Certificates have now been downgraded, with a substantial majority (84%) downgraded to "junk" status.   ¶¶ 9, 71, 89-90, 109-110, 119-120, 127-128, 142, 211, 214; Appendix to the Complaint.

- <u>Governmental Investigations and Other Lawsuits</u>: Attorneys General from various states, the FBI and Congress, as well as private litigants have commenced investigations and lawsuits against several of the Originators.  The findings reported from these investigations establish that a material percentage of the Mortgage Loans were originated in a manner that was not consistent with the stated underwriting standards, because the Originators' objectives were merely to increase volume. ¶¶ 76-81, 97-108, 151, 156, 162.

Defendants contend that at this stage Plaintiff must **prove** that the Mortgage Loans were affected by the widespread underwriting deficiencies.  JPM Br. at 3 (Plaintiff must identify "the number or volume of loans in the mortgage pools" that were improperly originated).  Defendants further maintain that because the Complaint does not identify the specifically affected Mortgage Loans, its allegations are immaterial.  *Id*. at 40-42.  Finally, Defendants claim that the allegations in the Complaint are "based almost exclusively on the accounts of CWs," *id*. at 21, and these CW accounts must be discounted as "vague and conclusory" because they do not provide "information concerning the specific loans in the pools underlying the Certificates at issue," *id*. at 25.

---

[23]    ¶¶ 76-88 (Chase); ¶¶ 94-96 (Countrywide); ¶¶ 113-118 (ResMAE); ¶¶ 124-126 (New Century); ¶¶ 133-141 (Wells Fargo); ¶¶ 152-155 (Accredited); ¶¶ 158-161 (American Home).

Defendants' arguments are based on mischaracterizations of the Complaint's allegations and are contrary to established law.  Numerous courts have recently sustained similar factual allegations that mortgage loan originators systematically disregarded their stated underwriting guidelines.[24]

### 1.   The Complaint Sufficiently Links The Improper Origination Allegations To The Certificates

There is no requirement that a plaintiff **prove** its case at this stage with "heightened fact pleading of specifics."  *Twombly*, 550 U.S. at 570.  A plaintiff need only "state a claim to relief that is **plausible** on its face" by providing factual allegations sufficient to "raise a right to relief above the speculative level" and "nudge[] [its] claims across the line from conceivable to plausible." *Id*. at 555, 570.  Nothing more is required under Rule 8(a).  *See Morgan Stanley Info. Fund*, 592 F.3d at 358 (for claims brought pursuant to Sections 11, 12(a)(2) and 15, "notice pleading supported by facially plausible factual allegations is all that is required—nothing more, nothing less").  Most importantly, while attempting to fulfill the plausibility requirement, the plaintiff is entitled to "all reasonable inferences."  *Kalliope R.*, 2010 WL 2243276, at *2.

Given the clarity of the facts alleged, the only reasonable inference is that the Originators' systematic and industry-wide abandonment of underwriting guidelines materially affected the specific Mortgage Loans underlying the Certificates.  The contrary suggestion that,

---

[24]  These similar factual allegations have been supported by:  (1) statements of confidential witnesses and of former employees of loan originators, *see Wells Fargo MBS*, 2010 WL 1661534, at *11; *Residential Capital MBS*, 2010 WL 1257528, at *6; (2) facts from governmental investigations, lawsuits, hearing testimony and reports, *see Residential Capital MBS*, 2010 WL 1257528, at *6; *RBS MBS*, 2010 WL 1172694, at *12; *Tsereteli MBS*, 2010 WL 816623, at *3; *Lehman Brothers MBS*, 684 F. Supp. 2d at 493-94; (3) facts from news articles, other media and investigative publications, and private litigation filings, *see RBS MBS*, 2010 WL 1172694, at *12; *Tsereteli MBS*, 2010 WL 816623, at *3; *Lehman Brothers MBS*, 684 F. Supp. 2d at 493-94; (4) reports showing the mortgage loans' rapidly increasing delinquency, foreclosure and default rates, *see Residential Capital MBS*, 2010 WL 1257528, at *5; *DLJ Mortgage MBS*, 2010 WL 1473288, at *6-7; *RBS MBS*, 2010 WL 1172694, at *12; *Tsereteli MBS*, 2010 WL 816623, at *3; *Lehman Brothers MBS*, 684 F. Supp. 2d at 493-94; and (5) credit rating reports significantly downgrading nearly all of the Certificates, *see Residential Capital MBS*, 2010 WL 1257528, at *5; *DLJ Mortgage MBS*, 2010 WL 1473288, at *6-7; *RBS MBS*, 2010 WL 1172694, at *12; *Tsereteli MBS*, 2010 WL 816623, at *3; *Lehman Brothers MBS*, 684 F. Supp. 2d at 493-94.

of all the Mortgage Loans the Originators' improperly underwrote during this time, the loans underlying the Certificates managed to be exempt from the same improper origination practices alleged is simply implausible.

Courts considering allegations similar to those in the Complaint have held that plaintiffs sufficiently alleged that the untrue statements and omissions materially affected the specific mortgage loans underlying the certificates at issue.[25]  Those courts have held that the complaints' factual support—especially facts demonstrating widespread abandonment of underwriting guidelines coupled with high mortgage loan default rates and significant downgrades of the subject certificates' credit ratings—"create[d] a sufficient nexus between the alleged underwriting standard abandonment and the loans underlying the Certificates," *Tsereteli MBS*, 2010 WL 816623, at *3, to "support a reasonable inference that the Offering Documents' description of the underwriting guidelines was materially misleading," *Lehman Brothers MBS*, 684 F. Supp. 2d at 493-94; *see, e.g.*, *Residential Capital MBS*, 2010 WL 1257528, at *6 ("[The complaint's] factual allegations about [the defendant's] improper underwriting practices coupled with the loan pools' near-total credit rating collapse and default rate spike are sufficient to create a fair inference that [the defendant] totally disregarded the underwriting guidelines, contrary to what was stated in the Offering Documents."); *DLJ Mortgage MBS*, 2010 WL 1473288, at *7 ("The allegations here are extreme, yet plausible in light of the rapid and precipitous decline in market value, concurrent with skyrocketing mortgage loan delinquency rates and plummeting credit ratings."); *RBS MBS*, 2010 WL 1172694, at *13 ("Plaintiffs provide a credible inference

---

[25]  One court in this District recently considered but declined to rule on this issue in two cases.  Those cases instead temporarily denied the defendants' motions to dismiss and allowed plaintiffs to replead their claims that the offering documents were misleading based on allegations that the originators disregarded their stated underwriting guidelines.  *See City of Ann Arbor Employees' Retirement System v. Citigroup Mortg. Loan Trust Inc.*, No. CV 08-1418, 2010 WL 1371417, at *10 (E.D.N.Y. Apr. 6, 2010) (Wexler, J.) ("*Citigroup MBS*"); *Mass. Bricklayers and Masons Fund v. Deutsche Alt-A Secs.*, No. CV 08-3178, 2010 WL 1370962, at *1 (E.D.N.Y. Apr. 6, 2010) (Wexler, J.) ("*Deutsche Bank MBS*").

that the originators of these underlying loan pools systematically disregarded underwriting guidelines. They allege widespread evidence that the mortgage originators disregarded underwriting guidelines, and the loan pools provided by those same originators failed at considerable levels and were near-universally downgraded to 'speculative junk bond investments.'").[26] Those cases also explicitly reject Defendants' argument that the only way to demonstrate that alleged widespread improper origination practices affected the Mortgage Loans underlying the Certificates is to identify the specific loans that were affected. *See, e.g.*, *Wells Fargo MBS*, 2010 WL 1661534, at *11 (plaintiffs need not directly "tie[] any inconsistent underwriting conduct to the specific Certificates at issue in this case"); *Tsereteli MBS*, 2010 WL 816623, at *3 (plaintiffs need not identify "the [specific] loans underlying the Certificates were issued in deviation from IndyMac Bank's underwriting standards"); *Lehman Brothers MBS*, 684 F. Supp. 2d at 494 (plaintiffs need not identify "the volume of loans that departed from the stated underwriting guidelines").

## 2. The Complaint's Improper Origination Allegations Are Material

Defendants assert that the Complaint's allegations are "insufficient to meet the materiality requirement of the 1933 Act" because the Complaint "does not identify" the number of Mortgage Loans that were affected by improper origination practices. JPM Br. at 40-42. Defendants are wrong. As discussed *supra*, there is no requirement that Plaintiff **prove** its claims with such level of specificity at this stage of litigation. *Arista Records*, 604 F.3d at 119-

---

[26] *See also*, *Tsereteli MBS*, 2010 WL 816623, at *3 ("The amended complaint . . . sufficiently alleges that there was widespread abandonment of underwriting guidelines at IndyMac Bank during the period of time at issue and that the percentage of 'defaulting' loans rose dramatically shortly after the Certificates were issued."); *Wells Fargo MBS*, 2010 WL 1661534, at *11 ("Defendants argue that these allegations are insufficient because they are not linked to the specific types of prime mortgages that were packaged into the securities at issue in this case. However, plaintiffs have alleged that the challenged conduct infected the entire underwriting process, including with respect to prime loans. . . . In the Court's view, plaintiff' allegations with respect to defendants' underwriting practices are sufficiently specific to state a claim.").

20.  Plaintiff is entitled to all reasonable inferences from the Complaint.  The Complaint details that during the time period at issue in this Action the specific Originators who originated the Mortgage Loans, like most originators in the mortgage loan industry, systematically disregarding their underwriting guidelines.   In addition, both the high default rates—especially when compared to Mortgage Loans originated several years earlier, ¶¶ 212-13, and the Rating Agencies' widespread downgrades of the Certificates to "junk," ¶¶ 8-9, 211, 214—confirm that the systemic disregard of underwriting guidelines affected the Mortgage Loans.

In rejecting a similar materiality argument, Judge Kaplan stated that:

[Defendant] argues that the amended complaint fails to allege that any of the loans underlying the Certificates were issued in deviation from IndyMac Bank's underwriting standards and therefore insufficiently alleges materiality.  **The amended complaint, however, sufficiently alleges that there was widespread abandonment of underwriting guidelines at IndyMac Bank during the period of time at issue and that the percentage of "defaulting" loans rose dramatically shortly after the Certificates were issued**.  . . .  At this stage, given these allegations, the Court can not conclude that the allegedly misleading statements were immaterial as a matter of law.

*Tsereteli MBS*, 2010 WL 816623, at *3; *see Lehman Brothers MBS*, 684 F. Supp. 2d at 494 ("Defendants argue that the allegedly omitted information is not material because the complaint fails to allege the volume of loans that departed from the stated underwriting guidelines . . . . These arguments are insufficient at this stage to determine that the alleged misstatements and omissions are immaterial as a matter of law.").[27]

---

[27]  While Defendants admit that Plaintiff has "alleged that a large number of loans in the pools are delinquent," they argue that Plaintiff "cannot satisfy the materiality requirement merely by alleging loan delinquencies—especially in light of the overall collapse of the real estate market."  JPM Br. at 41 n.48.  Defendants provide no authority to support their position.  First, Plaintiff is not **merely** alleging loan delinquencies, but has provided factual support for its improper origination allegations from multiple confidential witnesses, governmental reports, investigations, other litigation, and Certificate ratings downgrades.  As discussed *supra*, multiple courts have found this sufficient to allow underwriting abandonment allegations to survive a motion to dismiss.  Second, the *Tsereteli MBS* court **specifically** cited evidence of loan defaults as support for its finding of materiality.  When the defendants in *Tsereteli MBS* moved to reconsider on the theory that "a key factor overlooked by the Court in deciding the motion to dismiss [that] renders the 'nexus' created by Plaintiffs' allegations of increased 'defaulting' loans insufficient under Rule 8(a)" is "the residential real estate market collapse in the summer of 2007," that motion was promptly denied.  *See Tsereteli v. Residential Asset Securitization Trust 2006-A8*, No. 08-cv-10637 (S.D.N.Y.), Mar. 25, 2010

Lastly, whether untrue statements or omissions are material "presents 'a mixed question of law and fact,' [that] will rarely be dispositive in a motion to dismiss." *Morgan Stanley Info. Fund*, 592 F.3d at 360. "'[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Id.* (quoting *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)).

### 3. The Complaint's Allegations of Improper Origination Practices Are Not "Vague And Conclusory"

The Complaint is based on myriad corroborating sources, including publicly-available documents, media reports, loan performance data, congressional testimony and statements from confidential witnesses. These sources collectively confirm that Plaintiff's allegations are far more than enough "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. 544 at 570.

Ignoring these well-plead allegations, Defendants contend that the confidential witness allegations are "vague and conclusory" because, according to Defendants, they do not "connect" the improper loan origination and underwriting to the specific Mortgage Loans. JPM Br. at 21, 24-25. Defendants seek to impose a standard that does not exist and that has been rejected by other courts.

Here, the CW allegations demonstrate that Originators systematically abandoned their stated underwriting guidelines. Further, the Complaint includes corroborating details, including

---

Memorandum of Law in Support of Defendant's Motion for Reconsideration [Dkt. No. 63] at 3; (annexed as Exhibit A to the accompanying to the Declaration of James A. Harrod in Support of MissPERS Memorandum of Law in Opposition to the JPMorgan Defendants' Motion to Dismiss the Consolidated Class Action Complaint ("Harrod Decl."); Mar. 26, 2010 Order Denying Defendant's Motion for Reconsideration [Dkt. No. 66] (denying the motion for reconsideration), Harrod Decl. Ex. B.

the universal Certificate downgrades soon after their issuance and the severe Default Rates. The Complaint contains "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face'" and to "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. at 1949. The court's discussion in *Wells Fargo MBS* is instructive:

> Defendants argue that plaintiffs' allegations are insufficient to state a claim because plaintiffs have not **tied any inconsistent underwriting conduct to the specific Certificates at issue in this case**. To plead that defendants' stated underwriting guidelines were at odds with the reality of their practice, **plaintiffs rely heavily on the statements of confidential witnesses** who assert, among other things, that Wells Fargo placed "intense pressure" on its loan officers to close loans, including by coaching borrowers to provide qualifying income information, accepting implausible or falsified income information, and lowering its standards near the end of the calendar year. Complaint ¶¶ 83-88. Defendants argue that these allegations are insufficient because they are not linked to the specific types of prime mortgages that were packaged into the securities at issue in this case. However, **plaintiffs have alleged that the challenged conduct infected the entire underwriting process**, including with respect to prime loans. *See* Complaint ¶ 76 (defendants failed to disclose that Wells Fargo "systematically did not follow its stated underwriting standards") (emphasis added); ¶ 84 ("According to CW 1, Wells Fargo was approving so many stated income loans that it felt the same as CW 1's previous subprime lending job"). **In the Court's view, plaintiffs' allegations with respect to defendants' underwriting practices are sufficiently specific to state a claim**.

2010 WL 1661534, at *11. As in *Wells Fargo MBS*, the Complaint's CWs similarly provide information that the Originators pressured loan officers and underwriters to close loans, ¶¶ 95-96, 115, 126, 134, 137-138, coached borrowers to provide qualifying income information, ¶¶ 86, 88, 116, 135, and accepted implausible or falsified income information without resorting to a reasonableness test, ¶¶ 83, 87, 117, 136, 139. Furthermore, the CW accounts demonstrate that similar improper origination practices infected various Originators throughout the mortgage loan industry. *See* Appendix hereto, Confidential Witness Allegations Chart.

Defendants also assert that the Complaint does not contain factual allegations concerning the underwriting and appraisal practices of the majority of Originators.  JPM Br. at 14, 22.[28] Defendants ignore the **dollar volume** of Mortgage Loans generated by each of the Originators. The seven Originators whose systemic violations are detailed in the Complaint—Chase, Countrywide, ResMAE, New Century, Wells Fargo, Accredited, and American Home— generated approximately $23.5 billion of the Mortgage Loans, or 70% of the total dollar value of the Mortgage Loans whose Originators were identified in the Offering Documents.  *See* ¶¶ 71, 90, 110, 120, 128.[29]  The other identified Originators (including GreenPoint, for which there were detailed factual allegations in the Complaint, ¶ 151), generated approximately $10.7 billion of Mortgage Loans.  Seventy percent is much more than a "majority."

The Complaint corroborates the CW accounts with evidence demonstrating that "virtually all of the senior, AAA-rated Certificates that it purchased have now been downgraded to below investment-grade (¶ 211), and that the Mortgage Loans supporting the Certificates 'have experienced unprecedented rates of delinquencies, foreclosures, [REOs] and bankruptcies' (¶ 212)."  JPM Br. at 7 (quoting the Complaint).  In fact, the Complaint details the widespread ratings downgrades and significant default rates on the Mortgage Loans, including a 21-page Appendix summarizing the downgrades and default rates.   The various governmental investigations and lawsuits against the Originators further corroborate the CW accounts.  Finally,

---

[28]  To support this statement, Defendants merely count the number of Originators mentioned in the Complaint (19) and subtract the number for which the Complaint provides detailed factual support (8), to get the remainder (11).

[29]  Not all of the Originators who underwrote Mortgage Loans that secured the Certificates were included in the Offering Documents.  In fact, the originators of approximately $2.6 billion of Mortgage Loans securing the Certificates were simply not identified in the Offering Documents.  The originators of approximately $34.2 billion out of the $36.8 billion of Mortgage Loans underlying the Certificates, *see* ¶ 2, or 93% of the loans, are identified in the Offering Documents.  *See, e.g.*, Harrod Decl. Ex. C, JPALT 2006-A4 Prospectus Supplement ("JPALT 2006-A4 Suppl.") at S-19 (identifying Originators for 98.06% of Mortgage Loans in that offering)  Thus, of all identified Originators, the seven listed above generated approximately 70% ($23.5 billion of $34.2 billion) of the Mortgage Loans that were attributed to a specific Originator in the Offering Documents.

the CW allegations are corroborative of each other; they come from a multitude of former employees at various Originators throughout the mortgage industry and detail similar, pervasive origination improprieties at each Originator.  *See* Appendix hereto.

Defendants next quibble with the descriptions of four of the 31 CWs, although it is the descriptions of their **titles** and **geographic locations of employment**, rather than their **allegations** of improper origination practices, that Defendants contend are insufficiently pled. *See* JPM Br. at 25-29.[30]  This assertion is improper.  The "reasonable inference" to be drawn from the Complaint's CW statements is that the Originators systematically disregarded their stated underwriting guidelines.   Indeed, the CW statements support this inference, are sufficiently corroborated by other facts in the Complaint, and need not *prove* the Complaint's allegations or support them with any degree of specificity beyond that required by Rule 8(a).  *See Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) ("The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient."); *Rehman v. State Univ. of N.Y.*, 596 F. Supp. 2d 643, 650 (E.D.N.Y. 2009) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)) ("In considering a 12(b)(6) motion to dismiss, '[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'").

---

[30]  Defendants take this argument to the extreme when they assert that Plaintiff's descriptions of the CWs do not support that the CWs would possess information about the specific loans underlying the Certificates "because the Offering Documents make clear that many—if not the vast majority—of the loans at issue were originated in geographic locations other than those in which the CWs purportedly worked."  *Id.* at 25-26 (providing exact percentages of loans originated at various geographic locations).  First, there is no requirement that CW statements must prove that the underlying Mortgage Loans were affected.  *See* discussion at Section III.A.3., *supra*.  Second, whether or not the CW allegations were reflective of the origination practices affecting the "vast majority" of loans produced is a question of materiality that is inappropriate to decide on a motion to dismiss.  *Morgan Stanley Info. Fund*, 592 F.3d at 360.  Finally, even assuming Defendants' "facts" are accurate, their argument requires an implausible inference, namely that the practices described by the CWs were a departure from the overall practices at their employers.  The overwhelmingly poor performance of the Mortgage Loans (and the Certificates' downgrade history) rebuts the Defendants' suggestion that the CW allegations reflect the experience of geographically isolated "rogue" employees whose statements were not reflective of the practices in place at those Originators.

The two cases primarily relied upon by Defendants are inapposite. In *In re IAC/Interactivecorp Securities Litigation*, the complaint was dismissed because the allegations of two "confidential informants" were "stated in the most general of terms" without any "facts that might [be] corroborat[ive]." No. 04 Civ. 7447 (RJH), 2010 WL 996483, at *7 (S.D.N.Y. Mar. 19, 2010). In *Pyramid Holdings, Inc. v. Inverness Medical Innovations, Inc.*, the financial impact of Inverness's allegedly non-disclosed integration problems was not reflected in a material way by the company's reported Selling, General, and Administrative Costs ("SG&A costs"), regardless of the statements of confidential witnesses. 638 F. Supp. 2d, 120, 128 (D. Mass. 2009). Here, in contrast, the Complaint's 31 confidential witnesses provide far more detailed statements that are corroborated by the statements of other CWs, the Mortgage Loans' severe Default Rates and the Certificates' widespread credit rating downgrades.

The remaining cases Defendants cite are irrelevant because those cases discount insufficiently specific confidential witness allegations that do not support a strong inference of the defendants' scienter in the securities **fraud** context. Here, "the [instant] Complaint does **not allege fraud** and is therefore not subject to [the] heightened pleading standards [of Fed. R. Civ. P. 9(b)]." JPM Br. at 24; *see Morgan Stanley Info. Fund*, 592 F.3d at 359 ("[U]nlike securities fraud claims pursuant to section 10(b) of the Securities Exchange Act of 1934, . . . plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter . . . .").[31] *But see In re*

---

[31] *See, e.g.*, *Campo v. Sears Holdings Corp.*, No. 09-cv-3589, 2010 WL 1292329, at *3 n.4 (2d Cir. Apr. 6, 2010) ("The anonymity of the sources of plaintiffs' factual allegations concerning scienter frustrates the requirement, announced in *Tellabs*, that a court weigh competing inferences to determine whether a complaint gives rise to an inference of scienter."); *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) (the confidential source's "ambiguous allegation cannot support an inference of scienter, much less a 'strong inference.'"); *In re Loral Space & Commc'ns Ltd. Sec. Litig.*, No. 01 Civ. 4388 (JGK), 2004 WL 376442, at *11 (S.D.N.Y. Feb. 27, 2004) ("Even assuming that [a single unnamed source] would possess the information alleged, the [source's] allegation is not specific enough to raise a strong inference of fraudulent intent."). *Campo* is further distinguishable because it is a decision by unpublished summary order that has no precedential effect, *see* Second Circuit Internal Operating Procedure 32.1.1, that limits its discussion of confidential witnesses to a single footnote where the Court

*Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1057-58 (C.D. Cal. 2008) ("*Countrywide Derivative*") (even under heightened pleading standards, sustaining claims alleging that Countrywide "misled the public" by not disclosing that "Countrywide had virtually abandoned its own loan underwriting practices," and specifically finding that the "numerous confidential witnesses support a strong inference of a Company-wide culture that, at every level, emphasized increased loan origination volume in derogation of underwriting standards"). Tellingly, these inapplicable cases are the only ones Defendants cite in support of their arguments that the Complaint must conclusively demonstrate how the CWs came to possess the information they allege, *see* JPM Br. at 24-26, and that the CW allegations are "vague and conclusory," *see id*. at 26-29.

Finally, Defendants' challenge to the CWs suffers from the same deficiency that their other arguments do, namely that facts demonstrating widespread abandonment of underwriting guidelines—especially when combined with evidence of high default rates and significant certificate downgrades—"create a sufficient nexus between the alleged underwriting standard abandonment and the loans underlying the Certificates." *Tsereteli MBS*, 2010 WL 816623, at *3.

### 4.    The Offering Documents' Risk Disclosures Are Insufficient

The Securities Act "was designed to provide investors with full disclosure of material information concerning public offerings." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976); *see also Pinter v. Dahl*, 486 U.S. 622, 646 (1988) (the very purpose of the Securities Act is "to promote full and fair disclosure of information to the public in the sales of securities"). Boilerplate risk disclosures, however, cannot inoculate the speaker from liability for the untrue statements. *See Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 579 (S.D.N.Y. 2007).

---

addresses, as *dicta*, the plaintiffs' untimely and thus "waived" challenge to the district court's order that the confidential witnesses referenced in the complaint be deposed.  2010 WL 1292329, at *3 n.4.

Defendants attempt to argue that the Offering Documents contained "risk disclosures" that "clearly warned [investors] of the very risks that have come to pass." JPM Br. at 35. These supposed "warnings" included that: (i) the Originators had discretion to issue loans pursuant to exceptions to the guidelines, *id*. at 10, 37-38; (ii) the loans originated pursuant to alternative documentation programs had a greater risk of default than loans originated pursuant to traditional documentation programs, *id*. at 9-10, 36-37; and (iii) a possible **future** downturn in the housing market could negatively impact the Certificates' performance, *id*. at 10, 38.

As an initial matter, Defendants fail to recognize that the untrue statements and omissions at issue were of present or historical fact, *i.e.*, the **present** risk of the Certificates and the underwriting standards **actually used** to underwrite the Mortgage Loans. The "bespeaks caution" doctrine does not apply to statements of present or historical fact. *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004).

Moreover, it is well-established that cautionary language cannot "bespeak caution" unless it warns of the precise misstatements or omissions identified in the complaint. *See Halperin*, 295 F.3d at 359-60 (cautionary language must "expressly warn of or . . . directly relate to the risk that brought about plaintiffs' loss"); *Hunt v. Alliance North Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) ("[C]autionary language . . . must relate directly to that by which plaintiffs claim to have been misled."); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 322 (S.D.N.Y. 2009) ("*Flag Telecom II*") ("[C]autionary language must be specific, prominent and must directly address the risk that plaintiffs' claim was not disclosed. The requirement that the cautionary language match the specific risk is particularly important, considering that most, if not all security offerings contain cautionary language."). Because none of Defendants' purported "disclosures" warn investors "of the very risks that have come to

pass"—that the mortgage loan Originators could or would systematically abandon their stated underwriting standards—these disclosures cannot "bespeak caution."

> i.      *Disclosing Exceptions Does Not Bespeak Caution*

Defendants assert that "Plaintiff's allegation that the Offering Documents omitted information about 'systematic' departures from stated underwriting guidelines . . . is no more than the claim that many Originators made frequent exceptions to their policies." JPM Br. at 38. Defendants mischaracterize the Complaint and draw the erroneous conclusion that the systematic abandonment of stated underwriting guidelines "cannot have been a surprise because prospective investors were explicitly told that originators would grant exceptions from stated underwriting guidelines." *Id*. at 37.

The Complaint, however, alleges that the Originators made exceptions without considering compensating and mitigating factors. ¶¶ 67, 74, 92, 111, 121, 130. Thus it was the stated *procedure* for making exceptions—which was disregarded by Originators along with the other stated underwriting guidelines—and not the mere **existence** of such exceptions, that the Complaint alleges was misleading.

Facing nearly identical allegations, the court in *Lehman Brothers MBS* rejected the defendants' argument that attempted to equate the disregard of underwriting guidelines with the mere existence of exceptions:

> The essence of [the Complaint's] claim is that the loan originators systematically disregarded the stated underwriting guidelines, **including the procedures for originating loans pursuant to the guideline exceptions** . . . .
>
> . . . [The Individual Defendants] claim that the Offering Documents disclosed that the loan originators had discretion to issue loans pursuant to exceptions to the guidelines. **The complaint, however, does not allege that the loan originators simply made loans pursuant to the disclosed exceptions. Rather, it alleges that the originators systematically failed to follow the underwriting guidelines, including the procedures for using underwriting guideline exceptions**. . . . These allegations are sufficient at this stage to support a

reasonable inference that the Offering Documents' description of the underwriting guidelines was materially misleading.

684 F. Supp. 2d at 493.[32]

ii.     *Disclosing Alternative Documentation Loans Does Not Bespeak Caution*

Defendants similarly contend that the Offering Documents disclosed that the Mortgage Loans would be originated pursuant to alternative documentation guidelines that did not consider certain types of borrower financial information, did not verify the information that was provided to the Originator, or did not comply with Fannie Mae or Freddie Mac standards. JPM Br. at 36-37. The Defendants also cite to the purported "wealth of data" in the Offering Documents about these risky loans, including their prevalence (by percentage) in each loan pool. *Id*. at 9-10. Defendants do not—and cannot—cite to any disclosure that the Originators systemically disregarded their stated Underwriting Guidelines.[33]

The Complaint does not merely allege that the fact that loans were made pursuant to less-stringent, alternative documentation standards was misleading. To the contrary, the Complaint often cites to sections of the Offering Documents that explicitly disclose that alternative documentation loans may be made. ¶¶ 64-66, 73, 92, 111, 121, 131. Rather, the Complaint

---

[32]   Defendants also contort the Complaint's allegations by arguing that Originators' subjective determinations to grant exceptions are non-actionable opinions that cannot be challenged unless the Complaint demonstrates that those opinions were false at the time they were made. *See* JPM Br. at 36, 38-39. Of course the Complaint cannot demonstrate that these determinations were false when made; **they were never made in the first place**. The Complaint is explicit that underwriting guidelines, including those governing the procedures for making exceptions, were **completely abandoned**. *See, e.g.*, ¶¶ 7, 70, 75, 93, 112, 122, 132.

[33]   Defendants assert that the Offering Documents "were not misleading" because "there is no allegation" in the Complaint that the underwriting guidelines applicable to the particular loan documentation types listed in the Offering Documents were inaccurately disclosed. JPM Br. at 36. The Complaint, however, does not allege that the Offering Documents inaccurately disclosed the purported underwriting guidelines that the Originators were supposed to follow. Rather, the Complaint alleges that the standards used to originate the Mortgage Loans were different than the standards contained in the Offering Documents. As the court in *RBS MBS* noted in rejecting the defendants' substantially similar arguments there, "Plaintiffs' allegations here [do not] . . . focus[] on what the registration statement **failed to disclose**" but instead alleges "that the disclosures themselves were incorrect misstatements" because they were not followed. 2010 WL 1172694, at *11.

alleges that it was misleading for the Originators to make alternative documentation loans without following the stated underwriting guidelines that required them to first consider whether the borrower was **qualified** (based on additional quality control procedures) for such loans. Thus, as with loan exceptions, it was the stated **procedure** for making alternative documentation loans and not the mere **existence** of such loans, that the Complaint alleges was misleading.

Facing nearly identical allegations, the court in *RBS MBS* rejected the defendants' argument that attempted to equate the disregard of underwriting guidelines with the mere existence of loans made pursuant to riskier types of documentation programs:

> Although the Offering Documents disclosed the underlying loan pool data and indicated that underwriting guidelines included riskier types of loan programs, it did not indicate, as Plaintiffs allege, that mortgage originators like Countrywide would disregard even the most minimum of the stated guidelines. Plaintiffs can overcome cautionary language if the language did not expressly warn or did not directly relate to the risk that brought about plaintiffs' loss. . . . **Disclosures that described lenient, but nonetheless existing guidelines about risky loan collateral, would not lead a reasonable investor to conclude that the mortgage originators could entirely disregard or ignore those loan guidelines.**

2010 WL 1172694, at *12.[34]

        iii.    *Disclosing Potential Future Economic Risks Does Not Bespeak Caution*

Defendants' final "disclosure" is that possible future economic conditions could negatively impact the Certificates' performance. JPM Br. at 38. This "warning" cannot bespeak caution because it concerns a **future** event and fails to address the **historical** fact—one that had already transpired at the time the Certificates were offered to investors—that the Mortgage

---

[34] *See also Tsereteli MBS*, 2010 WL 816623, at *3 ("[Defendant] argue[s] that the Offering Documents disclosed the greater risk of default and loss attached to certain categories of loans. But plaintiffs have not alleged that the Offering Documents failed to warn investors about the risks of loss associated with these categories of loans. They have alleged instead that IndyMac Bank failed to disclose that it had abandoned the underwriting standards that it professed to follow and ignored whether borrowers ever would be able to repay their loans. The warnings [Defendant] highlights did not disclose these alleged facts."); *cf. Lehman Brothers MBS*, 684 F. Supp. 2d at 494 (rejecting the defendants' argument that the Offering Documents could not have omitted any material information because they contained "an 'ocean's worth' of specific data about the loan pools").

Loans underlying the Certificates were not originated pursuant to the underwriting standards described in the Offering Documents. *See Rombach*, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has [already] transpired."); *DLJ Mortgage MBS*, 2010 WL 1473288, at *6 ("The cautionary language and risk disclosures in the Offering Documents do not convey the severity of the investment risk—a risk already present at the time of the Offering."); *see also In re New Century*, 588 F. Supp. 2d 1206, 1226 (C.D. Cal. 2008) ("The Court cannot determine as a matter of law that the PSLRA's safe harbor provision is applicable to the statements regarding loan quality and underwriting . . . . The statements here, when made, seem to have concerned explanation of New Century's then-current loan origination, underwriting, and performance, at times in relation to the past.").[35]  Moreover, there is a vast difference between stating that a housing downturn might affect the Certificates' value and the vast majority of the Certificates being downgraded to below investment-grade shortly after issuance.

Finally, the effect of the economic downturn is improperly considered on a motion to dismiss.[36]  In fact, numerous courts have rejected similar attempts to blame plaintiffs' losses on

---

[35]  In addition, this is the type of boilerplate warning contained in nearly every securities offering and that fails to convey to investors any information about the risks inherent in the specific security being offered. *See In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 183 (S.D.N.Y. 2003) ("[B]oilerplate warnings will not suffice . . . . The cautionary statements must convey substantive information . . . ."); *see also New Century*, 588 F. Supp. 2d at 1226 ("references to generalized cautionary language regarding the sub-prime industry" are "largely unrelated" to alleged misstatements regarding loan quality and underwriting procedures).

[36]  *See, e.g.*, *Countrywide Securities*, 588 F. Supp. 2d at 1173-74 (rejecting defendants' argument that Countrywide's decline was due to an "'unprecedented' external 'liquidity crisis'" rather than on the abandonment of underwriting guidelines and poor loan production quality alleged in the complaint, because such a "wasteful" argument was inappropriate on a motion to dismiss.  "It will be the fact-finder's job to determine which losses were proximately caused by Countrywide's misrepresentations and which are due to extrinsic or insufficiently linked forces."); *In re StockerYale Sec. Litig.*, 453 F. Supp. 2d 345, 359 (D.N.H. 2006) ("Defendants' reference to a wide range of economic and other factors that may have caused or contributed to the decline in price of StockerYale shares raises issues that will be addressed at later stages of this litigation, but those possibilities do not warrant dismissal . . . ."); *see also In re 2007 Novastar Fin., Inc. Sec. Litig.*, No. 07-0139-CV-W-ODS, 2008 WL 2354367, at *1 (W.D. Mo. June 4, 2008) ("[J]ust as the Court could take judicial notice of the fact that the country suffered from the Great Depression in the 1930s, the Court cannot use that fact to infer anything in particular about a business operating at the time.").

the recent economic downturn.[37]

### B.  Appraisal Standards

The fundamental basis upon which the Certificates are valued is the ability of borrowers to repay the Mortgage Loans and the adequacy of the collateral for those loans in case of default. ¶¶ 35-36.  Accordingly, accurate appraisals of the collateralized real estate, and the calculated LTV ratios and averages based on those appraisals, were essential to assessment of the price and risk of the offered Certificates.  ¶¶ 36-37, 41.[38]

The "statements in the Offering Documents regarding the appraisals for the collateral underlying the Certificates contained untrue statements and omissions because appraisers and originators industry-wide systematically failed to follow accepted appraisal guidelines, resulting in pervasive appraisal inflation." ¶ 167.  Defendants misrepresented the standards and process by which the properties securing the Mortgage Loans were measured, such as conforming to USPAP standards.[39]  Moreover, as a result of the departure from the disclosed appraisal methods,

---

[37]  *See, e.g.*, *Freudenberg*, 2010 WL 1904314, at *1, *19 (rejecting defendants' argument that "the losses incurred were the result of a 'worldwide economic catastrophe'"); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493 (S.D.N.Y. 2009) (rejecting defendants' argument that the decline in stock price was due to intervening cause of market collapse as result of subprime mortgage crisis); *Countrywide Derivative*, 554 F. Supp. 2d at 1065 (rejecting defendants' argument that Countrywide's downfall was due to a general "economic downturn," and explaining that, "[i]ndependent of any turmoil in the capital markets, the widespread violations of underwriting standards, as alleged, would significantly raise the risk of loan default."); *see also In re Ambac Fin. Group, Inc. Sec. Litig.*, No. 08 Civ. 411 (NRB), 2010 WL 727227, at *21-22 (S.D.N.Y. Feb. 22, 2010) (refusing to accept defendants' argument that "Ambac's financial woes were caused by the global economic collapse," because "defendants' arguments on this issue are premised on a convenient confusion of cause and effect.  The conduct that plaintiffs allege, if true, would make Ambac an active participant in the collapse of their own business, and of the financial markets in general, rather than merely a passive victim.").

[38]  The Offering Documents included comprehensive and detailed data on LTV ratios, which—if accurate—would have aided investors in properly assessing the extent of the protections afforded against such known risks.  ¶ 180. For example, according to one Prospectus Supplement, the "weighted average [LTV] Ratio at origination of the Mortgage Loans [was] approximately 73.55%, and no Mortgage Loan had a [LTV] Ratio at origination exceeding 100.00%" (indicating that the borrower had positive equity in the home and was less likely to default).  JPALT 2006-A4 Suppl. at S-18.  (Harrod Decl. Ex. C).

[39]  "The generally accepted standard of appraisal practice in the United States is the Uniform Standards of Professional Appraisal Practice, as adopted by the Appraisal Standards Board of the Appraisal Foundation ("USPAP")."  ¶ 163.

the LTV ratios in the Offering Documents were artificially low, making it appear that the Mortgage Loans, and thus the Certificates, were safer than they were.  ¶¶ 167-82.

Here, the Originators pressured the appraisers to appraise properties at artificially high prices in order to allow more loans to close, in clear contrast to the standards disclosed in the Offering Documents.  For example, according to a senior loan processor and junior underwriter at Chase Home Finance between December 2002 and October 2007, underwriters at Chase received bonuses based solely on their loan production/approval rate, rather than the loans' performance, and would "brow beat[]" appraisers to appraise properties at artificially high levels so more loans could be approved.  ¶¶ 168.  If appraisers did not comply, they would not be rehired.  *Id.*  eAppraiseIT, one of the appraisal companies that was responsible for a significant percentage of the appraisals on loans originated by Chase Home Finance and Washington Mutual, was accused by New York Attorney General Andrew Cuomo of bowing to pressure and "inflat[ing] [property] values," which "contributed to the growing foreclosure crisis and turmoil in the housing market."  ¶¶ 172-73.  A former regional vice president of Countrywide described how appraisers were being strongly encouraged to inflate appraisal values by as much as 6% to close loans.  ¶ 176.  Such inflated home values left borrowers immediately "upside down" on their homes, which left these loans subject to default.  *Id.*  Former senior underwriters of Ownit explained that appraisals were "absolutely" higher than actual property values, ¶ 178, and that "if you had a pulse or you could breathe, you got [approved for] a loan" with virtually no review of appraisal amounts by management, ¶ 179.

In addition, appraisals were not performed in accordance with professional appraisal practices, and some Originators did not even bother to obtain required appraisals prior to approving loans.  A staff review appraiser at Chase Home Finance between 2006 and 2008

described how the system in place was "a totally unorthodox method of so-called appraisal review" where "there was no way that what we were doing—and what they pressured us to do—was conforming to USPAP" and appraisers were "pushed and pushed" by management to complete their review without drafting legally required appraisal reports. ¶ 175. A senior loan processor at Chase Home Finance from between late 2002 and late 2005 stated that some "no documentation" loans—where the income, assets and employment of the borrowers was not documented and the underwriting for such Mortgage Loans was purportedly "based primarily or entirely" on other factors including having "additional due diligence performed on the collateral," ¶ 173—were approved "without [any] appraisal" of the underlying property. ¶ 174.

The Chair of the Appraisal Institute before the Senate Committee on Banking corroborated these facts, stating that appraisers "experience[d] systematic problems of coercion" and were "ordered to doctor their [appraisal] reports." ¶ 169. A survey of a appraisers found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to make mortgage deals go through or they would suffer "negative ramifications" such as loss of business, also corroborates these facts. ¶ 170.

The court in *Wells Fargo MBS* considered similar allegations and factual support and determined that the complaint sufficiently alleged untrue statements regarding loan appraisals and loan-to-value ratios. According to the *Wells Fargo MBS* court:

> Plaintiffs again support their allegations [that appraisal values and LTV ratios of the underlying mortgaged properties were inaccurate] primarily with statements from confidential witnesses. *Id.* ¶ 103 ("CW 2 confirmed that, at Wells Fargo Home Mortgage, representatives constantly pushed the appraisers they worked with to inflate the value of the real estate underlying the mortgage loans"); ¶ 107 ("CW 1 remarked that 'appraisals were very inflated,' and observed that the retail officers 'always managed to get the value they wanted'"); ¶ 108 (CW 7, a former Senior Underwriter with Wells Fargo Home Mortgage, "estimated that 70% of the loans CW7 worked with had an LTV over 95"). Plaintiffs additionally cite to a 2007 survey which "found that 90% of appraisers reported that mortgage brokers

and others pressured them to raise property valuations to enable deals to go through," and to congressional testimony in which Alan Hummel, Chair of the Appraisal Institute, stated that loan appraisers had "experience[d] systemic problems of coercion." *Id.* ¶ 104-05. **Plaintiffs' allegations concerning the allegedly improper appraisal practices are sufficiently specific to state a claim with respect to the securities at issue in this case. In particular, plaintiffs have alleged that Wells Fargo's practices permitted the pervasive and systematic use of inflated appraisals, affecting all types of mortgages. Plaintiff need not allege anything further in order to state a claim.**

2010 WL 1661534, at *12.[40]

Defendants' yet again contend that the Complaint's appraisal allegations are not sufficiently connected to the Mortgage Loans. JPM Br. at 29-30. As with Plaintiff's underwriting allegations, at the motion to dismiss stage in a non-fraud case, the combination of allegations concerning poor performance of the Mortgage Loans, credit rating downgrades and accounts from CWs and public materials, are more than adequate to state a claim. *See* pp. 25-27, *supra.*

Defendants also contend that Plaintiff's appraisal allegations are subject to dismissal as subjective statements of opinion, which require allegations that the appraiser subjectively believed that the appraised home value was wrong. JPM Br. at 30 (citing *Tsereteli MBS*). This argument both is legally insufficient and relies upon a mischaracterization of the Complaint's allegations. Plaintiff identifies statements in the Offering Documents indicating that the Originators relied on specific methods and standards in determining appraisal values and in reporting LTV ratios. *See* ¶¶ 163-166. The Complaint alleges, based on CW accounts and public reports, pervasive abandonment of these disclosed standards. Such allegations do not allege that the individual appraisals were subjectively false, but rather that the standards

---

[40] Defendants cite to other MBS cases that were decided prior to *Wells Fargo MBS*.

disclosed in the Offering Documents were not followed and other, less reliable, methods were used.

Even if Plaintiff was challenging each individual appraisal—and it is not—Sections 11 and 12 do not require Plaintiff to plead scienter. *Rombach*, 355 F.3d at 169 n.4; *see In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 203-05 (E.D.N.Y. 2009) ("[T]he defendant's knowledge of the misrepresentations is not an element of a [Securities Act] claim; indeed, a defendant can be held liable even for an innocent misstatement."); *see also Wells Fargo MBS*, 2010 WL 1661534, at *12 (holding that pleading appraisal misstatements does not require plaintiffs to plead subjective belief.  "[P]laintiffs have alleged that Wells Fargo's practices permitted the pervasive and systematic use of inflated appraisals, affecting all types of mortgages.  Plaintiff need not allege anything further in order to state a claim.").

The Complaint alleges that the Offering Documents' statements regarding appraisals and LTV ratios were untrue primarily based on statements from confidential witnesses, ¶¶ 168-79, the testimony of Alan Hummel, the Chair of the Appraisal Institute, ¶ 169, and the 2007 survey of appraisers, ¶ 170.  Thus, as in *Wells Fargo MBS*, the Complaint's allegations are more than plausible and sufficient to state a claim.  *Compare Wells Fargo MBS*, 2010 WL 1661534, at *12 (untrue appraisal and LTV ratio allegations "sufficiently specific to state a claim" when supported "primarily with statements from confidential witnesses," testimony of Alan Hummel and the 2007 survey of appraisers) with *Tsereteli MBS*, 2010 WL 816623, at *4 (appraisal allegations "insufficient to state a claim" when "the only fact alleged in support of the allegation[s]" is a government report).

## C.   Ratings

The credit ratings discussed in the Offering Documents constitute an affirmative representation of the purported character and investment risk of the Certificates at the time of

issuance.  In similar contexts, credit ratings have been held to be actionable misstatements.  *See*

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 175 (S.D.N.Y.

2009) (finding high ratings and the information they conveyed to be actionable misstatements).

In addition, the Offering Documents omitted facts necessary to make statements

regarding the ratings not misleading.  For a complete discussion of the factual allegations related

to the ratings and the ratings process, including conflicts of interest, *see* RA Opp. at pp. 3-8, 23.

The court in *Wells Fargo MBS* considered similar allegations and factual support and

determined that the complaint sufficiently alleged untrue statements regarding the Certificates'

credit ratings.  According to the *Wells Fargo MBS* court:

> Plaintiffs allege that the "AAA" ratings assigned to the Certificates were "unjustifiably high and did not represent the true risk of the Certificates" because they were "based on insufficient information and faulty assumptions concerning how many underlying mortgages were likely to default."
>
> In support of their allegation that the Offering Documents' statements regarding the rating process constitute actionable misstatements, plaintiffs point to certain external evidence, including an SEC Summary Report stating that rating agencies had failed to disclose relevant rating criteria, implement written procedures for rating mortgage-backed securities, document specific steps in the rating process, implement procedures for identifying errors in ratings or assessing compliance with rating standards, or document rating agency decisions.  Plaintiffs also quote statements by executives of defendants Moody's and Standard & Poor's in which the executives admitted that they were aware at the time the subject ratings were made that the agencies' rating models were outdated.  . . . **In the Court's view, these allegations, particularly the statements from Moody's and S & P's executives, are sufficient to establish an actionable misstatement with respect to the rating process**.

2010 WL 1661534, at *12.[41]

Defendants assert that because the Offering Documents warned investors that the ratings

on the Certificates could be downgraded **in the future** if certain economic conditions occurred in

the residential real estate market, this sufficiently warned Plaintiff of the above-discussed ratings

---

[41]  Defendants cite to other MBS cases that were decided prior to *Wells Fargo MBS*.

problems.  JPM Br. at 33.  Defendants are wrong.  Although the fact that future downgrades might occur was disclosed in the Offering Documents, the Offering Documents **did not disclose** to investors that the Rating Agencies' rating methodologies and models were outdated and inaccurate **at the time the Certificates were issued and well prior to any potential future downgrades**.  *See Rombach*, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has [already] transpired."); Section III.A.4.iii., *supra*.[42]

Defendants also attempt to exempt themselves from liability by arguing that they did not have "any involvement in determining the ratings."  JPM Br. at 34 n.34.  However, Section 11 was "designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in the registered offering."  *In re WorldCom*, *Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 656 (S.D.N.Y. 2004).  Defendants, as the signors of the Offering Documents, depositor, and underwriter are strictly liable for the untrue statements and omissions in the Offering Documents.

Moreover, and contrary to Defendants' reading of the Complaint, it explicitly states that the Rating Agencies are not being sued here as "experts" under the Securities Act.  ¶¶ 22-23, 25; *see* JPM Br. at 34 n.34.  Thus, Defendants' attempt to squeeze in an affirmative defense of "reliance" under Section 11(b)(3)(c) of the Securities Act, which applies to reliance on "expert opinions" in registration statements, is moot.  *See also Twinlab*, 103 F. Supp. 2d at 203-05 ("the

---

[42]  Defendants summarily argue, as they did with respect to Plaintiff's appraisal allegations, that the ratings are matters of opinion and only actionable pursuant to a subjective falsity standard.  As described *supra*, this argument relies on a recasting of the Complaint's allegations.  The Complaint does not contend that the ratings themselves were false, but rather that the Offering Documents omitted to disclose that the methodologies and models used to derive the ratings and determine the "extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates," ¶ 50, were inaccurate, outdated and subject to conflicts of interest.  ¶¶ 7, 186-208.  These allegations do not challenge the "opinion" of the ratings themselves.  *See* RA Opp. at p. 23, incorporated by reference here, addressing the Rating Agencies' subjective disbelief of their ratings.

defendant's knowledge of the misrepresentations is not an element of a [Securities Act] claim; indeed, a defendant can be held liable even for an innocent misstatement. . . . . Lack of knowledge of misleading statements in a prospectus is an affirmative defense . . . for which the defendant bears the burden of proof.").[43]

## IV.   ECONOMIC LOSS

Defendants contend that the Consolidated Amended Complaint should be dismissed because it fails to plead a cognizable loss.   JPM Br. at 42-46.   However, the Complaint establishes that the Class has suffered a massive loss based on the decline in value of the Certificates.

While Defendants claim that Plaintiff, and the Class, can only prevail if they did not receive their pass-through payments (presumably meaning principal or interest), the Securities Act expressly provides for a different type of damages and states precisely how to calculate such damages.

Section 11(e) explains that "[t]he suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall

---

[43]   The Offering Documents also contained false and misleading statements regarding the amount of credit enhancement provided for the Certificates, including excess spread and overcollateralization.   ¶¶ 183-185. According to the Offering Documents, the amount of credit enhancement was directly dependent on accurate credit ratings, which addressed "the adequacy of the value of the trust fund assets and **any credit enhancement with respect to that class**."   ¶ 50.   This statement is untrue and misleading because the methodologies and models used to rate the Certificates were outdated and inaccurate and did not accurately reflect the expected performance of the Certificates.   *See* RA Opp. at pp. 5-8, 18-21.   In addition, the Offering Documents stated that the credit enhancement features are "intended to enhance the likelihood that holders of the senior and mezzanine certificates will receive regular payments of interest and principal."   ¶ 184.   The likelihood of repayment to Certificateholders was a function of the ability of the borrower to repay the loan and the adequacy of the mortgage loan collateral to support the loan amount, as determined by careful loan underwriting and accurate appraisals.   *See* ¶ 62.   However, the Mortgage Loans were originated pursuant to improper underwriting practices and inflated appraisals.   Thus, this assessment was incorrect and the corresponding amount of credit enhancement provided was inadequate.

have been disposed of in the market before suit…." 15 U.S.C. §77k(e).  Similarly, Section

12(a)(2) entitles a buyer who has shown a violation of the provision "to recover the consideration

paid for such security with interest thereon, less the amount of any income received thereon,

upon the tender of such security, or for damages if he no longer owns the security."  15 U.S.C.

§77l(a)(2).  *See also Commercial Union Assurance Co. v. Milken*, 17 F.3d 608, 615 (2d Cir.

1994); *Randall v. Loftsgaarden*, 478 U.S. at 655 ("§12[(a)](2) prescribes the remedy of

rescission except where the plaintiff no longer owns the security.").[44]

    The Complaint resolutely establishes that the Certificates have lost value.  "The

Certificates are no longer marketable near the prices paid by Lead Plaintiff and the Class."  ¶ 9.

"Fundamentally, the value for pass-through certificates depends on the ability of borrowers to

repay the principal and interest on the underlying loans and the adequacy of the collateral in the

event of default.  In this regard, rating agencies played an important role in the sale of such

securities to investors."  ¶ 48.  As the Appendix to the Complaint shows in exhaustive detail, the

Certificates have experienced a universal decline in their ratings.  As a result, "Mississippi PERS

purchased Certificates from J.P. Morgan Alternative Loan Trust 2006-A4 Trust at a price of

$1.003 that it later sold at a price of $0.400.  Additionally, MissPERS purchased Certificates

---

[44]   Moreover, Congress not only explained what types of damages are recoverable, it also explained what a
defendant must do to satisfy its affirmative defense of a lack of causation and damages.  *See* 15 U.S.C. §77k(e) ("if
the defendant proves that any portion or all of such damages represents other than the depreciation in value of such
security . . . . such portion of or all such damages shall not be recoverable."); *Adair v. Bristol Tech. Sys.*, 179 F.R.D.
126, 135 (S.D.N.Y. 2008) (by demonstrating negative causation, a defendant shows that some event other than the
material misstatement at issue caused plaintiff's damages).  Similarly, the PSLRA added an affirmative defense for
Section 12 claims modeled after Section 11.  *See* 15 U.S.C. §77l(b) (recovery is prohibited if "the person who
offered or sold such security proves that any portion or all of the amount recoverable…represents other than the
depreciation in value of the subject security resulting from such part of the prospectus or oral communication, with
respect to which the liability of that person is asserted….); *Goldkrantz v. Griffin*, 97 Civ. 9075, 1999 WL 191540, at
*6 (S.D.N.Y. Apr. 5, 1999), *aff'd*, 201 F.3d 431 (2d Cir. 1999).

from J.P. Morgan Mortgage Trust 2007-A1 Trust at a price of $0.982 that it later sold at a price

of $0.810." ¶ 14.[45]

Defendants claim that the Certificates are somehow different from any other securities

because the holders receive a stream of payments, and thus by implication there would never be

a loss under Sections 11 and 12 unless there is a payment default, relying on *AIG Global Sec.*

*Lending Corp. v. Banc of Am. Sec. LLC*, 646 F. Supp. 2d 385 (S.D.N.Y. 2009). As Judge Crotty

recently discussed in *DLJ Mortgage MBS*:

> *AIG Global* is not on point. *AIG Global* does not hold that investors in mortgage-
> backed securities do not allege a cognizable injury when they allege a loss arising
> from a decrease in market value. Plaintiffs were investors in asset-backed
> securities, fixed-income instruments serviced by cash-flows from consumers
> making installment contract payments. They claimed, under Section 10 of the
> Securities Exchange Act of 1934, that the issuing trust had insufficient funds to
> repay them. The AIG Global investors purchased securities with the expectation
> that they would receive an income stream for the life of the securitization and
> brought a cause of action when the issuing trust failed to contractually deliver. In
> discussing the adequacy of plaintiffs' loss causation proof on a motion for a new
> trial under Fed. R. Civ. P. 59, the *AIG Global* Court noted that there is a legal
> presumption applicable in typical securities cases that shares are purchased for the
> purpose of investment and that their true value to the investor is the price at which
> they may later be sold. The Court explained, however, that this presumption was
> inapplicable to the asset-backed securities at issue because the investors did not
> allege a loss from selling the securities at a reduced price. Here, by contrast,
> Plaintiff does allege a drop in market value—not a failure to realize cash-flow
> from payments on the underlying mortgage loans.

2010 WL 1473288, at *5.[46]

---

[45]   Defendants rely on a series of cases that dismissed actions for failure to plead an economic loss under Sections
11 and 12, but these are all inapplicable. In *In re Broderbund/Learning Company Securities Litigation*, it was clear
that plaintiff did not suffer a loss when he acquired "stock at $17.6875 per share and disposed of it at $33.45 per
share." 294 F.3d 1201, 1205 (9th Cir. 2002). Similarly, in *In re AOL Time Warner, Inc. Securities and ERISA
Litigation*, the value of the bonds purchased by plaintiffs actually increased in value by the time the suit was filed
against the underwriter defendants. 381 F. Supp. 2d 192, 245-47 (S.D.N.Y. 2004). Finally, in *In re Merrill Lynch &
Co., Research Reports Securities Litigation*, the plaintiff's complaint alleged that the value of her securities declined
prior to the disclosure of non-disclosed information. 272 F. Supp. 2d 243, 254 (S.D.N.Y. 2003).

[46] Defendants also rely on *Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576 (E.D. Pa.
2009), where a motion to dismiss was granted because the plaintiff failed to establish economic loss on their
purchase of mortgage-backed securities. However, while the plaintiffs raised arguments in their brief that they had
suffered a loss, the complaint itself did not allege that the increased default rate on the underlying loans caused

Defendants claim that the Offering Documents "warned" that the Certificates may be illiquid.  JPM Br. at 44.  Defendants are essentially claiming that *every* seller of *every* security can avoid Section 11 and 12 liability if they "warn" investors that they may not be able to sell their securities for a profit.  Such a result is clearly untenable and would render Sections 11 and 12 meaningless.

Further, the Appendix to the Complaint details the skyrocketing Default Rates for the Trusts in the few short months since they were issued.  Defendants now suggest, by cherry-picking the four of the most-successful Trusts, that the Mortgage Loans have Delinquency Rates "less than 17%, and as low as 5.2%."  JPM Br. at 45.  Defendants assert that this establishes that the performance of the Mortgage Loans has not withered and that there is nothing to worry about.  This is rather odd, since, in issuing the Prospectus Supplements, the Defendants thought it was material to provide 30-59 day delinquency rates calculated to the one-hundredths of a percent, and usually these were significantly below 1%.  *See, e.g.*, JPALT 2006-A4 Supplement at S-19 (Harrod Decl. Ex. C).  The Prospectus Supplements also warned that the "the numerical data and certain other characteristics of the Mortgage Loans described herein may vary within a range of plus or minus 5%."  *See, e.g.*, *Id.* at S-15.  Instead of simply relying on the four least-successful Trusts—which have Delinquency Rates of 57.1% (J.P. Morgan Acquisition Trust 2006-WMC3), 57.9% (J.P. Morgan Acquisition Trust 2006-RM1), 58.2% (J.P. Morgan Acquisition Trust 2006-WMC2) and 58.4% (J.P. Morgan Acquisition Trust 2006-WMC4)—the Appendix to the Complaint shows that the Trusts have obliterated this acceptable range of variance across the board.

---

plaintiffs to incur an economic loss.  *Id.* at 590-91.  Furthermore, plaintiffs in that action alleged that the defendants understated the availability of pre-payment fees on mortgage loans, which were the basis of the revenue streams in several of the certificates that they purchased.  Even assuming a total default on the underlying loans, "it would be irrelevant that Defendants misrepresented the prepayment penalties on these loans since a failure to repay the loan 'is the exact opposite of an early payment of the loan.'"  *Id.* at 591 n.8.

Finally, at best, Defendants' theory that the Class could never suffer damages arising from the diminution of value in the Certificates raises questions of fact that cannot be resolved at the motion to dismiss stage. *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 351 n.80 (S.D.N.Y. 2003) ("The determination of value [in a Section 11 case] is a fact-intensive inquiry."). Indeed, the issues regarding the value of the securities and the existence of a secondary market are questions of fact that will likely require expert analysis and testimony. *In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 702 (E.D. Mo. 2002) (securities trials generally involve "a veritable battle of the experts on the penultimate issues of causation and damages"); *Broderbund/Learning Co. Sec. Litig.*, 294 F.3d at 1204 (holding a market exists in any "sphere within which price-making forces operate").

## V.   RECOVERY NOT LIMITED BY "CURE" PROVISIONS

Defendants contend that they should be relieved of liability because the Offering Documents purportedly describe a process by which bad loans could be "cured" or replaced at the request of the investor. *See* JPM Br. at 39-40. But this "cure" procedure does not apply here, as liability exists under Sections 11 and 12(a)(2) for a misstatement in the Offering Documents irrespective of any other remedial relief. *See* 15 U.S.C. §77k. These provisions may not be waived, and language to the contrary in any offering document is void *ab initio*. 15 U.S.C. §77n ("Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this title . . . or of the rules and regulations of the Commission shall be void."); *see Doody v. E.F. Hutton & Co.*, 587 F. Supp. 829, 833 (D. Minn. 1984) ("'Since the securities laws are a remedial measure intended to encourage the prosecution of securities fraud actions, the Court refuses to enforce this indemnity provision."). Significantly, "[t]he statutory framework of the 1933 and 1934 Acts compels the conclusion that individual securityholders may not be forced to forego their rights under the federal securities laws due to a

contract provision." *McMahan & Co. v. Wherehouse Entm't*, 65 F.3d 1044, 1050-51 (2d Cir. 1995) (holding that claims under the federal securities laws cannot be precluded by a "no-action clause" in an indenture).

Despite Defendants' contentions, *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383 (5th Cir. 2010) does not change this analysis. First, the provisions in the Offering Documents cited by Defendants do not say that the misstatements of the type alleged by the Class can only be remedied by requiring the Originators to repurchase the loans. For example, the "Representations by Sellers or Originators; Repurchases" section of the April 24, 2006 Prospectus (excerpts attached as Exhibit J to the Spenner Declaration) discusses the various representations and warranties made by the Seller or Originator regarding the Loans that support the Trusts. These representations essentially focus on delivering mortgages with clear title, such as: that the property was covered by title insurance; that the seller had the title free and clear; that the mortgage was a perfected interest in the asset; there is no fire, water, or earthquake damage to the property; and that the mortgages were made in compliance with all laws and regulations. Spenner Declaration, Ex. J at 30-31. If the loans do not meet these representations, they must be replaced. However, they do not warrant that the Originators have not deviated from their own underwriting standards or conducted inappropriate appraisals, as the Consolidated Amended Complaint alleges. These clauses in no way "change the nature of [Defendants'] representation[s]." *Lone Star*, 594 F.3d at 390.

Further, Defendants' assertion that the Originators' representations clauses are "a key component of the deal structure" intended to limit the Certificateholders' remedies against the Defendants is simply preposterous. JPM Br. 40. As the *Lone Star* court noted, "complex contractual documents [] must be read in their entirety to be given effect." *Lone Star*, 594 F.3d

at 388.  The entire two-page discussion on representations and repurchases in the April 24, 2006 Prospectus only has a short reference to the rights of the Certificateholders:  "This repurchase or substitution obligation will constitute the sole remedy available to holders of securities or the trustee for a breach of representation by a seller or originator."  Spenner Decl., Ex. J at 32.  It isn't the responsibility of the Certificateholder to enforce this provision, but rather the Trustee must "promptly notify the relevant seller or originator of any breach of any representation or warranty made by it in respect of a loan which materially and adversely affects the interests of the securityholders in the loan."  *Id.* at 31.  The Prospectuses never even suggest that the Certificateholders would have sufficient information to evaluate which specific loans should be repurchased or replaced.  Restricting the Certificateholders' remedies for any misrepresentations in the Offering Documents to this so-called "sole remedy" also doesn't make sense considering the variety of warnings the Offering Documents contained—to the point that purchasers were advised of the effect of the Iraq War on mortgages held by reservists in the National Guard.  *See, e.g.*, JPALT 2006-A4 Suppl. at 12.  Under Defendants' proposition, simply stating "if it breaks, we'll swap it" would have sufficed.

Defendants' reliance on *Lone Star* should not prevent Plaintiff from recovering for the misstatements and omissions contained in the Offering Documents, as it is clear that the repurchase provisions were not intended to bar recovery.[47]

## VI.   STATUTE OF LIMITATIONS

Section 13 of the Securities Act provides, in part, that "[n]o action shall be maintained to enforce any liability created under [Section 11] of this title unless brought within one year after

---

[47] Notably, the *Lone Star* decisions in the Fifth Circuit or the Northern District of Texas have been ignored by the many courts that have considered similar mortgage pass-through certificates claims, despite the similar arguments raised by defendants.  *See, e.g., Citigroup MBS*, 2010 WL 1371417; *Deutsche Bank MBS*, 2010 WL 1370962; *DLJ Mortgage MBS*, 2010 WL 1473288; *Tsereteli MBS*, 2010 WL 816623.

the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.  "[T]he statute of limitations is an affirmative defense on which the defendant has the burden of proof.  . . . .  The defendant's normal burden includes showing when the cause of action accrued."  *Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 233 (N.D.N.Y. 2009) (internal citations and quotations omitted); *see also Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 427 (2d Cir. 2008) (time bar is an affirmative defense under federal law and a complaint is dismissible on statute of limitations grounds only if the defect appears on the face of the complaint).  The Second Circuit has set forth a particularly stringent standard.  "Inquiry notice exists only when **uncontroverted** evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct."  *Newman v. Warnaco Group, Inc*., 335 F.3d 187, 194-95 (2d Cir. 2003).  Moreover, a plaintiff is on inquiry notice only when "circumstances would suggest to an **investor of ordinary intelligence** the probability" that he or she has a claim.  *Staehr*, 547 F.3d at 411.

In *Merck & Co., Inc. v. Reynolds*, the U.S. Supreme Court, when dealing with a similar statutory provision in the Securities Exchange Act of 1934 ("Exchange Act"), recently explained what is required to put a plaintiff on inquiry notice, holding:

> We conclude that the limitations period … begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have "discover[ed] the facts constituting the violation"—whichever comes first. In determining the time at which the "discovery" of those "facts" occurred, terms such as "inquiry notice" and "storm warning" may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating. **But the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered "the facts constituting the violation"**. . . .

1305 S. Ct. 1784, 1798 (2010).  *See Merrill Lynch MBS*, 2010 WL 2175875, at *2.  As such, it is axiomatic that "whether a plaintiff had sufficient facts to place it on inquiry notice is 'often inappropriate for resolution on a motion to dismiss.'"  *LC Capital Partners, L.P. v. Frontier Ins.*

*Group*, 318 F.3d 148, 156 (2d Cir. 2003).   Accordingly, Defendants bear a heavy burden in establishing a timeliness defense on a motion to dismiss.[48]

In attempting to establish that Plaintiff's claims are untimely, Defendants rely upon matters outside of the Complaint and on unwarranted factual inferences and assertions that are not subject to judicial notice.  Absent a valid request for judicial notice, matters extraneous to the Complaint cannot be considered.[49]

### A. Unrelated Lawsuits and General News Articles Do Not Establish Inquiry Notice

Defendants apparently scoured the country for pending litigation, articles and transcripts relating to mortgage lending to contend that Plaintiff was on inquiry notice at some unspecified date prior to March 26, 2007, one year before the initial filing in this action.  *See* JPM Br. at 48-49; Defendants' Appendix B.   The news articles, bankruptcy filings and lawsuits do nothing more than generically report on the loosening of underwriting standards in the mortgage lending industry.  None of the general news articles, lawsuits or transcripts summarized by Defendants in their Appendix B specifically identifies the JP Morgan entities that acted as the Sponsor or the Depositor, the Certificates at issue in this litigation, or that such Certificates were anything less than AAA-rated securities.   Indeed, storm warnings must be "company-specific" and "the triggering . . . data must be such that it relates *directly* to the misrepresentations and omissions"

---

[48] *See, e.g.*, *Bano v. Union Carbide Corp.*, 361 F.3d 696, 710 (2d Cir. 2004); *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 249 (S.D.N.Y. 1993) ("defendants bear a 'heavy burden' in establishing that the plaintiff was on inquiry notice as a matter of law" as "[i]nquiry notice exists only when 'uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct'").

[49] Plaintiff objects to Defendants' submission of Appendix B (JPM Br. at 48) created by defense counsel, which purports to be a chronology of selected (by defense counsel) public reports concerning subprime mortgage matters from May 2005 through March 2007.  *See Staehr*, 547 F.3d at 424-25 (court cannot take judicial notice of an extrinsic document for the truth of the matter asserted).  Plaintiff does not object to the Court's consideration of documents that are referenced in or integral to the Complaint or that are properly the subject of judicial notice. *See id.* at 425; *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).  When a court considers extrinsic documents that are not proper for judicial notice, it must convert the motion to a motion for summary judgment and provide plaintiffs with an opportunity to conduct discovery and submit additional supporting materials.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154-55 (2d Cir. 2002).

plaintiffs allege in the complaint.[50]  In addition, many of the cited articles were published before the date of offerings in this case and, therefore, cannot as a matter of law begin the running of time for offerings after such publication.  *See Lentell,* 396 F.3d at 170 (holding that a triggering date cannot occur before the date of the offering).

Further, even the most explicit news articles reporting "bad loans" and "poor" underwriting practices at mortgage originators cannot give rise to a probable Securities Act claim absent some clear evidence that those practices specifically impacted the Certificates at issue prior to March 26, 2007.  This is especially true when all of the Certificates that the Rating Agencies initially rated "AAA" continued to have investment-grade ratings until, at the earliest, April 4, 2008.  ¶ 214.

The information and allegations in the various lawsuits and articles are insufficient to disclose the probability of Plaintiff's claims here and, therefore, cannot constitute "storm warnings."  *Staehr*, 547 F.3d at 428 ("Because nearly all of the stories in the record are devoid of company-specific information, the argument that they constitute 'storm warnings' is far from compelling"); *RBS MBS*, 2010 WL 1172694, at *9 (denying motion to dismiss on statute of limitations grounds where "[n]one of the articles are directly related to the . . . Trusts specifically at issue"); *see also Wells Fargo MBS*, 2010 WL 1661534, at *7-8 (denying motion to dismiss on statute of limitation grounds and holding that "whether this press coverage was sufficient to put a reasonable investor on notice of his claims is a factual question not appropriate for resolution on a motion to dismiss").

---

[50] *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168-71 (2d Cir. 2005) (emphasis in original); *see RBS MBS*, 2010 WL 1172694, at *9 (holding that "[a]lthough Defendants point to a number of publicly available documents generally related to the weakening and outright disregard for underwriting guidelines by subprime originators, this information alone does not 'relate directly' to the misrepresentations and omissions alleged in the Consolidated Amended Complaint").

Defendants' assertion that Plaintiff was on inquiry notice of its claims concerning J.P. Morgan Mortgage Trust 2006-A1 ("JPMMT 2006-A1") when ResMAE filed for bankruptcy fails for this same reason.  Defendants do not demonstrate that the February 2007 ResMAE bankruptcy indicated problems with the specific loans underlying the JPMMT 2006-A1 Certificates to put a plaintiff on inquiry notice.  Defendants have also provided no evidence that any reasonable investor who purchased the Certificates knew about such bankruptcy or unrelated lawsuits.  *See Staehr*, 547 F.3d at 416, 435 (noting that a lawsuit would trigger inquiry notice "only if an investor of ordinary intelligence would have been reasonably aware of the complaint").  None of the materials proffered by Defendants identify the Certificates at issue or negate the fact that the Certificates maintained investment-grade ratings until at least April 2008.

Defendants have failed to satisfy their burden that the limitations period started at some unspecified time prior to March 26, 2007.  At best, Defendants have created a factual issue not appropriate for determination on a motion to dismiss.  *See LC Capital Partners,* 318 F.3d at 156; *Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp. 2d 569, 577 (S.D.N.Y. 2001) (finding that "the issue of whether Plaintiffs were on inquiry notice, and thus whether their claims are barred by the statute of limitations, is a factual one to be resolved by the trier of fact").  Notably, in similar pending mortgage backed securities cases, courts have refused to dismiss Securities Act claims on the basis of the statute of limitations.  *See, e.g.*, *Merrill Lynch MBS*, 2010 WL 2175875, at *2; *RBS MBS*, 2010 WL 1172694, at *9; *Wells Fargo MBS,* 2010 WL 1661534, at *7-8.

## B.   The Claims As To The JPMorgan Mortgage Trust 2006-A1 Are Timely

Defendants also assert that claims relating to JPMMT 2006-A1 are time-barred because they do not relate back to the Original Complaint.  JPM Br. at 50 n. 56.  Defendants' "relation back" argument is a red herring.  As detailed *supra*, Plaintiff's claims are timely.

The Original Complaint and the Consolidated Complaint in this Action were both filed on behalf of a Class who acquired Certificates pursuant and/or traceable to Registration Statements Nos. 333-127020 and 333-130192 (compare Original Complaint ¶ 23 with Consolidated Complaint ¶ 1).  JPMMT 2006-A1 was issued pursuant to Registration No. 333-127020, and, therefore, indisputably was included in the Original Complaint.  Thus, for the same reasons articulated above, the JPMMT 2006-A1 claims are timely and a "relation back" analysis is unnecessary.

Regardless, if necessary, the JPMMT 2006-A1 claims clearly relate back to the Original Complaint.  The central inquiry under Fed. R. Civ. P. 15(c) is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general factual situation alleged in the original pleading.  *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86 (2d Cir. 1999) (holding that initial complaint provided adequate notice); *see RBS MBS*, 2010 WL 1172694, at *9 (holding that "Defendants had adequate notice of the nature of this action sufficient to relate back the added offerings in the Consolidated Amended Complaint").[51]  Here, both of the complaints filed in this Action assert claims based on

---

[51]  In *RBS MBS*, the court rejected similar arguments that the consolidated amended complaint, which added claims related to additional certificates, did not relate back to the initial pleading.  2010 WL 1172694, at *9.  The court held that the claims did relate back, explaining that:  "Where no new cause of action is alleged, relation back under Rule 15 is to be liberally granted.  The Consolidated Amended Complaint does not allege new causes of action.  Although Plaintiff included more Harborview Trusts that had Offering Documents that allegedly contained material misstatements and omissions, it shares the same core factual allegations contained in the [initial complaint] with regard to the central issues of the claim: misstatements about the underwriting guidelines, conflicts of interest with

the same facts, violations, misstatements and omissions, and make allegations against the same defendants for issuing securities pursuant to the same Registration Statements. Defendants clearly had notice of the claims related to JPMMT 2006-A1 as that offering was made pursuant to one of the Registration Statements identified in the Original Complaint.

Lastly, the statute of limitations was tolled with respect to any later-filed claims by the filing of the Original Complaint. *See American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) ("[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action"). *See also Flag Telecom I*, 352 F. Supp. 2d at 455.

In *American Pipe*, the Supreme Court held that the filing of a class action suspends the applicable statute of limitations for all putative class members, until a decision on class certification is issued. *American Pipe*, 414 U.S. at 554.[52] Accordingly, the claims in the Consolidated Complaint as to offerings issued pursuant to the **same** Registration Statements and the *same* Class set forth in the Original Complaint were tolled when the Original Complaint was timely-filed.

Moreover, whether or not the specific named plaintiff has standing to assert claims on behalf of members of the entire class is irrelevant when it comes to the application of the *American Pipe* tolling doctrine. As the court in *Flag Telecom I* explained: "[T]he failure to apply the *American Pipe* rule to cases where a class action was dismissed for lack of standing undermines the policies underlying Rule 23 and is inconsistent with the Court's reasoning in

---

the rating agencies, and outdated credit models. . . .  Defendants had adequate notice of the nature of this action sufficient to relate back the added offerings in the Consolidated Amended Complaint." *Id.*

[52] *See Cal. Pub. Employees' Ret. Sys. v. Caboto-Gruppo Intesa BCI (In re Worldcom Sec. Litig.)*, 496 F.3d 245, 256 (2d Cir. 2007) ("We hold that because Appellants were members of a class asserted in a class action complaint, their limitations period was tolled under the doctrine of *American Pipe* until such time as they ceased to be members of the asserted class").

*American Pipe*." 352 F. Supp. 2d at 455.[53]  Accordingly, as with Plaintiff's other claims, the

JPMMT 2006-A1 claims are timely.

## VII.    THE COMPLAINT'S SECTION 15 ALLEGATIONS ARE ADEQUATE

Section 15 extends liability created under Sections 11 and 12(a)(2) to "[e]very person

who, by or through stock ownership, agency, or otherwise . . . controls any person liable under

section[s] [11 or 12]."  15 U.S.C. § 77o.  "To state a claim under this provision, a plaintiff must

plead: (1) a primary violation; and (2) control over the primary violator."  *See, e.g.*, *CIT Group,*

*Inc. Sec. Litig.*, Civ. No. 08-6613, 2010 WL 2365846, at *8 (S.D.N.Y. June 10, 2010).  As set

forth fully above, the Complaint adequately alleges primary violations of both Sections 11 and

12(a)(2).   "Therefore, we must only decide whether the [Individual Defendants] were

'controlling persons' within the meaning of Section 15."  *Id.*[54]

"[S]ection 15 claims need only satisfy the minimal pleading standards of Rule 8."

*Vivendi*, 381 F. Supp. 2d at 187-88 (adding that "'naked allegations of control will typically

---

[53] *See also Newby v. Enron Corp. (In re Enron Corp. Sec. Derivative & ERISA Litig.)*, 529 F. Supp. 2d 644, 709 (S.D. Tex. 2006) (rejecting argument that doctrine of relation back cannot save Securities Act claims of a newly added plaintiff by acknowledging that class actions are tolled under American Pipe); *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, No. 00-4285 (GEB), 2002 WL 33934282, at *27 (D.N.J. June 26, 2002) (finding that limitations period was tolled upon filing of original class action complaint which allowed proper class representatives to be substituted for standing purposes to assert additional claims in amended complaint).

[54] In addition to alleging a "primary violation" and "control," Defendants urge this Court to require Plaintiff to allege Defendants' "culpable participation" in order to satisfy Section 15.  JPM Br. at 52.   While "culpable participation" is an element of control person liability required under Section 20(a) of the Exchange Act, courts in this Circuit have been careful to distinguish between Section 20(a) claims, which require such allegations, and Section 15 claims, which do not.  *See, e.g.*, *In re Global Crossing, Ltd., Sec. Litig.*, 322 F. Supp. 2d 319, 349 (S.D.N.Y. 2004) (noting that although both §§ 15 and 20(a) require plaintiffs to allege a "primary violation" and "control," "Section 20(a) contains the **additional requirement** that plaintiff allege culpable participation 'in some meaningful sense' by the controlling person in the fraud"); *see also CIT Group*, 2010 WL 2365846, at *5, *8 (requiring plaintiff to allege defendants' "culpable participation" as an element of his §20(a) claim, but not as an element of his §15 claim).  While some courts have included "culpable participation" as an element under both §§ 20(a) and 15, the majority of courts have not.  *See Residential Capital MBS*, 2010 WL 1257528, at *7 (requiring plaintiffs to only plead a "primary violation" and "control" to establish a §15 claim); *RBS MBS*, 2010 WL 1172694 at *15 (same); *Wells Fargo MBS*, 2010 WL 1661534, at *13 (same); *see also Lehman Brothers MBS*, 684 F. Supp. 2d at 495 (not mentioning any "culpable participation" requirement when sustaining § 15 claims against the individual defendants who signed the offering documents); *but see Merrill Lynch MBS*, 2010 WL 2175875, at *8 (allowing plaintiff to replead § 15 allegations against individual defendants to allege "meaningful culpable conduct").

suffice' to plead an adequate § 15 claim to withstand a motion to dismiss").  "Control of a primary violator at the time of an offering is sufficiently pled where a plaintiff alleges (1) that the defendant is an officer or director of the company in question and (2) that the defendant signed a registration statement containing materially false or misleading statements." *CIT Group*, 2010 WL 2365846, at *8.  Here, Plaintiff has "adequately pled that all [Individual] Defendants were officers [or directors] of [Defendant JPMorgan Acceptance] and signed the [operative] registration statement[s] . . . .  Therefore, [Plaintiff] has stated a claim for Section 15 liability as against the [Individual] Defendants." *Id.*; *see* ¶¶ 17-20.  *See, e.g., Lehman Brothers MBS*, 684 F. Supp. 2d at 495 (allegations "that the Individual Defendants were officers or directors of [the depositor] during the relevant time period and signed the relevant registration statements that [the depositor] filed" were "sufficient[] [to] allege[] that the individual Defendants were control persons" under § 15); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 638 (S.D.N.Y. 2007) (finding that defendant's "signature on an SEC filing containing the misrepresentations that are the subject of a claim is suggestive of control"); *Flag Telecom I*, 352 F. Supp. 2d 429 (concluding that officers or directors who signed registration statement controlled company at time of company's IPO); *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2004) (holding that directors who also signed registration statement controlled those who wrote the report).

Furthermore, the Complaint alleges that each Individual Defendant, "by virtue of his [or] her  . . . control, ownership, offices, directorship, and specific acts" had "the power to influence, and exercised that power and influence, to cause the Depositor to engage in violations of the Securities Act."  ¶ 242.  *See Wells Fargo MBS*, 2010 WL 1661534, at *13 (allegations that the individual defendants "had the power and influence, and exercised that power and influence, to

cause the Depositor to engage in violations of the Securities Act," left "no dispute that plaintiffs have adequately alleged that . . . the individual defendants managed and directed the activities of . . . the Depositor which sponsored the Certificates."); *see also* 17 C.F.R. § 230.405 (defining "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise.").

Finally, the question of whether a defendant exercised sufficient "control" over a primary violator is an inherently factual question "'that will not ordinarily be resolved summarily at the pleading stage'" because the control issue "raises a number of complexities that should not be resolved on such an undeveloped record." *Bielski v. Cabletron Sys. (In re Cabletron Sys.)*, 311 F.3d 11, 41 (1st Cir. 2002) (citing 2 T.L. Hazen, *Treatise on the Law of Securities Regulation* § 12.24(1) (4th ed. 2002)); *see Global Crossing*, 322 F. Supp. 2d at 351 (noting that control person analysis is a "decidedly fact-based determination").

As demonstrated by the above, the Complaint sufficiently alleges Section 15 control person claims against the Individual Defendants.[55]

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully submits that Defendants' Motion should be denied.  In the event the Court decides to dismiss all or part of Plaintiff's allegations, Plaintiff respectfully requests leave to replead.  Fed. R. Civ. P. 15(a) sets forth a policy in favor of granting leave to amend, stating that "leave shall be freely given when justice so requires." *Jaser v. N.Y. Prop. Ins. Underwriting Ass'n*, 815 F.2d 240, 243 (2d Cir. 1987) (reversing denial of request for leave to amend pursuant to "liberal policy").  "The Supreme Court has made clear

---

[55]   The sufficiency of the Complaint's Section 15 claims against the Rating Agencies is addressed in Plaintiff's concurrently-filed opposition brief.  RA Opp. Section IV.A.

that 'this mandate is to be heeded,' and that leave to amend should be permitted in the absence of an apparent or declared reason, such as undue delay, bad faith, or undue prejudice to the opposing party." *Tokio Marine & Fire Ins. Co. v. Employers Ins. Of Wausau*, 786 F.2d 101, 103 (2d Cir. 1986) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Here, as none of these factors are present, leave to amend is appropriately granted.

Dated:  June 21, 2010

**WOLF POPPER LLP**

By:    /s/ James A. Harrod
         JAMES A. HARROD

MARIAN P. ROSNER
JAMES A. HARROD
MATTHEW INSLEY-PRUITT
845 Third Avenue, 12th Floor
New York, NY 10022
Tel:    (212) 759-4600
Fax:    (212) 486-2093
*mrosner@wolfpopper.com*
*jharrod@wolfpopper.com*
*minsley-pruitt@wolfpopper.com*

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**

By:    /s/ Timothy A. DeLange
         TIMOTHY A. DeLANGE

DAVID R. STICKNEY
TIMOTHY A. DELANGE
MATTHEW P. JUBENVILLE
12481 High Bluff Drive, Suite 300
San Diego, California 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323
*davids@blbglaw.com*
*timothyd@blbglaw.com*
*matthewj@blbglaw.com*

-and-

GERALD H. SILK
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:     (212) 554-1400
Fax:     (212) 554-1444

-and-

POND, GADOW & TYLER, P.A.
JOHN GADOW
BLAKE TYLER
502 South President Street
Jackson, MS 39201

*Counsel for Lead Plaintiff and the Class*