UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| PLUMBERS' & PIPEFITTERS' LOCAL #562 SUPPLEMENTAL PLAN & TRUST and PLUMBERS' & PIPEFITTERS' LOCAL #562 PENSION FUND, On Behalf of Themselves and All Others Similarly Situated, | : : : : : : |
|  | 08-cv-1713 (ERK) (WDW) |
| Plaintiffs, | : : ECF CASE |
| vs. | : : |
| J.P. MORGAN ACCEPTANCE CORPORATION I, *et al.*, | : : : |
| Defendants. | : : : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
THE JPMORGAN DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT**

SIDLEY AUSTIN LLP

ATTORNEYS FOR THE JPMORGAN DEFENDANTS

787 SEVENTH AVENUE
NEW YORK, NEW YORK 10019
(212) 839-5300

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT..........................................................................................................3

I. PLAINTIFF LACKS STANDING TO ASSERT ANY CLAIM AS TO 25 OF THE 33 OFFERINGS...........................................................................................3

    A. Plaintiff Cannot Circumvent Standing Requirements By Styling The Complaint As A Class Action. ..........................................................4

    B. Plaintiff Cannot Manufacture Standing Based Solely Upon Shelf Registration Statements. ......................................................................7

II. PLAINTIFF LACKS STANDING UNDER SECTION 12(A)(2) FOR 31 OF THE 33 OFFERINGS.........................................................................................10

III. PLAINTIFF'S CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFF FAILS TO PLEAD ANY COGNIZABLE ECONOMIC LOSS....................11

    A. The Complaint Fails To Plead Any Conceivable Economic Loss With Respect To JPMMT 2006-A3 And JPMMAT 2006-WMC3. ...............11

    B. The Complaint Fails To Plead Cognizable Economic Loss Because Plaintiff Received All "Pass-Through" Payments On The Certificates. ..............11

IV. PLAINTIFF'S CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS. .......13

    A. Plaintiff's Allegations Of Misstatements And Omissions Are Not Plausible............................................................................................13

        1. The CWs Describe Conduct At Only A Minority Of Originators And Are Not An Adequate Or Reliable Source Of Information. ..............15

        2. The CW Allegations Are Vague, Conclusory, And Lack Sufficient Context................................................................................17

    B. Plaintiff Fails To Allege Any Actionable Misstatements Or Omissions Relating To Appraisal Standards And LTV Ratios. ...............................20

    C. Plaintiff Fails to Allege Any Actionable Misstatements Or Omissions Relating To The Sufficiency Of Credit Enhancement..........................22

    D. Plaintiff Fails to Allege Any Actionable Misstatements Or Omissions Relating To The Ratings Assigned To The Certificates......................22

i

E.    Plaintiff Fails To Allege Any Actionable Misrepresentations Or Omissions Regarding Underwriting Guidelines..................................................24

F.    There Are No Actionable Misrepresentations Or Omissions Because Plaintiff's Sole Remedy Is The Repurchase Of Non-Complying Loans..............27

G.    Plaintiff Does Not Adequately Allege Materiality. ................................29

V.    PLAINTIFF'S CLAIMS ARE TIME BARRED.................................................31

VI.   PLAINTIFF'S SECTION 15 CLAIMS MUST BE DISMISSED. ...................35

VII.  PLAINTIFF SHOULD BE DENIED LEAVE TO AMEND. ...........................36

CONCLUSION ................................................................................................41

**TABLE OF AUTHORITIES**

**PAGE(S)**

**CASES**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
   651 F. Supp. 2d 155 (S.D.N.Y. 2009) ...............................................................6, 23

*AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*,
   646 F. Supp. 2d 385 (S.D.N.Y. 2009) ...................................................................13

*American Pipe & Constr. Co. v. Utah*,
   414 U.S. 538 (1974) ...............................................................................*passim*

*Brimo v. Corporate Express, Inc.*,
   229 F.3d 1135, 2000 WL 1506083 (2d Cir. Oct. 6, 2000) ......................................34

*Central States Se. and Sw. Areas Health & Welfare Fund v. Merck-Medco Managed
   Care*, L.L.C., 504 F.3d 229 (2d Cir. 2007)...........................................................6, 7

*City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.*,
   2010 WL 1371417 (E.D.N.Y. Apr. 6, 2010) ....................................................*passim*

*Commercial Union Assurance Co. v. Milken*,
   17 F.3d 608 (2d Cir. 1994) .................................................................................12

*DeBlasio v. Merrill Lynch & Co., Inc.*,
   2009 WL 2242605 (S.D.N.Y. July 27, 2009)......................................................36, 37

*Dodds v. Signa Sec., Inc.*,
   12 F.3d 346 (2d Cir. 1993) ..............................................................................33, 34

*Doody v. E.F. Hutton & Co.*,
   587 F. Supp. 829 (D. Minn. 1984).......................................................................28

*Eisenberg v. Gagnon*,
   766 F.2d 770 (3d Cir. 1985) ...............................................................................7

*Fadem v. Ford Motor Co.*,
   352 F. Supp. 2d 501 (S.D.N.Y. 2005) ...................................................................20

*Grasty v. Amalgamated Clothing & Textile Workers Union*,
   828 F.2d 123 (3d Cir. 1987) ...............................................................................7

*Griffin v. Singletary*,
   17 F.3d 356 (11th Cir. 1994) ..............................................................................40

iii

*Hevesi v. Citigroup, Inc.*,
  366 F.3d 70 (2d Cir. 2004) ..................................................................7

*Hicks v. Morgan Stanley & Co.*,
  2003 WL 21672085 (S.D.N.Y. July 16, 2003) ..................................7

*Hoffman v. UBS-AG*,
  591 F. Supp. 2d 522 (S.D.N.Y. 2008) ..............................................6

*Hoxworth v. Blinder, Robinson & Co.*,
  980 F.2d 912 (3d Cir. 1992) ............................................................7

*In re AllianceBernstein Mut. Fund Excessive Fee Litig.*,
  2005 WL 2677753 (S.D.N.Y. Oct. 19, 2005) ..................................6

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 402 (S.D.N.Y. 2005) ............................................34

*In re Ambac Fin. Group, Inc. Sec. Litig.*,
  693 F. Supp. 2d 241 (S.D.N.Y. 2010) ............................................25

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
  381 F. Supp. 192 (S.D.N.Y. 2004) ................................................11

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
  665 F. Supp. 2d 404 (S.D.N.Y. 2009) ............................................30

*In re Broderbund/Learning Co. Sec. Litig.*,
  294 F.3d 1201 (9th Cir. 2002) ........................................................11

*In re Citigroup Inc. Bond Litig.*,
  08 Civ. 9522 (SHS), slip op. (S.D.N.Y. July 12, 2010) ................10

*In re Colonial Ltd. P'ship Litig.*,
  854 F. Supp. 64 (D. Conn. 1994)..............................................34, 38

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) ........................................8, 9

*In re Crazy Eddie Sec. Litig.*,
  747 F. Supp. 850 (E.D.N.Y. 1990) ..............................35, 38, 39, 40

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*
  2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000) ................................7

*In re Elscint, Ltd. Sec. Litig.*,
  674 F. Supp. 374 (D. Mass. 1987)..................................................38

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
   352 F. Supp. 2d 429 (S.D.N.Y. 2005) ................................................................. 35

*In re Global Crossing, Ltd. Sec. Litig.,*
   313 F. Supp. 2d 189 (S.D.N.Y. 2003) ................................................................... 6

*In re Grand Theft Auto Video Game Consumer Litig. (No. II),*
   2006 WL 3039993 (S.D.N.Y. Oct. 25, 2006) ........................................................ 7

*In re IAC/Interactive Sec. Litig.,*
   695 F. Supp. 2d 109 (S.D.N.Y. 2010) ..................................................... 18, 19, 20

*In re IndyMac Mortgage-Backed Sec. Litig.,*
   2010 WL 2473243 (S.D.N.Y. June 21, 2010) ............................................. *passim*

*In re Lehman Bros. Sec. & ERISA Litig.,*
   684 F. Supp. 2d 485 (S.D.N.Y. 2010) ......................................................... *passim*

*In re Merrill Lynch & Co., Inc.,*
   273 F. Supp. 2d 351 (S.D.N.Y. 2003) ................................................................. 31

*In re Parmalat Sec. Litig.,*
   2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) ....................................................... 6

*In re Prudential Sec. Inc. Ltd. P'ships. Litig.*
   163 F.R.D. 200 (S.D.N.Y. 1995) .......................................................................... 6

*In re Salomon Smith Barney Mut. Fund Fees Litig.,*
   441 F. Supp. 2d 579 (S.D.N.Y. 2006) ................................................................... 6

*In re Wells Fargo Mortgage-Backed Certificates Litig.,*
   2010 WL 1661534 (N.D. Cal. Apr. 22, 2010) ............................................. *passim*

*Korwek v. Hunt,*
   827 F.2d 874 (2d Cir. 1987) ............................................................................... 39

*Kruse v. Wells Fargo Home Mort., Inc.,*
   2006 WL 1212512 (E.D.N.Y. May 3, 2006) ............................................ 34, 38, 39

*LC Capital Partners, L.P. v. Frontier Ins. Group, Inc.,*
   318 F.3d 148 (2d Cir. 2003) ............................................................................... 33

*Lewis v. Casey,*
   518 U.S. 343 (1996) ............................................................................................. 4

*Lone Star Fund V (U.S.) v. Barclays Bank PLC,*
   594 F.3d 383 (5th Cir. 2010) ................................................................. 27, 28, 29

*Mass. Bricklayers and Masons Funds v. Deutsche Alt-A Sec.,*
  2010 WL 1370962 (E.D.N.Y. Apr. 6, 2010) ...................................................28, 30

*McMahon & Co. v. Wherehouse Entm't,*
  65 F.3d 1044 (2d Cir. 1995) ........................................................................28

*Merck & Co., Inc. v. Reynolds,*
  2010 WL 1655827 (U.S. Apr. 27, 2010) ........................................................33

*Metz v. United Cntys. Bancorp,*
  61 F. Supp. 2d 364 (D.N.J. 1999)...................................................................11

*N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.,*
  2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010).................................5, 13, 21, 24

*N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC,*
  2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010)...........................................passim

*NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.,*
  08 Civ. 10783 (MGC)........................................................................9,11, 13

*New Jersey Carpenters Health Fund v. Residential Capital, LLC,*
  2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010)............................................17, 24

*O'Brien v. Nat'l Prop. Analysts Partners,*
  719 F. Supp. 222 (S.D.N.Y. 1989) ................................................................20

*Palmer v. Stassinos,*
  236 F.R.D. 460 (N.D. Cal. 2006) ..................................................................39

*Pinter v. Dahl,*
  486 U.S. 622 (1988) .....................................................................................12

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.,*
  658 F. Supp. 2d 299 (D. Mass. 2009)...................................................5, 6, 25

*Pub. Emps. Ret. Ass'n v. PriceWaterhouseCoopers, LLP,*
  305 Fed. Appx. 742 (2d Cir. 2009)................................................................37

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.,*
  2010 WL 2175875 (S.D.N.Y. June 1, 2010) ..............................................passim

*Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.,*
  638 F. Supp. 2d 120 (D. Mass. 2009).......................................................18, 19

*Republic Bank & Trust Co. v. Bear, Stearns & Co., Inc.,*
  2010 WL 1489264 (W.D. Ky. Apr. 13, 2010)..................................................25

*Siebert v. Nives,*
    871 F. Supp. 110 (D. Conn. 1994)..................................................................33

*Staehr v. Hartford Fin. Servs. Group,*
    547 F.3d 406 (2d Cir. 2008) ...................................................................31, 33

*Tsereteli v. Residential Asset Securitization Trust,*
    692 F. Supp. 2d 387 (S.D.N.Y. 2010) ................................................*passim*

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP,*
    549 F.3d 100 (2d Cir. 2008) ......................................................................4

*Westinghouse Elec. Corp. v. '21' Int'l Holdings, Inc.,*
    821 F. Supp. 212 (S.D.N.Y. 1993) .............................................................11

*Wright v. Ernst & Young LLP,*
    152 F.3d 169 (2d Cir. 1998) ....................................................................20

## STATUTES

15 U.S.C. § 77f(a)........................................................................................8

15 U.S.C. § 77l(a)(2) ....................................................................................12

## OTHER AUTHORITIES

17 C.F.R. § 229.512(a)(3) ..............................................................................8

17 C.F.R. § 230.191(b) .................................................................................8

Fed. R. Civ. P. 12(b)(1) and 12(b)(6) ..............................................................1

Fed. R. Civ. P. 15..................................................................................34, 37

Fed. R. Civ. P. 23.................................................................................4, 5, 7

Defendants J.P. Morgan Acceptance Corporation I ("JPM Acceptance") and J.P. Morgan Securities Inc. ("JPMSI") and Defendants David M. Duzyk ("Duzyk"), Louis Schioppo, Jr. ("Schioppo"), Christine E. Cole ("Cole"), and Edwin F. McMichael ("McMichael") (collectively, the "Individual Defendants" and together with JPM Acceptance and JPMSI, the "JPMorgan Defendants") respectfully submit this reply memorandum of law in further support of their motion to dismiss the Consolidated Class Action Complaint (the "Complaint") of Lead Plaintiff, the Public Employees' Retirement System of Mississippi ("Plaintiff"), pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.[1]

## PRELIMINARY STATEMENT

Plaintiff's opposition ("Opp.") offers no persuasive argument for allowing this case to proceed. Plaintiff's claims are legally deficient and must be dismissed.

*First*, Plaintiff's arguments related to standing are unavailing. It is indisputable that a plaintiff cannot establish standing to assert claims under Sections 11 and 12 of the Securities Act of 1933 (the "1933 Act") for losses in securities it never purchased. Plaintiff cannot escape constitutional and statutory standing requirements simply by labeling the Complaint a class action, or by arguing that the existence of common shelf registration statements entitles it to assert claims pertaining to all securities issued under those statements, regardless of whether Plaintiff purchased them. The recent mortgage-backed securities decisions in this Circuit, upon which Plaintiff itself relies, have uniformly rejected these arguments. Because Plaintiff did not purchase securities in 25 of the 33 Offerings, all of its claims based on those offerings must be dismissed. In addition, Plaintiff's Section 12(a)(2) claims concerning 6 of the 8 remaining Offerings must be dismissed because Plaintiff concedes that it did *not* purchase its Certificates

---

[1] Capitalized terms not defined herein shall have the meaning set forth in the JPMorgan Defendants' opening brief. Paragraph references are to the Complaint and exhibit references are to exhibits to the Declaration of Dorothy J. Spenner, which was filed on May 7, 2010.

from those Offerings *directly* from any JPMorgan Defendant.

> ***Second***, Plaintiff wholly ignores that it sold Certificates that it purchased from 2 Trusts without incurring any loss whatsoever, and indeed profiting on one of its sales.  It makes no argument against dismissing its claims based on those Offerings, effectively conceding that such claims must be dismissed.  Nor does Plaintiff dispute that it has received all payments promised to it under the Certificates and that the Offering Documents warned investors that the Certificates were illiquid investments that it might not be able to sell.  Where, as here, the absence of cognizable damages is evident from the face of the Complaint, dismissal is entirely appropriate.

> ***Third***, Plaintiff fails to plead any actionable misstatements or omissions.  Plaintiff does not plead any facts that tie alleged misrepresentations or omissions to the loans underlying the Certificates it purchased, but, rather, conclusorily asserts that industry-wide, systematic abandonment of underwriting guidelines and appraisal standards must have affected its Certificates.  However, Plaintiff fails to explain, as it must, how the vague and conclusory statements of a handful of former employees from a few Originators, which do not describe systematic practices, plausibly support that *each* of the 19 Originators identified in the Complaint "systematically disregarded" their underwriting guidelines.  Moreover, Plaintiff distorts the decisions of the courts within this Circuit that have uniformly dismissed claims no different than those here relating to appraisals, credit enhancements, and credit ratings.  Plaintiff's arguments relating to the disclosures in the Offering Documents are also misplaced, as Plaintiff ignores the fact that the Offering Documents expressly disclosed Originators' discretion in departing from underwriting guidelines, as well as that credit ratings should not be relied upon too heavily and that numerous factors could have a negative impact on certificateholders' ability to receive pass through payments.  Further, Plaintiff misconstrues Fifth Circuit case law and attempts to write the "repurchase or substitute" clauses out of the Offering Documents.  In addition, Plaintiff

wrongly contends that it has adequately alleged materiality based on nothing more than its conclusory allegations of "systematic" practices.

**Fourth**, Plaintiff absurdly contends that the plethora of public information concerning loosening underwriting standards, inflated appraisals, and the very Originators at issue was not specific enough to place it on at least inquiry notice of its claims notwithstanding that its claims are based entirely on unspecific allegations of widespread practices. Plaintiff cannot have it both ways. Plaintiff cannot simultaneously argue that unspecific allegations are sufficient to state a claim *and* that public information regarding industry deviation from underwriting guidelines is insufficient to trigger inquiry notice. Discovery of the supposedly widespread misrepresentations should have been made well more than a year before the original complaint in this action was filed on March 26, 2008, and there is no basis for tolling. Thus, Plaintiff's claims are time-barred.

**Finally**, Plaintiff's Section 15 "control person" claims against the Individual Defendants must be dismissed because Plaintiff does not adequately plead any underlying violation of the 1933 Act and, in any event, fails to adequately allege the Individual Defendants' control of JPMorgan Acceptance or culpable participation in the alleged misstatements and omissions.

Plaintiff's claims should be dismissed with prejudice. A chart summarizing the grounds for dismissal of Plaintiff's claims by offering was attached as Appendix A to the JPMorgan Defendants initial memorandum.

## ARGUMENT[2]

### I. PLAINTIFF LACKS STANDING TO ASSERT ANY CLAIM AS TO 25 OF THE 33 OFFERINGS.

Plaintiff does not dispute that it acquired or purchased securities in only 8 of the 33

---

[2] The JPMorgan Defendants incorporate by reference and adopt the arguments set forth in the Rating Agencies' reply brief that are applicable to them.

challenged Offerings.  Plaintiff attempts to circumvent its standing deficiencies, however, by

arguing that constitutional and/or statutory standing requirements are (1) automatically deferred

until class certification if the complaint is labeled as a class action; and (2) necessarily satisfied

where separate and distinct offerings are made under the same shelf registration statement.

Plaintiff's arguments are meritless and, indeed, virtually every court that has addressed standing

in the mortgage-backed securities context has dismissed claims relating to offerings in which no

named plaintiff purchased certificates.  (*See* JPM Br. at 17-18); *In re IndyMac Mortgage-Backed*

*Sec. Litig.*, 2010 WL 2473243, at *10-11 (S.D.N.Y. June 21, 2010) ("*IndyMac MBS Sec. Litig.*");

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*, 2010 WL 2175875, at *3 (S.D.N.Y.

June 1, 2010) ("*Merrill Lynch & Co.*"); *In re Wells Fargo Mortgage-Backed Certificates Litig.*,

2010 WL 1661534, at * 4 (N.D. Cal. Apr. 22, 2010) ("*Wells Fargo MBS Cert. Litig.*").

### A.    Plaintiff Cannot Circumvent Standing Requirements By Styling The Complaint As A Class Action.

Plaintiff contends that it need not meet threshold constitutional and statutory standing

requirements to pursue 1933 Act claims relating to Certificates it never purchased because Rule

23 of the Federal Rules of Civil Procedure, which permits the assertion of claims on behalf of a

plaintiff class, effectively *creates* standing where none otherwise exists.  (Opp. at 16-20.)

However, "it is black letter law that a rule of procedure cannot create standing." *Merrill Lynch*

*& Co.*, 2010 WL 2175875, at *3 (dismissing with prejudice all 1933 Act claims relating to

offerings in which named plaintiffs did not purchase securities).  Accordingly, Plaintiff's attempt

to conflate standing and Rule 23 typicality requirements must be rejected.

The law is clear that "*named* plaintiffs who represent a class must allege and show that

they personally have been injured, not that injury has been suffered by other, unidentified

members of the class to which they belong and which they purport to represent." *Lewis v. Casey*,

518 U.S. 343, 357 (1996) (emphasis added); *see W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche*

*LLP*, 549 F.3d 100, 106 n.5 (2d Cir. 2008) (same). "[T]o hold otherwise would shunt aside the inevitable risk that 'any plaintiff could sue a defendant against whom the plaintiff has no claim in a putative class action, on the theory that some member of the hypothetical class, if a class were certified, might have a claim.'" *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 304 (D. Mass. 2009) ("*Nomura*").

In fact, Plaintiff's argument was recently rejected in *Merrill Lynch & Co.*, 2010 WL 2175875, at *3, where it is also lead plaintiff. There, as here, in response to a motion to dismiss for lack of standing, Plaintiff (represented by the same counsel as in this case) argued that "because 'at least one named plaintiff . . . can assert a claim directly against each defendant,'" and "because they seek to bring a class action," plaintiffs "can bring claims on behalf of those who purchased certificates in every one of the defendants' similar . . . offerings." *Id.* at *3. In dismissing claims based on certificates that plaintiffs did not purchase, Judge Rakoff explained that "[s]tanding . . . is a threshold question – antecedent to class certification – that requires plaintiffs to have been personally injured, and plaintiffs thus have no standing to assert claims in relation to 'funds in which [plaintiffs] did not personally invest.'" *Id.* (quoting *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 532 (S.D.N.Y. 2008)).

Numerous courts in this Circuit and elsewhere have reached precisely the same conclusion. *See, e.g.*, *N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*, 2010 WL 1473288, at *3-4 (S.D.N.Y. Mar. 29, 2010) ("*DLJ Mortgage*") ("A lead plaintiff asserting Section 11 claims concerning mortgage-backed securities from an issuing trust lacks standing to sue on claims arising from trust offerings which he did not purchase. Courts should dismiss these claims even at the pre-class certification stage."); *N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*, 2010 WL 1172694, at *8 (S.D.N.Y. Mar. 26, 2010) ("*RBS Group*") ("Plaintiffs' argument that [the standing inquiry] should be held in abeyance until class

5

certification is not persuasive."); *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 490 (S.D.N.Y. 2010) ("*Lehman Bros.*") ("[Standing] can not be dispensed with by styling the complaint as a class action."); *Nomura*, 658 F. Supp. 2d at 303-04 ("[A] named plaintiff cannot acquire standing . . . by bringing a cause of action on behalf of others who would have had standing had they been named plaintiffs.") (citation omitted).[3]

Nonetheless, Plaintiff argues that these (and other) cases were wrongly decided because they failed to consider the Second Circuit's decision in *Central States Se. & Sw. Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007) ("*Central States II*"). (Opp. at 19.) Plaintiff's reliance on *Central States II*, however, is entirely misplaced. That case merely holds that so long as one *named* plaintiff has standing to assert a direct claim against each named defendant, other named plaintiffs do not have to establish standing for every named defendant. *Central States II*, 504 F.3d at 241. Here, however, as in the cases cited above, no *named* plaintiff has standing with respect to the vast majority of Offerings.

The other cases that Plaintiff cites are equally unavailing. For example, in *In re Prudential Sec. Inc. Ltd. P'ships. Litig.* 163 F.R.D. 200 (S.D.N.Y. 1995), the court approved an

---

[3] *See also Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 175 (S.D.N.Y. 2009) ("Standing is a threshold question for any case brought before a federal court, regardless of whether plaintiffs bring the case as a class action. While plaintiffs are correct that they may be deemed adequate class representatives for claims based on securities they did not purchase, one of the named plaintiffs must have purchased those securities."); *Hoffman*, 591 F. Supp. 2d at 530-32 (dismissing securities claims against funds in which no named plaintiff purchased notwithstanding that such funds were "were 'substantially identical'" to funds in which plaintiffs did purchase and that plaintiffs "alleged a single course of wrongful conduct") (citation omitted); *In re Parmalat Sec. Litig.*, 2008 WL 3895539, at *3 (S.D.N.Y. Aug. 21, 2008) (common stock holders lack standing to bring claims on behalf of debt holders "notwithstanding the allegations that the same general course of conduct allegedly engaged in by defendants caused injury to all putative class members"); *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, 2005 WL 2677753, at *9 (S.D.N.Y. Oct. 19, 2005) ("[N]amed Plaintiffs do not have standing to sue on behalf of forty-eight AllianceBernstein mutual funds in which they do not own shares."); *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 607 (S.D.N.Y. 2006) ("[T]he Article III standing determination should precede that of class certification."); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 207 (S.D.N.Y. 2003) ("[I]t is not enough that plaintiffs seek damages only for a class that has standing; at least one named plaintiff must be a member of that class – that is, a named plaintiff must have purchased shares traceable to the challenged offering.").

uncontested class settlement without ever discussing standing.[4]  Likewise, in *Grasty v. Amalgamated Clothing & Textile Workers Union*, 828 F.2d 123, 130 n.8 (3d Cir. 1987), standing was not in question because "[e]ach of the named plaintiffs . . . presented claims of injury to herself."  And in *In re Dreyfus Aggressive Growth Mut. Fund Litig.* 2000 WL 1357509, at *3 (S.D.N.Y. Sept. 20, 2000), the court addressed typicality at class certification, not standing on a motion to dismiss.[5]  In fact, Judge Baer, who issued the opinion in *Dreyfus*, subsequently explained in *RBS Group*, 2010 WL 1172694, at *7 n.8, that "[t]he decision [in *Dreyfus*], rendered on a motion for class certification, only analyzed whether Plaintiffs had 'standing to represent a class' in terms of the 'typicality' requirement for class actions in Rule 23(a) . . . [and] did not directly pass upon the issue of plaintiffs' Article III standing."  Finally, in *In re Grand Theft Auto Video Game Consumer Litig. (No. II)*, 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006) (citation omitted), the court resolved the standing inquiry in plaintiffs' favor precisely because "this is not a case where the Named Plaintiffs are attempting 'to piggy-back on the injuries of the unnamed class members.'"  By contrast, Plaintiff here does improperly attempt to "piggy-back" on the alleged injuries suffered by hypothetical class members with respect to 25 of the 33 Offerings at issue in the Complaint.  Accordingly, Plaintiff's claims with respect to the 25 Offerings in which it did not purchase certificates must be dismissed.

**B.    Plaintiff Cannot Manufacture Standing Based Solely Upon Shelf Registration Statements.**

Plaintiff also incorrectly posits that it has standing with respect to each of the 33 Offerings because "all of the Offerings were issued pursuant to two Registration Statements, and

---

[4] Plaintiff asserts that *Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82-83 (2d Cir. 2004), "approved" *Prudential*.  (Opp. at 18.)  But *Hevesi* merely cites *Prudential* for the proposition that a lead plaintiff can satisfy Rule 23's typicality requirement without having standing as to all the claims at issue.  *See Hevesi*, 366 F.3d at 82-83; *Prudential*, 163 F.R.D. at 208.  Neither *Hevesi* nor *Prudential* "approved" Plaintiff's repeatedly rejected argument that Rule 23 "creates" standing where it does not otherwise exist.

[5] Similarly, *Hicks v. Morgan Stanley & Co.*, 2003 WL 21672085 (S.D.N.Y. July 16, 2003), *Eisenberg v. Gagnon*, 766 F.2d 770 (3d Cir. 1985), and *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912 (3d Cir. 1992), all addressed typicality at the class certification stage, not plaintiffs' standing at the motion to dismiss stage.

Plaintiff bought from each." (Opp. at 21.) But Plaintiff does not have standing to assert claims based upon securities it did not purchase simply because it purchased other securities under the same shelf registration statement. A shelf registration statement for asset-backed, including mortgage-backed, securities is a dynamic document, pursuant to which there is a new issuer and a new effective date for each issuance of asset-backed securities under the shelf registration statement. *See, e.g.*, 17 C.F.R. § 229.512(a)(3) ("for the purpose of determining any liability under the [1933] Act, each . . . post-effective amendment [to a shelf registration statement, such as a prospectus supplement] shall be deemed to be *a new registration statement* relating to the securities offered therein") (emphasis added); 17 C.F.R. § 230.191(b) ("The person acting in the capacity as the depositor specified in paragraph (a) of this section is *a different "issuer"* from that same person acting as a depositor for another issuing entity [trust] or for purposes of that person's own securities.") (emphasis added); 15 U.S.C. § 77f(a) ("[a] registration statement shall be deemed effective only as to the securities specified therein as proposed to be offered"). Acknowledging the distinct nature of shelf registration statements, many courts have rejected Plaintiff's argument here. For example, in *Wells Fargo MBS Cert. Litig.*, 2010 WL 1661534, at *4, which Plaintiff otherwise relies upon extensively in support of its claims, the court held that "a named plaintiff has standing . . . only as to the documents that governed his own purchase of securities," and therefore "cannot gain standing purely as a result of the common Registration Statements." Courts in this Circuit have reached the same conclusion. *See City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.*, 2010 WL 1371417, at *8 (E.D.N.Y. Apr. 6, 2010) (holding that "standing [is not] conferred by virtue of a common registration statement"); *RBS Group*, 2010 WL 1172694, at *7; *Lehman Bros.*, 684 F. Supp. 2d at 491.

At bottom, Plaintiff's argument relies exclusively on a single case, *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1162 (C.D. Cal. 2008) ("*Countrywide*"), which

involved corporate bonds of a single issuer and allowed a named plaintiff to assert claims relating to bonds it did not purchase because those bonds were issued under a shared shelf registration statement. That case, of course, is not binding in this district, and is against the weight of authority in this Circuit and elsewhere providing that a named plaintiff must have purchased securities traceable to a challenged offering in order to state a claim under Section 11.

Moreover, *Countrywide* is distinguishable and would not apply here even if this Circuit accepted its reasoning. *Countrywide* involved only three offerings of corporate bonds by a single issuer, with common prospectuses and pricing supplements for two of the three offerings, and the court itself specifically "emphasize[d] the narrow application of [its] analysis" to circumstances where the claims rely on nearly identical alleged violations for both the purchased and non-purchased securities. As the court explained, "it is possible that later issuances could incorporate very different alleged violations and have in common only a minor common misrepresentation or omission," and that "[t]he differences could be significant enough to lead a Court to deny standing for class plaintiffs on a motion to dismiss." *Countrywide*, 588 F. Supp. 2d at 1167. Here, where Plaintiff alleges claims in connection with 33 separate Offerings issued under different prospectuses with different disclosures, which describe different mortgage-backed certificates and different pools of mortgage loans originated by different loan originators, there is no basis for reaching the same conclusion that the court reached in *Countrywide*.

Indeed, Judge Cedarbaum recently criticized and refused to follow *Countrywide* in a bench ruling dismissing 1933 Act claims based on separate shelf offerings of mortgage-backed securitizations. *See NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, 08 Civ. 10783 (MGC), Tr. at 6 (S.D.N.Y. Jan 28, 2010) (Ex. S) (stating that *Countrywide* is a heavily

9

"criticized case" that is "essentially [a] deviation from the usual rule of standing").[6]

## II.   PLAINTIFF LACKS STANDING UNDER SECTION 12(A)(2) FOR 31 OF THE 33 OFFERINGS.

Plaintiff concedes that it "must allege that it bought securities directly from a defendant to have standing under § 12(a)(2)." (Opp. at 21.)  Plaintiff thus lacks standing to assert Section 12(a)(2) claims for the 25 Offerings in which it did not purchase any Certificates, as well as for 6 of the 8 Offerings in which it did purchase Certificates.

Although Plaintiff allegedly purchased Certificates issued in 8 of the Offerings, Plaintiff concedes that it purchased Certificates *directly* from a JPMorgan Defendant in only 2 of those Offerings – JPMALT 2006-A4 and JPMMAT 2006-RM1.  (Opp. at 21.)  Thus, Plaintiff concedes that it only has standing under Section 12(a)(2) for these 2 Offerings, and Plaintiff's Section 12(a)(2) claims with respect to 31 of the 33 Offerings must be dismissed on standing grounds. *See, e.g., Merrill Lynch & Co.*, 2010 WL 2175875, at *6 (allegation that "[p]laintiffs and other Class members purchased or otherwise acquired Certificates pursuant and/or traceable to the defective Prospectus Supplements" is "insufficient to allege standing for purposes of a Section 12(a)(2) claim"); *Wells Fargo MBS Cert Litig.*, 2010 WL 1661534, at *5-6 (same).  In addition, because Plaintiff does not dispute that it fails to allege that JPM Acceptance directly sold, or successfully solicited the sale of, any Certificates to Plaintiff, the Court should also dismiss all of Plaintiff's Section 12(a)(2) claims against JPM Acceptance.  (*See* JPM Br. at 50-

---

[6] Judge Stein's decision in *In re Citigroup Inc. Bond Litig.*, 08 Civ. 9522 (SHS), slip op. at 26-28 (S.D.N.Y. July 12, 2010), is distinguishable and inapplicable here.  First, like *Countrywide*, it involved offerings of corporate bonds by a single issuer, not mortgage-backed certificates by 33 different issuers.  *Id.* at 7.  Indeed, it relied almost exclusively on the reasoning in *Countrywide*, which, as set forth above, is an outlier case from the Central District of California. Judge Stein failed to cite, much less address, the many decisions of district courts in this Circuit and elsewhere that reached the opposite conclusion.  *Id.* at 26-28; *see, e.g., City of Ann Arbor*, 2010 WL 1371417, at *8 (finding that "standing [is not] conferred by virtue of a common registration statement"); *RBS Group*, 2010 WL 1172694, at *7; *Lehman Bros.*, 684 F. Supp. at 491; *Wells Fargo MBS Cert. Litig.*, 2010 WL 1661534, at *4-5.  Finally, Judge Stein concluded that a plaintiff had standing "where the actionable part of the registration statement is alleged to be common to all purchasers from the same shelf." *In re Citigroup Inc.*, slip op. at 27.  That is not the case here, because Plaintiff alleges misstatements concerning general underwriting guidelines and particular Originators, which are contained in the prospectus supplements and are not common to all purchasers from the same shelf.

51; ¶¶ 13, 232-40; Opp. 20-21.)[7]

## III.   PLAINTIFF'S CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFF FAILS TO PLEAD ANY COGNIZABLE ECONOMIC LOSS.

### A.   The Complaint Fails To Plead Any Conceivable Economic Loss With Respect To JPMMT 2006-A3 And JPMMAT 2006-WMC3.

Plaintiff does not dispute that it suffered no economic loss in connection with JPMMT

2006-A3 and JPMMAT 2006-WMC3.  (*See* Ex. A; JPM Br. 46; Opp. at 21.)  It is black letter

law that a plaintiff cannot assert 1933 Act claims based on offerings in which it suffered no

damages.  *See In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1205 (9th Cir. 2002);

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 192, 245-47 (S.D.N.Y. 2004).

Accordingly, as Plaintiff has effectively conceded, its claims in connection with JPMMT 2006-

A3 and JPMMAT 2006-WMC3 must be dismissed.

### B.   The Complaint Fails To Plead Cognizable Economic Loss Because Plaintiff Received All "Pass-Through" Payments On The Certificates.

Like the Complaint, Plaintiff's opposition brief does not dispute that Plaintiff has

received all of the pass-through distributions owed to it on the Certificates, or that the Offering

Documents expressly disclaimed that any secondary market for the Certificates existed or would

exist in the future.  The distribution of cash flows – and not the possibility of market price

appreciation – was the sole economic benefit that plaintiff bargained for in purchasing the

Certificates.  *Cf. NECA-IBEW*, No. 08-CV-10783, Tr. at 42 (Ex. S) (stating that risk of loss "is

not itself injury" and that "the current complaint does not appear to allege facts permitting an

---

[7] Notably, Plaintiff does not dispute that its Section 12(a)(2) claims concerning the 4 Trusts as to which Plaintiff still holds Certificates (JPMMT 2006-A1; JPMMT 2006-A5; JPMMAT 2006-RM1; and JPMMAT 2006-CH2) should be dismissed because Plaintiff has not alleged that it sold or offered to tender those Certificates. (*See* JPM Br. at 51 n.57.)  Rather, Plaintiff asks for leave to replead tender if the Court finds that the Complaint does not sufficiently plead it under Section 12.  (*See* Opp. at 22 n.20.)  Plaintiff's prayer for both "compensatory and/or rescissory damages" (¶ 247) flies in the face of the tender requirement, which prevents plaintiffs from "watch[ing] the market go up or down, thereby speculating on the success or value at the total risk of the [defendants]."  *Westinghouse Elec. Corp. v. '21' Int'l Holdings, Inc.*, 821 F. Supp. 212, 220 (S.D.N.Y. 1993); *see also Metz v. United Cntys. Bancorp*, 61 F. Supp. 2d 364, 378-79 (D.N.J. 1999) (holding that equivocal demand for rescission or damages does not satisfy the tender requirement of Section 12).  Moreover, as discussed below, Plaintiff should be denied leave to amend under the circumstances here.

11

inference that the plaintiff suffered a cognizable loss"). Accordingly, diminution of cash flow, if any, is the sole measure of loss on the Certificates.

Plaintiff's argument that it has suffered economic loss because the Certificates "'are no longer marketable near the prices paid by Lead Plaintiff and the Class'" (Opp. at 48 (quoting ¶ 9)) relies primarily on the first prong of Section 11(e), which permits recovery of damages "represent[ing] the difference between the amount paid for the security . . . and . . . the value thereof" at the time of suit (id. at 47 (quoting 15 U.S.C. § 77k(e)). This argument rests on the unsupported and improper assumption that the term "value" in Section 11(e) is synonymous with "market price" in the context of mortgage-backed securities such as the Certificates.[8] To the contrary, however, and as Plaintiff itself concedes, "[f]undamentally, the value of pass-through certificates depends on the ability of borrowers to repay the principal and interest on the underlying loans." (Opp. at 48 (quoting ¶ 48).) That is because Plaintiff (and others) purchased the Certificates to receive pass-through payments of such principal and interest, not to resell the Certificates at a profit on a secondary market. Indeed, as the Offering Documents clearly warned purchasers:

> There is currently no market for any of the certificates . . . . We cannot assure you that a secondary market will develop, or if it does develop, that it will continue for the term of the certificates. Consequently, you may not be able to sell your certificates readily or at prices that will enable you to realize your desired yield. The market values of the certificates are likely to fluctuate; these fluctuations may be significant and could result in significant losses to you.

(Ex. B. at S-14; *see also* Ex. J at 1, 7; Ex. K at 7.)[9]

---

[8] Although Plaintiff also relies on Section 12(a)(2), that Section does not address "value" at all, but rather provides a plaintiff with the right of rescission where, as here, the plaintiff did not dispose of the security at a loss. 15 U.S.C. § 77l(a)(2). Rescission under Section 12(a)(2) is limited to the purchase price of the security, plus interest, minus any income received from the security and/or from the sale of the security. *Id.* ("[recovery consists of] the consideration paid for such security with interest thereon, less the amount of any income received thereon"); *see also Pinter v. Dahl*, 486 U.S. 622, 641 n.18 (1988) (citing *Randall v. Loftsgaarden*, 478 U.S. 647, 655-56 (1986)); *Commercial Union Assurance Co. v. Milken*, 17 F.3d 608, 615 (2d Cir. 1994).

[9] Plaintiff makes the overwrought and ill-considered assertion that this means "that every seller of every security can avoid Section 11 and 12 liability if they 'warn' investors' that they may not be able to sell their securities for a

12

Consequently, Plaintiff suffers actionable damages only if there is a failure to distribute pass-through payments, not if there is some alleged decline in the market or resale value of the Certificates. As the court held in *AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 646 F. Supp. 2d 385, 403 (S.D.N.Y. 2009), in the context of asset-backed securities, "plaintiffs' loss was not a decrease in market price, but a decrease in the amount of money returned to them over the course of the securitization." Plaintiff argues that *AIG Global* is irrelevant based on Judge Crotty's discussion of that case in *DLJ Mortgage*. (Opp. at 49.) However, the JPMorgan Defendants respectfully submit that the court in *DLJ Mortgage*, 2010 WL 1473288, at *5, erroneously distinguished *AIG Global* on the ground that its reasoning does not extend to mortgage-backed securities. The court in *DLJ Mortgage* incorrectly treated a purported decrease in the "market value" of mortgage-backed certificates as indistinguishable from a loss realized upon the sale of the certificates, despite the fact that Section 11(e) clearly distinguishes between the two measures of damages. *Id.* Here, as to the vast majority of Certificates, Plaintiff asserts a decrease of "market price," not a loss realized in connection with the sale of Certificates. *See also NECA-IBEW*, Tr. at 42 (Ex. S) (expressing grave doubt that decline in market price can constitute cognizable loss on mortgage-backed certificates). Accordingly, Plaintiff has failed to allege economic loss and its claims must be dismissed.

## IV. PLAINTIFF'S CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS.

### A. Plaintiff's Allegations Of Misstatements And Omissions Are Not Plausible.

Unable to plead how the alleged misstatements and omissions regarding underwriting guidelines and appraisal standards are "tied to the loans in which Plaintiff invested," *City of Ann*

---

profit." (Opp. at 50.) Plaintiff's argument ignores the essence of the illiquid, asset-backed securities it bought. This is not a case involving, for example, equity securities or corporate bonds, where an active secondary market exists and securities often "are purchased for the purpose of investment and their true value to the investor is the price which they may later be sold." *AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 646 F. Supp. 2d 385, 403 (S.D.N.Y. 2009). Plaintiff's Certificates were never liquid, even on the day Plaintiff bought them, and were never represented to be liquid.

*Arbor*, 2010 WL 1371417, at *10, Plaintiff asserts sweeping and unsupported allegations that "industry wide," systematic abandonment of such guidelines and standards must have affected the loans underlying the Certificates it purchased (*see* ¶ 70; Opp. at 23, 25). The JPMorgan Defendants have not, despite Plaintiff's characterization, argued that Plaintiff must *prove* its allegations of "industry wide" conduct to maintain its claims. Rather, the JPMorgan Defendants have rightly insisted that such sweeping claims cannot be sustained based on the baldly vague and conclusory allegations contained in the Complaint.

Indeed, while Plaintiff spills much ink rehashing – and, in many instances, mischaracterizing[10] – CW allegations contained in the Complaint, its opposition brief fails to address the fundamental deficiency of those allegations: they simply do not support any "systematic" departure from either underwriting or appraisal guidelines. First, Plaintiff's allegations are based on the accounts of a few appraisers and former employees of a few Originators, but purport to allege far more – specifically, that *each* of the 19 Originators of loans underlying the Certificates engaged in a systematic departure from its respective guidelines. Second, although the CWs purport to allege, for example, that "what we *would* do" is look to a borrower's stated income and "hope to see assets that *would* compare to . . . that type of income" (¶ 83 (emphasis added); Opp. at 8), or that when an "underwriter *would* overturn one of their loans," that loan "*would* come back approved by a manager" (¶ 134 (emphasis added); Opp. at 11-12), these accounts are devoid of specificity regarding the conduct alleged, how often such conduct occurred, how many borrowers were involved, or the types of borrowers involved. Plaintiff's allegations are no more than mere snippets of CW statements that fail to support any inference that the vaguely described conduct affected loans to most or all borrowers the CWs

---

[10] For example, while Plaintiff states in its opposition that "[b]orrowers applying for stated income loans often listed implausibly high incomes on loan amounts" (Opp. at 10), the word "often" is glaringly absent from the CW account contained in paragraph 117 of the Complaint.

14

assessed, let alone to most or all borrowers of the particular Originator or other Originators for which no CWs exist. Such allegations do not plausibly support "industry wide," *systematic* practices of any kind. (*See* JPM Br. at 20-30.)

### 1. The CWs Describe Conduct At Only A Minority Of Originators And Are Not An Adequate Or Reliable Source Of Information.

Although Plaintiff's opposition reiterates the Complaint's sweeping allegation of "industry wide," systematic abandonment of underwriting guidelines and appraisal standards (*see* Opp. at 23, 25), it fails to adequately address the fact that (i) there are no CW allegations for the majority of Originators that allegedly participated in improper "industry wide" conduct, and (ii) the CWs from the minority of Originators were not in a position to have knowledge of the Originators' systematic practices. As a result of these deficiencies, the CW allegations do not support a reasonable inference of systematic practices by *any* Originator, much less that the alleged practices affected the loans underlying the Certificates that Plaintiff purchased. *See City of Ann Arbor*, 2010 WL 1371417, at *10 (holding that plaintiffs must "plead how [the alleged] misstatements and/or omissions are tied to the loans in which they invested").

Plaintiff's allegations of "industry wide," systematic abandonment of underwriting and appraisal standards are inadequate in the first instance because they are based almost exclusively on CWs from a small group of originators and appraisers. Indeed, *none* of the CWs offer *any* information about 11 of the 19 Originators mentioned in the Complaint. Plaintiff argues that its allegations are sufficient nonetheless because the 8 Originators for which CW allegations exist accounted for "70% of the total dollar value of the Mortgage Loans whose Originators were identified in the Offering Documents." (Opp. at 31.) This statistic is beside the point, however, because allegations regarding *fewer than half* of the Originators plainly cannot support a plausible inference regarding "industry wide" conduct of *all* Originators.

15

Further, Plaintiff's chosen statistic concerning "dollar volume" fails to account for the
fact that 4 of the 8 Originators *are not disclosed as having originated loans underlying the
Certificates that Plaintiff purchased.* (JPM Br. at 22.)  The Complaint is notably silent as to 4
other Originators that did originate loans underlying Plaintiff's Certificates, including Originator
WMC, which originated 100% of the loans in JPMMAT 2006-WMC3. (*Id.*)  Likewise,
Plaintiff's allegations regarding appraisals rely on 7 CWs who worked for only 3 Originators, 2
of which *are not disclosed as having originated any loans underlying Plaintiff's Certificates.*
(*Id.*)  Plaintiff's CW allegations, therefore, simply cannot support a plausible nexus between its
sweeping allegations of "industry wide" conduct and the particular loans underlying the
Certificates that Plaintiff purchased.

In addition, even with respect to the minority of Originators for whom there are CW
allegations, the CWs are not alleged to have occupied positions or worked in geographic
locations such that they would possess the information alleged. (JPM Br. at 24-26.)  Plaintiff
coyly attempts to minimize this fundamental problem by labeling it a "quibble" and asserting
that "it is the descriptions of . . . titles and geographic locations of employment, rather than . . .
allegations of improper origination practices, that Defendants contend are insufficiently pled."
(Opp. at 32.)  Plaintiff's sleight-of-hand is unavailing.  The JPMorgan Defendants have, in fact,
directly and forcefully contested the substance of Plaintiff's allegations. (*See, e.g.*, JPM Br. at
20-34, 40-42.)  And, Plaintiff has offered no substantive response to the JPMorgan Defendants'
argument concerning the CWs' positions and geographic locations.  Indeed, what Plaintiff
dismisses as a "quibble" actually exposes one of the Complaint's core deficiencies:  the CW
allegations fail to supply any information linking generic and conclusory allegations concerning
"industry wide" practices with either each of the Originators or the loans in the pools underlying
the Certificates that Plaintiff purchased.  Lacking any such link, the Complaint fails to state a

plausible claim for relief.

The cases cited by Plaintiff do not hold otherwise. For instance, in *Tsereteli v. Residential Asset Securitization Trust*, 692 F. Supp. 2d 387, 390, 392 (S.D.N.Y. 2010), plaintiff's allegations of systematic disregard for underwriting and appraisal standards focused on a *single* loan originator, IndyMac Bank, F.S.B. ("IndyMac"), and were supported by a purported dramatic spike in delinquency and foreclosure rates for the underlying loans shortly after the certificates were issued. *See also, e.g.*, *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, 2010 WL 1257528, at *6 (S.D.N.Y. Mar. 31, 2010) ("*Residential Capital*") (allegations involving only a single originator and relying on investigations by the Federal Trade Commission and West Virginia Attorney General regarding "predatory lending practices"). Similarly, in *Wells Fargo MBS Cert. Litig.*, 2010 WL 1661534, at *1, 11, plaintiffs' allegations focused almost exclusively on the practices of a *single* originator, Wells Fargo. And in *RBS Group*, where, as here, the practices of multiple originators were at issue, the court explained that the complaint "details how *each* of the relevant mortgage originators . . . sought to maximize the volume of loans they underwrote in order to benefit from the lucrative securitization process." *RBS Group*, 2010 WL 1172694, at *12 (emphasis added). Here, on the other hand, Plaintiff indiscriminately asserts claims concerning the "industry wide," systematic practices of mortgage originators as a group (Opp. at 23), while failing to provide specific factual allegations concerning the purported conduct of *each* of the 19 Originators identified in the Complaint.

### 2. The CW Allegations Are Vague, Conclusory, And Lack Sufficient Context.

Plaintiff does not dispute that the Complaint fails to provide a single example of an underwriting or appraisal determination about a borrower that contradicts the Offering Documents. The Complaint alleges industry-wide, systematic practices based on CWs' subjective generalizations about what they or others *would* do in unspecified circumstances, not

17

what they actually *did* do with respect to the loans underlying the Certificates. Plaintiff's allegations concerning management "overrides" of underwriting decisions are illustrative of the larger problem: the CW accounts vaguely assert that "rejected risk loans . . . would often 'come back to life'" (Opp. at 9; ¶ 96), or that "there were 'instances where underwriters were firm in their discomfort . . . , but management would override the underwriter'" (Opp. at 8; ¶ 82). Nowhere, however, does any CW allege that such conduct affected any particular loan to any particular borrower, much less that it contradicted the disclosures in the Offering Documents or affected any particular loan underlying Plaintiff's Certificates. Further, other CW allegations simply state, in conclusory fashion, that underwriting or appraisal guidelines were not followed, *e.g.*, that "underwriters 'didn't do their jobs' and were 'lax, very lax' about enforcing . . . underwriting guidelines." (Opp. at 13; ¶ 159.) These allegations, which are indicative of the vast majority of CW statements in the Complaint, fail to provide any specificity regarding the type of conduct involved, the frequency with which the alleged conduct occurred, or the types of borrowers with whom it occurred. (*See* JPM Br. at 26-29.) These are fatal insufficiencies.

Plaintiff attempts to distinguish *In re IAC/Interactive Sec. Litig.*, 695 F. Supp. 2d 109 (S.D.N.Y. 2010), and *Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*, 638 F. Supp. 2d 120 (D. Mass. 2009), on the false premise that the CW allegations in those cases lacked the detail of the CW allegations in the Complaint. In *Pyramid Holdings*, for example, which addressed CW allegations by 20 former employees of the same issuer defendant, the court held that CW statements "such as Inverness 'destroys every company it touches,'" or that a high-level executive admitted to the sales force that "Inverness is 'wonderful at buying companies, but not great in integrating them,'" were "subjective generalizations . . . insufficient to justify allegations of integration problems." *Pyramid Holdings*, 638 F. Supp. 2d at 127. Similarly, here, CW witness allegations throughout the Complaint, such as "[t]hey wanted us to do anything we could

to get loans closed" (¶ 138; Opp. at 11), or "[w]e didn't always feel the [stated] income was reasonable for the stated job" (¶ 136; Opp. at 12), or "[i]f the borrower breathed, he got a loan" (¶ 153; Opp. at 12) are, like the CW allegations discussed above, purely subjective generalizations and insufficient to state a claim.

Further, as in *Pyramid Holdings*, 638 F. Supp. 2d at 127-28, the rare CW allegations in the Complaint containing any degree of specificity still lack adequate contextualizing information to support a plausible inference regarding *systematic* origination practices. *See also In re IAC*, 695 F. Supp. 2d at 119 (CW allegations insufficient without "any 'facts that might corroborate the statements of unidentified former employees'"). Here, Plaintiff relies on purported "contextualizing information" in the form of governmental investigations and lawsuits, ratings downgrades, and loan delinquencies and defaults (*see* Opp. at 24), none of which is sufficient to rescue the deeply flawed CW allegations. First, Plaintiff references allegations of "governmental investigations" for only 1 of the 19 Originators identified in the Complaint, Countrywide. (*See id.* (citing ¶¶ 97-108).) The allegation that 1 Originator has been subject to investigations clearly does not provide context for Plaintiff's allegations concerning industry-wide practices. Nor does Plaintiff's reliance on civil lawsuits against other Originators support its claims, as those lawsuits advance not facts, but rather only other plaintiffs' allegations.

Likewise, Plaintiff's argument that delinquency and default rates and ratings downgrades provide "contextualizing information" is unavailing where, as here, Plaintiff does not allege that such factors have had any impact on the Certificates' performance. Nor does Plaintiff provide any factual allegations to suggest that such delinquency and default rates and ratings downgrades are primarily the product of industry-wide practices as opposed to the result of the recent, unprecedented collapse of the United States economy. (*See* JPM Br. at 1.) Finally, Plaintiff's argument that ratings downgrades, in particular, provide adequate context is undermined by a

19

fundamental contradiction, as Plaintiff maintains that such ratings are an unreliable measure of the credit quality of underlying loan pools. (*See, e.g.*, ¶ 191.) For all of these reasons, the Complaint fails to state a plausible claim for misrepresentations or omissions relating to industry-wide, systematic underwriting and appraisal practices.

### B.   Plaintiff Fails To Allege Any Actionable Misstatements Or Omissions Relating To Appraisal Standards And LTV Ratios.

Plaintiff offers no persuasive argument for allowing its claims concerning appraisal standards and LTV ratios to proceed. Distorting both the Complaint and case law in this Circuit, Plaintiff argues that the Complaint does not allege that the individual appraisals were subjectively false, but rather that "the standards disclosed in the Offering Documents were not followed and other, less reliable methods were used." (Opp. 43-44.) Plaintiff is wrong. First, the Complaint clearly alleges that "the appraisals of the properties underlying the mortgage loans were inaccurate and inflated" (¶ 181), as well as that the Offering Documents were false because appraisers and originators failed to follow accepted appraisal guidelines, "resulting in pervasive appraisal inflation" (¶ 167). Plaintiff cannot ignore these allegations and seek to amend its complaint by its brief. *See, e.g., Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (party may not amend its complaint through statements in briefs); *In re IAC*, 695 F. Supp. 2d at 124 (same, citing cases); *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005) (same); *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) ("it is axiomatic that the complaint cannot be amended by the briefs in opposition to a motion to dismiss"). Nor can Plaintiff ignore that the same district court decisions in this Circuit on which it relies have uniformly dismissed allegations relating to both appraisal guidelines and appraisal inflation, as well as LTV ratios. *See, e.g., IndyMac MBS Sec. Litig.*, 2010 WL 2473243, at *10-11 (dismissing claims based on allegations that appraisals did not comply with USPAP standards and were flawed or inflated as well as claims that LTV ratios were false or misleading);

20

*Tsereteli*, 692 F. Supp. 2d at 393 (dismissing claims based on allegations that appraisals were not conducted in accordance with USPAP and were inflated, including claims about LTV ratios); *DLJ Mortgage*, 2010 WL 1473288, at *7-8 (dismissing allegations regarding appraisals, appraisal practices, and LTV ratios).

Moreover, Plaintiff does not even address, let alone offer a persuasive rebuttal to, the JPMorgan Defendants' argument that appraisals are subjective opinions that are not actionable absent allegations that they were not truly believed when made. *See IndyMac MBS Sec. Litig.*, *2010* WL 2473243, *11; (JPM Br. at 29 (citing recent cases)).[11] Instead, Plaintiff relies solely on an outlier, out-of-Circuit decision that, unlike the decisions in this Circuit, allowed appraisal-related claims to proceed. (Opp. at 44.) Indeed, *Wells Fargo MBS Cert. Litig.*, 2010 WL 816623, at *11-12, is at odds with the recent decisions in this Circuit and does not address the argument raised here that appraisals are non-actionable opinions.

Under the more well-reasoned decisions by district courts in this Circuit, Plaintiff's claims relating to appraisals and LTV ratios should be dismissed. The Complaint fails to allege that appraisers did not truly believe the appraisals when they were made, and Plaintiff's allegations regarding appraisals (¶¶ 163-79), based on the accounts of a few CWs, a 2007 survey of appraisers, and testimony, are completely generic, vague, and conclusory, and have nothing to do with the loans underlying the Certificates, just as the confidential witness statements were in *IndyMac MBS Litig.*, and just as the report regarding IndyMac Bank's appraisals was in *Tsereteli*. *See IndyMac MBS Sec. Litig.*, 2010 WL 2473243, at *10 ("The fact that one IndyMac Bank employee believed that appraisals were 'shoddy' says nothing at all about whether

---

[11] Plaintiff cannot dispute that appraisals constitute the subjective opinion of the appraiser. The website for the Appraisal Institute, whose Chairman's Congressional testimony Plaintiff relies on in the Complaint (¶ 169) clearly states that "[a]n appraisal is a professional appraiser's opinion of value." *See* http://www.appraisalinstitute.org/profession/appraiser.aspx). The Offering Documents likewise state that an appraisal is an act of "judgment" by the appraiser, and this judgment includes the applicability of various appraisal standards to the creation of the appraisal. (*See, e.g.*, Ex. B at S-43 ("The appraisal of any Mortgaged Property reflects the individual appraiser's judgment . . .")

appraisals were made in accordance with USPAP."); *Tsereteli*, 692 F. Supp. 2d at 394 ("The OIG Report therefore does not even remotely support the allegation that the loans in the pool underlying the Certificates were made on the basis of appraisals that did not conform to USPAP.").

> **C.    Plaintiff Fails to Allege Any Actionable Misstatements Or Omissions Relating To The Sufficiency Of Credit Enhancement.**

Virtually ignoring the JPMorgan Defendants' arguments for dismissing the claims relating to the sufficiency of credit enhancements, Plaintiff states, in a mere footnote, that the statements in the Offering Documents are untrue and misleading because "the methodologies and models used to rate the Certificates were outdated and inaccurate" and because the "Mortgage Loans were originated pursuant to improper underwriting practices and inflated appraisals." (Opp. at 47 n.43.) Thus, Plaintiff concedes that its credit enhancement allegations are based on its allegations concerning appraisals and the Rating Agencies' models. Accordingly, those allegations must be dismissed for the same reasons that Plaintiff's allegations about appraisals and credit ratings are insufficient.

Indeed, Plaintiff offers no argument for deviating from the decisions of the district courts in this Circuit, which have uniformly dismissed allegations relating to the sufficiency of credit enhancement in the mortgage-backed securities context. (*See* JPM Br. at 30-32 (citing recent cases).) Nor does Plaintiff dispute that the Offering Documents expressly included disclosures which clearly warned investors about potential credit enhancement insufficiency and therefore are fatal to Plaintiff's claims. (*See* JPM Br. at 31.)

> **D.    Plaintiff Fails to Allege Any Actionable Misstatements Or Omissions Relating To The Ratings Assigned To The Certificates.**

As explained below and in the Ratings Agencies' reply brief, Plaintiff's opposition does nothing to salvage its claims of misstatements and omissions relating to the ratings assigned to

the Certificates.  As an initial matter, Plaintiff wholly ignores the many recent decisions in this Circuit, which have uniformly dismissed allegations concerning credit ratings, including allegations that the Rating Agencies relied on outdated rating models and had conflicts of interest.  *See* (JPM Br. at 32-34 (citing recent cases)); *IndyMac MBS Sec. Litig.*, 2010 WL 2473243, at \*11-12 (allegations about credit ratings were insufficient to state a claim because (1) there were no factual allegations supporting a plausible inference that the ratings did not express each rating agency's judgment at the time they were issued; (2) there was no duty to disclose the rating agencies' conflict of interest; and (3) the rating agencies' role in structuring the certificates was immaterial as a matter of law).

Rather than even attempt to distinguish these cases, Plaintiff again relies on *Wells Fargo MBS Cert. Litig.*, 2010 WL 1661534, at \*12-13, (Opp. at 45), which goes against the weight of authority in this Circuit, including Judge Kaplan's more recent decision in *IndyMac MBS Sec. Litig.*, and fails to address the arguments raised by the JPMorgan Defendants here, including that credit ratings are non-actionable statements of opinion; that the disclosure of risks associated with the reliance on ratings bespeak caution; that there was no duty to disclose the Rating Agencies' methodologies, models, or conflicts of interest; that the Rating Agencies' role is immaterial; and that there are no allegations that the Offerings at issue did not receive the stated credit ratings or that the ratings were incorrect at the time offered.

Plaintiff also relies on *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 175 (S.D.N.Y. 2009).  (Opp. at 45.)  But that case did not involve 1933 Act claims, and the court in *Abu Dhabi* acknowledged that ratings are only actionable "where plaintiffs have sufficiently pled that the Rating Agencies did not genuinely or reasonably believe that the ratings they assigned . . . were accurate and had a basis in fact."  *Id.* at 176.  Plaintiff has not sufficiently alleged that here.

Plaintiff's argument that "[t]he Complaint does not contend that the ratings themselves were false" and therefore "do[es] not challenge the 'opinion' of the ratings themselves" (Opp. at 46, n.42) is a puzzling – and improper – attempt to amend the Complaint. In fact, the Complaint is crystal clear that Plaintiff contends that "the[] ratings were unjustifiably high and did not represent the true risk of the Certificates . . ." (¶ 188.) Moreover, Plaintiff acknowledges that the Offering Documents disclosed that future downgrades might occur (Opp. at 46), and Plaintiff's argument that the Offering Documents did not disclose that the Rating Agencies' methodologies and models were outdated and inaccurate at the time the Certificate were issued (*id.*) has been expressly rejected by district courts in this Circuit. *See, e.g., IndyMac MBS Sec. Litig.*, 2010 WL 2473243, at *11 (dismissing allegation that offering documents failed to disclose that the ratings process relied on outdated models and data); *Residential Capital*, 2010 WL 1257528, at *6 ("Plaintiffs' allegations that the ratings were outdated . . . are not actionable."); *DLJ Mortgage*, 2010 WL 1473288, at *8 (dismissing allegations relating to rating methodology); *RBS Group*, 2010 WL 1172694, at *13-14 (dismissing allegations that models relied on to rate certificates were outdated); *Tsereteli*, 692 F. Supp. 2d at 395-96 (finding allegations that rating agencies used out-of-date models insufficient and finding that plaintiffs' argument that the offering documents failed to disclose the actual methodologies and models used was "without merit").

### E.    Plaintiff Fails To Allege Any Actionable Misrepresentations Or Omissions Regarding Underwriting Guidelines.

In response to the JPMorgan Defendants' argument that the Offering Documents, read as a whole, clearly disclosed that the Certificates were backed by low documentation loans, many of which constituted exceptions to stated underwriting guidelines, Plaintiff argues that such disclosures are insufficient and irrelevant because they are not "forward-looking statements" (Opp. at 34-40). Plaintiff misses the point. First, as Judge Buchwald recently observed, courts

in the Second Circuit have applied the bespeaks caution doctrine to protect statements that are not forward-looking. *See In re Ambac Fin. Group, Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 280 (S.D.N.Y. 2010) (collecting cases).  Moreover, here, it is Plaintiff who relies on future events (*i.e.*, downgrades and delinquencies) to support its claims.  Having done that, Plaintiff cannot ignore express disclosures warning of the very events that it alleges have come to pass.  Where, as here, the disclosures in the Offering Documents directly contradict that which Plaintiff claims to be false and misleading, Plaintiff's claim must be dismissed. *See, e.g., Republic Bank & Trust Co. v. Bear, Stearns & Co., Inc.*, 2010 WL 1489264, at *6 (W.D. Ky. Apr. 13, 2010) (dismissing misrepresentation claims based on disclosures of originators' lax lending standards and exceptions from them); *Nomura*, 658 F. Supp. 2d at 307 (dismissing 1933 Act allegations based on the "fusillade of cautionary statements" regarding underwriting standards in the offering materials).

Without question, the Offering Documents placed Plaintiff "on notice of [Originators'] 'soft' underwriting practices" and "abound with warnings of potential perils." *Nomura*, 658 F. Supp. 2d at 307 (internal quotation and alteration omitted).  The Offering Documents disclosed, for example, that Originators' underwriting standards required limited verification of borrower information for many loans, and that such loans were "likely to experience rates of delinquency, foreclosure and bankruptcy that are higher than those experienced by loans underwritten in accordance with Fannie Mae and Freddie Mac guidelines." (Ex J, at 14-15.)[12]  Although essentially ignored by Plaintiff, the Offering Documents also clearly disclosed that Originators frequently granted exceptions to the stated underwriting guidelines, including the nominal

---

[12] *See also* Exs. F at S15 ("The Underwriting Standards of the Originator Are Not as Stringent as those of Fannie Mae and Freddie Mac, Which May Result in Losses"); G at S-11 (same); H at S-11 (same); K at 14-15 ("[L]oans originated according to underwriting guidelines that are not as strict as Fannie Mae or Freddie Mac guidelines may be likely to experience rates of delinquency, foreclosure and bankruptcy that are higher than those experienced by loans underwritten in accordance with Fannie Mae or Freddie Mac guidelines.").

guidelines governing no-doc and low-doc loans.[13]  Wells Fargo, for instance, disclosed that it encouraged its underwriters to "aggressively" utilize their discretion to make exceptions, while ResMAE disclosed that "[a] substantial portion of the Mortgage Loans represent . . . underwriting exceptions." (Exs. B at S-44; G at S-54.)  These disclosures directly contradict the Complaint's central allegation that Originators' engaged in systematic departures from stated underwriting guidelines by failing to verify borrowers' ability to repay, and/or by making frequent exceptions to written underwriting policies.  (*See, e.g.*, ¶¶ 113-115 (alleging significant amount of exceptions to ResMAE guidelines), 139 (alleging that Wells Fargo made lots of exceptions without adequate verification of employment and income; *see also* ¶ 102 (Countrywide employees "were incentivized to make exceptions to underwriting standards and failed to verify borrower documentation and information").)  At the end of the day, departures from guidelines were fully disclosed in the Offering Documents, and thus cannot form the basis of Plaintiff's 1933 Act claims.

Plaintiff also fails to sustain its allegation that the Offering Documents contained misrepresentations because Originators "systematically disregarded" their stated underwriting guidelines by making exceptions "in the absence of *sufficient* compensating factors"  (*See* ¶¶ 7, 75, 93, 112, 132 (emphasis added).)  Plaintiff does not question that such exceptions constitute Originators' subjective opinions that are not actionable unless Plaintiff alleges that the Originators did not truly hold those opinions at the time.  (*See* Opp. at 37 n.32, 38.)  Instead, Plaintiff now contends that "with loan exceptions, it was the stated **procedure** for making alternative documentation loans and not the mere **existence** of such loans, that the Complaint alleges was misleading."  (*Id.* at 38.)  In the same breath, however, Plaintiff concedes that it

---

[13] *See, e.g.*, Exs. B at S-1-2, S-10-15, S-25-44; C at S-1-2, S-15-19, S-33-36; D at S-1-2, S-13-16, S-31-41; E at S-1-2, S-10-15, S-19-27; F at S-1-3, S-15-25, S-82-99; G at S-1-2, S-11-21, S-52-56; H at S-1-2, S-11-21, S-52-63; I at S-1-3, S-15-18, S-28-31.

"cannot demonstrate that these determinations were false when made" because these determinations "were never made in the first place." (*Id.*)  First, this new twist is an improper attempt to replead the Complaint.  Plaintiff's assertion that the Complaint alleges that "the procedures for making exceptions . . . were completely abandoned" is false.  (*Id.*)  That conclusory, unsubstantiated allegation cannot be found in the Complaint.  Moreover, because the determination of whether compensating factors were sufficient to grant exceptions was within each Originator's discretion and, at its core, was the expression of an opinion not unlike an appraisal or a credit rating, and because the Complaint does not allege that Originators did not truly hold those opinions at the time, Plaintiff's claims must be dismissed.  *See* (JPM Br. at 38-39); *cf. Tsereteli*, 692 F. Supp. 2d at 395 (allegations that rating agencies used out-of-date models were insufficient to support inference that they did not truly believe their rating at the time they were made).

**F.     There Are No Actionable Misrepresentations Or Omissions Because Plaintiff's Sole Remedy Is The Repurchase Of Non-Complying Loans.**

Plaintiff's arguments regarding the "repurchase or substitute" provisions disclosed in the Offering Documents are unavailing.  First, Plaintiff argues that *Lone Star Fund V (U.S.) v. Barclays Bank PLC,* 594 F.3d 383 (5th Cir. 2010), is inapplicable because the remedial provisions of the 1933 Act may not be waived and language to the contrary in any offering document is void.  (Opp. at 51-52.)  However, the Fifth Circuit rejected a virtually identical argument in *Lone Star*.  The Court stated:

> Appellants assert that the 'repurchase or substitute' clauses are void as against public policy because they waive Appellants' right to sue for fraud.  This argument is meritless. . . . Rather than waive Appellants' right to pursue claims of fraud, the 'repurchase or substitute' clauses change the nature of Barclays' representation.  If Appellants had alleged that Barclays falsely represented to prospective investors that it would repurchase or substitute delinquent mortgages, they might have stated a case of fraud under the pertinent agreements.  That is not their claim.

*Lone Star*, 594 F.3d at 390.[14] And, Judge Wexler recently indicated that "repurchase or substitute" provisions are relevant in 1933 Act cases alleging misrepresentations in connection with mortgage-backed securities offerings. *See City of Ann Arbor*, 2010 WL 1372417, at *10 (directing plaintiffs to plead how the alleged misrepresentations and/or omissions "are tied to the loans in which they invested," and stating that "[s]uch pleading will put the court in a better position from which to evaluate the merits of the claims alleged, particularly . . . the impact of any promise to repurchase or substitute mortgages that did not comply with the terms of the offering materials"); *Mass. Bricklayers and Masons Funds v. Deutsche Alt-A Sec.*, 2010 WL 1370962, at *1 (E.D.N.Y. Apr. 6, 2010) (same). Here, as in *Lone Star*, Plaintiff alleges material misrepresentations as to the nature of loans underlying mortgage-backed securities. The "repurchase or substitute" clauses do not abrogate the 1933 Act, as Plaintiff contends.[15] Rather, the clauses render alleged misrepresentations regarding the non-compliance of loans non-actionable because they expressly contemplate the existence of such loans, thereby changing the nature of the representations in the Offering Documents. *See id.* Indeed, *Lone Star* stands for the unremarkable proposition that representations must be interpreted in context, and the Fifth Circuit plainly held that "repurchase or substitute" provisions mean that either the loans underlying mortgage-backed securities will conform to the representations in the offering materials or, if they do not, they will be made to conform, upon demand. *Id.* at 388-89.

Plaintiff's argument that the provisions in the Offering Documents do not say that misstatements of the type alleged by Plaintiff can only be remedied by repurchase or substitute

---

[14] Plaintiff's reliance on *McMahon & Co. v. Wherehouse Entm't*, 65 F.3d 1044 (2d Cir. 1995), and *Doody v. E.F. Hutton & Co.*, 587 F. Supp. 829, 833 (D. Minn. 1984), (Opp. at 51-52), is misplaced. Neither case involved a "repurchase or substitute" provision, and the JPMorgan Defendants are not arguing that the repurchase clauses waived the provisions of the 1933 Act.

[15] Contrary to Plaintiff's suggestion, and as the court explained in *Lone Star*, "repurchase or substitute" provisions "are sensible given the difficulties of investigating the underlying residential mortgages. Even the best due diligence may overlook problems. . . . Some of the loans might fall into delinquency during the pendency of the transactions leading to an investor's purchases." *Lone Star*, 594 F.3d at 389.

(Opp. at 52) is likewise unavailing.  In fact, that is precisely what the Offering Documents state. Plaintiff conveniently omits the first representation and warranty in respect of the loans that the Offering Documents disclosed that sellers or originators typically made – "[t]he information set forth in the schedule relating to the loans attached to the applicable sale agreement is true and correct in all material respects."  (Ex. J, at 30; Ex. K at 30.)  Accordingly, the "repurchase or substitute" provisions unquestionably impact claims based on the deviation of loans from disclosed information, including stated underwriting guidelines.

Finally, Plaintiff's contention that "[i]t isn't the responsibility of the Certificateholder to enforce [repurchase or substitute] provision[s]" (Opp. at 53) misses the point.  As the Court explained in *Lone Star*, the Offering Documents did not represent that the mortgage pools were absolutely free from non-complying loans at the time of purchase.  *See Lone Star*, 594 F.3d at 389.  Instead, the Offering Documents expressly recognized that the pools might contain non-complying loans.  *See id.*  Like the plaintiff in *Lone Star*, Plaintiff is a sophisticated institutional investor that cannot disavow the "fine print."  *Id.* at 388 ("As a sophisticated investor placing a $60 million investment in the trusts, Lone Star has no basis to ignore these provisions or their consequences").  The representations in the Offering Documents must be read in context, and the alleged misrepresentations are not actionable.

### G.    Plaintiff Does Not Adequately Allege Materiality.

Plaintiff's arguments relating to materiality fare no better.  As an initial matter, Plaintiff's suggestion the JPMorgan Defendants are arguing that Plaintiff must *prove*, at this stage of litigation, that the alleged misstatements and omissions are material (Opp. at 27) is nonsense. Moreover, Plaintiff says nothing to refute that the Complaint does not allege that the number of non-complying loans reached material levels relative to the large number of loans held in the pools.  Indeed, Plaintiff does not dispute that the Complaint fails to identify even one loan in the

mortgage pools that did not comply with the characteristics disclosed in the Offering Documents, let alone any rough number of non-complying loans.

Tellingly, Plaintiff completely ignores the decision in *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404 (S.D.N.Y. 2009), which is directly on point. In that case, the court dismissed Section 11 and 12(a)(2) claims for failure to adequately plead materiality because the complaint specified only 1 transaction, out of the 37 at issue, as being inconsistent with the disclosures in the offering materials. *See id.* at 416. Plaintiff does not even allege one non-complying loan here. And, Plaintiff's reliance on high rates of delinquencies and conclusory factual allegations that are not tied to the Offerings at issue (Opp. at 28 n.27) does not satisfy materiality. Plaintiff conflates non-performance by borrowers with Originators' non-conformity with underwriting guidelines. Simply because a loan is in default does not show that there was any failure with respect to the underwriting of that loan. Plaintiff has not adequately alleged that the default of a single loan in the pools is connected to non-conformity with the guidelines. Consequently, Plaintiff has not pled materiality.

Notably, Plaintiff also ignores Judge Wexler's recent decisions in cases alleging 1933 Act claims in connection with offerings of mortgage-backed securities, which indicate that generic allegations which are not tied to loans underlying offerings at issue do not plead materiality. *See City of Ann Arbor*, 2010 WL 1372417, at *10 (directing plaintiffs to plead how the alleged misrepresentations and/or omissions "are tied to the loans in which they invested," and stating that "[s]uch pleading will put the court in a better position from which to evaluate the merits of the claims alleged, particularly the issues of materiality"); *Mass. Bricklayers*, 2010 WL 1370962, at *1 (same). Plaintiff cannot simply disregard decisions in this District, without even attempting to distinguish them, and rely on *Tsereteli* and *Lehman Bros.* instead. (*See* Opp. at 28.) In any event, in both *Tsereteli* and *Lehman Bros.*, the court dismissed allegations in their

30

entirety relating to appraisals, LTV ratios, credit enhancement and/or ratings.  *See Tsereteli*, 692

F. Supp. 2d at 396; *Lehman Bros.*, 684 F. Supp. 2d at 485.  However, the courts permitted a

portion of the complaints relating to underwriting guidelines to survive dismissal, and to that

extent, the JPMorgan Defendants respectfully submit that the allegations here are

distinguishable, as set forth above, and that the decisions were erroneous.

## V.  PLAINTIFF'S CLAIMS ARE TIME BARRED.

Plaintiff's opposition does not refute that its claims are untimely.  As a threshold matter,

despite the fact that Plaintiff devotes most of its opposition to arguing that its generic allegations

about a few Originators are specific enough to support its sweeping claim of systematic,

industry-wide deviation from underwriting guidelines, Plaintiff absurdly contends that the

myriad of industry-wide and Originator-specific publicly available materials cited by the

JPMorgan Defendants are not specific enough "absent some clear evidence that those practices

specifically impacted the Certificates at issue." (Opp. at 56.)[16]  Plaintiff cannot have it both

ways.  If Plaintiff's unspecific yet sweeping allegations – which are not tied to any of the loans

or Certificates at issue – are sufficient to state a claim, then news articles and other public

information regarding industry deviation from underwriting guidelines – including the poor

underwriting practices of the specific Originators mentioned in the Complaint – are by definition

sufficient to have placed Plaintiff on inquiry notice of its claims well before March 26, 2007, one

year prior to filing of the initial complaint in this action.  Indeed, such public information is

---

[16] Plaintiff also objects to the JPMorgan Defendants' submission of Appendix B to their opening brief.  (Opp. at 55 n.49.)  However, Appendix B is entirely appropriate and includes no more information than a lengthy string cite of publicly available information.  As demonstrated in the JPMorgan Defendants' opening brief, the Court may take notice of the fact of publicly available reports, without regard to their truth, in deciding inquiry notice.  *See* (JPM Br. at 48); *Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 425 (2d Cir. 2008); *see also In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 378-79 (S.D.N.Y. 2003) ("Courts in this district routinely dismiss securities fraud claims on statute of limitations grounds at the pleading stage where, as here, the facts necessary to trigger inquiry notice are apparent from the face of the complaint, the documents cited therein and other public documents.").  As indicated in footnote 1 of Appendix B, the JPMorgan Defendants have not submitted copies of the publicly available materials cited in Appendix B with their motion papers in order to reduce volume for the Court.  The JPMorgan Defendants have collected and compiled the materials and will provide them upon request.

much more specific than Plaintiff's own allegations.  Notably, Plaintiff does not – because it cannot – argue that it could not have constructively discovered its claims by that date, assuming that the materials cited by the JPMorgan Defendants had placed it on inquiry notice of its claims.

Despite Plaintiff's protestations, it is clear that Plaintiff was on inquiry notice of the factual basis of its claims well before March 26, 2007.  First, even Plaintiff admits that the materials cited in Appendix B "generically report on the loosening of underwriting standards in the mortgage lending industry."  (Opp. at 55.)  But the materials cited in Appendix B do much more than that.  They relate to the underwriting practices of the specific Originators mentioned in the Complaint.  For instance, Appendix B includes numerous articles and other public materials reporting problems with Countrywide's origination practices, and Countrywide originated 70% of the loans for JPMALT 2006-A4 and JPMMT 2006-A1.  (*See* Appx. B at 4, 7, 10, 12; JPM Br. at 49.)  Appendix B also includes public information reporting problematic loan origination practices of Originators Accredited, Novastar, New Century, and Washington Mutual, all of which are, according to Plaintiff, relevant to the Offerings at issue.  (*See* Appx. B at 3, 5-11; ¶¶ 34, 120-27, 143, 152-56.)  Appendix B further includes public information concerning problems with the Originators' appraisal practices, including an article reporting the results of the 2007 survey of appraisers relied upon by Plaintiff in paragraph 170 of the Complaint.  (*See* Appx. B at 6.)  Thus, the publicly available materials cited by the JPMorgan Defendants are directly on point, and not at all unspecific, as Plaintiff contends.  The surfeit of public information about the Originators' supposed deviation from prudent underwriting and appraisal standards, which are the core allegations in the Complaint, cannot be ignored, and must be deemed to have placed Plaintiff on inquiry notice of its claims long before March 26, 2007.

Moreover, contrary to Plaintiff's suggestion (Opp. at 57), it is well settled that "[b]ecause the issue of inquiry notice is determined by an objective standard – that is, whether an investor of

ordinary intelligence would have discovered the fraud [or misleading statements] – the court may resolve it as a matter of law on a motion to dismiss." *Siebert v. Nives*, 871 F. Supp. 110, 114 (D. Conn. 1994); *accord Staehr*, 547 F.3d 412 (also relied on by Plaintiffs). Indeed, the Second Circuit has clearly acknowledged that statute of limitations questions can be resolved on a motion to dismiss and has resolved the issue of notice on a motion to dismiss in a "vast number of cases." *LC Capital Partners, L.P. v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 156 (2d Cir. 2003) (citation omitted); *see Dodds v. Signa Sec., Inc.*, 12 F.3d 346, 352 n.3 (2d Cir. 1993). The Supreme Court's decision in *Merck & Co., Inc. v. Reynolds*, 2010 WL 1655827 (U.S. Apr. 27, 2010), does not undermine the Second Circuit's prior standard for determining inquiry notice. In fact, it confirms that constructive discovery of the facts giving rise to an action triggers the one-year statute of limitations for 1933 Act claims and acknowledges that inquiry notice is relevant in assessing constructive discovery. *See id.* at \*17.

That Plaintiff was on inquiry notice of its claims well before March 26, 2007 is all the more clear with respect to Offering JPMMAT 2006-RM1, from which Plaintiff purchased Certificates. Originator ResMAE originated 100% of the loans in JPMMAT 2006-RM1.[17] (Ex. G at S-3.) On February 13, 2007, Reuters reported that ResMAE filed for bankruptcy the previous day. (Appx. B at 7-8.) On February 15, 2007, the Wall Street Journal reported that ResMAE was forced into bankruptcy because of repurchase demands on loans that defaulted after they were sold by ResMAE. (*Id.* at 8.) Plaintiff's suggestion that the JPMorgan Defendants need to provide evidence that a reasonable investor knew about ResMAE's bankruptcy is absurd. Information that may constitute sufficient "storm warnings" to place an investor on inquiry notice of a claim includes:

---

[17] Plaintiff mistakenly suggests that ResMAE was an Originator for JPMMT 2006-A1, but it was not. (*See* Opp. 57; Ex. B at S-4.) Plaintiff was likely referring to JPMMAT 2006-RM1.

'any financial, legal, or other data, including public disclosures in the media about the financial condition of the corporation . . . available to the plaintiff providing him with sufficient storm warnings to alert a reasonable person to the probability that there were either misleading statements or significant omissions involved in the sale of securities.'

*Brimo v. Corporate Express, Inc.*, 229 F.3d 1135, 2000 WL 1506083, at *2 (2d Cir. Oct. 6, 2000) (citation omitted) (analyzing inquiry notice with respect to Exchange Act claim) (unpublished opinion); *see In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005) (quoting *Brimo*).  Moreover, a plaintiff is charged with knowledge of public information at the time of its release.  *See, e.g., Dodds*, 12 F.3d at 350 ("[t]he means of knowledge are the same thing in effect as knowledge itself") (citation omitted).  Plaintiff cannot ignore the storm warnings concerning ResMAE's origination practices, which placed it on inquiry notice of its potential claims concerning JPMMAT 2006-RM1 no later than February 12, 2007.

Finally, Plaintiff's argument that its claims relating to newly added offering JPMMT 2006-A1 are timely (Opp. at 58-60) is unavailing.  Plaintiff contends that those claims relate back to the original complaint because that Offering "was pursuant to one of the Registration Statements identified in the Original Complaint." (Opp. 59.)  But claims do not relate back where they do not arise out of the same conduct, transaction, or occurrence set out in the original complaint.  *See* Fed. R. Civ. P. 15(c)(1)(B).  And, as demonstrated above, courts in this Circuit have rejected the notion that separate mortgage-backed securities offerings under common registration statements involve the same conduct.  Moreover, Plaintiff's argument that its claims relating to the newly added offering were tolled by the filing of the original complaint (Opp. at 59) is both puzzling and wrong.  First, as discussed more fully below, the weight of authority in this Circuit – and, indeed, in this District – holds that *American Pipe* tolling does *not* apply where the original plaintiff lacked standing to sue.  *See Kruse v. Wells Fargo Home Mort., Inc.*, 2006 WL 1212512, at *4-6 (E.D.N.Y. May 3, 2006) (Glasser, J.); *In re Colonial Ltd. P'ship*

34

*Litig.*, 854 F. Supp. 64, 82 (D. Conn. 1994) (Cabranes, J.); *In re Crazy Eddie Sec. Litig.*, 747 F.

Supp. 850, 856 (E.D.N.Y. 1990) (Nickerson, J.).  In any event, the original complaint did not

even purport to assert claims on behalf of purchasers of JPMMT 2006-A1 Certificates.  (*See*

Orig. Compl. ¶ 23 (class includes purchasers of only the certificates of the trust series identified

in original complaint), ¶¶ 15, 64 (trusts do not include JPMMT 2006-A1).)  Accordingly,

Plaintiff could not have reasonably assumed that the original named plaintiff would have any

standing to assert claims with respect to JPMMT 2006-A1.[18]

## VI.   PLAINTIFF'S SECTION 15 CLAIMS MUST BE DISMISSED.

First, the Section 15 "control person" claim against the Individual Defendants must be

dismissed because, as demonstrated above and in the JPMorgan Defendants' initial brief,

Plaintiff fails to state an underlying violation of Section 11 or 12(a)(2) by JPM Acceptance.

In any event, Plaintiff has not advanced any persuasive argument for allowing Plaintiff's

"control person" claim to survive dismissal.  Plaintiff argues that it has sufficiently pled control

person liability by alleging that the Individual Defendants were officers or directors of Depositor

JPM Acceptance, signed the Registration Statements, and had "the power to influence" JPM

Acceptance.  (Opp.  61.)  However, at least one Court in this Circuit has dismissed similar

Section 15 claims after engaging in a lengthy analysis.  *See Merrill Lynch & Co.*, 2010 WL

2175875, at *8 (dismissing control person allegations against entities because plaintiff failed to

allege "beyond mere formulaic recitation" how those entities exercised control over the depositor

and dismissing control person allegations against individual defendants because plaintiff did not

---

[18] The facts in the *Flag Telecom* case relied upon by Plaintiff (Opp. at 59-60) are distinguishable from the facts presented here.  In *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 455-56 (S.D.N.Y. 2005), the court declined to adopt the decision in *Colonial* and found that an individual investor who sought to be added as a new plaintiff could not have anticipated that the lead plaintiff, who had made substantial investments, would lack standing.  In sharp contrast, Plaintiff here is an institutional investor with experienced counsel who were all on notice from the face of the original complaint that it did not even purport to assert claims on behalf of purchasers of Offering JPMMT 2006-A1, let alone identify the named plaintiff as having purchased certificates in that Offering. Moreover, the decision in *Flag Telecom* is contrary to the weight of authority in this Circuit, and the JPMorgan Defendants respectfully submit that it should not be followed by this Court.

allege meaningful culpable conduct beyond mere status as a director or officer).  This Court should reach the same conclusion here.

Moreover, Plaintiff has at least implicitly conceded that it has failed to plead any meaningful culpable conduct by the Individual Defendants.  Plaintiff's conclusory "power to influence" allegation amounts to no more than reliance on the Individual Defendants' titles, which are not enough to infer control, let alone culpable participation in the alleged conduct.  *See id.*; (JPM Br. at 52-53 (citing cases).)  The Southern District's recent decision in *Merrill Lynch & Co.* dismissing similar conclusory control person allegations is more well-reasoned than the *Lehman Bros.* and *Wells Fargo MBS Cert. Litig.* decisions upon which Plaintiff relies (Opp. at 61-62), as those decisions did not engage in a thorough analysis of the control person allegations at issue and disagree with the more well-reasoned conclusion, based on Second Circuit case law, that a plaintiff must plead culpable participation in order to state a Section 15 claim.  *See Lehman Bros.*, 684 F. Supp. 2d at 495; *Wells Fargo MBS Cert. Litig.*, 2010 WL 1661534, at *13; (JPM Br. at 52 (citing cases)).[19]

In sum, Plaintiff does not adequately plead that any Individual Defendant controlled JPM Acceptance, let alone that s/he was a culpable participant in the alleged wrongful conduct.  Accordingly, Plaintiff's Section 15 claim must be dismissed.

## VII.   PLAINTIFF SHOULD BE DENIED LEAVE TO AMEND.

Plaintiff's request for leave to amend the Complaint should be denied.  "While [Rule] 15(a) provides that leave to amend 'shall be freely given when justice so requires,' the Court has broad discretion in deciding whether or not to grant such a request."  *DeBlasio v. Merrill Lynch*

---

[19] Indeed, Plaintiff conveniently omits from its opposition that the *Wells Fargo MBS Cert. Litig.* court noted that "The Wells Fargo Defendants do not contest that they acted as control persons within the meaning of the statute." *Wells Fargo MBS Cert. Litig.*, 2010 WL 1661534, at *13.  Plaintiff also glaringly omits that the *Lehman Bros.* court dismissed Section 15 claims against the individual defendants based on their alleged control of the issuing trusts and parent corporation of the depositor because the complaint was "completely devoid of factual allegations suggesting that [they] controlled [those entities]." *Lehman Bros.*, 684 F. Supp. 2d at 495.

& *Co., Inc.*, 2009 WL 2242605, at \*41 (S.D.N.Y. July 27, 2009) (citation omitted). "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Pub. Emps. Ret. Ass'n v. PriceWaterhouseCoopers, LLP*, 305 Fed. Appx. 742, 745 (2d Cir. 2009) (citation omitted). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to [Rule] 12(b)(6)." *DeBlasio*, 2009 WL 2242605, at \*41 (quoting *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)).

Leave to amend should be denied as futile where, as here, a plaintiff fails to provide any basis for its amendment. "At the very least, a party seeking leave to amend must provide some indication of the substance of the contemplated amendment in order to allow the Court to apply the standards governing Rule 15(a)." *Id.* Plaintiff fails to do so. In its opposition brief, Plaintiff requests leave to amend the Complaint "to allow for other Class members to serve as plaintiffs" and because there is no "undue delay, bad faith, or undue prejudice to the opposing party." (Opp. at 20, 62-63.) But, "in the absence of any identification of how a further amendment would improve upon the Complaint, leave to amend must be denied as futile." *DeBlasio*, 2009 WL 2242605, at \*41. Plaintiff has not identified how amendment would improve the Complaint here, and therefore leave to amend should be denied as futile.

Leave to amend to add new class plaintiffs also would be futile because such claims are time-barred. Plaintiff presumably seeks to add new class plaintiffs who purchased in Offerings in which Plaintiff did not in order to cure, in whole or part, Plaintiff's standing deficiencies. (*See* Opp. at 20.) The 1933 Act's three-year statute of repose and one-year statute of limitations are applicable to the claims of new plaintiffs, however, rendering their claims time-barred, because such plaintiffs would not have filed suit within three years of the alleged conduct or within one year of constructive discovery of the facts underlying their claims. (*See* JPM Br. at 46-50.)

Although new plaintiffs presumably would attempt to salvage their tardy claims by relying on

the tolling rule set forth in *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), as

discussed above, the weight of authority in this Circuit – and, indeed, in this District – holds that

*American Pipe* does not apply where, as here, a putative class representative never had standing

to assert claims on behalf of a proposed new plaintiff. *See, e.g., Kruse,* 2006 WL 1212512, at

*4-6 (class action complaint did not toll statute of limitations on claims for which the original

putative class representatives lacked standing to sue); *Colonial Ltd. P'ship Litig.*, 854 F. Supp. at

82 ("if the original plaintiffs lacked standing to bring their claims in the first place, the filing of a

class action complaint does not toll the statute of limitations for other members of the purported

class") (citation omitted); *Crazy Eddie ,*747 F. Supp. at 856 (class action complaint did not toll

statute of limitations on claims for which the original putative class representatives lacked

standing to sue); *In re Elscint, Ltd. Sec. Litig.*, 674 F. Supp. 374, 378 (D. Mass. 1987) ("[I]t

would be improper to allow the filing of a class action by nominal plaintiffs who are wholly

inadequate to represent the asserted class [because of lack of standing] to have the effect of

tolling [the statute of] limitation to permit the otherwise untimely intervention of proper class

representatives."); *cf. Merrill Lynch & Co.*, 2010 WL 2175875, at *3 ("leave will [not] be

granted for plaintiffs to add additional, as yet unnamed plaintiffs who purchased certificates

related to the additional . . . offerings; this addition would at this point be futile, since plaintiffs

themselves concede that the one-year limitations period began to run at some point . . . more than

a year ago . . . "). In *American Pipe*, 414 U.S. at 554-55, the limitations period for proposed

intervenors' claims was deemed tolled where the original plaintiff was found to be representative

of the class. As the above courts have found, however, *American Pipe* has no application in a

case such as this one, where Plaintiff lacks standing to assert the proposed new plaintiffs' claims.

      The decision in *Crazy Eddie* is directly on point. Like Plaintiff here, the putative class

representatives in *Crazy Eddie* lacked standing to sue on an offering of debentures that they did not purchase. *Crazy Eddie*, 747 F. Supp. at 853-55. In an attempt to cure their lack of standing, the plaintiffs in *Crazy Eddie* added a new named plaintiff who allegedly did purchase the debentures at issue. *Id.* at 853. Judge Nickerson rejected the plaintiffs' argument that the original complaint tolled the limitations period for class claims relating to the debenture offering, finding that allowing tolling where named plaintiffs had no standing would allow resourceful counsel to "toll the statute of limitations indefinitely." *Id.* at 856 (citation omitted). As the court went on to explain, "[t]here appears to be no good reason to encourage bringing of a suit merely to extend the period in which to find a class representative." *Id.* Similarly, in *Kruse*, Judge Glasser held that a motion to intervene filed to "resuscitate a suit in which the original named plaintiffs never had standing to sue" was an "impermissible use of intervention" because it may condone or encourage attempts to circumvent the statute of limitation. *Kruse*, 2006 WL 1212512, at *4, *6. Allowing new plaintiffs to be added here would circumvent the statute of limitation and be contrary to the weight of authority in this Circuit.[20]

The tolling rule in *American Pipe* also does not apply here because the new plaintiffs presumably would seek to assert class claims. In *Korwek v. Hunt*, 827 F.2d 874 (2d Cir. 1987), the Second Circuit held that the *American Pipe* tolling rule applies only to members of a rejected class who seek to assert *individual claims* on their own behalf. Members of a rejected class who later seek to assert *class claims* are not entitled to *American Pipe* tolling. As the Second Circuit explained, allowing class members to "piggyback one class action onto another" would "toll the

---

[20] This Court also lacks jurisdiction to toll the statutes of repose or limitations as to claims for which Plaintiff lacks standing. Because Plaintiff never had standing to assert any purported new plaintiff's claims, there was in all events never any case or controversy before this Court based on those claims. Indeed, "[l]ack of standing is a constitutional limitation on the power of federal courts," and "it would be beyond the constitutional power of a federal court to toll a period of limitations based on a claim that failed because the claimant had no power to bring it." *Palmer v. Stassinos*, 236 F.R.D. 460, 466 n.6 (N.D. Cal. 2006) (citation omitted). Accordingly, none of Plaintiff's filings could have tolled the statute of repose or limitations for any purported new plaintiff's claims purely as a constitutional matter.

statute of limitations indefinitely" and be "inimical to the purposes behind statutes of limitations and the class action procedure." *Id.* at 878-79; *see also Griffin v. Singletary*, 17 F.3d 356, 359 (11th Cir. 1994). The decision in *Crazy Eddie* is again directly on point. After Judge Nickerson dismissed plaintiffs' claims for lack of standing, plaintiffs filed an amended complaint that included a new named plaintiff, who also filed his own putative class action complaint. *Crazy Eddie*, 747 F. Supp. at 853. Like the claims of new plaintiffs here, the claims of the proposed new plaintiff in *Crazy Eddie* were time-barred absent tolling. *Id.* at 856. Judge Nickerson acknowledged that the proposed new plaintiff's *individual claims* may have been tolled while the putative class action was pending. *Id.* Citing the Second Circuit's decision in *Korwek*, however, Judge Nickerson rejected the plaintiffs' argument that *American Pipe* tolling should be extended to revive the *class claims* that previously had been dismissed. *Id.* (citing *Korwek*, 827 F.2d at 878). This Court should likewise reject any argument here that *American Pipe* tolling should be extended to allow piggybacking on top of a failed putative class action to revive class claims.

Leave to amend to add new plaintiffs also should be denied for undue delay and undue prejudice. This action was initiated on March 26, 2008, Plaintiff's motion for appointment as lead plaintiff was filed on March 23, 2009, and Plaintiff was appointed Lead Plaintiff on November 24, 2009. More than 6 months have passed since that time. Plaintiff has known of its standing deficiencies since it filed its lead plaintiff motion and has had much time to seek to add new plaintiffs. Plaintiff's belated attempt to do so now – out of fear that this Court will, as it should, dismiss its claims on standing – is nothing more than an unfair attempt to unduly delay this action. Moreover, granting Plaintiff leave to add new plaintiffs would result in undue prejudice to the JPMorgan Defendants, because Plaintiff would essentially be granted unlimited time to find a class representative with standing while the JPMorgan Defendants are forced to continue to defend claims relating to Offerings as which no class representative has standing.

The JPMorgan Defendants have a right to certainty as to the state of this litigation, which has already been pending for over 2 years.

To the extent that Plaintiff seeks leave to make other changes to the Complaint, which is unclear from Plaintiff's opposition, its request is improper because Plaintiff has not provided sufficient indication of the substance of its proposed amendment. In any event, leave to amend would be futile for the reasons set forth above, including, among other reasons, that the Complaint fails to state a claim as a matter of law because it alleges non-actionable misrepresentations and omissions and because Plaintiff has failed to plead cognizable economic loss. For all of these reasons, this Court should deny Plaintiff's request for leave to amend the Complaint.[21]

## CONCLUSION

For all of the foregoing reasons, as well as the reasons set forth in the JPMorgan Defendants' opening brief, and the applicable reasons set forth in the Rating Agencies' briefs, the Complaint should be dismissed with prejudice.

Dated:  New York, New York
        July 21, 2010

SIDLEY AUSTIN LLP

By: _____

A. Robert Pietrzak
rpietrzak@sidley.com
Dorothy J. Spenner
dspenner@sidley.com
Owen H. Smith
osmith@sidley.com
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

---

[21] To the extent that the Court determines that it cannot, at this stage, deny Plaintiff's request for leave to amend the Complaint to add new plaintiffs, the JPMorgan Defendants respectfully submit that separate briefing is necessary to more fully address that issue.

*Attorneys for Defendants J.P. Morgan*
*Acceptance Corporation I, J.P. Morgan*
*Securities Inc., David M. Duzyk, Louis*
*Schioppo, Jr., Christine E. Cole, and Edwin F.*
*McMichael*