UNITED STATES DISTRICT COURT        <u>**NOT FOR PUBLICATION**</u>
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
PLUMBERS' & PIPEFITTERS' LOCAL #562 :
SUPPLEMENTAL PLAN & TRUST, et al.,      :
                                  :
              Plaintiffs,     :        <u>**MEMORANDUM & ORDER**</u>
                                  :
        - against -            :
                                  :        No. 08 CV 1713 (ERK) (WDW)
J.P.      MORGAN      ACCEPTANCE :
CORPORATION I, et al.,           :
                                  :
            Defendants.    :
-------------------------------------------------------- X

KORMAN, District Judge.

      Lead Plaintiff, the Public Employees' Retirement System of Mississippi, filed this

putative class action, asserting violations of Section 11, Section 12(a), and Section 15 of the

Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), 77o. Defendants move to dismiss the

complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## FACTUAL BACKGROUND

*I.*     *The Parties*

      The Public Employees' Retirement System of Mississippi ("Lead Plaintiff" or

"MissPERS") is a defined benefit pension plan that serves as the retirement system for most

nonfederal public employees in the State of Mississippi. Am. Compl. ¶ 13. The Lead Plaintiff

brings this purported class action both individually and on behalf of a class of investors who

purchased $36.8 billion of mortgage pass-through certificates (the "Certificates," and often

colloquially known as "mortgage-backed securities") issued by J.P. Morgan Acceptance Corp. I

in thirty-three separate offerings between May 23, 2006 and September 18, 2007. Am. Compl. ¶

2.  Defendant J.P. Morgan Acceptance Corp. I ("JPM Acceptance") is a Delaware corporation with its principal place of business in New York City.  Am. Compl. ¶ 16.

Defendant J.P. Morgan Securities Inc. ("JPM Securities") is also a Delaware corporation with its principal place of business in New York City.  Am. Compl. ¶ 15.  JPM Securities engages in investment banking activities and is the primary nonbank subsidiary of JPMorgan Chase & Co.  Am. Compl. ¶ 15.  JPM Securities acted as an underwriter of the Certificates under the Securities Act of 1933, 15 U.S.C. § 77b(a)(11).  Am. Compl. ¶ 15.

During the relevant period, defendants David M. Duzyk, Christine E. Cole, and Edwin F. McMichael were directors of JPM Acceptance.  Am. Compl. ¶¶ 18-20.  In addition to his directorship, Duzyk also served as President of JPM Acceptance.  Am. Compl. ¶ 17.  Louis Schioppo, Jr. was both the Controller and the Chief Financial Officer of JPM Acceptance.  Am. Compl. ¶ 18.  Duzyck, Cole, McMichael, and Schioppo are referred to collectively as the "Individual Defendants."

*II.*     *The Certificates*

The Lead Plaintiff's claims stem from the issuance and sale of the Certificates.  To create the Certificates, JPM Acceptance purchased from J.P. Morgan Acquisition Corp. (a nondefendant) an inventory of mortgage loans set at various interest rates and secured by various types of liens.  Am. Compl. ¶ 29.  JPM Acceptance transferred the loans to an issuing trust and securitized the pool so that the right to cash-flow from the loan inventory could be sold to investors in the form of the Certificates.  Am. Compl. ¶ 30.  Each issuing trust was comprised of varied mortgage loans from between one and six loan originators.[1]  Am. Compl. ¶ 34.  The

_____

[1]   Nineteen loan originators created the mortgages underlying the thirty-three issuing trusts: Chase Home Finance; Countrywide Home Loans; ResMAE Mortgage Corp.; New Century Mortgage Corp.; Wells Fargo Home Mortgage; WMC Mortgage Corp.; PHH Mortgage Corp.;

holder of a Certificate is entitled to a portion of the payments received on the underlying mortgage loans.  Am. Compl. ¶ 28.  The Lead Plaintiff describes the Certificates as an equity interest, where value is derived from owning equity in the trust as well as from the right to receive future mortgage payments.  Am. Compl. ¶ 33.  Defendants, however, claim that the value of the Certificates is derived solely from the payments made from the underlying mortgages and not from any secondary-market value.  Defs.' Mem. Law 7, ECF No. 58.

Within each trust, the Certificates were divided into tranches based on the perceived risk of the underlying mortgages, such that any loss to those mortgages due to default or delinquency was applied to the Certificates in reverse order of seniority.  Am. Compl. ¶ 30.  Accordingly, Certificates from the more senior tranches carried a higher credit rating and offered lower payments.  Am. Compl. ¶ 30.  The Certificates were then transferred from the trust back to JPM Acceptance and sold to JPM Securities, acting as an underwriter, who sold to investors in exchange for cash that was passed back to JPM Acceptance.  Am. Compl. ¶ 32.

On July 29 and December 7, 2005, JPM Acceptance filed with the Securities and Exchange Commission (the "SEC") Form S-3 Registration Statements, both of which were jointly prepared by JPM Securities and signed by the Individual Defendants.[2]  Am. Compl. ¶ 42. Between August 25, 2005, and February 26, 2007, five Prospectuses were also filed with the SEC by JPM Acceptance describing issuing trusts and the series of Certificates to be offered from each.  Am. Compl. ¶ 44.  Prospectus Supplements were then filed for each of thirty-three

---

M&T Mortgage Corp.; GreenPoint Mortgage Funding, Inc.; NovaStar; Accredited Home Lenders Inc.; American Home Mortgage Corp.; CTX Mortgage Company, LLC; Flagstar; FSB; Mortgage, Inc.; Ownit Mortgage Solutions; SunTrust Mortgage, Inc.; and Washington Mutual Mortgage Securities Corp.  Am. Compl. ¶¶ 3, 71-143.

[2]  JPM Acceptance filed Form S-3/A amendments to the registration statements on August 15, 2005, February 8, 2006, March 13, 2006, and March 31, 2006.  Am. Compl. ¶¶ 16, 42.

separate Certificate-series offerings by JPM Acceptance describing in greater detail the underlying mortgages comprising the trust and the specific terms of the particular Certificate series. Am. Compl. ¶ 45. Both the July and December Registration Statements incorporated by reference these later-filed Prospectuses and Prospectus Supplements (collectively, the "Offering Documents"). Am. Compl. ¶ 47.

Between August 22, 2006, and July 26, 2007, the Lead Plaintiff purchased Certificates issued from eight offerings.[3] Am. Compl. ¶ 13. Two of these Certificates were purchased directly from defendant JPM Securities (JPMALT 2006-A4 A7 and JPMMAT 2006-RM1 A2), Am. Compl. ¶ 13, although the Lead Plaintiff makes no allegations as to where the other six were purchased. The Lead Plaintiff did not purchase or hold Certificates from the remaining twenty five of the thirty-three total offerings.[4] Am. Compl. ¶ 13.

Although the Lead Plaintiff does not allege that it has failed to receive cash payments due under the Certificates, it alleges that the Certificates are now worth less than their original value. Am. Compl. ¶ 9. The Lead Plaintiff sold its holdings in two Certificates for a loss and also sold

---

[3]  The eight Certificates are: J.P. Morgan Mortgage Trust ("JPMMT") 2006-A1 2A2; JPMMT 2006-A3 7A1; JPMMT 2006-A5 2A1; JPMMT 2007-A1 6A1; J.P. Morgan Alternative Loan Trust ("JPMALT") 2006-A4 A7; J.P. Morgan Mortgage Acquisition Trust ("JPMMAT") 2006-WMC3 A3; JPMMAT 2006-RM1 A2; and JPMMAT 2006-CH2 AV2. Am. Compl. ¶ 13.

[4]  The twenty-five offerings from which Plaintiff did not purchase are: JPMALT 2006-A1, JPMALT 2006-A2, JPMALT 2006-A3, JPMALT 2006-A5, JPMALT 2006-A6, JPMALT 2006-A7, JPMALT 2006-S1, JPMALT 2006-S2, JPMALT 2006-S3, JPMALT 2006-S4, JPMMT 2006-A4, JPMMT 2006-A6, JPMMT 2006-A7, JPMMT 2006-S2, JPMMT 2007-A2, JPMMT 2007-S1, JPMMAT 2006-ACC1, JPMMAT 2006-HE2, JPMMAT 2006-HE3, JPMMAT 2006-NC1, JPMMAT 2006-WF1, JPMMAT 2006-WMC2, JPMMAT 2006-WMC4, JPMMAT 2007-CH1, JPMMAT 2007-CH2. Am. Compl. ¶ 34.

two for a profit or no gain.[5]  Decl. of Dorothy J. Spenner Ex. A, ECF No. 59.  The Lead Plaintiff

still holds four of the eight Certificates originally purchased.

<u>*III.*</u>      <u>*Alleged Misstatements and Omissions of Material Facts*</u>

The Lead Plaintiff's claims arise from four broad categories of alleged misstatements and

omissions of material facts in the Offering Documents.  First, the Lead Plaintiff alleges that the

Offering Documents contained material misstatements and omissions in detailing the

underwriting standards used by loan originators.  Am. Compl. ¶ 70.  Specifically, the Lead

Plaintiff alleges that the originators "systematically disregarded their stated underwriting

standards in order to increase loan volume regardless of the borrower's ability to meet its

obligations or the adequacy of the property to serve as collateral."  Am. Compl. ¶ 70.  The

Offering Documents describe the standard underwriting guidelines that were to be followed by

the loan originators in most cases, but also describe alternative guidelines that could be used.

Am. Compl. ¶¶ 63-64, 66.  The Amended Complaint alleges that twenty-five confidential

witnesses ("CWs"), all former employees who held various positions at the loan originators,

documented behavior that allegedly deviates from the underwriting (and alternative) guidelines

as stated in the Offering Documents.  *See, e.g.,* Am. Compl. ¶ 82.

Second, the Lead Plaintiff alleges that the Offering Documents contained material

misstatements and omissions of fact regarding appraisal methods used to value the property

serving as collateral for the underlying mortgages.  Am. Compl. ¶ 167.  For example, one

Prospectus Supplement stated that all appraisals would conform to a published uniform

---

[5]   The Lead Plaintiff purchased JPMALT 2006-A4 A7 at $1.003 and sold for $0.400, and purchased JPMMT 2007-A1 6A1 at $0.982 and sold for $0.810.  Am. Compl. ¶ 14.  The Lead Plaintiff realized a profit on the sale of JPMMT 2006-A3 7A1, which was purchased for $0.976 and sold for $0.983.  JPMMAT 2006-RM1 A2 was purchased and sold for $1.000, resulting in no profit or loss.  Decl. of Dorothy J. Spenner Ex. A, ECF No. 59.

professional standard.  Am. Compl. ¶ 164.  The Amended Complaint alleges statements by CWs describing how certain originators failed to follow appraisal methods or would allow management to override an appraiser's valuation.  Am. Compl. ¶¶ 175, 177.  One named former executive of Countrywide stated that its appraisers were encouraged to inflate appraisal values by six percent.  Am. Compl. ¶ 175.  The Prospectus Supplements also detailed the loan-to-value ("LTV") calculations of the mortgage loans underlying the Certificates, which the Lead Plaintiff alleges to also be false because many of the appraisal values were artificially inflated.[6]  Am. Compl. ¶¶ 180-181.

Third, the Lead Plaintiff alleges that the Offering Documents contained material misstatements and omissions of fact regarding credit enhancement: the amount of protection from losses the Certificates purported to have.  Am. Compl. ¶ 183.  One Prospectus Supplement stated that the Certificates had "subordination, overcollaterization, and excess interest," which was said to increase the likelihood that senior Certificates would always receive payment.  Am. Compl. ¶ 184.  The originators allegedly systematically disregarded their underwriting and appraisal standards making this credit enhancement deficient even though the Offering Documents described it to be adequate.  Am. Compl. ¶ 185.

Fourth, and finally, the Lead Plaintiff alleges that the Offering Documents made material misstatements and omissions by giving the Certificates' ratings that were unjustifiably high and based on faulty information concerning the underlying mortgages.  Am. Compl. ¶ 188.  The Offering Documents stated that the issuance of Certificates was conditioned on the assignment of a particular rating, which reflected the likelihood that proper payments would be received by the

---

[6] An LTV is calculated by dividing the mortgage loan amount by the value of the home. Accordingly, an artificially low LTV makes it appear that the loans underlying the trusts have more collateral value and carry less risk.  Am. Compl. ¶ 181.

Certificate holders.  Am. Compl. ¶¶ 186-87.  The Lead Plaintiff maintains that the ratings were based on faulty appraisal and LTV values, as well as systematically disregarded underwriting standards.  Am. Compl. ¶ 189.  Additionally, the Lead Plaintiff alleges that public record evidence—such as news reports, Congressional testimony, and SEC reports—shows that the ratings agencies relied on fundamentally flawed models for evaluating risk by failing to consider the modern use of non-thirty-year-fixed-term mortgages and by failing to address inherent conflicts of interest that exist between ratings agencies and those underwriting the Certificates. Am. Compl. ¶¶ 192-208.

## PROCEDURAL BACKGROUND

The Lead Plaintiff filed this action in the New York Supreme Court, Nassau County, on behalf of all persons and entities that purchased or acquired any Certificates issued pursuant to the Offering Documents, alleging violations of Sections 11 and 15 of the Securities Act of 1933. Notice of Removal ¶ 1, ECF No. 1.  On April 25, 2008, defendants removed the case.  *Id.*  A Report and Recommendation by Magistrate Judge Wall, adopted on November 24, 2009, appointed MissPERS the Lead Plaintiff.  Subsequently, on March 8, 2010, the Lead Plaintiff filed an amended complaint, which added three rating agencies as defendants (all voluntarily dismissed with prejudice on July 12, 2011), and which asserted additional causes of action under Section 12(a)(2) of the Securities Act of 1933.  *See* Am. Compl. ¶¶ 1, 4.

The defendants' then filed a motion to dismiss the amended complaint in its entirety pursuant to F.R.C.P. 12(b)(1) for lack of subject-matter jurisdiction and 12(b)(6) for failure to state a claim.  Specifically, the defendants made six arguments.  First, defendants challenge the standing of the Lead Plaintiff to sue on twenty-five of the thirty-three offerings from which it did not purchase Certificates.  Defs.' Mem. Law 2, ECF No. 58.  Second, defendants argue that the

amended complaint fails to plead any actionable misstatements or omissions because, for among other reasons, the Lead Plaintiff's factual allegations are vague and implausible and the Offering Documents contain extensive warnings that bespoke caution. *Id.* at 3. Third, defendants argue that the Lead Plaintiff fails to plead any economic loss because the Certificates sole economic value is in providing pass through payments to its holders, which the Lead Plaintiff has always received. *Id.* Fourth, defendants argue that the Lead Plaintiff's claims are time-barred because the alleged misrepresentations should have been discovered before one year prior to the filing of the original complaint in this action. *Id.* at 4. Fifth, defendants argue that the Lead Plaintiff's Section 12(a)(2) claims concerning six of the eight Certificates held must be dismissed because it did not purchase directly from any of the defendants. Sixth, and finally, the defendants argue that the Lead Plaintiff's Section 15 "control person" claims against the Individual Defendants must be dismissed because no primary violations were adequately pled and, alternatively, the amended complaint fails to adequately allege the Individual Defendants' control over a primary violator. *Id.*

## DISCUSSION

### I.  *Article III Standing*

Because the Lead Plaintiff concededly bought Certificates in only eight of the thirty-three Offerings, Am. Compl. ¶ 13, defendants move to dismiss for lack of standing all claims that arise out of the twenty-five offerings from which the Lead Plaintiff did not purchase Certificates. Defs.' Mem. Law 17-20, ECF No. 58; Defs.' Reply Mem. 3-11, ECF No. 72. In ruling on a motion to dismiss for lack of standing, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

Pursuant to Article III of the Constitution, the jurisdiction of federal courts is limited to the resolution of actual "cases" and "controversies." U.S. CONST. art. III, § 2. As part of this "bedrock requirement," *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982), the party seeking the federal forum must always establish his or her standing to sue. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Consequently, the issue of standing is "the threshold question in every federal case."[7] *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

At an "irreducible constitutional minimum," Article III standing requires the plaintiff to allege three elements: (1) an injury in fact, (2) fairly traceable to the defendant's allegedly unlawful conduct, and (3) that is likely to be redressed by the requested relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Allen v. Wright*, 468 U.S. 737, 751 (1984). In the broadest sense, to adequately allege an "injury in fact," the plaintiff must have sustained an injury "in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. More specifically, "the plaintiff must have suffered . . . an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. Thus, "the plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). Accordingly, "a plaintiff who has been

---

[7] Relying on *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fireboard Corp.*, 527 U.S. 815 (1999), the Lead Plaintiff argues that the issue of standing should be deferred until after class certification. This argument was considered and rejected by my colleague Judge Gleeson. *In re AIG Advisor Group*, No. 06-1625, 2007 WL 1213395, *4-5 (E.D.N.Y. Apr. 25, 2007) (holding that *Amchem* and *Ortiz* are "limited to the unique circumstances of global mass-tort settlements" and dismissing certain claims for lack of standing prior to a ruling on class certification). I agree with Judge Gleeson and other district judges that have reached the same conclusion. *See Gunther v. Capital One, N.A.*, 703 F. Supp. 2d 264, 274-75 (E.D.N.Y. 2010) (holding that the prevailing approach by courts in the Second Circuit is to analyze standing prior to class certification).

9

subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982).

It is well settled that stylizing a complaint as a class action "adds nothing to the question of standing," *Lewis v. Casey*, 518 U.S. 343, 357 (1996), because Rule 23 "does not relax this jurisdictional requirement." *Denny v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006); *see also* FED. R CIV. P. 82 (Federal Rules "do not extend or limit the jurisdiction of the district courts . . .) *and* 28 U.S.C. § 2072 (Federal Rules "shall not abridge, enlarge or modify any substantive right"). Consequently, each named plaintiff in a class action "'must allege and show that [he] personally [has] been injured, not that injury has been suffered by other, unidentified members of the class . . . they purport to represent.'" *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP,* 549 F.3d 100, 106 n.5 (2d Cir. 2008) (*quoting Warth v. Seldin*, 422 U.S. 490, 502 (1975)). "Standing cannot be acquired through the back door of a class action." *Allee v. Medrano*, 416 U.S. 802, 829 (1974) (Burger, C.J., concurring in part and dissenting in part).

Here, the Lead Plaintiff purchased or held Certificates in eight of the thirty-three offerings listed in the Amended Complaint, and the defendants do not dispute Article III standing to pursue claims under these eight offerings. The Lead Plaintiff argues that, because it has standing to bring claims on its own purchases, it can also sue on all thirty-three offerings because "its ability to bring claims on behalf of *absent* class members is not a question of 'standing' but of Plaintiff's fitness to represent a defined class, and is therefore inappropriate for resolution on a motion to dismiss" and should instead be decided as a part of class certification under F.R.C.P. 23. Pl.'s Mem. Opp. 17, ECF No. 66.

This argument is simply wrong.  As Judge Marcus accurately observed in directly addressing this issue:

> It is well-settled that prior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim. . . . It is not enough that a named plaintiff can establish a case or controversy between himself and the defendant by virtue of having standing as to one of many claims he wishes to assert.  Rather, each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.

*Prado-Steiman Ex Rel. Prado v. Bush*, 221 F.3d 1266, 1279-1280 (11th Cir. 2000) (quotations omitted).

Consequently, to prevail on any of its claims, the Lead Plaintiff will ultimately have to prove "that the practices of which they complain occurred with respect to the mortgages in which they invested, and thereby caused injury."  *City of Ann Arbor Emps. Ret. System v. Citigroup Mortg. Loan Trust Inc.,* 703 F. Supp. 2d 253, 260 (E.D.N.Y. 2010).  This showing cannot be made as to any offering in which the Lead Plaintiff did not invest.  Specifically, the Lead Plaintiff cannot demonstrate any injury flowing from Certificates in the twenty-five offerings it never held, even if it is proven that the Offering Documents underlying them contain violations of the securities laws.  Claims must be dismissed for a lack of standing where, as here, the "plaintiffs have not alleged any injury traceable to the Certificates issued . . . ."  *In re Lehman Bros. Secs. and ERISA Litig.*, 684 F. Supp. 2d 485, 491 (S.D.N.Y. 2010); s*ee also City of Ann Arbor Emps. Ret. System v. Citigroup Mortg. Loan Trust Inc.,* 703 F. Supp. 2d 253, 260 (E.D.N.Y. 2010); *Massachusetts Bricklayers and Masons Funds and the Pipefitters' Ret. Fund Local v. Deutsche Alt-A Secs.*, No. 08-3178, 2010 WL 1370962 (E.D.N.Y. Apr. 6, 2010); *New Jersey Carpenters Health Fund v. Novastar Mortg., Inc.*, No. 08-5310, 2011 WL 1338195

(S.D.N.Y. Mar. 31, 2011); *In re Indymac Mortgage-Backed Secs. Litig.*, 718 F. Supp. 2d 495 (S.D.N.Y. 2010); *Public Emps. Ret. System of Mississippi v. Merrill Lynch & Co., Inc.*, 714 F. Supp. 2d 475 (S.D.N.Y. 2010); *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08-8781, 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010); *New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08-5653, 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010); *New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*, 720 F. Supp. 2d 254 (S.D.N.Y. 2010); *In re Lehman Bros. Secs. and ERISA Litig.*, 684 F. Supp. 2d 485, 491 (S.D.N.Y. 2010); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762 (1st Cir. 2011).

  The Lead Plaintiff relies on a district court case which held that a plaintiff had standing to sue on securities it did not purchase or hold but were issued pursuant to a shelf registration from which plaintiff purchased different securities "[s]o long as (1) the securities are traceable to the same initial shelf registration and (2) the registration statements share common 'parts' that (3) were false and misleading at each effective date . . . ." *In re Countrywide Fin. Corp. Secs. Litig.*, 588 F. Supp. 2d 1132, 1166 (C.D. Cal. 2008). The issue in that case, however, was whether the plaintiff had statutory standing under Section 11 of the Securities Act of 1933. The present case involves the separate issue of whether the Lead Plaintiff has Article III standing. Moreover, *In re Countrywide* was a shareholder suit brought on behalf of those who invested in the Countrywide business. The very same district judge who decided *In re Countrywide* later determined that its reasoning did not control a claim based on the shelf offering of a mortgage-backed security, holding that in the latter situation, "[p]laintiffs have standing only with respect to the [] Offerings in which the named plaintiffs purchased." *Maine State Ret. System v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1164 (C.D. Cal. 2010).

II.     *Sections 11 and 12(a)(2) Statutory Standing: Tranches*

Although not raised in their moving papers, defendants argue in post-brief letters that the Lead Plaintiff's standing is limited to claims arising from the individual tranches within the eight offerings from which it purchased its Certificates.  Defs.' May 17, 2011 Letter, ECF No. 90; Defs.' Oct. 26, 2011 Letter, ECF No. 108.  The defendants argue that Sections 11 and 12(a)(2) claims only accrue for individual securities, and that each tranche within an offering is an individual security that differs from other tranches.  The Lead Plaintiff argues that it has standing for every tranche of an offering because "where the actionable part of the registration statement is alleged to be common to all purchasers from the same shelf, then a plaintiff has standing to represent them because they have all suffered from the same alleged injury."  *In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 584 (S.D.N.Y. 2010); Pl.'s Jun. 6, 2011 Letter 2, ECF No. 97.

In *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, the district judge held that a plaintiff's standing is limited to the specific tranches from which it purchased securities.  No. 10-0302, 2011 WL 4389689, *6 (C.D. Cal. May 5, 2011).  *Maine State* held that the plain text of Sections 11 and 12(a)(2) require that a plaintiff have purchased or acquired a security, and each tranche within a mortgage-backed securities offering was a unique security: each was its own Certificate, had its own credit rating and interest rate, and was supported by an individual package of mortgages that differed from other tranches.  *Id.* at *5.  Moreover, as another district judge observed, "[t]he very point of pooling mortgages and creating tranches is to create different securities whose credit and risk profiles attract different purchasers.  Plaintiffs' standing is thus limited only to those tranches in which they actually purchased certificates."  *In re Washington Mutual Mortgage-Backed Secs. Litig.*, No. 09-37, 2011 WL 5027725, *2 (W.D. Wash. Oct. 21, 2011).

The securities transactions in the case here are identical to those at issue in *Maine State* and *In re Washington Mutual*. The Amended Complaint states that "the risk of loss is divided among different levels of investment, or tranches. Tranches are related [mortgage-backed securities] offered as part of the same pass-through certificate offering, each with a different level of risk and reward."[8] Am. Compl. ¶ 30. Sections 11 and 12(a)(2) require a plaintiff to be a purchaser or acquirer of the security at issue. *See City of Ann Arbor Emps. Ret. System v. Citigroup Mortg. Loan Trust Inc.,* 703 F. Supp. 2d 253, 260 (E.D.N.Y. 2010); s*ee also Massachusetts Bricklayers and Masons Funds and the Pipefitters' Ret. Fund Local v. Deutsche Alt-A Secs.*, No. 08-3178, 2010 WL 1370962, *1 (E.D.N.Y. Apr. 6, 2010). In sum, because each Certificate is a unique security, the Lead Plaintiff's claims on tranches from which it has not purchased are dismissed for lack of statutory standing.

III.    *Section 12(a)(2) Seller Liability*

Defendants also argue that the Lead Plaintiff lacks statutory standing under Section 12(a)(2) for claims arising from six Certificates because the Lead Plaintiff failed to allege that it purchased the securities directly from the defendants. Defs.' Mem. Law 50, ECF No. 58. In response, the Lead Plaintiff merely states that it is "sufficient" to allege that they purchased two Certificates from JPM Securities because standing is established when "plaintiffs 'allege[d] that defendants, including Underwriter Defendants, sold securities as part of the Offerings, and plaintiffs acquired securities in the Offerings.'" Pl.'s Mem. Opp. 21, ECF No. 66 (*quoting In re Scottish Re Group Secs. Litig.,* 524 F. Supp. 2d 370, 400 (S.D.N.Y. 2007).

---

[8]  The Lead Plaintiff argues that standing is not tranche-based because every tranche within an offering receives cash flow from the same pool of loans. Pl.'s Nov. 22, 2011 Letter 2, ECF No. 116. There is no question that an offering's tranches are financially interrelated, but there is also no question that each tranche is a discrete security.

Section 12(a)(2) states that the seller of a security in violation "shall be liable . . . to the person purchasing such security from him . . . ." 15 U.S.C. § 77l(a).  This section "provides that only a defendant from whom the plaintiff purchased securities may be liable . . . .  'It imposes liability on only the buyer's *immediate seller* . . . .'"  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 49 (2d Cir. 1991) (*quoting Pinter v. Dahl*, 486 U.S. 622, 643-44 (1988)) (emphasis in original).  Persons not in privity with a plaintiff, however, can be held liable, but only "if they solicited the sales in question for a financial gain."  *Wilson v. Saintine Exploration and Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir. 1989).

Here, the Lead Plaintiff alleges that it purchased two Certificates directly from defendant JPM Securities.[9]  Am. Compl. ¶ 13.  It makes no allegations as to where the other Certificates were purchased.  Securities purchased from an initial public offering can create an inference that the defendant-issuer sold them to the plaintiff.  *See In re Scottish Re Group Secs. Litig.,* 524 F. Supp. 2d at 400.  Here, however, the Lead Plaintiff failed to allege that they were purchased in the initial public offerings.  Accordingly, because the Lead Plaintiff failed to allege that any defendant was the direct seller or solicitor of six Certificates, the Section 12(a)(2) claims regarding those Certificates are dismissed with leave to replead.[10]

IV.   *Sections 11 and 12(a)(2) Economic Loss*

The defendants also argue that the Lead Plaintiff's claims must be dismissed because they failed to plead any cognizable economic loss.  Defs.' Mem. Law 42, ECF No. 58.  The defendants contend that the Certificates' sole economic value is in providing payments from the

---

[9]  JPMALT 2006-A4 A7 and JPMMAT 2006-RM1 A2.

[10]  This includes the Lead Plaintiff's 12(a)(2) claims brought under the following six Certificates: JPMMT 2006-A1 2A2; JPMMT 2006-A3 7A1; JPMMT 2006-A5 2A1; JPMMT 2007-A1 6A1; JPMMAT 2006-WMC3 A3; and JPMMAT 2006-CH2 AV2.

underlying mortgages, not the possibility of market price appreciation, and the Lead Plaintiff received all payments it was due under the Certificates.  *Id.* at 43.  Additionally, the defendants argue that the Lead Plaintiff sold two Certificates for a profit or no loss.  *Id.* at 46.  The Lead Plaintiff argues that it has alleged that the Certificates have declined in value, which is sufficient loss to maintain Sections 11 and 12(a)(2) claims.  Pl.'s Mem. Opp. 47, ECF No. 66.

Section 11 allows a plaintiff to, *inter alia*, "recover such damages as shall represent the difference between the amount paid for the security . . . and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit . . . ."  15 U.S.C. § 77k(e).  Section 12(a)(2) allows a plaintiff to "recover the consideration paid for such security with interest thereon, less the amount of income received thereon, upon the tender of such security, or for damages if he no longer owns the security."  15 U.S.C. § 77l(a).  Remedy is in the form of rescission if a plaintiff still owns the security.  *See Commercial Union Assur. Co., plc v. Milken*, 17 F.3d 608, 615 (2d Cir. 1994).  Finally, plaintiffs need not prove their loss at this stage.  "To survive a motion to dismiss, Plaintiffs need not plead their exact damages. They must, however, plead allegations supporting some theory, as described in the statute, pursuant to which damages may be awarded."  *City of Ann Arbor Emps. Ret. System v. Citigroup Mortg. Loan Trust Inc.*, No. 08-1418, 2010 WL 6617866, *6 (E.D.N.Y. Dec. 23, 2010).

The Lead Plaintiff has alleged that the Certificates declined in value.  Am. Compl. ¶ 9 ("The Certificates are no longer marketable near the prices paid by Lead Plaintiff and the Class."); Am. Compl. ¶ 14 (detailing the lower resale price the Lead Plaintiff received for two Certificates); Am. Compl. ¶ 48 (explaining that the Certificates value depends on the repayment of the underlying mortgages and that the ratings largely dictate this analysis); Am. Compl. ¶¶

210-214 (detailing the Certificates' drastic ratings downgrade). Although the Lead Plaintiff provided no specific figures for the loss in value of most Certificates, it need not at this time. The Lead Plaintiff sufficiently alleged that the value of the Certificates depends on the underlying mortgages and the assigned credit ratings, and pleaded that the Certificates have declined in value.

Defendants contend that the Certificates' sole value is the payments from the underlying mortgages, and because these payments have not ceased, the Lead Plaintiff has suffered no loss. Defs.' Mem. Law 43, ECF No. 58 (*citing AIG Global Secs. Lending Corp. v. Banc of America Secs. LLC*, 646 F. Supp. 2d 385, 403 (S.D.N.Y. 2009). This argument is without merit. The Second Circuit has explained that "in securities cases there is a presumption that shares are purchased for the purpose of investment and their true value to the investor is the price at which they may later be sold." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.,* 500 F.3d 171, 183 (2d Cir. 2007). This presumption was overcome in *AIG Global* because the plaintiffs there did not allege loss due the reduced price of the securities in the secondary market; they only claimed loss from not having received interest payments due. *AIG Global Secs. Lending Corp.*, 646 F. Supp. 2d at 403. Where, as here, plaintiffs allege a decrease in market value, such a decrease in is sufficient to establish loss under Sections 11 and 12(a)(2). *See New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08-5653, 2010 WL 1473288, *5-6 (S.D.N.Y. Mar. 29, 2010) (refusing to apply *AIG Global* to claims brought pursuant to the purchase of Certificates indistinguishable from those at issue here).

Although the Lead Plaintiff has sufficiently alleged economic loss with respect to the Certificates generally, it is unable do so with respect to the two Certificates it sold for a profit or no loss (JPMMT 2006-A3 7A1 and JPMMAT 2006-WMC3 A3). Decl. of Dorothy J. Spenner

Ex. A, ECF No. 59.  Accordingly, the Lead Plaintiff fails to state a claim with respect to these Certificates under Sections 11 and 12(a)(2), *see In re AOL Time Warner, Inc. Secs. and "ERISA" Litig.*, 381 F. Supp. 2d 192, 246-47 (S.D.N.Y. 2004), and its claims based on the above-named two Certificates are dismissed for failing to allege economic loss.

   *V.*     *Sections 11, 12(a)(2), and 15 Statute of Limitations*

   The defendants next argue that the Lead Plaintiff's claims are time-barred.  Section 13 provides that Sections 11 and 12(a)(2) claims must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . ."  15 U.S.C. § 77m.  Specifically, defendants argue that the Lead Plaintiff had constructive notice of its claims prior to March 26, 2007—one year before it filed the original complaint—and that claims under JPMMT 2006-A1 2A2, which the Amended Complaint alleged for the first time, are time-barred because they do not relate back to the filing of the original complaint.  These arguments are without merit.

   Defendants' argument on constructive notice relies heavily on public record documents provided in Appendix B of their motion to dismiss.  The Lead Plaintiff contends that these documents may not be considered because they were not referenced in the Amended Complaint and judicial notice of these documents may not be taken for the truth of the matter asserted.  Pl.'s Mem. Opp. n.55, ECF No. 66.  While this legal principle is correct, judicial notice may be taken if the documents are not considered for their truth, but rather to establish that they existed in the public sphere.  *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).  To determine whether the Lead Plaintiff had constructive notice of its claims, the public documents provided by the defendants' motion's Appendix B may be considered.

The defendants argue that the Lead Plaintiff was put on inquiry notice because "[i]t is clear from the face of the Complaint and publicly available documents that Plaintiff had notice of the unmistakable storm warnings alerting it to its claims long over a year before the commencement of this action." Defs.' Mem. Law 48, ECF No. 58. The statute of limitations begins to run on federal securities claims when the plaintiff has actual or constructive notice. *Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993). Inquiry notice is a type of constructive notice that exists when uncontroverted evidence clearly demonstrates that the plaintiff should have discovered the violation. *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008). The Supreme Court recently altered the inquiry notice analysis, holding that "the discovery of facts that put a plaintiff on inquiry notice does not automatically begin the running of the limitations period."[11] *Merck & Co. v. Reynolds*, 130 S.Ct. 1784, 1798 (2010). The limitations period does *not* begin to run once the plaintiff has facts that would lead a reasonable investor to investigate, but rather only when "when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation." *Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.,* 637 F.3d 169, 174 (2d Cir. 2011). In other words, "a fact is not deemed 'discovered' until a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint." *Id.* at 175.

To show inquiry notice, "the triggering information must 'relate[] directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants.'" *New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*, 720

---

[11]   *Merck* addressed the issue of the inquiry notice standard as it applied to the statute of limitations for securities fraud cases under Section 10(b). While the language of that statute of limitations differs slightly from Section 13, which applies here, it does not do so in any material regard. *See In re Wachovia Equity Secs. Litig.*, 753 F. Supp. 2d 326, 371 n.39 (S.D.N.Y. 2011) (finding that the reasoning in the leading Second Circuit case interpreting *Merck, Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.,* 637 F.3d 169, 173 (2d Cir. 2011), also applies to Section 13).

F. Supp. 2d 254, 267 (S.D.N.Y. 2010) (*quoting Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008)).  Here, the defendants reference seventy news stories, only thirty-nine of which even mention an originator of the offerings at issue.  *See* Defs.' Mem. Law App. B, ECF No. 58.  Further, none of stories refer to the offerings, the Certificates, or tie the originators to securities offered by the defendants.  Of the stories that do refer to an originator, most describe the high rate of default experienced by subprime mortgages and the worsening business situation of the originators.  This information would put a potential plaintiff on notice merely that their mortgage-backed securities were likely to decline in value.  But, default on subprime loans could be caused by any number of broad economic factors besides the practices alleged by the Lead Plaintiff to be in deviation from descriptions in the Offering Documents.  Even if this were enough to cause a reasonable investor to investigate, it would not establish that their offering documents contained material misstatements and omissions.

Moreover, though the articles do describe undocumented loans given by the originators, no article describes any conduct that deviates from the descriptions in the Certificates' Offering Documents.  For example, one article stated that originator Washington Mutual "bungled" the underwriting of most mortgages issued in 2004-05.  But this only shows that ill-conceived business practices caused ill-advised loans, not that Washington Mutual strayed from the underwriting standards described in the Offering Documents.  Additionally, articles describing securities law actions brought against the originators only give notice of the *originators'* securities violations, not those of the defendants here.

These considerations underscore the wisdom of the observation that "whether a plaintiff had sufficient facts to place it on inquiry notice is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6)," *LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d

148, 156 (2d Cir. 2003) (quotations omitted), and that the more appropriate vehicle is a motion for summary judgment on a complete record.  *See* 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1277, p. 629 (3d ed. 2004) (describing that courts often "avoid 'little trials' on the pleadings because under federal practice the pleadings are designed merely to provide notice of the respective claims and defenses of the adversaries") (citations omitted).  The record as it stands does not justify dismissal on this ground.

Additionally, the Lead Plaintiff's claims under JPMMT 2006-A1 2A2 relate back to the filing of the original complaint.  F.R.C.P. 15(c)(1)(B) provides that an amended pleading "relates back to the date of the original pleading when: the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  FED. R. CIV. PRO. 15(c)(1)(B).  Under Rule 15, "the central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading. . . . Where no new cause of action is alleged . . . this Court liberally grants relation back under Rule 15(c)."  *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86-87 (2d Cir. 1999) (quotations omitted).

The Lead Plaintiff's JPMMT 2006-A1 2A2 claims were not new causes of action, they simply added a Certificate to the already existing Sections 11, 12(a)(2) and 15 claims alleged in the original complaint.  Although the new Certificate may be composed of different or additional underlying mortgage loans, the claims rely on the "same core factual allegations contained in the initial . . . complaint with regard to the central issues of the claim: misstatements about the underwriting guidelines, conflicts of interest with the rating agencies, and outdated credit rating models."  *New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*, 720 F.

Supp. 2d 254, 266-67 (S.D.N.Y. 2010) (allowing an amended complaint to relate back when it added a new Certificate to a mortgage-backed securities suit).  The original complaint here gave sufficient notice to defendants of the factual matters implicated by the JPMMT 2006-A1 2A2 claims, which arose out of the same allegedly proscribed conduct.  Thus, they relate back to the filing of the original complaint for statute of limitations purposes.

## VI.    *Sections 11 and 12(a)(2) Actionable Misrepresentations and Omissions*

Defendants assert that the Lead Plaintiff's claims must be dismissed because the Amended Complaint failed to adequately plead any actionable misstatements or omissions.  Defs.' Mem. Law 20, ECF No. 58.  F.R.C.P. 8 requires that a plaintiff "state a claim for relief that is plausible on its face," one that has "enough fact to raise a reasonable expectation that discovery will reveal evidence of" the alleged illegality.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007).  Plausible means that a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 139 S.Ct. 1937, 1949 (2008).  But, "[t]o survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (*quoting Twombly*, 550 U.S. at 555).  Of course, in determining the sufficiency of a plaintiff's pleadings on a motion to dismiss, a "court must accept all factual allegations as true and draw all inferences in the plaintiff's favor."  *Levy v. Southbrook Intern. Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).  The numerous arguments on the adequacy of the Lead Plaintiff's pleadings will be addressed in turn.

A. *Plausibility*

The defendants argue that the Lead Plaintiff failed to plead any facts about the loan originator WMC Mortgage Corp., which generated one-hundred percent of the loans underlying three Certificates (JPMMAT 2006-WMC2, JPMMAT 2006-WMC3, and JPMMAT 2006-WMC4). Defs.' Mem. Law 22, ECF No. 58. Indeed, the only reference directly to WMC in the Amended Complaint merely states that WMC is an entity that originated loans included in the Certificate pools. Am. Compl. ¶ 143. No factual assertions were made about WMC's conduct. At the most basic level, the Lead Plaintiff's Section 11 and 12 claims turn on whether the underlying loan originators' conduct was different than described by the Certificates' Offering Documents. Accordingly, the Lead Plaintiff failed to plead plausible claims arising from these three Certificates and they are dismissed.

B. *Appraisal Standards and LTV Ratios*

The defendants argue that the Lead Plaintiff's claims of misstatements and omissions relating to appraisal standards and loan-to-value ("LTV") ratios must be dismissed because they are non-actionable opinions. Defs.' Mem. Law 29, ECF No. 58. Generally, only factual misstatements or omissions create Securities Act violations, but subjective opinions can be actionable "if the speaker knows the statement to be false." *Shields v. Citytrust Bancorp.*, 25 F.3d 1124, 1131 (2d Cir. 1994); *see also Tsereteli v. Residential Asset Securitization*, 692 F. Supp. 2d 387, 393 (S.D.N.Y. 2010). "[N]either an appraisal nor a judgment that a property's value supports a particular loan amount is a statement of fact. Each is instead a subjective opinion based on the particular methods and assumptions the appraiser uses." *Tsereteli v. Residential Asset Securitization*, 692 F. Supp. 2d at 393; *see also New Jersey Carpenters Health*

23

*Fund v. DLJ Mortg. Capital, Inc.*, No. 08-5653, 2010 WL 1473288, *7-8 (S.D.N.Y. Mar. 29, 2010).

Here, the Lead Plaintiff alleged that the Offering Documents stated that "[a]ll appraisals conform to the Uniform Standards of Professional Appraisal Practice . . . ," Am. Compl. ¶ 164, yet the mortgage originators systematically failed to follow accepted appraisal guidelines.  Am. Compl. ¶ 167.  To factually support this claim, the Lead Plaintiff relied upon statements from seven CWs who worked at three different originators, a named former vice president of Countrywide Mortgage, and results from a 2007 survey of appraisers, which found that 90% felt pressured to raise appraisal values to facilitate loans for the originators.[12]  Am. Compl. ¶¶ 168-179.  For example, CW30, a senior underwriter at the Atlanta, Georgia, branch of Ownit Mortgage Solutions from 2005-2006, stated that "everyone was riding on totally inflated values" for a year or two.  Am. Compl. ¶ 178.

The Lead Plaintiff here does not argue that the actual amount of any appraisal given is a misstatement.  Rather, the alleged misstatement was the Offering Documents' assertion that the originators would use appraisals that conformed to the Uniform Standards.  The assertion, therefore, is not a subjective opinion like giving an appraisal, but a factual one: the originators failed to perform a task as the Offering Documents said it would be performed.  *See In re*

---

[12]   The defendants argue that the CW statements relied on by the Lead Plaintiff are untrustworthy.  Defs.' Mem. Law 21-29, ECF No. 58.  This argument, however, largely relies on case law dealing with the heightened pleading standard required for fraud claims under Section 10.  S*ee, e.g., In re American Express Co. Secs. Litig.*, No. 02-5533, 2008 WL 4501928, *6-7 (S.D.N.Y. Sept. 26, 2008).  This pleading standard does not apply to pleading Sections 11 and 12 claims.  *See Rombach v. Chang*, 355 F.3d 164, 178 (2d Cir. 2004).  Moreover, *In re IAC/InterActiveCorp Secs. Litig.*, 695 F. Supp. 2d 109 (S.D.N.Y. 2010), upon which the defendants rely, did not discount CW allegations or apply a non-Rule 8 standard; they merely determined that the particular statements at issue did "not provide enough detail to nudge plaintiffs' claims across the line from conceivable to plausible."  *In re IAC/InterActiveCorp Secs. Litig.*, 695 F. Supp. 2d at 119.

*Wachovia Equity Secs. Litig.*, 753 F. Supp. 2d 326, 378 n.48 (S.D.N.Y. 2011) (finding that alleged appraisal misconduct, as opposed to appraisal values, is not a subjective opinion).

Nevertheless, the issue is whether the Lead Plaintiff sufficiently pled this factual misstatement.  The Amended Complaint's description of a survey of unnamed appraisers do not alone support the claims here because it failed to identify any specific originators or loans underlying the Certificates that were affected by the appraisers' conduct.  *See Tsereteli v. Residential Asset Securitization*, 692 F. Supp. 2d 387, 394 (S.D.N.Y. 2010).   But, CW statements, along with allegations incorporated from a 2007 New York Attorney General suit, *see* Am. Compl. ¶ 173, sufficiently allege deviant conduct by five originators: Chase, WaMu, Countrywide, Ownit, and Accredited.  The information alleged, though not tied to specific individual loans underlying the Certificates, describes sufficiently widespread conduct to plausibly infer that Certificates at issue were affected.  *See, e.g.,* Am. Compl. ¶ 177 (alleging that twelve to fifteen percent of mortgages were given pursuant to invalid management overrides of appraisals); Am. Compl. ¶ 177 (alleging that any loans rejected for having an inflated appraisal would be reversed and reinstated without any valid justification).  While the Lead Plaintiff's allegations here are not strong, they raise a reasonable expectation that discovery will produce evidence of a misstatement regarding the failure of five originators to follow appraisal standards.  Accordingly, the Lead Plaintiff's causes of action based on this misstatement are dismissed except as to Certificates backed by loans from the following originators: Chase, WaMu, Countrywide, Ownit, and Accredited.[13]

---

[13]   Claims regarding appraisal standard misstatements and omissions under Certificates from the following trusts are dismissed:  JPMALT 2006-S2; JPMMAT 2006-HE3; JPMMAT 2006-NC1; JPMMAT 2006-RM1; JPMMAT 2006-WMC2; JPMMAT 2006-WMC3; and JPMMAT 2006-WMC4.

### *C. Credit Enhancement*

The defendants next argue that the Lead Plaintiff failed to sufficiently plead claims of misstatements and omissions relating to the sufficiency of credit enhancement supporting the Certificates' offerings.  Defs.' Mem. Law 30, ECF No. 58.  "Credit enhancement represents the amount of 'cushion' or protection from losses exhibited by a given security."  Am. Compl. ¶ 183.  The Offering Documents detail myriad forms of credit enhancement that the Certificates had, which were "intended to enhance the likelihood that holders of the senior and mezzanine certificates will receive regular payments of interest and principal."  Am. Compl. ¶ 184 (*quoting* Prospectus Supplement for JPMALT 2006-A4).  The Lead Plaintiff alleges that the Offering Documents failed to disclose the originators' underwriting failures, which made the credit enhancement deficient.  Am. Compl. ¶ 185.  These allegations here are insufficient to properly plead this claim.

First, the Lead Plaintiff fails to allege that any credit enhancement description was incorrect.  "The truth of a statement made in the prospectus is adjudged by the facts as they existed when the registration statement became effective."  *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08-8781, 2010 WL 1257528, *6 (S.D.N.Y. Mar. 31, 2010) (internal quotations omitted).  Regardless of any malfeasance by the originators, there are no allegations here that the Certificates did not have the type of credit enhancement described; the Lead Plaintiff only alleges that the credit enhancement was "deficient."  Moreover, statements relating to "the adequacy of credit enhancements are clearly opinion statements because they predict future value and reliability, and are not actionable unless it is alleged that the opinions were not truly held."  *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08-8781, 2010 WL 1257528, *6 (S.D.N.Y. Mar. 31, 2010); *see also New Jersey Carpenters*

*Vacation Fund v. Royal Bank of Scotland Grp., PLC*, 720 F. Supp. 2d 254, 271 (S.D.N.Y. 2010). The Lead Plaintiff makes no allegations that this opinion was not truly held when made in the Offering Documents.  Accordingly, the Lead Plaintiff's claims regarding credit enhancement are dismissed with leave to replead.

### D.  *The Certificates' Ratings*

The defendants next contend that the Lead Plaintiff's allegations of misstatements and omissions relating to the Certificates' ratings must be dismissed.  Defs.' Mem. Law 32, ECF No. 58.  Issuance of the Certificates was dependent on achieving certain ratings and the Offering Documents stated that "the ratings addressed 'the adequacy of the value of the trust fund assets and any credit enhancement with respect to that class and . . . the likelihood that holders of a class of securities of that class will receive payments.'"  Am. Compl. ¶ 186.  The Lead Plaintiff alleges that the credit ratings were unjustifiably high because they were based on inaccurate mortgage loan data and generated by outdated models.  Am. Compl. ¶¶ 189, 192.  The Lead Plaintiff argues that the credit ratings are actionable misstatements and that the Offering Documents omitted facts necessary to make statements regarding the ratings not misleading. Pl.'s Mem. Opp. 44-45, ECF No. 66.

While the ratings assigned to the Certificates may have poorly predicted their original value, a credit rating is not an objective fact, but rather "a statement of opinion by each agency that it believed, based on the models it used and the factors it considered, that the credit quality of the mortgage pool underlying each Certificate was sufficient to support the assigned rating." *Tsereteli v. Residential Asset Securitization*, 692 F. Supp. 2d 387, 394 (S.D.N.Y. 2010) (*citing In re Lehman Bros. Secs. and ERISA Litig.*, 684 F. Supp. 2d 485, 494-95 (S.D.N.Y. 2010)).  As noted above, statements of opinion are not actionable unless the speaker did not truly hold the

27

opinion at the time it was made.  *See Tsereteli v. Residential Asset Securitization*, 692 F. Supp. 2d 387, 395 (S.D.N.Y. 2010).  The Lead Plaintiff here has made no allegations that the rating agencies did not believe that their ratings were accurate when given.

Judge Kaplan considered and rejected similar allegations in *In re Indymac Mortgage-Backed Secs. Litig.*, 718 F. Supp. 2d 495 (S.D.N.Y. 2010).  There, the closest plaintiffs came to stating a plausible claim for relief

> are their allegations that the ratings were based on outdated models, unverified loan information, and that the ratings agencies 'failed to properly consider the credit quality of the mortgage loans.'  These allegations, however, do not support a plausible inference that the ratings did not express each rating agency's judgment at the time they were issued about the likelihood that each Certificate's holders would be paid. At most they are a challenge to the accuracy of the ratings themselves, as they suggest that a different set of models based on a different set of assumptions using different loan data might have resulted in a different rating.

*In re Indymac Mortgage-Backed Secs. Litig.*, 718 F. Supp. 2d 495, 512 (S.D.N.Y. 2010) (citations omitted).  The Lead Plaintiff's allegations here are indistinguishable and likewise fail to establish actionable misstatements or omissions.

The Lead Plaintiff also attempts to hang its hat on conflicts of interest that existed in the ratings agencies but not disclosed by the Offering Documents.  Am. Compl. ¶¶ 202-208.  The Securities Act of 1933, however, does not require offerings to disclose information that is already public, *see United Paperworkers Int'l Union v. Int'l Paper Co*., 985 F.2d 1190, 1199 (2d Cir. 1993), and "the risk that the ratings agencies operated under a conflict of interest because they were paid by the issuers had been known publicly for years."  *In re Lehman Bros. Secs. and ERISA Litig.*, 684 F. Supp. 2d 485, 492 (S.D.N.Y. 2010) (citing a 2003 SEC report that clearly illustrates the conflict of interest created by the rating agencies relying on fees from securities issuers).   Accordingly, the Lead Plaintiff's claims regarding the Certificates' ratings are dismissed with leave to replead.

### E.   Underwriting Guidelines

The defendants next argue that the Lead Plaintiff failed to state a claim regarding statements about the underwriting guidelines because the Offering Documents "bespoke caution" by accurately disclosing the originators' underwriting practices.  Defs.' Mem. Law 34, ECF No. 58.   The defendants also argue that the Lead Plaintiff failed to show that any alleged misstatements regarding the underwriting practices were material.  Defs.' Mem. Law 41, ECF No. 58.

The Offering Documents state that the underwriting guidelines are "to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property as collateral."  Am. Compl. ¶ 62.  The Offering Documents also describe the information considered during the underwriting process: a borrower applying for a loan must complete a detailed application of credit information, including a list of assets and liabilities, a statement of income and expenses, a credit report, bankruptcy records, independent employment verification stating the length of employment and salary of the borrower, and authorization to verify bank deposits.  Am. Compl. ¶ 63.  Underwriting for full documentation loans requires using "'standard Fannie Mae/Freddie Mac approved forms for verification of income/employment, assets and certain payment histories.'"  Am. Compl. ¶ 64 (*quoting* J.P. Morgan Alternative Loan Trust 2006-A4 Prospectus Supplement at S-20).

The Offering Documents also describe four less rigorous types of underwriting: "alternative," "reduced," "stated income/stated assets," and "no income/no asset."  Am. Compl. ¶ 64.   These alternative underwriting programs are "designed to facilitate the loan approval process.   Under these programs, certain documentation concerning income/employment and

asset verification is reduced or excluded."[14]  Am. Compl. ¶ 65.  The Offering Documents stated

that, "[l]oans underwritten under these programs are generally limited to borrowers who have

demonstrated an established ability and willingness to repay the mortgage loans in a timely

fashion.  Permitted maximum loan to value ratios under these programs are generally more

restrictive than those under the lender's standard 'full' documentation programs."  Am. Compl. ¶

66.  The Offering Documents provided for exceptions:

> From time to time, exceptions to a lender's underwriting policies may be made.
> Such exceptions may be made on a loan-by-loan basis at the discretion of the
> lender's underwriter.  Exceptions may be made after careful consideration of
> certain mitigating factors such as borrower liquidity, employment and residential
> stability and local economic conditions.

J.P. Morgan Acceptance Corp. I SEC Registration Statement Form S-3, Dec. 7, 2005.

First, it is necessary to determine whether the Lead Plaintiff adequately pleaded

misstatements.  The Lead Plaintiff alleges that the Offering Documents contained misstatements

because the "Originators systematically disregarded their stated underwriting standards in order

to increase loan volume regardless of the borrower's ability to meet its obligations or the

adequacy of the property to serve as collateral."  Am. Compl. ¶ 70.  The Lead Plaintiff's CW

statements sufficiently establish pervasive deviations from the stated underwriting guidelines.

*See, e.g.,* Am. Compl. ¶ 85 (describing how applicants' credit scores were manipulated); Am.

Compl. ¶ 88 (describing how applicants' incomes were misreported); Am. Compl. ¶ 96 (stating

---

[14]  "Under a stated 'income/stated assets' program, no verification of either a mortgagor's
income or a mortgagor's assets is undertaken by the originator although both income and assets
are stated on the loan application and a 'reasonableness test' is applied.  Generally, under a 'no
income/no asset' program, the mortgagor is not required to state his or her income or assets and
therefore, no verification of such mortgagor's income or assets is undertaken by the originator.
The underwriting for such mortgage loans may be based primarily or entirely on the estimated
value of the mortgaged property and the LTV ratio at origination as well as on the payment
history and credit score."  Am. Compl. ¶ 64 (*quoting* J.P. Morgan Alternative Loan Trust 2006-
A4 Prospectus Supplement at S-20).

that 80% of loans required management override because they departed from the underwriting standards); Am. Compl. ¶ 116 (describing how appraisal fraud was commonplace and known by the originator); Am. Compl. ¶ 126 (stating that management told underwriters to do what was necessary to increase loan volume).

The defendants argue that the Offering Documents gave specific warnings about individual originators' underwriting practices.  For example, many stated that their practices were "less stringent than the standards generally acceptable to Fannie Mae and Freddie Mac with regard to the borrower's credit standing and repayment ability."  Defs.' Ex. F at S-88, ECF No. 59; *see also* Ex. F at S-15; Ex. G at S-11, S-53; Ex. H at S-11; Ex. J at 15.   Additionally, exceptions would be made:

> On a case by case basis, Chase Home Mortgage may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception.  Compensating factors may include, without limitation, relatively low loan-to-value ratio, relatively low debt-to-income ratio, stable employment and time in the same residence.  It is expected that a significant number of the mortgage loans underwritten . . . will have been originated with such underwriting exceptions based on compensating factors.

Defs.' Ex. F at S-88; *see also* Ex. F at S-82; Ex. BB at S-89; Ex. CC at S-77, S-83.   The defendants contend that such warnings make any alleged deviations immaterial.

To be actionable, a misrepresentation or omission must be material.  15 U.S.C. §§ 77k(a), 77l(a)(2).  Materiality turns on "[w]hether the defendants' representations, taken together and in context, would have misled a reasonable investor" about the nature of the investment.  *In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) (quotations and citations omitted); *see also I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 761 (2d Cir. 1991).  The Offering Documents must be read as whole and "cautionary language . . . must relate directly to that by which plaintiffs claim to have been misled."  *Hunt v.*

*Alliance North Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998).  Materiality, however, should not be a dispositive issue on a motion to dismiss "unless [the misstatements] are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d at 360 (*quoting ECA and Local 134 IBEW Joint Pension Trust of Chicago v. J.P. Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)).

Here, the Offering Documents warn that originators made exceptions to the stated underwriting guidelines.  The warnings, however, make the originators' practices clear: underwriting followed the accepted Fannie/Freddie method, one of four alternative programs requiring less documentation, or loans were made on a case-by-case basis pursuant to compensating factors.  While the Offering Documents are not required to provide an exhaustive list of "compensating factors," increasing the originator's total loan volume was not contemplated or warned of.  Compensating factors, such as stable employment or low loan-to-value ratios, speak to the borrower's ability to repay.  *See* Defs.' Ex. F at S-88.  The Lead Plaintiff has alleged systematic deviation motivated by management's desire to increase the volume of business.  *See* Am. Compl. ¶ 138.  This type of exception was not warned of. Moreover, some allegations show that employees knew documents in a loan application to be false or misleading, which is not an underwriting "exception" as described but simply failing to follow stated practices.  *See, e.g.,* Am. Compl. ¶¶ 85, 88.  The Offering Documents failed to warn of the types of misstatements alleged by the Lead Plaintiff.

The defendants also argue that misstatements about the underwriting standards are not material because the Lead Plaintiff failed to identify any specific noncomplying loans that

underlie the Certificates.  Judge Kaplan, however, directly rejected this argument in an opinion I find persuasive:

> The amended complaint . . . sufficiently alleges that there was widespread abandonment of underwriting guidelines at [the loan originator] during the period of time at issue and that the percentage of "defaulting" loans rose dramatically shortly after the Certificates were issued. These allegations create a sufficient nexus between the alleged underwriting standard abandonment and the loans underlying the Certificates.  At this stage, given these allegations, the Court can not conclude that the allegedly misleading statements were immaterial as a matter of law.

*Tsereteli v. Residential Asset Securitization*, 692 F. Supp. 2d 387, 392-93 (S.D.N.Y. 2010); *see also New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*, 720 F. Supp. 2d 254, 270 (S.D.N.Y. 2010) (allegations that "behavior permeated the originators such that they systematically ignored their stated underwriting practices" combined with very high default of loans underlying the Certificates adequately connects the allegations to the offerings in question).  The Lead Plaintiff here has likewise sufficiently pleaded this nexus.  Reasonable minds could disagree on how important these misstatements are to a reasonable investor, meaning they are not immaterial as a matter of law.  *See In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d at 360.

Accordingly, the Lead Plaintiff has sufficiently pleaded material misstatements regarding the originators' underwriting guidelines.  The Amended Complaint, however, only contains allegations about underwriting deviations by eight originators: Chase, Countrywide, ResMAE, New Century, Wells Fargo, Greenpoint, Accredited, and American Home.  Am. Compl. ¶ 71-161.  As such, the Lead Plaintiff's claims for underwriting misstatements under Certificates that

are not supported by loans from any of these originators must be dismissed with leave to replead.[15]

### *F.  Cure Provision as the Sole Remedy*

Finally, the defendants argue that—if violations existed—the sole remedy available to the Lead Plaintiff is contractual.  Defs.' Mem. Law 39, ECF No. 58.  The Offering Documents contained a "cure provision," which dictates that the "sole remedy available to holders of securities . . . for a breach of representation by a seller or originator" is for the seller or originator to repurchase or substitute the defective loan.  Defs.' Ex. J 31-32, ECF No. 59.  Defendants argue that this provision precludes the Lead Plaintiff's securities law claims.

The defendants rely solely on *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, in which the Fifth Circuit affirmed dismissal of plaintiff's allegations that securities it purchased were backed by delinquent loans, contrary to representations made by the defendant.  594 F.3d 383 (5th Cir. 2010).  The offering documents at issue in *Lone Star* contained a cure provision similar to the one here, which the defendants argue "negates Plaintiff's 1933 Act claims."  Defs.' Mem. Law 39, ECF No. 58.  This argument misconstrues the *Lone Star* decision.

Plaintiff's claim in *Lone Star* was that many loans underlying its securities were delinquent when the offering documents stated that there were no delinquencies.  *Lone Star*, 594 F.3d at 386.  The Fifth Circuit, however, construed the cure provision as an admission by the offering documents that delinquencies would exist, meaning that the offering documents were in fact not misleading.  *Id.* at 389.  The cure provision did not 'negate' the plaintiff's Securities Act claims.

---

[15]  This includes Certificates from the following trusts: JPMMAT 2006-HE2; JPMMAT 2006-WMC2; JPMMAT 2006-WMC3; JPMMAT 2006-WMC4.

The reasoning in *Lone Star* does not apply here because the Lead Plaintiff alleges, among other things, deviation from the underwriting guidelines purportedly used by the originators. The cure provision does not affect the interpretation of the Offering Documents' statements about the underwriting guidelines.  Moreover, the *Lone Star* plaintiffs alleged that a specific and limited number of loans failed to conform to representations about default, whereas here, the Lead Plaintiff claims "securities laws disclosure violations in the form of widespread misrepresentations regarding the nature of the underwriting practices described in the offering documents."  *City of Ann Arbor Emps. Ret. System v. Citigroup Mortg. Loan Trust Inc.*, No. 08-1418, 2010 WL 6617866, *7 (E.D.N.Y. Dec. 23, 2010) (finding that *Lone Star* is factually distinguishable from mortgage-backed securities claims identical to this case); *see also Emps. Ret. System of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.*, 09-3701, 2011 WL 1796426, *11 (S.D.N.Y. May 10, 2011).

Moreover, the reasoning in *Lone Star* conflicts with the established rule that "the 1933 and 1934 Acts compels the conclusion that individual security holders may not be forced to forego their rights under the federal securities laws due to a contract provision."  *McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1051 (2d Cir. 1995) (basing its holding, in part, on 15 U.S.C. § 77n: "Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter . . . shall be void."). Enforcing the cure provision as defendants request would completely undermine the strict liability created by Sections 11 and 12.  *See City of Ann Arbor Emps. Ret. System v. Citigroup Mortg. Loan Trust Inc.*, No. 08-1418, 2010 WL 6617866, *7 (E.D.N.Y. Dec. 23, 2010); *Emps. Ret. System of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.*, 09-3701, 2011 WL

1796426, *11 (S.D.N.Y. May 10, 2011).   Accordingly, the defendants' motion to dismiss pursuant to the cure provision is denied.

## VII.   _Section 15 Control Person Liability_

Defendants contend that the Lead Plaintiff's Section 15 claims against the individual defendants must be dismissed.  Defendants argue that the Lead Plaintiff failed to allege sufficient control of JPM Acceptance by the individual defendants and failed to allege that any individual defendant was a culpable participant in the alleged violations.  Defs.' Mem. Law 52, ECF No. 58.  The Lead Plaintiff argues that culpable participation is not a required showing for control person liability and that the amended complaint sufficiently alleged the individual defendants' control over JPM Acceptance.  Pl.'s Reply Mem. Law 60, ECF No. 66.

Section 15 of the Securities Act of 1933 extends liability to "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under [Sections 11 or 12]."  15 U.S.C. § 77o.  To show control person liability at the pleading stage, "a plaintiff must plead: (1) a primary violation; and (2) control over the primary violator."  _In re CIT Group Inc. Secs. Litig._, No. 08-6613, 2010 WL 2365846, *8 (S.D.N.Y. Jun. 10, 2010).  It is well settled law that officers and directors of the primary violator who signed the registration statements containing alleged violations fulfill the control prong.  _See In re CIT Group Inc. Secs. Litig._, No. 08-6613, 2010 WL 2365846, *8 (S.D.N.Y. Jun. 10, 2010); _In re Lehman Bros. Secs. and ERISA Litig._, 684 F. Supp. 2d 485, 495 (S.D.N.Y. 2010); _In re Flag Telecom Holdings, Ltd. Secs. Litig._, 352 F. Supp. 2d 429, 457 (S.D.N.Y. 2005) (abrogated on other grounds).  Here, the individual defendants were all officers and/or directors of JPM Acceptance, the primary violator, and signed the two Registration Statements at issue.  Am. Compl. ¶¶ 16-21.  Accordingly, the Lead Plaintiff sufficiently alleged that each individual defendant controlled the primary violator.

The defendants, however, also contend that control person liability only extends to those who were "in some meaningful sense a culpable participant in the primary violation." *Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07-0976, 2008 WL 4449280, at *10 (S.D.N.Y. Sept. 30, 2008) (quotation omitted).   The culpable participant defense on which the defendants rely derives from Section 20(a), under which a control person is subject to liability "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).   The present case, however, does not arise under Section 20(a).  Instead, it arises under Section 15, which creates liability for a control person "unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts" creating the primary violation.   15 U.S.C. § 77o.   The defendants argue that the same culpable participant defense available to causes of action arising under Section 20(a) is also applicable to those arising under Section 15.   This is an open question.  *See In re Lehman Bros. Mortgage-Backed Secs. Litig.*, 650 F.3d 167, 186 (2d Cir. 2011).   Nevertheless, cases that tend to discuss this issue overlook the difference between the evidence necessary to plead a prima facie case and the affirmative defense of lack of culpability. *See, e.g., id.*

This distinction is significant because "[t]he pleading requirements in the Federal Rules of Civil Procedure . . . do not compel a litigant to anticipate potential affirmative defenses . . . and to affirmatively plead facts in avoidance of such defenses."  *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007).  The Second Circuit has held that a plaintiff makes out a prima facie case of control person liability under Section 20(a) by showing a "primary violation by the controlled person and control of the primary violator by the targeted defendant . . . .  Once the plaintiff makes out a prima facie case of § 20(a) liability, the burden shifts to the defendant to show that

37

he acted in good faith, and that he 'did not directly or indirectly induce the act or acts constituting the violation.'"  *S.E.C. v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996) (citations omitted).  This fits the classic definition of an affirmative defense because if the defendant fails to come forward with evidence of good faith, the plaintiff is entitled to prevail simply upon showing a primary violation plus control.[16]  Indeed, the Second Circuit has expressly described Section 20(a) as creating a good faith defense to control person liability. *Marbury Mgm't, Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir. 1980).  Consequently, it necessarily follows that a complaint arising out of Section 20(a) does not need to affirmatively plead facts in avoidance of this defense so that, even if the Section 20(a) affirmative defense is engrafted onto Section 15, the complaint in this case is sufficient to allege a violation of Section 15.

Moreover, even if culpable participation is an element of a prima facie case under Section 20(a), rather than an affirmative defense, I agree with those cases that hold that this element should not be applied to causes of action under Section 15.  *See, e.g., In re CINAR Corp. Secs. Litig.*, 186 F. Supp. 2d 279, 309-310 (E.D.N.Y. 2002).  Consequently, the defendants' motion to dismiss the Lead Plaintiff's Section 15 claims is denied.

---

[16]  The confusion on this issue arises from the less than precise language in *First Jersey*, which was an appeal from a judgment after a bench trial and thus did not address the standard for pleading control person liability under Section 20(a).  While there is language in *First Jersey* that seems to suggest that the plaintiff has the burden of showing that the defendant was "in some meaningful sense a culpable participant in the fraud," its subsequent discussion of the burden of proof at trial, which is quoted in the text above, clearly indicates that once the plaintiff establishes a prima facie case, the burden of proof shifts to the defendant to establish that he acted in good faith.  *S.E.C. v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1472-73 (2d Cir. 1996).

## CONCLUSION

The defendants' motion to dismiss is granted in part and denied in part.  Specifically, material misstatements and omissions regarding the appraisal standards and the underwriting guidelines are sufficiently pled.  The same is true with respect to the Section 11 claims (and corresponding Section 15 claims) based on the following Certificates: JPMMT 2006-A1 2A2; JPMMT 2006-A5 2A1; JPMMT 2007-A1 6A1; JPMALT 2006-A4 A7; JPMMAT 2006-CH2 AV2.  The Section 12(a)(2) claim (and corresponding Section 15 claim) based on JPMALT 2006-A4 A7 is also sufficiently pled.  The Lead Plaintiff is granted leave to replead, except as to Article III standing, tranche-based statutory standing, and economic loss based on JPMMT 2006-A3 7A1 and JPMMAT 2006-WMC3 A3.

**SO ORDERED.**

Brooklyn, New York
February 23, 2012

*Edward R. Korman*
Edward R. Korman
Senior United States District Judge